90

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                        21-CR-483(ENV)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4           Plaintiff,                  Brooklyn, New York

5           -against-                   November 14, 2022
                                        10:00 a.m.
6   CHRIS BANTIS,

7           Defendant.

8   ------------------------------x

9           TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
            BEFORE THE HONORABLE ERIC N. VITALIANO
10           UNITED STATES SENIOR DISTRICT JUDGE
                        BEFORE A JURY
11

12  APPEARANCES

13  For the Government:     UNITED STATES ATTORNEY'S OFFICE
                            Eastern District of New York
14                          271 Cadman Plaza East
                            Brooklyn, New York 11201
15                          BY:  LINDSEY OKEN, ESQ.
                                 TARA BRIGIT McGRATH, ESQ.
16                               JENNIFER M. SASSO, ESQ.
                            Assistant United States Attorneys
17

18  For the Defendant:     FEDERAL DEFENDERS OF NEW YORK
                            One Pierrepont Plaza
                            Brooklyn, New York 11201
19                          BY:  NORA K. HIROZAWA, ESQ.
                                 MARISSA SHERMAN, ESQ.
20

21  Also Present:           EMILY MOOSHER, PARALEGAL
                            CAROLINE KISSICK, PARALEGAL
                            PAUL TAMBRINO, AGENT
22

23  Court Reporter:         LINDA D. DANELCZYK, RPR, CSR, CCR
                            Phone:  718-613-2330
24                          Fax:    718-804-2712
                            Email:  LindaDan226@gmail.com

25  Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.

PROCEEDINGS                               91

1            (In open court; Jury not present.)

2            THE COURTROOM DEPUTY:  All rise.

3            Court is now open.  The Honorable Eric N. Vitaliano

4    presiding.  Case on calendar is U.S.A. versus Chris Bantis,

5    Case Number 21-CR-483, on for a jury trial.

6            Will the attorneys please note their appearances,

7    beginning with government counsel.

8            MS. OKEN:  Good morning, Your Honor.  Lindsey Oken,

9    Tara McGrath and Jennifer Sasso on behalf of the United

10   States.  We're joined by Special Agent Paul Tambrino and

11   paralegal specialist Emily Moosher.

12           THE COURT:  Good morning all.

13           MS. HIROZAWA:  And good morning, Your Honor.  Nora

14   Hirozawa and Marissa Sherman, Federal Defenders, on behalf of

15   Chris Bantis who is present.  Also present at counsel table is

16   our paralegal Carol Kissick.

17           THE COURT:  And good morning to all of you as well.

18           THE COURTROOM DEPUTY:  Counsel for both sides

19   present, including defendant.

20           THE COURT:  Okay.  All be seated.  And before we

21   start, do we have any housekeeping that we need to attend to?

22           MS. OKEN:  I think we do, Your Honor, and as with

23   Thursday, we will try to limit ourselves to issues that we

24   think need to be addressed in advance of today's evidence.

25           The first, Your Honor, is that a couple of the

1   exhibits that the Court has determined are admissible that the

2   government expects to introduce today are transcripts that

3   were previously sealed.  And so the government would just move

4   for a limited unsealing for purposes of today's testimony to

5   ensure that we can admit them into evidence and publish them

6   today but that they would remain sealed beyond that.

7                THE COURT:  So ordered.

8                MS. OKEN:  Thank you, Your Honor.

9                The second issue that we wanted to raise is one that

10  we've alerted the Court to previously and that is the

11  testimony of John Doe 1, who we expect to be in court this

12  morning.

13               John Doe 1 has a number of medical issues that we

14  have addressed with the Court in filings.  We just want to

15  alert you, Your Honor, that in the event that we are under the

16  impression that the witness may need a short break or that it

17  may be prudent to bring the jury out because of an issue that

18  the witness is undergoing, we'll promptly alert the Court of

19  that.  And the witness is accompanied by a medical

20  professional who we understand will be seated nearby and can

21  also alert the government if we think intervention may be

22  necessary.  We are optimistic --

23               THE COURT:  When you say "nearby," you mean nearby

24  by the witness or nearby you?

25               MS. OKEN:  Nearby the witness, Your Honor.

PROCEEDINGS                                          93

1           And so we just wanted to alert the Court that

2    although we are optimistic that nothing will flow from this,

3    we wanted to alert the Court in the event it arises that that

4    is our intention.

5           And I think the final issue that we wanted to put on

6    the record this morning pertains to the mechanism by which the

7    parties will be either refreshing witness' recollections or

8    conducting impeachments, and this is one we had flagged for

9    the Court last week.  But we -- there is some audio and video

10   footage, some of which I think either the Court has ruled

11   inadmissible or the parties are presently disputing their

12   admissibility, and that -- so that we are under the impression

13   that in order for those to be played for a witness, they would

14   have to be played in a manner that they're not exposed to the

15   jury.

16          And so there are a number of ways in which that can

17   be accomplished.  Obviously filing the jury in and out every

18   time would be a little bit unwieldily but to the extent that

19   there is a mechanism that the parties can use that would

20   provide headphones for the witness or use transcripts in lieu

21   of video or use video without audio, we're amenable to the

22   different options in terms of how to do that, so long as, as

23   you mentioned, things that are not in evidence and are solely

24   being used for impeachment or refreshing purposes are not

25   inadvertently displayed to the jury.

PROCEEDINGS                                        94

1          MS. SHERMAN:  Judge, may we respond to that briefly?

2          THE COURT:  Yes.

3          MS. SHERMAN:  This also addresses some of the

4    government's concern about the defense exhibits that were

5    labeled.

6          We agree with the government that in the event that

7    there's refreshing recollection that that has to be done

8    outside the presence of the jury, including audio and video.

9          In terms of impeachment, I think one of the issues

10   that's going to come up is that there are several statements

11   that are made on body cam video and 9-1-1 calls that I believe

12   at this point are not admissible.

13         We obviously don't know what the witness is going to

14   testify to.  But if there is a moment for impeachment, our

15   argument is that we have the right to confront the witness

16   with the previous statement.  If the witness denies making the

17   statement, we have the right to perfect the impeachment.

18         What we suggested to the government is that we can

19   perfect the impeachment by the body cam footage, which was all

20   turned over by the Government in Rule 16 discovery.  This is

21   all discovery that was accessed by the government.

22         If the government is not willing to allow that to

23   happen, then we will have to call all of the NYPD officers who

24   took these statements in order to perfect the impeachment on

25   our case.

PROCEEDINGS                                    95

1           But as the Court is aware, there's a difference

2    between a witness saying, I don't remember, and a witness

3    saying, no, I didn't say that.  If the witness said I didn't

4    say that, we do have the right to present to the jury, not for

5    the truth of the matter but for the fact that the statement

6    was said.

7           THE COURT:  Ms. Oken?

8           MS. OKEN:  Your Honor, we agree that there is a

9    right to confront the witness with a prior inconsistent

10   statement in the event that that occurs.

11          I think what we disagree on is that the -- so, for

12   example, if there were grand jury testimony that wouldn't be

13   published to the jury in the form of transcript.

14          In the same way we're concerned that this is sort of

15   a backdoor avenue of getting in body cam footage that the

16   government contends is inadmissible and that -- that we

17   understand that the Court has not yet had an opportunity to

18   review because a number of the footage -- a number of the

19   defense exhibits that were marked were provided to the Court

20   yesterday.

21          And so perhaps we can take an incremental approach

22   and see if the situation even presents itself, but I do think

23   while we agree that the witness can be confronted with the

24   prior inconsistent statement, we disagree that body cam

25   footage that is not admissible can be broadcast to the jury in

PROCEEDINGS                                    96

1    that -- in the event that that occurs.

2              THE COURT:  Has there been a transcript made of the

3    audio on the body cam images?

4              MS. OKEN:  The body cam footage that I think the

5    government expected may be used to refresh our witnesses, we

6    have created transcripts of that.  I don't know whether the

7    defense has done the same for body cam footage that --

8              THE COURT:  So I make sure I understand it.  Based

9    on what Ms. Sherman has told me is that all of the footage

10   that they have originated with you.

11             MS. OKEN:  The footage itself did, Your Honor.  But

12   we -- it's quite a bit of footage and we haven't had all of it

13   transcribed.  We had some bits and pieces here and there

14   transcribed from a -- from an efficiency standpoint.  But I

15   mean a lot of this body cam footage, Your Honor, is just

16   statements of the defendant.

17             THE COURT:  We have to cut to the quick here.  The

18   words are what this is all about.  We're going to impeach him

19   or her, whoever the witness may be, it's going to be on the

20   words, so that a -- a transcript of video footage in

21   particular would be the appropriate to avoid the prejudice

22   of -- unless, footnote, obviously if the footage or the

23   audiotape were otherwise admissible independently it's not an

24   issue, it would then be in evidence.  But assuming for

25   purposes of this discussion that neither the video or an

1    audiotape is independently admissible so it would not be

2    before the jury, then the way we will handle the perfection of

3    the impeachment is through a transcript.

4              MS. SHERMAN:  Just so I understand that, Judge, so

5    if the witness denies making a statement, then we would read

6    the transcript into evidence and ask --

7              THE COURT:  Same way as if it were a deposition.

8              MS. SHERMAN:  Sure.  That's fine.  There is --

9    because these were not coming into evidence, we do have --

10             THE COURT:  That hasn't been determined yet, but as

11   of now they have not --

12             MS. SHERMAN:  Correct.  But if it was just solely

13   for the purpose of impeachment and not coming into evidence --

14             THE COURT:  Correct.

15             MS. SHERMAN:  -- the only issue, and we can discuss

16   this with the government, but there are a couple of areas

17   where we don't agree the transcript is accurate, but we can

18   address that as it comes up.

19             And those are just for transcripts as we said that

20   we were intending to use for impeachment purposes not for

21   evidence purposes.

22             MS. OKEN:  We're happy to take a look.  These

23   transcripts of the government have been produced for quite

24   some time and this is the first we're hearing of any issues

25   with them, but we are happy to take a look and see if we can

PROCEEDINGS                          98

1    come to an agreement on --

2              THE COURT:  It would not be unusual that --

3    particularly all of us from New York, we're not exactly

4    enunciating every syllable.  So sometimes things sound strange

5    on a tape.  So that some ears will hear it one way and other

6    ears will hear it another way.  That is not a shock.

7              MS. OKEN:  It is not, Your Honor.  As I mentioned,

8    we're happy to take a look at any proposed revisions.

9              THE COURT:  But again -- that's possible.  I suppose

10   anything is possible but not likely that that's going to be

11   the wording that prompts the impeachment.

12             You may disagree about the third word in three

13   sentences.  The audibility of that third word of, it but the

14   overall thrust of the impeachment is not going to be

15   effective, I would imagine.

16             Is it conceivable?  Sure.  It's conceivable that

17   there may be disputed -- putting it another way.  But I don't

18   know if we have to go jump up and down about what the words

19   mean.  And if there's a dispute, you can even get some agreed

20   thing that says, you know, it was either this or that, and

21   then continue to read the balance of the -- of what everybody

22   agrees was on the body camera.

23             MS. OKEN:  Understood, Your Honor.

24             MS. SHERMAN:  That's fine, Judge.  And, again, as it

25   comes up, you know, if there are specific instances where we

PROCEEDINGS                                    99

1    choose to call the person it was said to on our case we may do

2    that in lieu of the transcript if there's an issue.

3          I'm not sure if the government had any additional

4    issues.  We just wanted to flag a few.

5          MS. OKEN:  I think the only remaining one we wanted

6    to note for the record, Your Honor, is that we do expect -- it

7    seems as though the parties have been unable to agree to a

8    stipulation as to the authenticity of 9-1-1 calls, so we do

9    expect a custodian to testify today, who we arranged over the

10   weekend to come in, as the authenticity of the 9-1-1 calls in

11   the event that a stipulation is not signed before that time.

12         MS. SHERMAN:  Judge, that's not accurate.  We are

13   agreeing to the authenticity of the 9-1-1 calls.  The issue

14   that we raised was that there still wasn't -- they were

15   still -- the government was still intending to have us

16   stipulate to calls that were not coming into evidence.  The

17   calls that had been precluded in previous rulings were

18   included on that stipulation.  So we asked the government to

19   remove those calls and then we would sign a stipulation.

20         We also indicated we were never challenging the

21   authenticity of the 9-1-1 calls at all.

22         THE COURT:  And those calls should be removed, by

23   the way, because ultimately it's the stipulation that's going

24   into evidence, and then it's going to reference calls that the

25   jury doesn't get.

PROCEEDINGS                      100

1           MS. OKEN:  Well, your Honor, I think -- I think my

2    response to that is twofold.

3           The first is that we certainly agree that Your

4    Honor's prior ruling held that two of the four 9-1-1 calls

5    were not coming in for their content.  We do expect, though,

6    that the witness will testify about the fact of calling 9-1-1

7    just not about the content of those calls.  And so to the

8    extent the fact of calling 9-1-1 and the date and time --

9           THE COURT:  But the stipulation is to be -- you want

10   to -- what's your -- with respect to 9-1-1 calls that I ruled

11   are not admissible, what is it that you intend to do with

12   them?

13          MS. OKEN:  Well, I think -- I should lead with my

14   second point, Your Honor, which is that, Your Honor then ruled

15   over the weekend that prior consistent statements of Victim 1

16   do come in.  And so to the extent that those two prior 9-1-1

17   calls are this witness' prior consistent statement they no

18   longer constitute hearsay, which was the basis for Your

19   Honor's ruling for precluding them.

20          So I think we're sort of now back to the place we

21   were before the motion *in limine* ruling where we do expect all

22   four calls will come in because those two are no longer

23   hearsay, they are prior consistent statements under

24   Rule 801(d), as in dog, and so that I guess should have been

25   point number one.

PROCEEDINGS                            101

1          Even in the absence of that, we still think the date

2    and time and the fact that the call is something that can come

3    into evidence regardless of whether the content could come in.

4    But we also think Your Honor has now ruled that these calls

5    are no longer hearsay, because they're prior consistent

6    statements and this victim's general credibility has been

7    attacked.

8          THE COURT:  Well, I haven't expressly ruled on any

9    of your statements, just the right to use prior consistent

10   statements subject to Rule 403.  There are 57,006 prior

11   consistent statements, they're not all coming in.

12         MS. OKEN:  We certainly agree with that, Your Honor.

13   We think there are -- and we tried, I apologize, Your Honor,

14   to lay out in our motion the specific items of prior

15   consistent statements that we think -- that we think -- that

16   we expect to use, and the two 9-1-1 calls that were previously

17   excluded on hearsay grounds are one of those things.

18         MS. SHERMAN:  Judge, I think just to respond, and

19   this will -- we can also address what our concerns are.

20         We reviewed -- we understand what Your Honor's

21   ruling is with the prior consistent statements.  Obviously, we

22   understand that also it's constrained by the Rules of

23   Evidence.  And so the government has to proffer specific

24   consistent statements and by your ruling it's constrained by

25   statements pertaining to alleged stalking, harassment and/or

PROCEEDINGS                                      102

1    threats by Chris Bantis in 2021.  In addition, that it was --

2    that they were made before any motive to fabricate.  That's

3    under the standard Rules of Evidence.

4            What the government has provided in their motion,

5    and then updated the exhibits, contain a substantial part of

6    Ms. Harrison's grand jury testimony that they are intending to

7    introduce and publish for the jury, which is rambling,

8    confusing, has sections that have nothing to do with alleged

9    stalking, harassment or threats.  It details her family's

10   medical issues, her financial issues, instances in 2018 where

11   she doesn't -- where your order specifically went to 2021.  An

12   indication of some altercation that Mr. Bantis allegedly had

13   with her brother back in 2018.  Again, not specific,

14   consistent statements that are subject to cross-examination.

15           And, in addition, they included text messages with

16   Special Agent Tambrino where she's detailing her generalized

17   fears.  She's asking him to send police officers because she

18   fears something is going to happen.  Again, they're not

19   specific instances or consistent statements, which is

20   construed by your ruling.

21           So I think that, in general, we understand your

22   ruling and so we're not going to revisit it, but we just

23   would -- we just would like to flag that there has to be a

24   baseline for what's considered a consistent statement and

25   within your ruling.

PROCEEDINGS                        103

1          MS. OKEN:  And, Your Honor, we certainly agree that

2   has not opened the door for everything this witness has ever

3   said to now come in.

4          I do think we disagree with one piece of what

5   Ms. Sherman just said, and that is that under (d)(1)(A), the

6   statements have to have occurred prior to a purported motive

7   to fabricate.  That is not -- that is not the sole basis that

8   these statements come in.

9          801(d)(1)(B) provides that statements come in to

10  rehabilitate the declarant's credibility as a witness when

11  attacked on other grounds.  So, for example, when there is a

12  general, overall attack on the victim's credibility, which I

13  think Your Honor's ruling was quite clear, there was in the

14  opening statement.

15         And so I think we agree that we are certainly

16  constrained by the language of Your Honor's ruling.  We

17  certainly agree that this has not opened the door for every

18  single thing that this witness has ever said to come into

19  evidence, but we do expect that the prior consistent

20  statements that pertain to alleged stalking, harassment and/or

21  threats by Chris Bantis in 2021 are admissible for their

22  truth.

23         MS. SHERMAN:  Judge, just to respond to that.  I

24  just want to read from a case, *United States versus Portillo*,

25  which is 969 F.3d 144, 174 to 75, out of the Fifth Circuit.  I

PROCEEDINGS                                    104

1    understand that's not our controlling circuit from 2020.   And

2    it says:

3           "In the advisory committee's note to the 2014

4    amendment, the committee explained that the amendment does not

5    change the traditional and well-accepted limits on bringing

6    prior consistent statements before the fact finder for

7    credibility purposes."   Internal citations.

8           The *Tome* limitation predates Rule 801 and was a well

9    established common law principle that was accepted by the

10   drafters of the rule.   Then it cites *Tome*.

11          In order to safely give effect to the drafters'

12   intentions, courts must interpret Rule 801 with this rule in

13   mind.   In parentheses.   The notes disclose a purpose to adhere

14   to the common law in the application of evidentiary principles

15   absent express provisions to the contrary.   If the *Tome*

16   limitation is mapped onto Rule 801(d), as in dog,(1)(B), as in

17   boy, (2), a litigant may not introduce a prior consistent

18   statement if that statement was made at the time when the

19   litigant allegedly had a motive to fabricate.   Even if the

20   litigant supplements his attack on the witness' credibility by

21   pointing to other flaws in the declarant's testimony.

22          MS. OKEN:   Your Honor, I don't know that we disagree

23   with any of that, that the 2014 was -- amendment, I apologize,

24   was intended to preserve the *Tome* motive pool while, quote,

25   properly expanding substantive admissibility to statements

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                          105

1   offered to rehabilitate on other grounds.

2            In other words, statements that had always been

3   admitted as rehabilitation are now admitted as substantive

4   evidence.  And so we think Your Honor's ruling was accurate

5   and reasonable, and we expect to introduce prior consistent

6   statements in accordance with it.

7            THE COURT:  So this was not with respect to witness

8   number one but with the subsequent one -- witness.

9            MS. OKEN:  This is with respect to -- not the first

10  witness of the day, not John Doe 1, but this is with respect

11  to Victim 1.

12           I apologize, there's a lot of Victim 1 and John

13  Doe 1, and so this does not apply to our first witness, but it

14  does apply to a witness who we expect will testify today.

15           THE COURT:  Give us a chance to take a look at that.

16           MS. SHERMAN:  And -- then Judge, just -- and, again,

17  we're not sure the order the government is producing

18  witnesses, and so this may not be relevant today or before

19  this first witness, but we just wanted to address the Court's

20  other ruling from yesterday as to certain exhibits.

21           We received updated exhibits after the Court's

22  ruling from the government.  And based on the updated

23  exhibits, it seems that the government is still trying to

24  introduce Government Exhibit 520, 523, and 525.

25           They did redact certain statements.  But Your

PROCEEDINGS                                    106

1    Honor's ruling was very clear, it says, "Consistent with the

2    Court's prior order regarding evidence referencing organized

3    crime, proposed exhibits 520, 521, 523 and 525 are

4    inadmissible in the entirety."

5            They're also, it seems, still trying to introduce

6    portions of Government Exhibit 532 and 536.  Again, they did

7    some redactions.  The government was -- I'm sorry, Your Honor,

8    was even more clear on those exhibits saying, "Regarding

9    proposed Exhibits 532 and 536, absent a representation by the

10   government that it will introduce other evidence that

11   independently connects these messages to the retaliation

12   alleged in this case, the Court finds these proposed exhibits

13   not relevant for any purpose beyond establishing a propensity

14   for animus against cooperating witnesses.  Further, the text

15   messages would be, even in redacted form, highly prejudicial

16   and would substantially risk confusing the jury.  And unless

17   and until the government makes such represent a

18   representation, these exhibits are inadmissible in their

19   entirety under Rules 401 and 403."

20           MS. OKEN:  I think I can address this very briefly,

21   Your Honor.

22           We did produce a number of exhibits yesterday that

23   we had redacted in accordance with the Court's prior rulings.

24   That was -- we obviously are in receipt of an additional

25   ruling from yesterday.  We have no expectation of introducing

PROCEEDINGS                          107

1    any of the exhibits that were governed by that ruling

2    without -- without first raising it with the Court.  And so --

3    but I think that the quickest way to short circuit all of this

4    is that none of this will come up today.

5            THE COURT:  The ruling is pretty clear, so it

6    shouldn't come up at all.

7            All right.  Anything else?

8            MS. OKEN:  Nothing from the government, Your Honor.

9            MS. SHERMAN:  Only one quick thing.

10           Judge, we did -- I believe that the recordings are

11   going to be played this morning if they're intending to call

12   John Doe 1, George Harrison, first.

13           We did send two proposed words to be redacted from

14   the recordings to the government based on the inflammatory

15   nature of the words themselves and that they don't actually go

16   to motive.  The government, our understanding, is not willing

17   to redact them or because they had already gone through it

18   with their witness, we just wanted to put it on the record

19   that we did proposes these redactions.

20           The first is use of a homophobic slur, which is on

21   page 3 of 4 of government transcript 12, I believe it is, 12T.

22   It's just one word.  And we're asking to redact that one word.

23           And then the other was a word that is derogatory

24   towards women.  So those were two words.  That's what we asked

25   the government.  Our understanding, we spoke to them this

PROCEEDINGS                                    108

1    morning, is not prepared to make those redactions.

2              MS. OKEN:  Your Honor, these were exhibits that were

3    the subject of Your Honor's prior ruling.  They were deemed

4    admissible.  I'm happy to just sort of go through why we think

5    it's admissible, but I think we've done that already.  Your

6    Honor has done a prejudice, probative analysis and -- on those

7    recordings determined that they were admissible.

8              THE COURT:  We spent time on reviewing the exhibits

9    and the rulings that we made were quite specific.  Could

10   have -- is it possible we might have missed something?  It is.

11   But those are the rulings that we made and we adhere to them.

12             MS. OKEN:  And I think with that, Your Honor, at

13   least from the government's perspective, we are ready to bring

14   in the jury.

15             THE COURT:  So let me raise this with counsel.

16             It might be helpful to alert the jury, and I assume,

17   Ms. Oken, the witness is come -- will be coming in after the

18   jury is seated?  What is your plan there?

19             MS. OKEN:  It's a good point, Your Honor.  And I

20   think perhaps with respect to the first witness, it may be

21   best to bring the witness in first.  With respect to the

22   others, I don't know that we have a preference either way, but

23   for this particular witness, it may make sense to bring the

24   witness in.

25             THE COURT:  Normally it would be, once the witness

PROCEEDINGS                                    109

1   has been seated, then I normally have the witness come in

2   before the jury is seated.  To the extent a witness is being

3   called, I usually have the witness come in at that point after

4   the jury is seated.

5            So, yes, we can do that.  And I -- the further point

6   that I raised, and I seek advice of counsel, I might make a

7   general advisory that we have a witness that has health needs,

8   so that it's possible that we would have to take a break

9   during the course of the testimony, and we'll make that

10  determination based on the advice of the health care

11  professional.

12           MS. OKEN:  I think we don't object to that, Your

13  Honor, but we'd also be happy if the Court prefers to do it in

14  sort of a more vague fashion and say it may be possible that

15  the parties or the Court or, you know, may need to take a

16  break.  And if that happens, we'll alert the jury so that they

17  can file out.  But we defer to the Court on a ruling on that.

18           THE COURT:  I vacillated on but what was -- what

19  prompted it was the advice of the health care professional we

20  seated next to the witness -- near the witness.

21           MS. OKEN:  That's right, Your Honor, the health care

22  professional will be --

23           THE COURT:  So even if nothing happens, the jury may

24  speculate about that.

25           MS. HIROZAWA:  Your Honor, how -- perhaps this is a

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                              110

1   question best directed to the government.  How close would the

2   health care professional need to sit?

3           MS. OKEN:  I think, Your Honor, we had -- the

4   Court's deputy had assisted us to put a seat out --

5           THE COURT:  Normally we would put a seat right near

6   the witness box.

7           MS. OKEN:  That's right.  And we don't -- we don't

8   think it's going to be -- it will be a quite subtle, it's not

9   going to be, you know, it's -- and this may also counsel in

10  favor of bringing in the witness and the health care

11  professional first so that we can get everybody settled and it

12  doesn't draw the jury's attention to anything unusual going

13  on.  There will be agents and marshals and spectators sitting

14  in the courtroom today.  I don't know that there will be

15  anything notable about this -- about this arrangement to the

16  jury without us drawing their attention to it.

17          THE COURT:  Based on this health care professional

18  is a nurse, and is the professional wearing civilian clothes?

19          MS. OKEN:  She's wearing civilian clothes, Your

20  Honor.  She's not wearing scrubs or anything that will draw

21  attention to her as a medical professional.

22          THE COURT:  That changes it also.

23          MS. OKEN:  I apologize, Your Honor --

24          THE COURT:  Then it's less significant.

25          MS. OKEN:  I may have been mistaken, Your Honor.  I

PROCEEDINGS                          111

1    just want to confirm what the health care professional is

2    wearing before I put it on the record.  I apologize.

3              THE COURT:  Okay.

4              MS. OKEN:  Your Honor, it sounds like she may be

5    wearing scrubs, but does have a coat over them.

6              THE COURT:  It can get awfully warm in here.

7              MS. OKEN:  We can -- we're happy to request that she

8    keep it on.

9              We do think from a health standpoint it makes sense

10   for her to sit close to the witness because her purpose is to

11   alert everybody if something is sort of going south.

12             We are happy to have that addressed either not at

13   all, if the Court or the defense thinks that will just draw

14   attention to it, but we're also happy to have the Court

15   instruct the jury on it if that --

16             THE COURT:  I mean here's -- the other piece is, as

17   I understand it, the witness is in a wheelchair.

18             MS. OKEN:  That's correct, Your Honor.  So the Court

19   won't be telling them anything they can't see with their own

20   eyes.

21             THE COURT:  Then obviously there's a witness with

22   special needs, and those special needs may require a recess.

23             MS. OKEN:  Fair enough, Your Honor, we have no issue

24   with that.

25             MS. HIROZAWA:  Your Honor, I think we would prefer a

PROCEEDINGS                                    112

1   more general instruction.  I don't think that --

2              THE COURT:  Come up with it, Ms. Hirozawa.

3         MS. HIROZAWA:  I think simply stating that the Court

4   may take a break at some point during the course of the

5   witness' testimony would be sufficient.

6              Obviously, it's highly prejudicial that the medical

7   staff accompanying this witness is in scrubs.  Certainly

8   that's not something that we anticipated or discussed with the

9   government beforehand because it seemed simple enough to

10  arrive in civilian clothing.

11             But, in any event, given that the government has

12  moved to preclude the defense from referencing any of

13  Mr. Bantis' medical conditions, I think it would be -- I think

14  the purpose of that is to avoid eliciting sympathy from the

15  jury, I think it would be inappropriate to address the

16  witness' medical condition.

17             THE COURT:  That will be untouched.

18        MS. OKEN:  And, Your Honor, I think one final point

19  that I neglected to mention is the transcript binders that

20  were set out for the jury last week have been modified, a copy

21  of them has been provided to the defense.  And within them

22  right now are only the transcripts that have accompanying

23  exhibits that were previously admitted or that the government

24  expects to move into today and have been covered by the

25  Court's prior rulings.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                           113

1          THE COURT:  Okay.  Are we ready then?

2          MS. OKEN:  We are, Your Honor.

3          THE COURT:  Then let's seat the witness.

4          (Pause in the proceedings.)

5          THE COURT:  We're ready to proceed.

6          Counsel, ready for the jury?

7          MS. McGRATH:  We are, Your Honor.

8          MS. SHERMAN:  Yes, Your Honor.

9          (Pause in the proceedings.)

10         (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                              114

1          (Witness takes the witness stand.)

2     **GEORGE HARRISON**, called as a witness, having been first duly

3     sworn/affirmed, was examined and testified as follows:

4          (Jury enters the courtroom.)

5          THE COURT:  Be seated, please.  Counsel will

6     stipulate that the jury is present and properly seated.

7          MS. OKEN:  So stipulated, Your Honor.

8          MS. HIROZAWA:  So stipulated.

9          THE COURT:  Thank you, counsel.

10         Ladies and gentlemen of the jury, welcome.  The last

11    time we gathered on Thursday, we are now ready to proceed.

12         As I indicated to you last week, there are really

13    two phases to any trial.  One is the fact phase.  And that's

14    totally within your province as the jury.  And the other is

15    the law phase.  All cases create legal issues as well and that

16    the Court and counsel have to attend to them outside the

17    presence and hearing of the jury.  And so that's what we've

18    been doing while you were back in the jury deliberation room.

19         But we are now ready to proceed.  Again, we all

20    appreciate your prompt attendance and the sacrifices that you

21    make in your lives and the lives of your family and business

22    associates by performing your civic duty as members of this

23    jury.

24         With that we are ready, we have a witness, and,

25    Ms. Oken, are you handling the witness?

G. HARRISON - DIRECT - MS. McGRATH          115

1          MS. McGRATH:  Your Honor, this is Tara McGrath.

2          THE COURT:  Ms. McGrath.  Thank you.

3          MS. McGRATH:  Your Honor, at this time, just for the

4   record, we call George Harrison to the witness stand.

5          THE COURTROOM DEPUTY:  Please raise your right hand.

6          THE WITNESS:  I do.

7          THE COURTROOM DEPUTY:  Please state your first and

8   last name, and spell it for the record.

9          THE WITNESS:  George Harrison.  G-E-O-R-G-E.

10  H-A-R-R-I-S-O-N.

11         THE COURTROOM DEPUTY:  Thank you.

12         THE COURT:  Ms. McGrath, you may inquire.

13         MS. McGRATH:  Thank you, Your Honor.

14  DIRECT EXAMINATION

15  BY MS. McGRATH:

16  Q    Good morning.

17         What was your name at birth?

18  A    George Harrison.

19  Q    Did you subsequently change your name?

20  A    Yes, I did.

21  Q    Why did you do that?

22  A    Because I was afraid for Chris Bantis.

23         MS. SHERMAN:  Objection.

24         THE COURT:  Overruled.

25  Q    For today's proceedings, we'll refer to you by your name

G. HARRISON - DIRECT - MS. McGRATH                116

1    at birth.

2            Mr. Harrison, how old are you?

3    A    Forty-nine years old.

4    Q    Where did you grow up?

5    A    In Brooklyn, New York.  Like the Dyker Heights area.

6    Q    Do you have any siblings?

7    A    Yes, I do.

8    Q    How many?

9    A    Six.

10   Q    What are your names?

11   A    Ann, Lisa, Christine, Donna, Jessie, and James.

12   Q    Who is the youngest?

13   A    Jessie.

14           MS. McGRATH:  I'm going to show you a photo marked

15   Government Exhibit 1.

16           And, Your Honor, may I approach the witness?

17           THE COURT:  You may.

18           (Counsel approaches the witness.)

19   Q    Do you recognize this?

20   A    Yes, I do.

21   Q    What is it?

22   A    That is Christopher Bantis.

23           MS. McGRATH:  Your Honor, the government moves

24   Government Exhibit 1 into evidence.

25           THE COURT:  Any objection?

G. HARRISON - DIRECT - MS. McGRATH                117

1          MS. HIROZAWA:  No objection.

2          THE COURT:  Received in evidence without objection.

3          (Government Exhibit 1, was received in evidence.)

4          MS. McGRATH:  And may we publish.

5          THE COURT:  You may indeed.

6          (Exhibit published.)

7     Q    How did you meet Chris Bantis?

8     A    Through Troy Magalhaes.

9     Q    And at a very high level, who is that?

10    A    My sister's Christine's boyfriend.

11    Q    And approximately when was that?

12    A    Roughly about maybe 10 to 12 years ago.

13    Q    Were you and Chris Bantis friends?

14    A    We were never friends.  It was more like a business

15    association.

16    Q    Directing your attention to 2013, were you employed?

17    A    Yes, I was.

18    Q    Where?

19    A    New York City Department of Sanitation.

20    Q    And still directing your attention to 2013, did your

21    financial situation change?

22    A    Yes.

23    Q    Did you take any steps as a result of that?

24    A    Yes, I did.

25    Q    What did you do?

G. HARRISON - DIRECT - MS. McGRATH                    118

1   A     I borrowed money from Christopher Bantis.

2   Q     In connection with borrowing money, what, if any,

3   information did you give him about yourself?

4   A     I had given him my address.  My telephone number.  My

5   Social Security number.  My date of birth.  I pretty much gave

6   him everything like if I was filling out like an application.

7   Q     Why did you do that?

8   A     Because he asked for it.

9   Q     Did Chris Bantis charge you interest on the loan?

10  A     Yes.

11  Q     Did you make payments on the loan?

12  A     Yes, I did.

13  Q     How often?

14  A     Every week.

15  Q     Were the payments on interest or principle?

16  A     It was on interest.

17  Q     Did you ever miss a payment?

18  A     Yes, I did.

19  Q     What happened when you missed a payment?

20  A     He went crazy on me.

21        MS. SHERMAN:  Objection.

22  Q     Can you describe what he did?

23  A     He came to my house with --

24        MS. SHERMAN:  Objection.  The relevance to the

25  instant case.

G. HARRISON - DIRECT - MS. McGRATH          119

1        THE COURT:  Probably be helpful at sidebar to know

2   far we're going here, Ms. McGrath and Ms. Sherman.

3        MS. McGRATH:  Sure, Your Honor.

4        (Continued on the next page.)

5        (Sidebar conference.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    120

1            (The following occurred at sidebar.)

2            MS. McGRATH:  Your Honor, we have a few questions

3    for the witness establishing that he borrowed money from the

4    defendant, that there were threats made for that purpose, and

5    that he reported that information to law enforcement, and that

6    he also made consensual recordings.  And so his --

7            THE COURT:  Just for that purpose?

8            MS. McGRATH:  Correct, Your Honor.

9            MS. SHERMAN:  Our concern is that he was about to

10   start going into specific instances of threats.

11           Again, we're not retrying 2014.  Mr. Bantis pled

12   guilty to the charges in 2014.  And the issue here is the

13   alleged threats made in 2021 to members of his family.

14           So that's our concern, that he was starting to go

15   into specific instances of threats.

16           THE COURT:  Preferably we are not relitigating the

17   2014 trial.

18           MS. McGRATH:  Correct.

19           Your Honor, we agree with that, but there are two

20   reasons why it is very pertinent to the crime charged.

21           One is it explains why the defendant went to -- this

22   witness went to law enforcement.  And also people can plead

23   guilty for any reason, it doesn't have to be because someone

24   was --

25           THE COURT:  Right, but just the idea that we're

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

SIDEBAR CONFERENCE                          121

1   going to go through every covert act that would have supported

2   the conviction in 2014, we're not going to do that.

3           MS. McGRATH:  Completely agree.  We expect this to

4   be limited to just a few questions.

5           THE COURT:  Okay.

6           MS. McGRATH:  Including, I mean the threating

7   conduct.

8           THE COURT:  Yes, I'll allow that for those purposes,

9   and to that extent.

10          MS. SHERMAN:  Judge, my -- again, my main concern is

11  I think he was about to say he showed me, you know, what he

12  thought was a handle of a gun.  We don't have any discovery

13  from 2014.  I don't -- we don't have the cross on the

14  credibility of that statement.  That's my concern.

15          And so we're renewing our objection to that.  I

16  think -- we're not disagreeing that he made threats.  He

17  admitted it in his plea.  I don't know why we need to go back

18  into it.

19          MS. McGRATH:  Your Honor, the point is what this

20  individual -- this witness provided to the FBI, to a federal

21  official, and so it's irrelevant with respect to if it's one

22  thing or not.

23          And we expect this to be limited testimony.  We

24  don't expect there to be testimony concerning a firearm.

25          MS. SHERMAN:  Just for the record, I'm sorry,

1    everyone can hear us, is there a way to put on the noise?

2              THE COURTROOM DEPUTY:  I took care of it.

3              THE COURT:  You're giving us far too much credit for

4    the voice projection.  We can barely hear it here, much less

5    over there.  Fine.

6              MS. HIROZAWA:  Also just for the record, I think

7    it's extremely prejudicial under Rule 403.  I think the

8    testimony should be narrowly cabined.

9              MS. SHERMAN:  If there is going to be testimony

10   regarding specific threats, we'd ask for an instruction that

11   this is not coming in for the truth, that these threats

12   actually happened, that these specific threats they're trying

13   to get in.

14             If they're just going to say "he threatened me,"

15   fine, we understand.  But if they're going to try to get to

16   specific instances, we are objecting to that, and we are

17   asking for a limiting instruction that this is not coming for

18   things that actually happened.

19             MS. McGRATH:  Your Honor, to be clear, though, under

20   the crime charged, under 1513(e), it's necessary for a

21   retaliation because an individual provided truthful

22   information about a possible offense to law enforcement.

23             And so we intend to elicit:  One, that the threat

24   was made after he made payment; and two, he subsequently

25   provided that information to law enforcement.  They wouldn't

SIDEBAR CONFERENCE                    123

1   be able to find that element if they were instructed that

2   information --

3            THE COURT:  It's relevant, not here, but it's

4   relevant.

5            MS. SHERMAN:  Judge, we're just introducing --

6   they're introducing the detention memo with threats.  They're

7   introducing the sentencing witness impact statement.  They're

8   introducing -- and again, we offered countless times --

9            THE COURT:  They have a right to prove their case --

10           MS. SHERMAN:  Of course.

11           THE COURT:  -- their way.

12           MS. SHERMAN:  Of course, but you also mentioned

13  cumulativeness, and the amount of times that this prejudicial

14  evidence is coming in, it's going to be coming in several

15  different ways and several different times.  That's why we're

16  objecting to it.

17           MS. McGRATH:  And, Your Honor, I'll just further

18  note that the recordings with respect to John Doe 1 have

19  prior -- consistent with your prior rulings, have been

20  scrubbed of the threats.  There are no explicit threats on the

21  recordings with respect to John Doe 1.

22           MS. HIROZAWA:  My recollection is the original

23  recordings did not include explicit threats.

24           MS. McGRATH:  The original recordings included

25  numerous conversations in which the defendant invoked his ties

1    to an organized crime family, which we pretty much deleted for

2    the implicit threats to him about the power that was behind

3    him, and this witness would testify about that.

4            Of course, we're not getting into that.  Of course,

5    the recordings that have been marked contain that.  But

6    insofar as we're concerned about cumulativeness, we've

7    indicated we intend to elicit a few questions to establish the

8    elements required for this charge and we'll be very mindful of

9    the Court's concern.

10           THE COURT:  I'm going to assume that you are going

11   to follow what the order was and that's consistent with the

12   evidence.

13           (End of sidebar conference.)

14           (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

G. HARRISON - DIRECT - MS. McGRATH                    125

1    DIRECT EXAMINATION (Continued)

2    BY MS. McGRATH:

3    Q    Mr. Harrison, before the break I asked you what happened

4    when you missed a payment.

5    A    He had come to my house with a little bat and he had put

6    it to my face and he went crazy on me.

7              MS. SHERMAN:  Objection.

8              THE COURT:  Overruled.

9              Mr. Harrison, when you use the expression, you used

10   it more than once, go crazy on you, what does that mean?

11             THE WITNESS:  Well, he was -- he was slurring his

12   words and everything.  He was -- he was -- he was not

13   mentally --

14             MS. SHERMAN:  Objection.

15             THE COURT:  This is his sense impression.

16             You may answer.  You may continue to describe what

17   you mean by goes crazy on you.

18             THE WITNESS:  He was yelling at me.  He was

19   screaming at me.  He was throwing things around.  And I had

20   told him prior to this that I was gonna miss the payment and

21   he must have forgot and he just went ballistic.  He was

22   like -- came to my house, put the little bat to my face, told

23   me he was gonna kill me.

24             THE COURT:  But the expression that you used going

25   crazy is referring to statements?

G. HARRISON - DIRECT - MS. McGRATH          126

1          THE WITNESS:  Yeah.

2          THE COURT:  And the manner of the statements that --

3          THE WITNESS:  Throwing things around like a tantrum.

4     BY MS. McGRATH:

5     Q    Mr. Harrison, you referenced a little bat.  What was it

6     made of?

7     A    Wood.

8     Q    At that time did you tell your sister Jessie about the

9     loan?

10    A    No.

11    Q    Did you tell her about the threat?

12    A    No.

13    Q    Why not?

14    A    Because it wasn't her -- her -- her business.

15    Q    Directing your attention to approximately 2014, did you

16    report Chris Bantis to law enforcement?

17    A    Yes, I did.

18    Q    Who did you report him to?

19    A    To the FBI.

20    Q    Why did you report him?

21    A    Because I felt that my life and my brother's life were in

22    danger.

23    Q    And at a very high level, what did you report to the FBI?

24    A    That I had a loan out with Chris and I couldn't afford

25    the payments, and he was gonna come after me and kill me.  And

G. HARRISON - DIRECT - MS. McGRATH                127

1    that my brother's life was in grave danger at the time.

2    Q    You testified earlier about an incident when Chris Bantis

3    held a wooden bat to your face.

4              Did you tell the FBI about that?

5    A    I believe so, yes.

6    Q    At the time you reported Chris Bantis to the FBI, did you

7    still owe him money?

8    A    Yes.

9    Q    Were you still meeting with him to make payments?

10   A    Yes.

11   Q    After you reported him, what, if anything, did law

12   enforcement ask you to do?

13   A    Make recordings, meet with Chris.

14   Q    Do you recall the names of any of the FBI agents you met

15   with during this process?

16   A    Paul Tambrino.  And then there was detectives from the

17   NYPD.  Mike, I can't remember -- I can't remember his last

18   name.

19   Q    To your knowledge, did your brother James also seek help

20   from the FBI?

21             MS. SHERMAN:  Objection.

22             THE COURT:  As to form.

23             MS. McGRATH:  Your Honor, we can move on for the

24   moment.

25   BY MS. McGRATH:

G. HARRISON - DIRECT - MS. McGRATH          128

1    Q     You indicated that law enforcement asked you to record

2    conversations you were having with Chris Bantis.

3    A     Yes.

4    Q     Approximately how many conversations did you record?

5    A     About fifteen or so.

6    Q     I am going to show you a CD that's marked Government

7    Exhibit 11, and then ask you a few questions.

8              MS. McGRATH:  Your Honor, may I approach?

9              THE COURT:  You may.

10   BY MS. McGRATH:

11   Q     Do you recognize Government Exhibit 11?

12   A     Yes, I do.

13   Q     What is it?

14   A     It's a CD that I made.

15   Q     Have you seen it before?

16   A     Yes, have.

17   Q     How do you know that?

18   A     I -- my -- my initials and my date that I dated it is on

19   there.

20   Q     Have you listened to the audio recordings on the CD?

21   A     Yes, I have.

22   Q     Were they marked Government Exhibits 12, 13, 14, 15 and

23   16A?

24   A     Yes.

25   Q     And what are those exhibits?

G. HARRISON - DIRECT - MS. McGRATH          129

1    A    Those are recordings that I have made.

2    Q    Are they true and accurate copies of some of the recorded

3    conversations you just testified about?

4    A    Yes, they are.

5             MS. McGRATH:  Your Honor, at this time the

6    Government moves Exhibits 12, 13, 14, 15 and 16A into

7    evidence.

8             THE COURT:  Any objection?

9             MS. SHERMAN:  None other than prior objection.

10            THE COURT:  Received in evidence.

11            (Government Exhibit 12, 13, 14, 15 and 16A, were

12   received in evidence.)

13   BY MS. McGRATH:

14   Q    So, we're going to play first the May 14th, 2014

15   recording that's now in evidence as Government Exhibit 12, and

16   then I'll ask you some questions about it.

17            I'll just note to the extent helpful to you, there

18   is a black binder there that has a transcript aid behind

19   Tab 12.

20            MS. McGRATH:  And, Your Honor, perhaps at this time

21   you could instruct the jury the same.

22            THE COURT:  Right.

23            You will recall we used the binder last time, and we

24   are using it again for the same purpose.  They are an aid to

25   what is in evidence.  What is in evidence is what you are

G. HARRISON - DIRECT - MS. McGRATH                130

1    going to hear.  The transcript is there to try to help you.

2              To the extent that you hear something that is

3    different than the transcript, then what you think you heard

4    is the evidence and not the transcript.

5              We are going to ask you only to look at the material

6    under the tab you are directed to look at.

7              And, Ms. McGrath, we said we were at Tab  12, was

8    it?

9              MS. McGRATH:  Yes, Your Honor.

10             THE COURT:  Tab 12.  And with that, you are free to

11   play the exhibit.

12             MS. McGRATH:  Ms. Moosher, would you please play

13   Government Exhibit 12?

14             (Audio played.) (Audio stopped.)

15   BY MS. McGRATH:

16   Q    Mr. Harrison, during the recording did you hear a

17   reference to a Victim 2?

18   A    Yes.

19   Q    Do you know who Victim 2 is?

20   A    Yes.

21   Q    Who is that?

22   A    That is me.

23   Q    Do you recognize any of the voices on the call we just

24   listened to?

25   A    Yes, I do.

G. HARRISON - DIRECT - MS. McGRATH                131

1    Q    Whose voices?

2    A    The recordings were me and Christopher Bantis.

3    Q    And during the recording did you hear someone state:

4    Your brother went to the cops?

5    A    Yes, I did.

6    Q    Whose voice was that?

7    A    Christopher Bantis.

8    Q    To your knowledge, had your brother, in fact, gone to the

9    cops?

10   A    I -- to be honest, I don't know.

11   Q    I am now going to play the June 4th, 2014 recording in

12   evidence as Government Exhibit 13, and we will just direct you

13   to that tab in your binder.

14            (Audio played.)   (Audio stopped.)

15   Q    Mr. Harrison, during the recording did you hear a

16   reference to CI Husky?

17   A    Yes, I did.

18   Q    Who is that?

19   A    That is me.

20   Q    Do you recognize any voices on the recording?

21   A    Yes.

22   Q    Whose?

23   A    Me and Christopher Bantis.

24   Q    And what was happening during this call?

25   A    I was calling to tell him that I'd be there in the

G. HARRISON - DIRECT - MS. McGRATH                    132

1   morning to drop off money.

2   Q    I will now direct your attention to Tab 14, and we will

3   play what's in evidence as the June 4th, 2014 recording,

4   Government Exhibit 14.

5              (Audio played.) (Audio stopped.)

6   BY MS. McGRATH:

7   Q    Do you recognize any of the voices on the call we just

8   listened to?

9   A    Yes, it was me and Christopher Bantis.

10  Q    And during the recording, did you hear someone state:  I

11  give you 2,000 for a week and 2,000 another week?

12  A    Yes, that was me.

13  Q    What did you mean when you said that?

14  A    I was trying to see if I can offer some kind -- get a

15  payment arrangement with Chris.

16  Q    And did Chris Bantis agree?

17  A    No.

18  Q    I am going to play for you the June 19th, 2014 recording

19  in evidence as Government Exhibit 15, and I'll just direct you

20  to that tab.

21             (Audio played.) (Audio stopped.)

22  Q    Do you recognize any voices on this call?

23  A    Yes, me and -- me and Christopher Bantis.

24  Q    And what were you doing during this call?

25  A    I was calling him to let him know I'd be bringing him

G. HARRISON - DIRECT - MS. McGRATH          133

1   money.

2          MS. McGRATH:  And, Your Honor, I don't know if now

3   would be a convenient time for a very brief comfort break.

4          THE COURT:  Any time anyone needs comfort, we're

5   ready.

6          MS. McGRATH:  Thank you, Your Honor.

7          THE COURT:  Normally, we would take a mid-morning

8   break.  This is as good a time as any.

9          Again, ladies and gentlemen of the jury, go back and

10  refresh in the jury room.  Do not discuss the case amongst

11  yourselves or with anyone else and continue to keep an open

12  mind, and we will see you shortly.

13          (Jury exits.)

14          MS. McGRATH:  Thank you, Your Honor.

15          We just understand that there is just like a

16  timeliness by which some medication needs to be taken.  We

17  imagine it will only take a few moments.

18          THE COURT:  Do you want us just to stand at ease or

19  do you want to take a break?

20          We can take a break.

21          MS. McGRATH:  Yes, I think it depends on Your Honor.

22  We should only need two minutes to get situated.  So we're

23  happy to --

24          THE COURT:  We will just take the brief at-ease

25  break for the medication, and then if we need a longer break

G. HARRISON - DIRECT - MS. McGRATH          134

1    we will take it closer to 12.

2              MS. McGRATH:  Okay, thank you, Your Honor.

3              (Recess taken.)

4              (In open court - jury not present.)

5              THE COURT:  The deputy clerk is bringing the jury

6    in.

7              (Pause.)

8              (Jury enters.)

9              THE COURT:  Be seated, please.

10             Counsel will stipulate that the jury is present and

11   properly seated.

12             MS. McGRATH:  Yes, Your Honor.

13             MS. SHERMAN:  So stipulated.

14             THE COURT:  Thank you, counsel.

15             Ladies and gentlemen, welcome back.  We are ready to

16   resume.

17             Ms. McGrath is still on her direct examination of

18   Mr. Harrison.

19             MS. McGRATH:  Thank you, Your Honor.

20   BY MS. McGRATH:

21   Q    Mr. Harrison, I am finally going to play for you the June

22   19th, 2014 recording in evidence as Government Exhibit 16A,

23   and it will be behind Tab 16.

24             (Audio played.) (Audio stopped.)

25   Q    Mr. Harrison, did you recognize any voices on the

1    recording?

2    A    Yes, I did.

3    Q    Whose?

4    A    It was me and Christopher Bantis.

5    Q    Did you hear someone state:  I'm gonna fucking kill this

6    kid?

7    A    Yes, I did.

8    Q    Whose voice was that?

9    A    That was Christopher Bantis.

10   Q    Still directing your attention to 2014, did you come to

11   learn whether Chris Bantis was charged with crimes relating to

12   some of the loan activity you described?

13   A    Yes, I did.

14   Q    Did you come to learn whether he was convicted of a

15   crime?

16   A    Yes, I did.

17   Q    Were you notified of these events?

18   A    Yes.

19   Q    Were you also notified of a sentencing hearing?

20   A    Yes.

21   Q    Did you attend the sentencing hearing?

22   A    Yes, I did.

23   Q    Did you speak at the defendant's sentencing hearing?

24   A    Yes, I did.

25            MS. McGRATH:  Your Honor, at this time the

1    Government moves Government Exhibit 24 into evidence, the

2    sentencing transcript as self-authenticating pursuant to Rule

3    902(4).

4              THE COURT:  Any objection?

5              MS. SHERMAN:   Not other than our objection to the

6    cumulative nature.

7              THE COURT:  Overruled.

8              (Government Exhibit 24, was received in evidence.)

9    BY MS. McGRATH:

10   Q    So, in your binder, Mr. Harrison , behind tab 24, if you

11   could just look at page 4 of that document.

12   A    Okay.

13   Q    Do you recognize it?

14   A    Yes, I do.

15   Q    What is it?

16   A    This is my victim impact statement.

17   Q    And just starting with page 4, can you read aloud for the

18   jury lines 17 to 19?

19   A    I am here to state today that I am a victim and I am

20   afraid that when this man gets out that he is gonna come after

21   me and my family.

22   Q    And if you can just turn to the next page, page 5.

23              Can you please read aloud for the jury lines 5

24   through 11?

25   A    And I know that every day that while he sat in that jail

G. HARRISON - DIRECT - MS. McGRATH          137

1    cell, that the only thing that he could think of is that when

2    he gets out is when he gets out he -- how he is going to harm

3    me and my family.  I beg of you, because I have nightmares

4    about this man every day and I know eventually he will be let

5    out, but I beg of you do not make this reality come sooner

6    than it really has to be.

7    Q    Were you kept up-to-date about the status of Chris

8    Bantis's case after sentencing?

9    A    Yes.

10   Q    How?

11   A    Through the victim notification -- victim notification

12   through the -- like it was the VINE system, and also through

13   the PACER court system.

14   Q    At a very high level, what is the PACER court system?

15   A    It gives you, like, updates about the court case.

16   Q    Were you notified of any conditions that had been ordered

17   for your safety as part of the sentencing?

18   A    Yes.

19   Q    And what were you -- what did you learn?

20   A    I learned that I had an order of protection.  He had -- I

21   had an order of protection against him.  I also learned that

22   he had restitution owed to me.  I learned that -- I learned a

23   lot of things.

24   Q    And you testified about an order of protection.

25            Who did that cover?

G. HARRISON - DIRECT - MS. McGRATH          138

1   A    It covered me and my whole family.

2   Q    Were you later notified that the defendant was placed on

3   probation?

4   A    Yes.

5   Q    You previously testified that you changed your name.

6        Did you take any other steps for your safety?

7   A    I changed my Social Security number and I relocated.

8   Q    What, if any, assistance did the FBI provide you when you

9   were relocating?

10  A    They financially helped me.

11  Q    Did you relocate more than once?

12  A    Yes.

13  Q    Without disclosing where you presently reside, did you at

14  one point relocate to Tennessee?

15  A    Yes, I did.

16  Q    So you testified earlier that you were notified when

17  Chris Bantis was put on probation.

18       After that, did you have an occasion to call Special

19  Agent Tambrino regarding Chris Bantis?

20  A    Yes, I did.

21  Q    Why did you call Special Agent Tambrino?

22  A    Oh, I had called him when he was on probation because he

23  was menacing my sister's store.

24       MS. SHERMAN:  Objection.

25       THE COURT:  I am going to overrule it.

*SAM      OCR      RMR      CRR      RPR*

1   Q    Without describing anything that was said, how did you

2   learn that?

3   A    My mom had called me and told me.

4   Q    In your testimony you mentioned a store, what store are

5   you referring to?

6   A    E&J Boutique.

7   Q    And who owns E&J Boutique?

8   A    My sister Jessie.

9   Q    You also testified earlier that you received

10  notifications regarding Chris Bantis's case through a few

11  channels.

12        Were you notified when the defendant was released

13  from probation?

14  A    Yes, I was.

15  Q    After that, did you have occasion to call Special Agent

16  Tambrino again regarding Chris Bantis?

17  A    Yes.

18  Q    And why was that?

19  A    Because at that time I learned that Christopher Bantis

20  went into the store --

21        MS. SHERMAN:  Objection, hearsay.

22  A    I --

23        THE COURT:  No.

24        Do you have a basis, Ms. McGrath?

25        MS. McGRATH:  Your Honor, his testimony is

G. HARRISON - DIRECT - MS. McGRATH          140

1   explaining why he took an action; specifically, why he called

2   Special Agent Tambrino.  And so, we don't need the statement

3   to come in for its truth, but rather to explain the effect on

4   the listener and his next course of action.

5          THE COURT:  I'll allow it for that limited purpose.

6   BY MS. McGRATH:

7   Q    Mr. Harrison, if you remember the question you can

8   continue answering.

9   A    All right.  My mom called me and told me that Christopher

10  Bantis had -- had gone into the store and he started fighting

11  with my sister Jessie inside the store.  And then I called

12  the -- Paul.

13         THE COURT:  So what that meant, Jury, is that

14  statement is not being admitted as evidence that that

15  happened, but this is being admitted to explain why Mr. Bantis

16  called the FBI.

17         MS. McGRATH:  Yes, Your Honor.  And why Mr. Harrison

18  called the FBI.

19         THE COURT:  Pardon me, Mr. Harrison called the FBI.

20  Q    And you referenced a store again.  What store are you

21  referring to?

22  A    E&J Boutique.

23  Q    To be clear, were you physically present during either of

24  the occasions you just described?

25  A    No, not at all.

G. HARRISON - DIRECT - MS. McGRATH                141

1    Q    Do you have a cell phone?

2    A    I do.

3    Q    Was your cell phone number most recently 718-802-8082?

4    A    Yes, it was.

5    Q    You testified earlier that you didn't tell your sister

6    Jessie about the loan you took out from Chris.

7              When you reported him to the FBI more recently, did

8    you tell Jessie?

9    A    I did.

10   Q    And why did you do that?

11   A    Because at that time he was pretty much now coming after

12   her.

13             MS. SHERMAN:  Objection.

14             THE COURT:  Yes, that is sustained.

15   BY MS. McGRATH:

16   Q    Growing up, what kind of relationship did you have with

17   your sister Jessie?

18   A    Me and Jessie were always close.

19   Q    And can you just -- what do you mean by that, you were

20   close?

21   A    We were close.  We hung out.  We -- we -- we looked at

22   baseball cards together, football cards.  We collected cards

23   together.  We talked a lot on the phone.  We helped one

24   another out.  You know, like the -- I'm the older brother,

25   she's the younger sister.  You know, we did, you know --

G. HARRISON - DIRECT - MS. McGRATH          142

1  Q     What kind of relationship have you had with her recently?

2  A     Since that day it's been downhill and we really don't

3  talk anymore, you know.

4  Q     And you referenced "that day," what day are you referring

5  to?

6  A     The day Chris went into the store.

7  Q     And you said you don't talk anymore.  Have you tried to

8  call your sister since that day?

9  A     I do.  I do.

10 Q     Does she answer your calls?

11 A     Sometimes.

12 Q     And sometimes --

13 A     She gets -- she's a little upset and she tells me

14 straight up because she's -- she's upset of the fact that --

15          MS. SHERMAN:  Objection.

16          THE COURT:  Sustained.

17          MS. McGRATH:  Mr. Harrison, no further questions.

18 Thank you.

19          THE COURT:  Thank you, Ms. McGrath.

20          Who is handling cross?

21          MS. SHERMAN:  That would be, Marissa Sherman.

22          THE COURT:  Ms. Sherman.

23          MS. SHERMAN:  Thank you.

24

25

1   CROSS-EXAMINATION

2   BY MS. SHERMAN:

3   Q    Good morning, Mr. Harrison.

4   A    Good morning.

5   Q    Now, Mr. Harrison, you testified on direct about the

6   extent of your cooperation in 2014 against Mr. Bantis,

7   correct?

8   A    Yes.

9   Q    And you participated in recorded conversations, correct?

10  A    Yes.

11  Q    And we just heard you testify that you spoke at his

12  sentencing; yes?

13  A    Yes.

14  Q    And you testified that you were notified that you were

15  going to get restitution in this case, correct?

16  A    Yes.

17  Q    From Mr. Bantis?

18  A    Yes.

19  Q    And that's money, essentially; yes?

20  A    I'm sorry?

21  Q    That's money, correct?

22  A    Yes.

23  Q    Okay.  And you also testified that the FBI helped you

24  financially with relocating, correct?

25  A    Yes.

G. HARRISON - CROSS - MS. SHERMAN                    144

1   Q    And they provided you over $12,000 with help in

2   relocating, correct?

3   A    I'm not sure of the dollar amount.

4   Q    But does around over $10,000 ring true to you?

5   A    Yes.

6   Q    Okay.  Now, you also testified on direct that your

7   financial situation changed in 2014, correct?

8   A    Yes.

9   Q    And that's when you began borrowing money from

10  Mr. Bantis?

11  A    Yes.

12          THE COURT:  I believe the testimony was 2013, wasn't

13  it?

14          MS. SHERMAN:  Oh, I apologize.

15  BY MS. SHERMAN:

16  Q    2013?

17  A    Yeah.

18  Q    Okay.  And part of your financial situation was that you

19  were gambling, correct?

20          MS. McGRATH:  Objection, Your Honor.

21          THE COURT:  Well, he didn't testify to any reason as

22  to what the problem was.

23          MS. SHERMAN:  Correct, he said his financial

24  situation changed.

25          THE COURT:  Changed.

1          MS. McGRATH:  Your Honor, I object to the question

2   that was asked.

3          THE COURT:  I know, but did you say that he

4   testified about gambling?

5          I thought you heard you say that.

6          MS. SHERMAN:  No.  I said:  You testified that your

7   financial situation changed, part of the reason your financial

8   situation changed is because you were gambling .

9          THE COURT:  Well, split the question up.

10          MS. SHERMAN:  Sure.

11          THE COURT:  We don't need the preface of why did he

12   testify.

13          MS. SHERMAN:  Okay.

14          THE COURT:  What was the cause of the change in your

15   financial situation in 2013.

16          MS. SHERMAN:  Sure.

17   BY MS. SHERMAN:

18   Q    The change -- part of the change of your financial

19   situation in 2013 was because you were gambling, correct?

20          MS. McGRATH:  And, Your Honor, we object to that

21   question.

22          THE COURT:  Overruled.

23   A    No.

24   Q    You were not gambling in 2013?

25   A    I had an on-the-job injury.

G. HARRISON - CROSS - MS. SHERMAN          146

1   Q     Okay.

2   A     Which caused me to have multiple illnesses.

3   Q     Correct.

4         And, again, part of the reason that your financial

5   situation changed is you were having -- you were gambling;

6   yes?

7   A     No.

8   Q     Okay.  Now, you testified on direct you changed your name

9   because you were scared of Mr. Bantis, correct?

10  A     Yes.

11  Q     Your cooperation with the FBI in Mr. Bantis's 2014 case

12  is not the time -- the first time you were an FBI informant,

13  correct?

14  A     Yes.

15  Q     Before you cooperated with the FBI in 2014, you were an

16  informant on a different case, right?

17        MS. McGRATH:  Objection, Your Honor.

18        THE COURT:  I am going to allow it.  Not far, that

19  may be the last question.  He cooperated on a different case.

20        MS. SHERMAN:  I don't think he answered the

21  question.

22  A     I'm sorry?

23  Q     You cooperated on another case with the FBI before

24  Mr. Bantis's case, correct?

25  A     Yes, I did.

147

1   Q    And as part of that case, you also participated in secret

2   recordings, correct?

3   A    Yes, I did.

4            MS. McGRATH:  Objection, Your Honor.

5            THE COURT:  Yes, this is the end of that line,

6   unless you have something you want to tell me.

7            MS. SHERMAN:  May we approach sidebar, Judge?

8            THE COURT:  Sure.

9            (Sidebar held outside the hearing of the jury.)

10

11           (Continued on the following page.)

12

13                SAM      OCR      RMR      CRR      RPR

14

15

16

17

18

19

20

21

22

23

24

25

sidebar                                          148

1              (The following sidebar took place outside the

2      hearing of the jury.)

3              MS. SHERMAN:  Judge, the prior cooperation efforts

4      go to a witness' motive and credibility and bias.  This is

5      another loansharking case that was done a couple of years

6      before this one.  He participated in secret recordings.  He

7      received restitution in the amount of $45,000.  That's what

8      was ordered.  It's the same U.S. Attorney's office, same

9      courthouse.

10              It all goes towards his motive and credibility in

11      terms of motivation to testify falsely.

12              MS. McGRATH:  Your Honor, insofar as we're concerned

13      about going into a sideshow with respect to the 2014 case,

14      certainly, going into a rabbit hole about an entirely

15      different case seems wholly inappropriate.

16              THE COURT:  So, we can cut right to the chase.

17              He participated in that case, the question is:

18              Were you an alleged victim in that case?

19              Did you get restitution?

20              MS. SHERMAN:  That's fair.

21              THE COURT:  Because it relates to his -- they are

22      free to make the argument to the jury that all of this is

23      because he was so successful in the other case.

24              MS. SHERMAN:  Yes.

25              MS. McGRATH:  Your Honor, those two questions that

sidebar                                                 149

1    you articulated seem fine to us.

2              Our concern is going into a rabbit hole about his

3    cooperation on an entirely different case with a defendant who

4    is not here.

5              MS. SHERMAN:  I was not intending to elicit any

6    information about the name of that person anything like that.

7              THE COURT:  Exactly.

8              MS. HIROZAWA:  I do think that the nature of the

9    charge being the same --

10             MS. SHERMAN:  Loansharking.

11             MS. HIROZAWA:  -- is relevant.

12             MS. OKEN:  I'm not sure how this speaks to the

13   witness' credibility.  His testimony is relevant for the

14   purpose of his providing assistance to law enforcement in this

15   case.

16             And I'm not sure of the relevance of a prior --

17             THE COURT:  They have a right to establish, if they

18   think they can, that he had a motive to provide the

19   information that he provided and that the information was not

20   truthful.

21             MS. OKEN:  But even assuming he did, that would not

22   undermine the defendant's guilt in any way.  He still provided

23   information to law enforcement.

24             MS. HIROZAWA:  The truthful portion.

25             MS. SHERMAN:  He's testifying about his credibility

sidebar                                      150

1    in this case.

2              THE COURT:  In this case.

3              MS. McGRATH:  Your Honor, has significantly

4    precluded us from proving up the -- certain of the facts from

5    the 2014 case, which we completely understand, by virtue of

6    concern about going into a sideshow.  And so, certainly

7    depending on --

8              THE COURT:  That's why it is going to be very

9    limited.

10             MS. SHERMAN:  I am asking those three questions that

11   we just laid out:  Victim, loansharking, restitution, that's

12   it.

13             THE COURT:  That's it.

14             MS. McGRATH:  Your Honor will just note we expect

15   there will be no further questions concerning additional

16   recorded conversations with respect to this other case, which

17   also seems --

18             THE COURT:  The other case?

19             MS. SHERMAN:  No.

20             MS. McGRATH:  The other case.

21             THE COURT:  Yes, no.

22             MS. SHERMAN:  I already asked that.

23             THE COURT:  That is definitely not going in.

24             (Sidebar concluded.)

25             (Continued on the following page.)

G. HARRISON - CROSS - MS. SHERMAN                    151

1              (In open court - jury present.)

2              MS. SHERMAN:  May I proceed?

3              THE COURT:  You may.

4              MS. SHERMAN:  Thank you.

5    CROSS-EXAMINATION (Continued)

6    BY MS. SHERMAN:

7    Q    And in that other case, the charge in which you were

8    cooperating was also loansharking, correct?

9    A    Yes, it was.

10   Q    And you were an alleged victim in that case as well,

11   correct?

12   A    Yes, I was.

13   Q    And as a result of that case, you -- there was an order

14   of restitution as well, correct?

15   A    Yes, there was.

16   Q    To be paid to you?

17   A    Yes, there was.

18   Q    Now, Mr. Harrison, the recordings that we listened to

19   during your direct were made in 2014, correct?

20   A    Yes.

21   Q    And Mr. Bantis's sentencing where you gave a statement,

22   that was in 2016, correct?

23   A    I believe so.

24   Q    And until you walked into court today, you had not seen

25   Mr. Bantis since 2016, correct?

G. HARRISON - CROSS - MS. SHERMAN                    152

1   A     That is -- that is correct.

2   Q     And you testified on direct about certain events that

3   were told to you by other people relating to your sister

4   Jessie's store, correct?

5   A     Yes.

6   Q     And, again, you were not present for any of those events,

7   correct?

8   A     That is correct.

9   Q     Now, you testified that one of the reasons you went to

10  the FBI back in 2014 is because you were worried about your

11  brother James, correct?

12  A     Yes.

13  Q     And one of the recordings we listened to was a call you

14  made to Mr. Bantis on May 14th of 2014, correct?

15  A     Yes.

16  Q     And during that call that we just listened to, you were

17  talking with Mr. Bantis about your brother James, correct?

18  A     Yes.

19  Q     And based on other conversations you had with Mr. Bantis,

20  you knew that Mr. Bantis believed James had left him a

21  threatening voicemail, correct?

22  A     Yes.

23

24             (Continued on the following page.)

25

G. HARRISON - CROSS - MS. SHERMAN                153

1    CROSS-EXAMINATION (Continued)

2    BY MS. SHERMAN:

3    Q    Based on other conversations you had with Mr. Bantis, you

4    understood that that voicemail contained threats against

5    Mr. Bantis' family, correct?

6    A    That is correct.

7    Q    Back in 2014 your brother James admitted to you that he

8    called Mr. Bantis and pretended to be somebody else, correct?

9    A    I don't know about him pretending to be somebody else.

10             MS. SHERMAN:  May I approach the witness, your

11   Honor?

12             THE COURT:  Sure.

13             MS. SHERMAN:  I'm going to ask that you read this to

14   yourself and when you're done reading it let me know.

15             (Witness reviewing document.)

16             THE COURT:  Identify the page, Ms. Sherman.

17             MS. SHERMAN:  3500-GH-1.

18             THE WITNESS:  Okay.

19   BY MS. SHERMAN:

20   Q    Does that refresh your recollection as to whether your

21   brother James admitted to you that he had called Mr. Bantis

22   pretending to be somebody else?

23             MS. McGRATH:  Objection, your Honor.

24             THE COURT:  I'll allow.

25   A    Yes.

G. HARRISON - REDIRECT - MS. McGRATH          154

1   Q    Thank you.

2        MS. SHERMAN:  One moment, please.  No further

3   questions.

4        Thank you, Mr. Harrison.

5        May I approach the witness just to take the piece of

6   paper back?

7        THE COURT:  Yes, you may.  Thank you, Ms. Sherman.

8        Ms. McGrath, any redirect?

9        MS. McGRATH:  Very briefly, your Honor.

10       THE COURT:  You may proceed.

11  REDIRECT EXAMINATION

12  BY MS. McGRATH:

13  Q    Mr. Harrison, on cross-examination defense counsel asked

14  you about your financial situation in 2013 and why it changed.

15  Do you remember that?

16  A    Yes.

17  Q    You responded that there was an on-the-work injury.  Do

18  you remember that?

19  A    Yes.

20  Q    Can you explain what you meant by that?

21  A    I got hit by a car while I was working.

22  Q    What, if any, impact did that have on your job situation?

23  A    I couldn't work no more.  So I was on home sick leave.

24  And while I was on home sick leave, I couldn't pick up the

25  garbage.  I was losing an additional $15,000 a year in extra

G. HARRISON - REDIRECT - MS. McGRATH         155

1   money.  So I couldn't -- and that came out to an extra couple

2   hundreds dollars a week in my paycheck that I couldn't make.

3   So I needed to borrow money to cover those expenses.

4        And my wife was constantly taking off of work to

5   bring me to medical appointments.  And she didn't have sick

6   hours, so she was taking off without pay on some of those

7   hours.

8   Q    You were also asked a number of questions about James

9   calling Chris Bantis pretending to be someone else.  Do you

10  remember that?

11  A    Yes.

12  Q    Were you ever present when James made one of these

13  alleged calls?

14  A    No.

15  Q    Did you hear about this from Chris Bantis?

16  A    I don't remember who I heard it from to be honest.

17  Q    Did Chris Bantis ever tell you why he wanted to kill your

18  brother James?

19  A    Yes.

20  Q    What did he say?

21  A    He had told me --

22        MS. SHERMAN:  Objection.  Beyond the scope of cross.

23        THE COURT:  No, it's not.  You may proceed.  You

24  asked about the call.

25  A    He had told me that -- I don't --

G. HARRISON - REDIRECT - MS. McGRATH      156

1          MS. McGRATH:  We're happy to withdraw the question.

2    That's all from the Government.  Thank you very much.

3          THE COURT:  Very good.

4          Ms. Sherman, any recross?

5          MS. SHERMAN:  No, your Honor.

6          THE COURT:  Then we've concluded with this witness.

7    We'll take a slightly longer mid-morning break and have a

8    chance to reconfigure the courtroom, let Mr. Harrison to leave

9    the courtroom.  It will be easier if you're more comfortable

10   in the jury liberation, so take that break.

11         I ask you again to not to speak amongst yourselves

12   or anyone else that you may run into in the back and continue

13   to keep an open mind.  We'll see you shortly.

14         (Jury exits the courtroom.)

15         MS. OKEN:  Can we clear the courtroom?

16         THE COURT:  The Court is in recess.

17         (Brief recess.)

18         THE COURTROOM DEPUTY:  All Rise.  Court is back in

19   session.  Counsel for both sides are present, including

20   defendant.

21         THE COURT:  Welcome back.  Are we ready to proceed?

22         MS. OKEN:  We are, your Honor.

23         MS. HIROZAWA:  Yes, your Honor.

24         THE COURT:  Who is handling the next witness?

25         MS. OKEN:  Ms. Oken for the Government.

*Rivka Teich CSR, RPR, RMR, FCRR*
*Official Court Reporter*

G. HARRISON - REDIRECT - MS. McGRATH          157

1           MS. HIROZAWA:  It depends on who the next witness

2      is.

3           MS. OKEN:  We'll be calling Andrew Rendeiro.

4           MS. HIROZAWA:  Ms. Sherman will be handling that.

5           (Jury enters the courtroom.)

6           THE COURT:  Be seated, please.  Counsel will

7      stipulate that the jury is present want properly seated.

8           MS. OKEN:  So stipulated by the Government.

9           MS. HIROZAWA:  So stipulated by the defense.

10          THE COURT:  Thank you, counsel.

11          Ladies and gentlemen, welcome back.  We're ready to

12     finish off our morning session.  Ms. Oken tells me she has

13     another witness.

14          MS. OKEN:  We do.  The Government calls Andrew

15     Rendeiro.

16          COURTROOM DEPUTY:  Raise your right hand.

17          (Witness takes the witness stand.)

18     **ANDREW RENDEIRO**, called as a witness, having been first duly

19     sworn/affirmed, was examined and testified as follows:

20          THE WITNESS:  Yes.

21          THE COURTROOM DEPUTY:  State and spell your full

22     name.

23          THE WITNESS:  Andrew Rendeiro.

24          THE COURT:  Ms. Oken, you may inquire.

25          MS. OKEN:  Thank you, your Honor.

A. RENDEIRO - DIRECT - MS. OKEN                    158

1    DIRECT EXAMINATION

2    BY MS. OKEN:

3    Q    Good morning.

4    A    Good morning.

5    Q    Were you subpoenaed to testify here today?

6    A    I was.

7    Q    What do you do for work, Mr. Rendeiro?

8    A    I work for a global not-for-profit called Vital

9    Strategies.

10   Q    Do you also practice criminal law?

11   A    I do.

12   Q    Do you practice criminal defense work?

13   A    I do.

14   Q    What kind of criminal cases have you handled?

15   A    I've been doing it for 30 years, I've handled cases from

16   the lowest level to murder cases.

17   Q    Repeat that one more time?

18   A    I've been a lawyer for over 30 years.  I've handled

19   shoplifting, I've handled murdered cases, up and down the

20   line.

21   Q    Are you familiar with Chris Bantis?

22   A    I am.

23   Q    How do you know Mr. Bantis?

24   A    How I do know Chris, Chris and I live in the same

25   neighborhood.  I've known him for about 20 years.  I

A. RENDEIRO - DIRECT - MS. OKEN                    159

1    represented him.  I met his family.

2    Q    Directing your attention to 2014 specifically, did you

3    represent Chris Bantis in connection with a criminal case?

4    A    I did.

5    Q    Were you appointed counsel or retained counsel?

6    A    Retained counsel.

7    Q    Can you tell us what it means to be retained counsel?

8             MS. HIROZAWA:  Objection.

9             THE COURT:  It's introductory.  Make it brief.

10   A    Retained counsel and appointed counsel are exactly the

11   same, except in a retained-counsel situation the client or the

12   family chooses the lawyer.

13   Q    At a high level, what kind of case was it that you

14   represented Mr. Bantis in this 2014?

15   A    I don't remember the exact charges, I think it had to do

16   with money, loan sharking.

17   Q    Did the Government produce discovery in connection with

18   that case?

19   A    Yes.

20   Q    Again, can you tell us as a general matter what is

21   discovery?

22   A    Generally discovery is I guess another word for evidence

23   to an extent.  It's paperwork, it's documents that the

24   Government has that they have to give to a person that they

25   accuse of a crime so they can have a fair opportunity to

A. RENDEIRO - DIRECT - MS. OKEN                    160

1   defend themselves.

2   Q    In connection with your work with your criminal defense

3   work specifically, what do you typically do when you receive

4   discovery?

5   A    Typically, typically I think I do it, all lawyers do, is

6   review it and discuss it with my client.

7   Q    Is it your typical practice to share it with clients?

8   A    If a client wants a copy of something, I'll give it to

9   them if they are allowed to have it.  If there are rules from

10  the Court saying they are not allowed to it, then I wouldn't

11  give it to them.  In Chris' case I don't remember if he wanted

12  any documents himself or not.

13  Q    Is it your usual practice to review discovery with your

14  clients?

15  A    Yes.  Again, I would always offer to review discovery

16  with a client.  But if a client doesn't want to be bothered,

17  then I don't force them.  They are grown ups.

18  Q    I'm going to show you, the witness only, your Honor, what

19  is marked Government Exhibit 22.

20       THE COURT:  You may.

21  A    You're going to have to do a little better with the

22  blurriness with this if you want me to read it or loan me

23  somebody's reading glasses.

24  Q    Do you see a stamp on this document on the right side?

25  A    I see it.

A. RENDEIRO - DIRECT - MS. OKEN                161

1    Q    Is that a stamp from the clerk's office?

2    A    It looks like it, yes.

3    Q    Does that stamp indicate this is it a certified or a true

4    copy of this document?

5    A    It's acknowledges that it's a true copy.

6         MS. OKEN:  We move to admit Government Exhibit 22

7    for pursuant to 902(f) as a self-authenticating document.

8         THE COURT:  Any objection?

9         MS. SHERMAN:  None other than the previously made

10   objections.

11        MS. OKEN:  May we publish Government Exhibit 22?

12        THE COURT:  Received.  You may publish.

13        (Government Exhibit 22, was received in evidence.)

14   BY MS. OKEN:

15   Q    What is the date on this letter?

16   A    July 29, 2014.

17   Q    Is Government 22 on letterhead?

18   A    It is.

19   Q    Whose letterhead is it on?

20   A    That's yours.

21   Q    Does that mean it's a prosecutor's office?

22   A    The United States Attorney's Office for the Eastern

23   District of New York.

24   Q    Taking a look at the content of this letter, what kind of

25   letter is it?

A. RENDEIRO - DIRECT - MS. OKEN                    162

1    A    Discovery letter.

2    Q    What case does it relate to?

3    A    U.S. vs. Chris Bantis.

4    Q    Do you see where it says:  Dear Mr. Rendeiro?

5         THE COURT:  And the docket number, Mr. Rendeiro?

6    A    It is 14 -- Ms. Oken, let's get that zooming in going

7    again.

8    Q    There we go.

9    A    14-388, then the judge's initials ENV.

10        THE COURT:  What that means, this was not produced

11   in connection with the case before you.  This was produced

12   only in connection with the previous case that you already

13   heard about where Mr. Rendeiro represented Mr. Bantis in 2014.

14   That's what that 14 signifies, that was the year that the

15   Indictment was issued by the Grand Jury.

16        MS. OKEN:  Thank you, your Honor.

17   BY MS. OKEN:

18   Q    Zooming back out.  First paragraph:  Dear Mr. Rendeiro.

19   Do you see where it says:  Dear Mr. Rendeiro?

20   A    Yes.

21   Q    Can you please read the first sentence after, Dear

22   Mr. Rendeiro?

23   A    Sure.  It says:  Enclosed please find the Government's

24   discovery in accordance with Rule 16 of the Federal Rules of

25   Criminal Procedure.  Government also requests reciprocal

A. RENDEIRO - DIRECT - MS. OKEN                    163

1   discovery from the defendant.

2   Q    Thank you.  Do you see the headline below that says

3   statement of the defendant?

4   A    I do.

5   Q    Can you please read that paragraph?

6   A    It says:  Enclosed please find one DVD marked disk one

7   containing statements of the defendant on one consensual audio

8   recordings made by individual referred to in the above caption

9   Indictment as John Doe.  And two voicemail recordings left by

10  the defendant for the individual referred to in the

11  Government's memorandum in support of the pretrial detention

12  docket number three as John Doe number two.

13  Q    Do you see there is a footnote reference in that

14  paragraph?

15  A    I see it.

16  Q    Can you zoom in on that footnote?  Is that reference to a

17  protective order in the case?

18  A    Yes.

19  Q    Was there in fact a protective order in the case?

20  A    Yes.

21  Q    Did that protective order permit the defendant to review

22  those recordings when in the presence of defense counsel?

23  A    I think so.  But that sounds like what it says; but it's

24  not in front of me right now.

25  Q    Would it refresh your recollection to look at it?

A. RENDEIRO - DIRECT - MS. OKEN                164

1    A    Yes.

2    Q    Let's show the witness only Government Exhibit 21.  I'll

3    direct your attention to the second to last paragraph on page

4    one.  This is just for the witness only.  Read that to

5    yourself Mr. Rendeiro.

6              (Witness reviewing document.)

7    A    Okay.

8    Q    Does that refresh your recollection --

9    A    Yes.

10   Q    -- as to whether the protective order permitted the

11   defendant to review those in the presence of counsel?

12   A    It does.

13   Q    Was this case ultimately resolved?

14   A    Yes.

15   Q    How was it resolved generally?

16   A    You want me to answer that?  I don't know -- I can tell

17   you he pled guilty to a charge, I don't know what charge it

18   was.

19   Q    That's all I'm looking for.  I'm going to show the

20   witness only Government Exhibit 26.  I'll direct your

21   attention to page one where it says transcript of criminal

22   cause for pleading.

23   A    Yes.

24   Q    Can you tell me what this document is?

25   A    It is the minutes of the plea.

A. RENDEIRO - DIRECT - MS. OKEN          165

1   Q    If we can show the witness the very last page, I believe

2   page eight, is there a certification that this transcript is a

3   true and accurate transcript?

4   A    Certified by the court reporter, yes.  I think.

5         MS. OKEN:  We move to admit Government Exhibit 26

6   pursuant to Rule 902.

7         THE COURT:  Any objection?

8         MS. SHERMAN:  None, other than previously made.

9         THE COURT:  Received in evidence.  You may publish.

10         (Government Exhibit 26, was received in evidence.)

11         MS. OKEN:  Thank you, your Honor.

12   BY MS. OKEN:

13   Q    Let's publish for the jury.  Look at page one of the top

14   left corner, is there a case caption?

15   A    Yes.

16   Q    Can you tell us what the case caption says?

17   A    United States of America versus Chris Bantis.

18   Q    Directing your attention to the right of the caption,

19   what is the date of this proceedings?

20   A    October 14, 2014.

21   Q    I'll direct your attention to page two.  If you could

22   look over this page and tell us who was present for this

23   proceeding?

24   A    So who is present is the court clerk, obviously the

25   judge, Kristen Mace, the prosecutor from your office,

A. RENDEIRO - DIRECT - MS. OKEN                    166

1    Mr. Tamborino, I don't know who that is, me, and Mr. Bantis.

2    Q    At a very high level, can you summarize for us what

3    happens at a change of plea hearing?

4    A    Generally?

5    Q    Generally.

6    A    Generally at a change of plea hearing, a person would

7    have previously entered a not guilty to the charges against

8    them, then negotiated a plea bargaining agreement with the

9    Government to end the case.  Then is brought back to court,

10   like a courtroom like this, with all the different people like

11   here, where they then acknowledge on the record that they are

12   withdrawing their previously entered not guilty plea and

13   replacing it with a guilty plea that summarizes an agreement

14   between the Government and themselves.

15   Q    Does something called an allocution typically happen at a

16   guilty plea?

17   A    Yes.

18   Q    Can you describe what is an allocution?

19   A    An allocution is when a person accused or charged with a

20   crime, whether innocent or not, changed their plea to a guilty

21   plea for whatever reason they are changing their plea to a

22   guilty plea, the judge asks them, and sometimes the prosecutor

23   asks them, about whether they know their rights that they are

24   giving up before they plea, and what the consequences of the

25   plea are, and whether they have doing this freely and

A. RENDEIRO - DIRECT - MS. OKEN                167

1   voluntarily, and maybe some of the things I forgot if you

2   would like to add.

3   Q    None at all.  I'll direct your attention to page five of

4   this document.  Do you see line ten where the Court says:  All

5   right?

6   A    All right.

7   Q    I'll ask you to read aloud the next four lines below

8   that.

9   A    I read the charge to you a few minutes ago, I want you to

10  tell me in your own words what happened between October 2013

11  and July 2014 in connection with this extension of credit to

12  John Doe.

13            That was from the judge.

14  Q    Let's look at the immediate response to that -- first

15  I'll ask you, did the defendant respond?

16  A    It appears so.  The court reporter wrote that he did.

17  Q    What did he say?

18  A    It says:  I loaned money to brothers James and George

19  with the understanding that violence could be used to collect

20  the payments.

21  Q    Let's turn now to page 24 of the transcript, which I

22  believe is either page five or six of this document.  I would

23  like to direct your attention to line six.  Who is speaking

24  there?

25  A    The prosecutor from your office, Kristen Mace.

A. RENDEIRO - DIRECT - MS. OKEN                168

1    Q    Can you read what she says from line six to 17?

2    A    Your Honor, I would like to clarify, John Doe that's

3    named in the Indictment, the defendants referred to two

4    different individuals that he made extensions of credit to, I

5    want to make clear for the record that John Doe is George.

6    I'll also ask that the Court seal that portion of the

7    transcript that refers to John Doe's name.  Also for clarity,

8    the individual who is John Doe is the person who is on a

9    recording that was provided in discovery to the defendant on

10   July 29, 2014.  And so I would just like to make that clear

11   who we're talking about for the record.

12              That was from Ms. Mace.

13   Q    Looking down to the next line, line 18, did the Court ask

14   whether that was correct?

15   A    Yes.  On line 18 the judge says:  Okay.  Is that correct,

16   Mr. Bantis?

17   Q    Did he respond and confirm that it was, correct?

18   A    I responded:  Yes.  Yes, your Honor.

19              And then there are more words I can't see.

20   Q    We'll zoom in on all of those final words.  Let's go to

21   the bottom.  Did Mr. Bantis also confirm that it was correct?

22   A    Yes.  So I answered the judge, I shouldn't have answered

23   the judge, the judge wasn't speaking to me, I answered any

24   way.

25              That's why I said:  Yes.  Yes, your Honor.  Oh, I'm

A. RENDEIRO - DIRECT - MS. OKEN          169

1    sorry.

2              The judge asked Mr. Bantis if that's correct.  He

3    said:  Yes, that's correct.

4              The judge said okay.

5              Mr. Bantis said:  Your Honor.

6              The judge said:  All right, counsel has confirmed.

7              I'm counsel, not him.

8    Q    Understood.  After Mr. Bantis pled guilty, was he

9    ultimately sentenced?

10   A    Yes.

11   Q    I'm going to show you what is in evidence as Government

12   Exhibit 24, middle of page one, can you tell us what this

13   document is?

14   A    Transcript of sentencing before Judge Vitaliano.

15   Q    Is there a date on it?

16   A    January 8, 2016.  Is that what it says?

17   Q    Let's take a closer look.

18   A    Yes.

19   Q    I'll direct your attention now to page two.  I'll again

20   ask you to take a look over and tell us who was present?

21   A    Sure.  You're ready?

22   Q    Ready when you are.

23   A    The clerk was present, I don't know which clerk it is.

24   Kristen Mace from your office is the prosecutor, a Probation

25   Officer Jennifer Fisher, who is physically present in the

1   courtroom, I'm there, judge is there.  It doesn't say anything

2   about Mr. Bantis being there, I'm guessing he was there as

3   well.

4   Q     Do you recall that he was there?

5   A     It's his sentencing, it's his party, I assume he's there.

6   Q     Let's take a look at page three.  Looking there, did any

7   victim or victims appear at the sentencing?

8   A     The person named George Harrison.

9   Q     Did Mr. Harrison speak at the sentencing?

10  A     Yes.  As I'm reading down further it says that

11  Mr. Harrison was making a statement.

12  Q     I'm going to direct your attention to page five of the

13  document, which I believe will be page six of the transcript.

14  Did the court inquire here about a presentence report?

15  A     Yes.  The judge asked if both sides received a copy of

16  the presentence report prepared by probation.

17  Q     At a very high level, can you explain for us what a

18  presentence report is?

19  A     So a presentence report is a report prepared by the

20  probation department that outlines a number of things about a

21  sentence that is coming up, including what the charges are,

22  but also things about the person being accused.  They talk

23  about that person's background, whether they have mental

24  health issues that may have led to some of this alleged

25  activity, various things that are offered to the judge so the

A. RENDEIRO - DIRECT - MS. OKEN                 171

1   judge can determine what an appropriate sentence is.

2   Q    I'll direct your attention to lines five and six.  Did

3   the Court ask you whether you had a full and fair opportunity

4   to review that report with Mr. Bantis?

5   A    He did.

6   Q    Did you respond?

7   A    I did.

8   Q    Can you tell us what you said?

9   A    I said:  Yes, your Honor, I have received it.  I mailed

10  him a copy.  I also sat with him read it and discussed and

11  reviewed with him.

12  Q    Having represented that you mailed him a copy, did you in

13  fact mail him a copy?

14  A    You're asking me if I remember mailing him a copy?  No.

15  But I said I mailed him a copy, so I must have mailed him a

16  copy.

17  Q    Would you have told the Court --

18  A    Lie to him?  No.

19  Q    I assume not.

20  A    No.

21  Q    Having represented that you read it and discussed it and

22  reviewed it with him, did you in fact read it and discuss and

23  review it with him?

24  A    Yes.

25  Q    I'll direct your attention to page six of Government

A. RENDEIRO - DIRECT - MS. OKEN                    172

1    Exhibit 24.  Do you see where Ms. Mace makes a statement on

2    this page?

3    A    Mine starts on line 19.

4    Q    Yes.

5    A    I see, Ms. Mace is speaking.

6    Q    Can you read what she says beginning at line 19?

7    A    Sure.  Ms. Mace speaking says:  My request is that an

8    additional condition be that the defendant, upon release, have

9    no contact with the victim or any member of the victim's

10   family, including the victim's brother, the victim's wife, the

11   victim's brother-in-law, any member of the victim's family,

12   the defendant should have no contact at all with.

13         The Court asks:  Are there any objections.

14   Q    Next page, I believe is page seven of the document, did

15   you respond?

16   A    I did.

17   Q    Can you read your response lines one through three?

18   A    I said:  No objection.  As long as the others are known

19   to the defendant.  Obviously no contact with this witness or

20   his family or the other witnesses and their family.

21   Q    When you say "this witness," were you referring to the

22   witness in the courtroom George Harrison?

23   A    I suspect I was, but I don't remember if I was referring

24   to him.  I assume he was still there.  I only saw half of one

25   page and quarter of another.

A. RENDEIRO - DIRECT - MS. OKEN            173

1   Q    We'll jump down to line nine and ten.  Can you read what

2   you said there?

3   A    My client understands that he will not have contact with

4   them.

5   Q    Did you take any steps before you made that

6   representation to the Court?

7   A    I don't remember; but by reading it, I can guess for you

8   what I did.

9   Q    I don't want you to guess.  But I suppose my question is,

10  when you told the Court my client understands and he will not

11  have contact with them, was that an accurate representation to

12  the Court?

13  A    I believe all my representations to the Court are

14  accurate.

15          THE COURT:  Do you have a pattern or practice that

16  you follow in connection with sentencing?

17          THE WITNESS:  Yes, it's called honesty.  I stick to

18  that.

19  Q    In your work as a criminal defense attorney, is it your

20  practice to review court filings with your client?

21  A    Yes, whenever a client would like a document of any type

22  reviewed, I will review it with them.

23  Q    You testified earlier about discovery that was produced

24  in this case.  We read on that discovery letter about

25  recordings, were those recordings ever mentioned in other

A. RENDEIRO - DIRECT - MS. OKEN                     174

1   court filings in the case?

2   A    I've got to guess the answer is yes; but I don't remember

3   exactly if they were.

4   Q    I certainly don't want you to guess, Mr. Rendeiro.  Let's

5   see if we can refresh your recollection.

6             Let's show the witness only two documents, the first

7   will be Government 20A.  Let's go to page two of this

8   document.  I'll direct your attention to the bottom of the

9   page, see if this refreshes your recollection?

10  A    I see it.

11  Q    Does that refresh your recollection about whether the

12  recordings were ever mentioned in court filings in the case?

13  A    It does.  And the answer is yes, the recordings were

14  mentioned in the Court filings in the case.

15  Q    Let's go back to page one of this document, Government

16  Exhibit 20A.  Do you see that same stamp on Government Exhibit

17  20A?

18  A    I do.

19  Q    Does that stamp indicate that this is a certified or true

20  copy?

21  A    True copy certified by the clerk.

22  Q    Let's show the witness only what is marked as Government

23  Exhibit 23A.  Does that have the same stamp?

24  A    It does.

25            MS. OKEN:  Your Honor, at this time we move to admit

A. RENDEIRO - DIRECT - MS. OKEN                175

1   Government Exhibit 23 and 23A pursuant to rule 902(4).

2           THE COURT:  Any objection?

3           MS. SHERMAN:  Only as to cumulative evidence, your

4   Honor.

5           THE COURT:  Received in evidence.

6           (Government Exhibit 23 & 23A, were received in

7   evidence.)

8   BY MS. OKEN:

9   Q    Let's pull up Government Exhibit 20A.  Mr. Rendeiro, what

10  is this document?

11  A    This document is a memorandum of law in support of a

12  pretrial detention order.

13  Q    Let's go to page two, if we can, of this document.  Do

14  you see paragraph A entitled extension collection and credit

15  John Doe number one?

16  A    I do.

17  Q    We won't make you read the whole paragraph aloud; but

18  read it over, and tell us generally what is described in this

19  paragraph.

20          (Witness reviewing document.)

21  A    This paragraph is making an accusation that Mr. Bantis

22  has a lucrative business loaning people money and charging

23  high interest rates.  It's an accusation from I'm not sure

24  who, listed as John Doe one, I don't see -- it does mention

25  that John Doe one said that he saw a hammer on the floor of an

A. RENDEIRO - DIRECT - MS. OKEN          176

1    automobile and a bat, I assume a baseball bat near a door.

2    But it doesn't -- it just shows what this other person is

3    saying, it doesn't show any other evidence of this thing

4    happening.

5              MS. OKEN:  Your Honor, in case I neglected to ask

6    earlier, may I publish this for the jury?

7              THE COURT:  You may.

8              MS. OKEN:  Thank you, your Honor.

9    BY MS. OKEN:

10   Q    Do you see the following paragraph that is entitled

11   threats to John Doe 2?

12   A    I see it.

13   Q    Does this paragraph list, or discuss rather, the

14   recording that I asked you about earlier?

15   A    It does.

16   Q    Let's publish for the jury 23A.  If you could read the

17   first sentence to yourself and then tell us what this document

18   is.

19              (Witness reviewing document.)

20   A    This document, 23A, looks like the Government's

21   sentencing memo to the judge.

22   Q    Directing your attention to the bottom of this page, do

23   you see the paragraph entitled:  The charged extortion?

24   A    I do.

25   Q    Taking a look over that paragraph, does that describe the

A. RENDEIRO - CROSS - MS. SHERMAN          177

1  conduct relating to loan shark victim listed as John Doe 1?

2  A    It looks like roughly the same words as the document we

3  just read.

4  Q    Looking now at page two of this document, do you again

5  see a paragraph threats to John Doe 2?

6  A    I see it.

7  Q    Does it contain similar content about the recordings we

8  saw earlier?

9  A    It's just repeating the same stuff again and again.

10 Q    Do you still practice criminal defense work today?

11 A    I do.

12        MS. OKEN:  One moment, your Honor.  Thank you, your

13 Honor, and Mr. Rendeiro, no further questions.

14        THE COURT:  Any cross?

15        MS. SHERMAN:  Yes, very briefly.

16 CROSS-EXAMINATION

17 BY MS. SHERMAN:

18 Q    Good afternoon, Mr. Rendeiro.

19 A    Nice to see you, Ms. Sherman.

20 Q    One question for you.  I want to pull up Government

21 Exhibit 24, which was just placed into evidence.  Turning to

22 page 24 of that document.  On direct the Government had you

23 read certain lines from the sentencing transcript, correct?

24 A    Yes.

25 Q    I'm going to ask that you read lines one through ten from

A. RENDEIRO - CROSS - MS. SHERMAN          178

1   that document, please?

2   A    I'm speaking:  No objection as long as the others are

3   known to the defendant.  Obviously no contact with this

4   witness or his family or the other witnesses and their family.

5          Judge asks:  Probation ordinarily will provide the

6   list.

7          Probation Officer said:  Yes.

8          Court then said:  With the assistance of the

9   Government.

10          The Government lawyer Ms. Mace said:  Yes.

11          Then I said:  My client understands and will not

12   have contact with them.

13   Q    Thank you and your understanding of the probation

14   providing the list was in reference to the people he was not

15   supposed to have contact with, correct?

16   A    Yes.  My understanding is that it had to be listed

17   specifically by probation or he would not have any way of

18   knowing who not to be in contact with.

19          MS. SHERMAN:  Thank you.  No further no questions.

20          THE COURT:  Ms. Oken, no redirect I assume?

21          MS. OKEN:  No redirect.

22          THE WITNESS:  Am I done, judge?

23          THE COURT:  I think so.  Thank you, Mr. Rendeiro.

24   I'll see you on the other table. You're excused.

25          (Whereupon, the witness was excused.)

PROCEEDINGS                            179

1              THE COURT:  Ms. Oken, do you a have a plan for us?

2              MS. OKEN:  It's shortly after 1:00 p.m. now, we

3      defer to the Court as to whether it's an appropriate time for

4      a lunch break.

5              THE COURT:  Normally we would, unless you're going

6      to promise me a five-minute witness, then maybe I'm tempted.

7              MS. OKEN:  It will be brief, but I can't promise

8      five minutes.

9              THE COURT:  Ladies and gentlemen, we're at a lunch

10     break, that's the good news.  The bad news is nobody is buying

11     you lunch.  There is a cafeteria of recent vintage, I can't

12     comment on it, here on the third floor of the courthouse.  Or

13     you're free to visit any of the local establishments that are

14     scattered about.  Those are the things that you can do.

15             There are other instructions that I told you from

16     the first day, those instructions are very important which is

17     why we continue to repeated them.  Some of them you heard

18     already today on a couple of occasions, which is not to

19     discuss the case amongst yourselves or with anyone else.  And

20     to continue to keep an open mind.

21             Because you're going out into the big world, we also

22     ask you to keep in mind that there is to be no communication

23     of any kind.  We're on radio silence.  No communication of any

24     kind by social media or whatever to the world to say that

25     you're coming here, that you are coming to the courthouse and

PROCEEDINGS                  180

1    that you're a juror, anything about the case, anything about

2    the personalities of those who appeared before you, and to the

3    extent that there may be something in the media which includes

4    social media about the case, I direct you to totally disregard

5    any of that commentary.  And urge you to tune out commentary

6    about any kind of case for fear that it might confuse you

7    about what your responsibilities are in this case.

8              We will excuse you.  We ask you to come back to the

9    jury room around two, 2:15.  We'll get started soon thereafter

10   as we can.

11             We appreciate your service, your sacrifice, and look

12   forward to you all enjoying a good lunch.  We'll see you

13   afterwards.

14             (Jury exits the courtroom.)

15             THE COURT:  We will take our lunch break.  Our

16   general rules from pre-COVID remain the same.  You're free,

17   counsel, to leave anything here.  William will be locking up

18   the courtroom.  The corollary to that is, if there is

19   something you might need during the lunch break then please

20   take it with you; you won't be able to get back in.

21             Is there anything we need to attend to,

22   housekeeping-wise, before we break?

23             MS. OKEN:  Not at this time, your Honor.

24             MS. HIROZAWA:  No, your Honor.

25             THE COURT:  Everybody enjoy your lunch.  William

PROCEEDINGS                                    181

1    will lock up.  We'll see you around 2:15 or so.

2              (Lunch recess.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                                        182

1                    A F T E R N O O N   S E S S I O N

2              (Time noted:  2:15 p.m.)

3              (In open court; Jury not present.)

4              THE COURTROOM DEPUTY:  All rise.

5              THE COURT REPORTER:  Court is now back in session.

6    Counsel for both sides present, including the defendant.

7              THE COURT:  Are we ready to go?

8              MS. OKEN:  Yes, Your Honor.

9              MS. SHERMAN:  Sorry.  Judge, sorry, just briefly to

10   address one of the issues we discussed this morning in terms

11   of impeachment.

12             We understand Your Honor's ruling about the

13   transcripts.  I do think we have a couple of discrepancies

14   which we were not able to necessarily get transcribed over the

15   lunch break.

16             But I also just want to bring the Court's attention

17   to a case which indicates that extrinsic evidence of an

18   inconsistent statement is permitted.  And this is quoting from

19   a case at the bottom, there's a Second Circuit quote here.

20             The government is correct that the *United States*

21   *versus Strother,* S-T-R-O-T-H-E-R, which otherwise appears to

22   address the issue within this circuit contains factual

23   distinctions to the case at hand, however, the Second Circuit

24   also makes clear that extrinsic evidence of a prior

25   inconsistent statement is more persuasive to a jury than a

PROCEEDINGS

183

1    witness' acknowledgment of inconsistencies in a prior

2    statement.  With internal citations.

3            And so I think that if we -- if it comes time to

4    impeach the witness, I ask if the prior statement was made.

5    She agrees the prior statement was made, that's it, we're

6    done.  We understand that.

7            But if she disagrees, we believe the Second Circuit

8    has held that extrinsic evidence of that statement is

9    permitted.  And I do think it is a different situation when

10   there's body camera footage, which has not always been

11   available to the courts, and is actual evidence of her making

12   the statement that the jury would be able to hear.

13           And again, it's not hearsay, it's not coming in for

14   the truth, it's coming in simply as a prior inconsistent

15   statement.  So we would renew our request if there is an

16   inconsistency that she denies that we be able to play the body

17   camera footage.

18           THE COURT:  I renew my ruling.  We're not playing

19   the body camera language.

20           Are we ready?

21           MS. OKEN:  Yes, Your Honor.

22           And for the Court's awareness after we bring the

23   jury in, I think the first thing the government intends to do

24   prior to calling the first witness is to read a stipulation

25   into the record.

PROCEEDINGS                            184

1            (Pause in the proceedings.)

2            (Jury enters the courtroom.)

3            THE COURT:  Be seated, please.

4            Counsel will stipulate that the jury is present and

5    properly seated.

6            MS. OKEN:  The government so stipulates, Your Honor.

7            MS. HIROZAWA:  So stipulated.

8            THE COURT:  Thank you.

9            Ladies and gentlemen, welcome back.  I hope you

10   enjoyed your lunch.  We're ready to resume the trial in our

11   afternoon session.

12           And, Ms. Oken, we're still on your case, so where

13   are we going next?

14           MS. McGRATH:  Yes, Your Honor, this is Tara McGrath

15   for the government.

16           At this time we'd just like to read in a stipulation

17   and move in some evidence, and then we'll call our next

18   witness.

19           Would your deputy mind helping me turn on the ELMO?

20           THE COURTROOM DEPUTY:  Sure.

21           THE COURT:  The ELMO is that contraption over there.

22           MS. McGRATH:  Yes.

23           So at the close of our last trial day, we had read

24   stipulation marked Government Exhibit 1016 but neglected to

25   move it in.  So we'd like to move it in at this time.

PROCEEDINGS                          185

1          THE COURT:  I think we did.

2          But no objection, Ms. Hirozawa?

3          MS. HIROZAWA:  No objection, Your Honor.

4          MS. McGRATH:  And we'd also like to move in

5    Government Exhibit 283, which I understand is covered by the

6    stipulation as well.

7          THE COURT:  No objection?

8          MS. HIROZAWA:  No objection.

9          THE COURT:  Both exhibits are received in evidence

10   without objection.

11         (Government Exhibit 1016, was received in evidence.)

12         (Government Exhibit 283, was received in evidence.)

13         MS. McGRATH:  And I'll just read another stipulation

14   that the parties have.

15         It is hereby stipulated and agreed, by and between

16   the undersigned parties, that Government Exhibit 300 is a true

17   and accurate audio recording of the 9-1-1 call received by the

18   New York City Police Department on August 31st, 2021, at

19   approximately 10:42 a.m., Eastern Standard Time, from the

20   phone number (718)775-8471.

21         Government Exhibit 301 is a true and accurate audio

22   recording of the 9-1-1 call received by the New York City

23   Police Department on September 8th, 2021 at approximately

24   11:32 a.m., Eastern Standard Time, from phone number

25   (718)775-8471.

PROCEEDINGS                                    186

1          Government Exhibit 302 is a true and accurate audio

2   recording of the 9-1-1 call received by the New York City

3   Police Department on September 9th, 2021, at approximately

4   11:06 a.m., Eastern Standard Time, from phone number

5   (718)775-8471.

6          Government Exhibit 303 is a true and accurate audio

7   recording of the 9-1-1 call received by the New York City

8   Police Department on September 9th, 2021, at approximately

9   11:10 a.m., Eastern Standard Time, from the phone number

10  (347)206-5746.

11         Government Exhibits 300 through 303 were collected

12  from data retrieved from the computer archive system of the

13  New York Police Department, were created by a person with

14  knowledge of or created from information transmitted by a

15  person with knowledge of the information shown, were created

16  at or near the time the information became available to the

17  New York City Police Department, and were created and

18  maintained by the New York City Police Department as part of

19  its regularly conducted business activities.

20         The transcripts of Government's Exhibits 300 through

21  303, which are marked Government Exhibit 300T through 303T,

22  are true and accurate transcripts of those recordings.

23         This stipulation which has been marked as Government

24  Exhibit 1010 is admissible in evidence at trial.

25         And, Your Honor, I would now move Government

PROCEEDINGS                                    187

1    Exhibit 1010 into evidence.

2              THE COURT:  I just have one inquiry.  I assume that

3    the times you gave were Eastern Time in effect at the time?

4              MS. McGRATH:  Yes, Your Honor.

5              THE COURT:  Not Eastern Standard Time?

6              MS. McGRATH:  Apologies, Your Honor, yes, Eastern

7    Time at the time in question whether it be Eastern Standard or

8    Eastern Daylight.

9              THE COURT:  So it was actually Daylight Savings Time

10   I think.  But it would have been the time that would have

11   appeared on everybody's clocks.  The 9:00, if everyone were

12   looking their watch, is the 9:00 you're talking about?

13             MS. McGRATH:  Yes, Your Honor.

14             THE COURT:  Ms. Hirozawa, do you agree?

15             MS. HIROZAWA:  Yes, Your Honor.

16             THE COURT:  With that understanding, any objection

17   to the exhibit being received?

18             MS. HIROZAWA:  No objection.

19             THE COURT:  So those exhibits -- stipulation of

20   those exhibits are received in evidence.

21             MS. McGRATH:  Thank you, Your Honor.

22             At this time the government calls its next witness,

23   Jessica Harrison.

24             (Government Exhibits 300 through 303, were received

25   in evidence.)

PROCEEDINGS                              188

1              (Government Exhibits 300T through 303T, was received

2      in evidence.)

3              (Government Exhibit 1010, was received in evidence.)

4              THE COURTROOM DEPUTY:  Stand right there please.

5      Please raise your right hand.

6              THE WITNESS:  I do.

7              THE COURTROOM DEPUTY:  Please state your first and

8      last name and spell it for the record.

9              THE WITNESS:  Jessie, J-E-S-S-I-E.  The last name is

10     Harrison, H-A-R-R-I-S-O-N.

11             THE COURTROOM DEPUTY:  All right.  Thank you.

12             (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

J. HARRISON - DIRECT - MS. McGRATH                189

1           (Witness takes the witness stand.)

2      **JESSICA HARRISON,** called as a witness, having been first duly

3      sworn, was examined and testified as follows:

4              THE COURT:  Please speak directly into the mic,

5      Ms. Harrison, and Ms. McGrath you may inquire.

6              MS. McGRATH:  Thank you, Your Honor.

7      DIRECT EXAMINATION

8      BY MS. McGRATH:

9      Q    Ms. Harrison, were you subpoenaed to testify here today?

10     A    Yes, I was.

11     Q    How old are you?

12     A    I'm 34.

13     Q    Where did you grow up?

14     A    Dyker Heights, Brooklyn.

15     Q    And in what neighborhood do you currently live?

16     A    Borough Park.

17     Q    Are you engaged?

18     A    Yes.

19     Q    What's your fiancé's name?

20     A    Eric.

21     Q    Do you have any siblings?

22     A    Yes, I do.

23     Q    How many?

24     A    I have four sisters and two brothers.

25     Q    And what are their names?

J. HARRISON - DIRECT - MS. McGRATH          190

1   A     My sisters are Christine, Donna, Ann and Lisa.  And my

2   brothers are James and George.

3   Q     Of your siblings, who's the youngest?

4   A     I'm the youngest.

5   Q     What's the approximate age gap between you and George?

6   A     Well, he's 50 years old and I'm 34, so it's 16 years.

7   Q     Are you familiar with an individual named Chris Bantis?

8   A     Yes.

9   Q     Have you seen him before?

10  A     Yes.

11  Q     Would you recognize him if you saw him again?

12  A     Yes.

13          MS. McGRATH:  Your Honor, we would ask that you

14  request everyone in the courtroom to briefly lower their

15  masks.

16          THE COURT:  Yes, please, just for this moment you

17  may lower your masks.

18  Q     And, Ms. Harrison, do you see Chris Bantis in the

19  courtroom now?

20  A     Yes, I do.

21  Q     Can you identify where he is sitting?

22  A     Would you like me to point to him?

23  Q     Sure.

24  A     (Witness complying.)

25  Q     And can you identify an article of clothing he's wearing?

J. HARRISON - DIRECT - MS. McGRATH          191

1   A    Looks like a navy blue jacket.

2         MS. McGRATH:  Your Honor, let the record reflect the

3   witness has identified the defendant.

4         THE COURT:  The record will so reflect.

5   Q   We'll get into this in greater detail, but at a very high

6   level --

7         THE COURT:  Of those who wish to raise their masks,

8   they are free to do so.

9   Q    And again at the very high level, approximately when was

10  the last time you saw the defendant?

11  A    The last time I seen him was the day he got arrested.

12  Q    And approximately when was that?

13  A    That was in September of 2021.

14  Q    And again at a very high level, what was the defendant

15  doing the last time you saw him?

16  A    He was threatening me.

17  Q    Where were you when this happened?

18  A    I was outside my store.

19  Q    We'll discuss that in a lot more detail later, but first

20  I want to get into a bit more background.

21        You referenced a store.  What do you for work?

22  A    I own a toy store.

23  Q    What is your role in the store?

24  A    I'm the owner.

25  Q    And what type of things do you sell there?

J. HARRISON - DIRECT - MS. McGRATH          192

1   A     Sports cars, toys and comic books.

2   Q     What is the name of the store?

3   A     E&J Boutique.

4   Q     And how long have you been an owner of E&J Boutique?

5   A     Almost eight years.

6   Q     Where is E&J Boutique located?

7   A     The current address is 6906 Fort Hamilton Parkway,

8   Brooklyn, New York 11218.

9   Q     What neighborhood is that in?

10  A     That's in Dyker Heights, Brooklyn.

11  Q     Prior to its current location, where was E&J located?

12  A     Directly across the street from where it's located now on

13  the corner.  7001 Fort Hamilton Parkway, Brooklyn, New York

14  11218.

15  Q     Approximately how long was the store located at 7001 Fort

16  Hamilton Parkway?

17  A     Five years.

18  Q     And when did the store move from the old location to the

19  new location?

20  A     It moved about 16 months ago from now.

21  Q     I'm going to --

22        MS. McGRATH:  I'd like to show just the witness

23  what's marked as Government Exhibits 105, 106 and 107.

24        They should flash on your screen in front of you one

25  at a time.

J. HARRISON - DIRECT - MS. McGRATH          193

1              (Exhibit published to the witness.)

2    Q    Did you see those?

3    A    It's coming up.  It says "searching."

4    Q    105, 106 and then 107.

5              (Exhibit published to the witness.)

6    Q    Do you recognize those?

7    A    Yes, I do.

8    Q    What are they?

9    A    That was my previous location of the store.

10   Q    Do they appear to be true and accurate depictions of your

11   store when it was located at 7001 Fort Hamilton Parkway?

12   A    Yes, they do.

13             MS. McGRATH:  Your Honor, at this time we'd move

14   them in and publish them for the jury.

15             THE COURT:  Any objection?

16             MS. HIROZAWA:  No objection.

17             MS. SHERMAN:  No objection.

18             THE COURT:  Received without objection.

19             (Government Exhibits 105, 106 and 107, were received

20   in evidence.)

21             MS. McGRATH:  Ms. Moosher, if you wouldn't mind

22   please start with 105.

23             And 106.

24             (Exhibit published.)

25             And 107.

J. HARRISON - DIRECT - MS. McGRATH                    194

1                (Exhibit published.)

2     Q    And just looking at 107, what cross street appears here?

3     A    That's the corner of 70th Street and Fort Hamilton

4     Parkway.

5                MS. McGRATH:  I'm now showing just the witness

6     what's been marked as Government Exhibit 108 and 117.

7                (Exhibit published to the witness.)

8     Q    Do you recognize those?

9     A    Yes, I do.

10    Q    What are they?

11    A    My current location of my store.

12    Q    Do they appear to be true and accurate depictions of

13    current location of your store?

14    A    Yes.

15               MS. McGRATH:  Your Honor, we move those in and ask

16    to publish to the jury.

17               THE COURT:  Any objection?

18               MS. HIROZAWA:  No objection.

19               THE COURT:  Received without objection, and you may

20    publish.

21               (Government Exhibits 108 and 117, were received in

22    evidence.)

23               (Exhibit published.)

24               MS. McGRATH:  And, Ms. Moosher, just moving to the

25    next one.

J. HARRISON - DIRECT - MS. McGRATH          195

1          I'm now going to show just the witness what's marked

2    as Government Exhibit 118.

3          (Exhibit published to the witness.)

4    Q    Do you recognize this?

5    A    Yes, I do.

6    Q    What is it?

7    A    That's Jimmy's Deli & Grill.

8    Q    Does it appear to be a true and accurate depiction of

9    Jimmy's Deli & Grill?

10   A    Yes.

11          MS. McGRATH:  Your Honor, we'd like to move 118 into

12   evidence and publish it for the jury.

13          THE COURT:  Any objection?

14          MS. SHERMAN:  No objection.

15          THE COURT:  Received in evidence without objection.

16          (Government Exhibit 118, was received in evidence.)

17          (Exhibit published.)

18          MS. McGRATH:  And again showing just the witness

19   what's been marked as Government Exhibit 115, 119, 122 and

20   125.  They should just flash before you on the screen.

21          (Exhibit published to the witness.)

22   Q    Do you recognize these?

23   A    Yes, I do.

24   Q    What are they?

25   A    Those are businesses on the same avenue as mine.

J. HARRISON - DIRECT - MS. McGRATH                196

1   Q     Do they appear to be true and accurate photos of those

2   businesses?

3   A     Yes.

4           MS. McGRATH:  Your Honor, we'd offer these into

5   evidence and ask to publish.

6           THE COURT:  Any objection?

7           MS. HIROZAWA:  No objection.

8           MS. McGRATH:  Ms. Moosher, if we could just turn --

9           THE COURT:  They're received in evidence without

10  objection.

11          MS. McGRATH:  Thank you, Your Honor.

12          (Government Exhibits 115, 119, 122 and 125, were

13  received in evidence.)

14          MS. McGRATH:  If we can turn to Government

15  Exhibit 115.

16          (Exhibit published.)

17  Q     Ms. Harrison, what's depicted here?

18  A     That's the Parkway Flower Shop.

19  Q     What side of the block is this on in relation to your

20  current store location?

21  A     It's on the exact same side of the street as mine.

22  Q     And just turning to Government Exhibit 119, what is

23  depicted here?

24  A     That's Sancho Pancho's Bakery.

25  Q     What side of block is it on in relation to your current

J. HARRISON - DIRECT - MS. McGRATH            197

1   location?

2   A    It's the opposite side of the street directly across from

3   me.

4   Q    And what's located to the right of Sancho Pancho Bakery?

5   A    It's Auspicious Flowers, the flower shop.

6   Q    Do you see an awning in this photograph directly to the

7   right of Sancho Pancho Bakery?

8   A    That's the laundromat.

9   Q    Turning to Government Exhibit 122.

10           What is depicted here?

11  A    The nail salon.

12  Q    And what side of the block is this on in relation to E&J?

13  A    The opposite side of the street.

14  Q    Finally turning to Government Exhibit 125.

15           What is depicted here?

16  A    Auspicious flower shop.

17  Q    And what side of the block is this on in relation to E&J?

18  A    It is the opposite side of the street of mine.

19  Q    Okay.  So we're now going to show you, just the witness,

20  what's been marked as Government Exhibits 109 through 114.

21           And then 127 to 128.

22           (Exhibit published to the witness.)

23  Q    Ms. Harrison, do you recognize these?

24  A    Yes, I do.

25  Q    What are they?

J. HARRISON - DIRECT - MS. McGRATH          198

1   A    That's the avenue my store is located on.

2   Q    And these other photographs, are they also depicting the

3   street your store is located on?

4   A    Yes.

5         MS. McGRATH:  Your Honor, we offer these into

6   evidence and would ask permission to publish.

7         THE COURT:  Any objection?

8         MS. SHERMAN:  No objection.

9         THE COURT:  Received without objection and you may

10  publish.

11        (Government Exhibits 109 to 114, were received in

12  evidence.)

13        (Government Exhibits 127 to 128, were received in

14  evidence.)

15        (Exhibit published.)

16        MS. McGRATH:  Ms. Moosher, can we turn to Government

17  Exhibit 109?

18  Q    What is depicted here?

19  A    My previous store location.

20  Q    And what cross street are we looking at?

21  A    70th Street and Fort Hamilton Parkway.

22  Q    And what, if anything, was located across the street from

23  your old store location?

24  A    There was a Slovakian restaurant across the street.

25  Q    Is it still open?

J. HARRISON - DIRECT - MS. McGRATH          199

1    A    They closed down.

2    Q    Approximately when did they close?

3    A    I would say about six weeks ago they closed down.

4    Q    And looking at -- turning to Government Exhibit 110, what

5    is depicted here?

6    A    The furniture store.

7    Q    And to the extent you can see E&J Boutique in this photo,

8    could you, just using your finger, circle it on the screen in

9    front of you?

10   A    Sure.

11         (Witness complying.)

12   Q    And to the extent you can see Parkway Flower Shop in this

13   photo, can you just circle it on your screen?

14   A    Yes.

15         (Witness complying.)

16   Q    And turning to Government Exhibit 111, is E&J Boutique

17   visible?

18   A    Yes.

19   Q    What street is depicted to the right of this photo?

20   A    On the right is Bay Ridge Avenue and Fort Hamilton

21   Parkway.

22   Q    Turning to Government Exhibit 112, to the extent you can

23   see Auspicious Florist in this photo, can you please use your

24   finger and circle on the screen in front of you?

25   A    Yes.

J. HARRISON - DIRECT - MS. McGRATH          200

1               (Witness complying.)

2    Q    What street is depicted to the right of this photo?

3    A    70th Street and Fort Hamilton Parkway.

4    Q    And so finally turning to Government Exhibit 113, to the

5    extent you can see Sancho Pancho Bakery in this photo, can you

6    please circle it on your screen?

7    A    Yes.

8               (Witness complying.)

9    Q    And to the extent you can see Jimmy's Deli & Grill, can

10   you circle it?

11   A    Yes.

12              (Witness complying.)

13              MS. McGRATH:  Thank you, Ms. Harrison.

14              Ms. Moosher, you can take that down.

15   Q    So now we want to ask -- to discuss a bit more about E&J

16   Boutique.

17              So directing your attention to the summer and fall

18   of 2021, what were the store hours for E&J Boutique?

19   A    We were open 11 to 7, Tuesday through Sunday and we were

20   closed on Monday.

21   Q    And that same time period, who worked in the store?

22   A    I worked in the store.  My fiancé Eric worked in the

23   store.  My nephew Andrew.  And at the time I had an employee

24   named Cliff and sometimes Blake.

25   Q    Did any other family members work in the store?

J. HARRISON - DIRECT - MS. McGRATH                 201

1    A    For a very brief period of time my nephew Anthony did.

2    We tried to give him a job at that point.

3    Q    In that same time period were shifts divided?

4    A    Yes.

5    Q    How so?

6    A    So my husband -- well, fiancé and I, we worked Tuesdays

7    from 11 to 7.

8              My nephew Andrew worked Wednesday through Sunday

9    from 11 to 7.  And then we would put him on with either Cliff,

10   Blake or at the time Anthony.

11   Q    Would anyone come in on Monday?

12   A    Sometimes I would come in on Monday to pack packages that

13   I would have orders for.

14   Q    How would you start an average workday?

15   A    So an average workday for me I would open up the gate,

16   walk inside, bring the broom and dust pan and go outside and

17   sweep.  After I was done sweeping, I would bring the garbage

18   inside and start my workday.

19   Q    Approximately what time would you arrive?

20   A    Any time between 10:20 and 10:40 in the morning.

21   Q    You referenced "sweeping."  Why would you sweep?

22   A    I would sweep all the time because I couldn't afford to

23   get another ticket.

24   Q    And why would not sweeping result in a ticket?

25   A    Sanitation would come around every day to check the

J. HARRISON - DIRECT - MS. McGRATH            202

1    sidewalks to make sure there wasn't any litter in front of the

2    businesses.

3    Q    Where would you sweep?

4    A    I would sweep directly in front of my store.

5    Q    In the summer and fall of 2021, did E&J Boutique have

6    external security cameras?

7    A    No, we did not.

8    Q    You testified earlier that you were familiar with

9    defendant Chris Bantis.

10          Approximately when did you first put a face to the

11   name Chris Bantis?

12   A    After he got into an argument with my brother.

13   Q    And where was the store located when that happened?

14   A    6906 Fort Hamilton Parkway, Brooklyn, New York 11228.

15   Q    Before you put a face to the name, had you heard the name

16   Chris Bantis before?

17   A    Yes, I had.

18   Q    Approximately how old were you when you first heard the

19   name?

20   A    I was just a kid when I first started hearing about him.

21   Q    At that time, how much, if anything, did you know about

22   Chris Bantis' history with your family members?

23   A    I didn't know enough.  I just knew he was dangerous

24   because my brother would always tell me.  He was always

25   dangerous.  My brother would tell me.

J. HARRISON - DIRECT - MS. McGRATH          203

1          THE COURT:  That's what you knew?

2          THE WITNESS:  Yeah.

3          THE COURT:  Not of your own knowledge.

4          THE WITNESS:  No, I knew my brother had -- well, I

5   don't know if I'm allowed to speak but --

6          THE COURT:  Just the answer was, no, not of your own

7   knowledge.

8          THE WITNESS:  No, not of my own knowledge.

9   BY MS. McGRATH:

10  Q    Before you put a face to the name Chris Bantis, had you

11  seen him before?

12  A    Yes, I have.

13  Q    Have you seen him on more than one occasion?

14  A    Yes, I have.

15  Q    Were any of those occasions when you were at E&J

16  Boutique?

17  A    Yes, they were.

18  Q    For the first time you saw Chris Bantis when you were at

19  E&J Boutique, where was the store located?

20  A    7001 Fort Hamilton, Parkway, Brooklyn, New York 11228.

21  Q    Approximately how many times did you see the defendant

22  when you were at that old location?

23  A    I seen him many times.

24  Q    Do you know the exact day and month of those occasions?

25  A    I do not.

1   Q     Do you have a recollection of the general chronology of

2   those occasions?

3   A     I do not.

4   Q     Do you recall the first time you saw Chris Bantis when

5   you were at the old E&J Boutique location?

6   A     Yes.

7   Q     What, if anything, did you observe him do?

8   A     The first time I seen him there, he came into my store

9   and actually purchased something.

10  Q     What did he purchase?

11  A     A pinkie ring.

12  Q     When was the next time you saw Mr. Bantis at the old E&J

13  location?

14  A     I saw him -- I saw him peeking in my windows, my front

15  windows.

16  Q     And how long was that in relation to the purchase of the

17  pinkie ring?

18  A     That was a couple of weeks later.

19  Q     Did he enter the store at that time?

20  A     He did not.

21  Q     Did he say anything to you?

22  A     He did not.

23  Q     When was the next time you saw Chris Bantis at the old

24  E&J Boutique location?

25  A     Again, I seen him standing at the windows.

J. HARRISON - DIRECT - MS. McGRATH                    205

1    Q    And after that?

2    A    I seen him across the street at George's Souvlaki.

3    Q    What, if anything, did you observe him doing?

4    A    He would sit outside George's Souvlaki daily just staring

5    at my store.

6    Q    Did he have food in front of him?

7    A    He did not.

8    Q    What was he wearing?

9    A    A velour jumpsuit most of the time.

10   Q    What were you doing when you saw him?

11   A    I was sweeping.

12   Q    Did you tell anyone about your observations?

13   A    I did.

14   Q    Who did you tell?

15   A    I told my older brother George.

16   Q    What, if anything, did you tell George about it?

17   A    I told George that there was a guy standing across the

18   street.

19              MS. SHERMAN:  Objection.

20              THE COURT:  Ms. Sherman, did you have an objection?

21              MS. SHERMAN:  I did, yes, Judge, before --

22              THE COURT:  I did not hear you.

23              MS. SHERMAN:  Yes, I was objecting to the answer.

24              THE COURT:  What was the question?

25              MS. SHERMAN:  Sure.  Calling for hearsay.

J. HARRISON - DIRECT - MS. McGRATH          206

1          THE COURT:  I totally lost the question.  Why don't

2  we have a sidebar.

3          (Continued on the next page.)

4          (Sidebar conference.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                              207

1              (The following occurred at sidebar.)

2              THE COURT:  Okay, the government has an exception.

3              MS. McGRATH:  These are her present sense

4    impressions.  She's on the telephone and she is speaking to

5    her brother.

6              THE COURT:  But she's communicating to her brother?

7              MS. McGRATH:  She is, Your Honor.

8              THE COURT:  So I don't see that.  If she can tell us

9    here, you have to tell me why the communication to her brother

10   is significant.  And then maybe you can tell me.

11             MS. McGRATH:  We will elicit after that what his

12   reaction was and whether he explained that to her.

13             MS. OKEN:  And, Your Honor, additionally in order to

14   connect to what the brother knew, so proof of what the

15   brother's knowledge was.  So her testimony here today would be

16   for the truth.  So she would convey to the jury directly

17   that's what it would be through and then the repeating

18   statement to the brother, which is before the brother's

19   knowledge as opposed to the inherent truth of that statement.

20             THE COURT:  So you're saying that you want her --

21   this is being offered to show that George knew, had this --

22             MS. OKEN:  Exactly.

23             THE COURT:  And then the fact that George had that

24   knowledge is relevant to what?

25             MS. OKEN:  Related to law enforcement as George

SIDEBAR CONFERENCE                    208

1   testified to this morning.

2            THE COURT:  I'm losing the time.  When is this, in

3   relation to 2014?

4            MS. OKEN:  No, this is the charged time period

5   beginning in 2018.

6            THE COURT:  Okay.  And then George then relates that

7   to the --

8            MS. OKEN:  To law enforcement, yes.

9            MS. SHERMAN:  Judge, George already testified this

10  morning as to what the information he relayed.  I'm not sure

11  why this witness has to then repeat what his knowledge was, he

12  already testified to it.  So just seems to be replicating it.

13           THE COURT:  For that reason I will allow it.

14           MS. OKEN:  Thank you, Your Honor.

15

16           (End of sidebar conference.)

17           (Continued on the next page.)

18

19

20

21

22

23

24

25

J. HARRISON - DIRECT - MS. McGRATH                209

1   DIRECT EXAMINATION (Continued)

2   BY MS. McGRATH:

3   Q    Ms. Harrison, the question was, what, if anything, did

4   you relay to your brother George about what you observed?

5   A    I told him that there was an old guy staring at me from

6   across the street.

7   Q    Without going into anything that was said, what was

8   George's reaction?

9   A    He said, "What does he look like"?

10  Q    Sorry, without --

11  A    He was surprised and he sounded like he was upset.

12  Q    And again without going into anything that was said, at

13  that time did George explain his reaction to you?

14  A    He did not.

15  Q    Do you know if George did anything with that information?

16  A    He never told me.

17  Q    When was the next time you saw Chris Bantis at the old

18  E&J Boutique location?

19  A    It was years later that I seen him.

20  Q    Do you remember approximately when?

21  A    Right before I was moved into my current location.

22  Q    What, if anything, did you observe the defendant do?

23  A    He stopped in front of my door of the store and started

24  laughing hysterically.

25  Q    Who were you with at the time?

J. HARRISON - DIRECT - MS. McGRATH                    210

1    A    I was with my brother James and my sister Lisa.

2    Q    And what, if anything, did you observe him do next?

3    A    My brother James and him got into an argument.

4         THE COURT:  This next time you see him, where is the

5    store located?  Is it the old --

6         THE WITNESS:  It's still the old location.

7    Q    And to be clear, what -- do you remember the date and

8    month you moved from your old store to your new store?

9    A    My grand opening was in May of 2021 in the new location.

10   Q    So approximately when was this fight?

11   A    It's either March or April.

12   Q    And you testified that you were with your sister and your

13   brother James.

14        So what did you do?

15   A    I took my sister Lisa and my brother inside with me and

16   my brother James stayed outside arguing with him.

17   Q    Without disclosing anything that was said, at that time

18   did your brother James tell you who he was fighting with?

19   A    He did not.

20   Q    You testified that your store moved to a new location in

21   May of 2021.

22        Did anything out of the ordinary begin happening

23   after the store moved?

24   A    I started seeing him more.

25   Q    And describe what you mean.

J. HARRISON - DIRECT - MS. McGRATH          211

1   A       So I started seeing Chris more and more every day.  I

2   would see him looking in my store windows.  I would see him at

3   Jimmy's standing outside.  I didn't really think anything of

4   it, I actually just thought he was a neighborhood guy.

5   Q       And approximately when did that begin happening?

6   A       As soon as I moved.

7   Q       And what happened next?

8   A       So after I moved and he kept staring in my windows, I

9   didn't put two and two together, but I started hearing someone

10  screaming things at me from a car and from a distance.

11  Q       Did you see where -- who the person screaming?

12  A       The last time it happened I did.

13  Q       Okay.  So the first time it happened, did you see the

14  person screaming?

15  A       I did not see them.

16  Q       What did the voice sound like?

17  A       It was a very raspy male voice.

18  Q       And you testified that the last time you heard the

19  person, what did that person look like?

20  A       It looked like Chris Bantis.

21  Q       And you testified that you saw the person screaming from

22  a distance and from a white car.  Approximately what time of

23  the day would you hear those screams?

24  A       Early in the morning when I was sweeping.

25  Q       And what did you hear the person screaming specifically?

J. HARRISON - DIRECT - MS. McGRATH                212

1    A    They would say, "The Harrisons are rats.  George is a

2    rat.  I want you dead.  E&J is rats."

3    Q    At that time how did it make you feel?

4    A    At first I didn't really think much of it.  But when it

5    happened a second and third time, I started getting really

6    nervous and concerned.

7    Q    And at that time did you recognize the person screaming

8    as the person you had had these earlier encounters with at the

9    old E&J location?

10   A    I didn't put two and two together.

11   Q    Directing your attention to August 31st, 2021, did you

12   call 9-1-1 that day?

13   A    Yes, I did.

14   Q    At a high level, why did you call 9-1-1?

15   A    I called 9-1-1 because that was the day a fight broke out

16   between Chris and my brother.

17   Q    Where did the fight break out?

18   A    6906 Fort Hamilton Parkway, Brooklyn, New York 11208.

19   It's my current location of the store outside.

20   Q    So breaking it down piece by piece, what did you first

21   observe?

22   A    So I was coming to work and I got out of the truck that

23   we pulled up in, Eric and I were together, and my brother

24   James and nephew Anthony for some reason were in a black car

25   and they pulled behind me.

J. HARRISON - DIRECT - MS. McGRATH          213

1          When I got out of car to go open the gate, I heard a

2  guy screaming and my brother was behind me.  My brother

3  started screaming at this guy from across the street.  And I

4  kept asking my brother, I said, "Who is that?  What are you

5  screaming at?"  And I just hear them both cursing each other

6  out non-stop.  And I kept asking my brother "Who is that, who

7  is that?"

8          He finally told me, he goes, "That's Chris Bantis."

9  And they kept on screaming at each other.  And after a few

10  seconds of that going on, they chased after each other down

11  the block.  And I stayed at the location.

12  Q    After your brother chased the defendant away what, if

13  anything, did you observe next?

14  A    Well, I contacted -- at the time I think I contacted my

15  brother George and got some information on who to contact, but

16  it happened again after that.  He came back.

17  Q    And why did you contact George?

18  A    Because I was very nervous.  As soon as I heard that

19  name, I remember that's the name my brother always spoke

20  about.

21  Q    So after the fight, what did you do?

22  A    I dialed 9-1-1.

23  Q    Did you contact anyone else?

24  A    I contacted my brother and Paul.

25  Q    Who is Paul?

J. HARRISON - DIRECT - MS. McGRATH                    214

1    A     Paul is the FBI agent.

2    Q     Do you know his full name?

3    A     Paul Tambrino.

4    Q     And you testified that you called 9-1-1.  Whose phone did

5    you use?

6    A     I believe I used my phone.

7    Q     So pausing briefly there what was your phone number at

8    the time?

9    A     (718)775-8471.

10   Q     Did the police arrive?

11   A     Yes, they did.

12   Q     Did you speak with them?

13   A     Yes, I did.

14   Q     In very general terms, what did you share with them?

15   A     I told them that my brother had testified against him and

16   was in witness protection and this was the guy.

17   Q     Based on your observations, did the defendant return to

18   the store vicinity that day?

19   A     I believe it -- that day -- I get the dates mixed up, but

20   I'm pretty sure he did.

21   Q     You testified that Eric and Anthony were present at E&J

22   when this fight broke out.  Did you tell any of your other

23   employees about the fight?

24   A     I told my nephew Andrew.

25   Q     Why did you tell Andrew?

1  A    Because he was at the store more often than I was and I

2  was concerned about his safety.

3  Q    After August 31st, were there any other encounters with

4  Chris Bantis at E&J?

5  A    Yes.

6  Q    Approximately when was the next encounter?

7  A    A couple days later Andrew called me and said that he was

8  peeking through the windows.

9           MS. SHERMAN:  Objection.  Calls for hearsay.

10          THE COURT:  Sustained.

11 Q    Sorry.  Without disclosing anything that anyone said, I

12 think you testified that the next occasion was a couple days

13 later; is that correct?

14 A    Yes.

15 Q    Were you present when that encounter occurred?

16 A    Not at that time.

17 Q    Okay.  Without describing anything that was said, how did

18 you learn that there was another encounter?

19 A    My nephew contacted me.

20 Q    And what, if anything, did you do after getting this

21 information?

22 A    I called 9-1-1.

23          And I contacted Paul again.

24 Q    Directing your attention to September 8th, 2021, did you

25 call 9-1-1 that day?

J. HARRISON - DIRECT - MS. McGRATH                216

1    A    Yes, I did.

2    Q    Why?

3    A    I believe that was the day he came back when my nephew

4    Andrew and Anthony were both working at the store.

5    Q    Were you present at the store on that day?

6    A    I was not.

7    Q    Without disclosing anything that was said, how did you

8    learn -- how did you learn that?

9    A    My nephew Andrew contacted me.

10   Q    How did Andrew sound when he contacted you?

11   A    He was a mess.  He was screaming.  He sounded like he was

12   crying and he was very nervous.

13   Q    Who, if anyone, were you with when Andrew contacted you?

14   A    I was with Eric.

15   Q    So after learning this, what did you do next?

16   A    I went directly back to the store.

17   Q    Did you arrive at the store?

18   A    Yes, I did.

19   Q    Who was at the store when you arrived?

20   A    When I arrived, my nephew Andrew was, my nephew Anthony

21   was, and I believe my employee Blake -- I am sorry, not Blake,

22   Cliff was.

23   Q    How did Andrew appear?

24   A    Andrew was in tears, he was crying.  He was -- he was a

25   mess.  He was a total mess.

J. HARRISON - DIRECT - MS. McGRATH                217

1    Q    How did Anthony appear?

2    A    Anthony I couldn't even speak to him.  He just -- he kept

3    ignoring me and told me he wanted to go home, he was too

4    nervous.

5    Q    At that time what were you feeling?

6    A    I was -- I was very upset that I left Andrew that day.

7    Q    Did you consider closing the store?

8    A    Yes, I did.

9    Q    Did you close the store?

10   A    I didn't.  I couldn't afford it.

11   Q    You testified a moment ago about an encounter on

12   September 8th.  Who was scheduled to work at the store the

13   next day?

14   A    The next day.  After September -- you're talking about

15   September 9th, correct?

16   Q    Yes.

17   A    I was -- Andrew was supposed to work.

18   Q    Did he work that day?

19   A    He did not.

20   Q    Who worked that day?

21   A    I did.

22   Q    Anyone else?

23   A    Eric did.

24   Q    And why did you work that day?

25   A    I didn't want to put Andrew's life in danger.

J. HARRISON - DIRECT - MS. McGRATH          218

1    Q    Approximately what time did you arrive at work that day?

2    A    Between 10:20 and 10:40.

3    Q    What did you do when you arrived?

4    A    I went to the store.  I opened up the lock.  I did what I

5    always did.  I went inside, grabbed the broom and the dust pan

6    and I went outside to sweep.

7    Q    Taking things very slowly what, if anything, did you

8    first observe?

9    A    I don't remember.

10   Q    While you were sweeping, did anything out of the ordinary

11   happen?

12   A    I believe that was the day that Chris came back.

13   Q    And after you were sweeping, what happened next?

14   A    I don't remember.  I was so nervous I couldn't remember.

15   Q    Is there something that would refresh your recollection?

16   A    My text messages.

17   Q    Your text messages of who?

18   A    Paul.

19          MS. McGRATH:  Your Honor, permission to approach the

20   witness?

21          THE COURT:  You may.

22

23          (Continued on the following page.)

24

25

J. HARRISON - DIRECT - MS. McGRATH          219

1    DIRECT EXAMINATION (Continued)

2    BY MS. McGRATH:

3    Q    Ms. Harrison, having reviewed that, does that refresh

4    your recollection about what happened on September 9th?

5    A    Yes, it does.

6    Q    So, you testified that you were sweeping.

7              What, if anything, did you observe?

8    A    So, on September 9th when I went outside to sweep, that

9    was the day that Chris was standing outside Jimmy 's Grill &

10   Deli.  That was the day that he pointed his finger at his head

11   and he was screaming things to me and made a gesture that he

12   was gonna shoot me.

13   Q    And can you describe the gesture you're making with your

14   hand?

15   A    So, he made the shape of a gun, held it to his temple and

16   nodded his head like that, after he was screaming at me.

17   Q    What was he screaming at you?

18   A    The Harrisons are rats.  That was his favorite thing to

19   always say, and I want you dead, you're fucking dead.  That's

20   what he would always yell.

21   Q    What did you do next?

22   A    I went inside.  I told Eric.  I locked the door.  And I

23   called 9-1-1.  I texted Paul immediately to let him know.  I

24   took pictures of him.  God forbid I was gonna die that day, I

25   wanted proof that he was standing there.  And 9-1-1 came.

J. HARRISON - DIRECT - MS. McGRATH          220

1    Q    I am going to play the first few seconds of Government

2    Exhibit 302-A and ask you some questions about it.

3    A    Okay.

4              (Audio played.) (Audio stopped.)

5    BY MS. McGRATH:

6    Q    Do you recognize this?

7    A    Yes.

8    Q    What is it?

9    A    That was my 9-1-1 call.

10             MS. McGRATH:  Your Honor, the Government moves it

11   into evidence at this time.

12             THE COURT:  Any objection?

13             MS. SHERMAN:  No objection.

14             THE COURT:  Received in evidence without objection.

15             (Government Exhibit 301-A, was received in

16   evidence.)

17             MS. McGRATH:  Ms. Moosher, if you could just

18   continue playing.

19             (Audio played.) (Audio stopped.)

20   Q    Ms. Harrison, who is the man you're describing on the

21   call?

22   A    I was describing Chris Bantis.

23   Q    During the call do you state that Chris Bantis was armed?

24   A    Yes.

25   Q    What were you referring to?

J. HARRISON - DIRECT - MS. McGRATH          221

1   A    Well, before he did this to his temples, he also kind of

2   like grabbed on his waist, made me believe he had a gun.

3   Q    Did you see a gun?

4   A    I did not see a gun.

5   Q    And pausing briefly there, during any of the encounters

6   you've described did you actually see a gun?

7   A    I did not see a gun.

8   Q    And during the call you -- did you state that Chris

9   Bantis had tried to shoot you?

10  A    Well, I believed he was gonna shoot me.

11  Q    And during the call did you state that Chris Bantis had

12  pulled out a pipe on you the day before?

13  A    Yeah, but I meant my nephew, though.  He didn't pull a

14  pipe on me, I was not there.

15  Q    During the 9-1-1 call, why did you describe some of Chris

16  Bantis's history with your brother?

17  A    Because it's important, and I figured if I told them

18  that, they would get there faster and I wouldn't get shot.

19  Q    During the call were you speaking to anyone else apart

20  from the 9-1-1 operator?

21  A    I was speaking with Eric in the background.

22  Q    What, if anything, did you observe Eric doing?

23  A    He was looking by the door to make sure he wasn't coming

24  to the store.

25            MS. McGRATH:  If we could just show the witness

J. HARRISON - DIRECT - MS. McGRATH          222

1    what's marked as Government Exhibit 129 and then 130.

2              (Pause.)

3    BY MS. McGRATH:

4    Q    Do you recognize these?

5    A    Yes, I do.

6    Q    What are they?

7    A    Those are the photos I sent to Paul.

8    Q    Are they true and accurate depictions of the photos you

9    took that day?

10   A    Yes, they are.

11             MS. McGRATH:  Your Honor, the Government would move

12   these in.

13             THE COURT:  Any objection?

14             MS. SHERMAN:  No, no objection.

15             THE COURT:  Received without objection.

16             (Government Exhibit 129 and 130, were received in

17   evidence.)

18             MS. McGRATH:  And if we could publish Government

19   Exhibit 129 first?

20             THE COURT:  You may.

21             (Exhibit published.)

22             MS. McGRATH:  And 130.

23             (Exhibit published.)

24   Q    Where were you when you took these photos?

25   A    I was inside my store.

1   Q     What do they show?

2   A     They show Jimmy's Deli & Grill.

3   Q     And who do they depict?

4   A     Chris Bantis.

5   Q     What does he appear to be doing in those photos?

6   A     Standing outside Jimmy's Deli.

7   Q     Was this before, did you take these photos before or

8   after he made the gesture as you described?

9   A     After.

10  Q     Why did you take these photos?

11  A     Because I thought I was gonna get shot and I wanted proof

12  that it was him.

13          MS. McGRATH:  And, Your Honor, if we could now show

14  just the witness -- I'm sorry, Ms. Moosher -- Government

15  Exhibit 550-A.

16          (Pause.)

17  BY MS. McGRATH:

18  Q     Do you recognize these?

19  A     Yes, I do.

20  Q     What are they?

21  A     Those are my text messages to Paul.

22  Q     Are they true and accurate?

23  A     Yes, they are.

24          MS. McGRATH:  Your Honor, the Government would move

25  these in as excited utterances under Rule 803(2).

Sidebar                                                    224

1          THE COURT:  Any objection?

2          MS. SHERMAN:  Yes, Judge.  I don't believe the

3    proper foundation for excited utterances has been laid.

4          THE COURT:  Is this subject to the prior in limine

5    ruling or is this something new?

6          MS. McGRATH:  It is something new, Your Honor.

7          THE COURT:  Then we will have to look at it.

8          MS. McGRATH:  Would it be helpful if we meet at

9    sidebar briefly?

10          THE COURT:  We can.

11          (Sidebar held outside the hearing of the jury.)

12

13          (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                          225

1            (The following sidebar took place outside the

2       hearing of the jury.)

3            MS. McGRATH:  Your Honor, the text messages are from

4       two minutes after her 9-1-1 call where she messages the agent:

5       Help me, please, he is here.  Paul, he is here.

6            I'm happy to ask her further questions about how she

7       was feeling at the time, but she has stated that she, you

8       know, was fearful that she was about to die.

9            THE COURT:  So, this is all in the same moment?

10           MS. McGRATH:  Yes, Your Honor.

11           MS. SHERMAN:  Judge, the fact remains she's texting

12      the agent involved in the investigation of her case.  And this

13      is testimonial.  It's different than a 9-1-1 call.

14           THE COURT:  It's close.  It's close to a

15      testimonial.

16           MS. OKEN:  Your Honor, she's summoning assistance

17      from law enforcement because she believes she's under imminent

18      threat of death.

19           MS. HIROZAWA:  And, Your Honor, if I may just add

20      some context.

21           The earlier text messages prior to this series of

22      text messages include Ms. Harrison inquiring when Mr. Bantis

23      will be arrested.  And Agent Tambrino, I believe prior to this

24      text message, is saying --

25           THE COURT:  In that same?

Sidebar                                    226

1           MS. HIROZAWA:  In the same chat.

2           THE COURT:  In the same chat?

3           MS. McGRATH:  No.

4           Your Honor, I think the messages to which she's

5    referring are from a few hours earlier.  So, the timeline of

6    this goes:  She calls 9-1-1 at 11:06.  Speaks to 9-1-1 for

7    approximately two --

8           THE COURT:  Okay, you have the times?

9           MS. McGRATH:  Yes.

10          THE COURT:  What is the time on the 9-1-1 call?

11          MS. McGRATH:  11: 06.

12          THE COURT:  And what is the time on this, the first?

13          MS. McGRATH:  11:08.  So, two minutes later.  It is

14   before the police respond to this event.

15          THE COURT:  And how long does it go, 11:08 to what?

16          MS. McGRATH:  11: 09.  Two from 11:08, one to 11:09.

17          MS. HIROZAWA:  And, Your Honor, for reference, Agent

18   Tambrino texts her back:  We are going to court this

19   afternoon, before this text message is made in response to her

20   inquiry:  Has he been arrested yet?

21          So, I think it is clearly testimonial, at least with

22   regards to her communications to Agent Tambrino.

23          MS. McGRATH:  Your Honor, to be clear, earlier that

24   day she asked:  Is it safe for me to be by the store?  Has he

25   been arrested yet?

Sidebar                                                    227

1          That is an inquiry in connection with her own

2     personal safety.

3          THE COURT:  And what was the response?

4          MS. McGRATH:  He has not yet been arrested.

5          THE COURT:  Right.  And then there's a gap.

6          MS. McGRATH:  And then there is a gap.

7          THE COURT:  Then there is the incident.

8          MS. McGRATH:  Then there is the incident.

9          THE COURT:  She calls 9-1-1.

10          MS. McGRATH:  And seconds after getting off the

11     phone with 9-1-1, she texts him.

12          THE COURT:  Temporally it is all the same.  There's

13     nothing else, aside from the temporality and the excited

14     utterance, is there anything else in the text, itself, that

15     might be a basis for exclusion?

16          MS. SHERMAN:  In three text messages that they put

17     on --

18          THE COURT:  The ones here.

19          MS. SHERMAN:  -- no.  I mean I think if they're

20     going to be putting -- I think we're going to get into an

21     issue later about them putting -- selectively picking text

22     messages with Agent Tambrino.

23          I think the text messages she sent him that morning

24     are relevant, but those three text messages alone, no, there's

25     no other basis.

Sidebar                                             228

1          THE COURT:  Okay, then I'll allow it as an excited

2    utterance.

3          MS. OKEN:  Thank you, Your Honor.

4          (Sidebar concluded.)

5

6          (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. HARRISON - DIRECT - MS. McGRATH          229

1              (In open court - jury present.)

2              MS. McGRATH:  Your Honor, permission to publish

3    550-A?

4              THE COURT:  You may.

5    DIRECT EXAMINATION (Continued)

6              (Exhibit published.)

7    BY MS. McGRATH:

8    Q    Ms. Harrison, can you just note the time stamps and the

9    date on these text messages?

10   A    They were from September 9th at 11:08  and 11:09.

11   Q    And just one by one, can you please read them aloud?

12   A    These messages were to Paul and it says:

13              Please, he is here.  Help me.  Paul, he is here.

14   Q    Who are they from?

15   A    They're from myself.

16   Q    Why did you send these?

17   A    Because I was fearing for my life.

18   Q    Had the police arrived yet?

19   A    Not at that time.

20   Q    Did the police ultimately arrive?

21   A    Yes, they did.

22   Q    What, if anything, did you do when the police arrived?

23   A    I met with the police.

24   Q    Where did you speak to the police?

25   A    I spoke to the police outside my store.

```
                    J. HARRISON - DIRECT - MS. McGRATH         230
```

1    Q    Anywhere else?

2    A    Outside Jimmy's Deli.

3    Q    What, if anything, was your reaction to going by Jimmy's

4    Deli?

5    A    I didn't want to do it.

6    Q    Why not?

7    A    I was afraid he was gonna see me.

8    Q    Who?

9    A    Chris Bantis.

10   Q    What happened next?

11   A    I spoke with the police, and he kept staring at me as I

12   was speaking to the police.

13          MS. SHERMAN:  Objection as to what Mr. Bantis was

14   doing, as to what she believed Mr. Bantis was doing.

15          THE COURT:  What did you observe?

16          THE WITNESS:  He was staring at me.

17          THE COURT:  I'll allow that answer.

18   BY MS. McGRATH:

19   Q    And after that, what happened next?

20   A    I spoke with the police and he was arrested.

21   Q    Have you seen Chris Bantis, other than today have you

22   seen Chris Bantis since that day?

23   A    I have not.

24   Q    Have you heard from Chris Bantis since that day?

25   A    I have not.

1   Q    Pausing there, what, if any, impact have these encounters

2   had on you financially?

3   A    I'm in debt because of this.

4            MS. SHERMAN:  Objection.

5            THE COURT:  I am going to sustain the objection.

6   BY MS. McGRATH:

7   Q    Growing up, how would you describe your relationship with

8   your brother George?

9   A    I had a good relationship with George.

10  Q    And how would you describe your relationship with your

11  brother James growing up?

12  A    I had a very good relationship with James.

13  Q    What is your relationship with George like now?

14  A    I don't have a relationship with him.

15  Q    Why is it changed?

16  A    Because of the situation.

17  Q    What do you mean by that?

18  A    Because of everything that happened, I -- I blame him.

19  Q    What is your relationship with James like now?

20  A    I do not speak with James.

21  Q    Why?

22  A    Because of what happened.

23           MS. McGRATH:  Your Honor, may I have a brief moment?

24           THE COURT:  Yes.

25           (Pause.)

J. HARRISON - DIRECT - MS. McGRATH                232

1   Q    Ms. Harrison, you testified earlier that when your store

2   moved to the new location, you would hear Chris Bantis

3   screaming at you?

4   A    Yes, I did.

5   Q    Can you describe some of the things you heard him scream

6   at you?

7   A    He would always scream:  The Harrisons are rats.  George

8   is a rat.  I want you dead.  I want your brother dead.  George

9   is dead.  E&J is rats.

10          It would just keep going on and on.

11  Q    And you testified about a fight between James and Chris

12  in front of the new location when they were screaming at each

13  other?

14  A    Yes, I did.

15  Q    Do you recall any of the things that Chris Bantis said at

16  that point?

17  A    Yes.

18  Q    What did he say?

19  A    He kept calling my brother a rat and telling him that he

20  was gonna kill him.  And my brother kept screaming:  You shut

21  the fuck up.  Shut the fuck up.

22          You know, it just kept going.

23          MS. McGRATH:  Thank you, Your Honor.

24          No further questions.

25          THE COURT:  Thank you, Ms. McGrath.

J. HARRISON - CROSS - MS. SHERMAN          233

1          Who is handling this one?

2          MS. SHERMAN:  That would be Marissa Sherman, Judge.

3          THE COURT:  Ms. Sherman.

4          MS. SHERMAN:  One moment, please.

5          THE COURT:  Certainly.

6          (Pause.)

7          MS. McGRATH:  Your Honor, may I approach the witness

8  just to grab the papers I had dropped off with her?

9          THE COURT:  Yes, please.

10  CROSS-EXAMINATION

11  BY MS. SHERMAN:

12  Q    Good afternoon, Ms. Harrison.

13  A    Good afternoon.

14  Q    Ms. Harrison, we've never met before, correct?

15  A    Correct.

16  Q    And you've never met my colleague, Nora Hirozawa;

17  correct?

18  A    No, I have, correct.

19  Q    So we've never discussed the facts of this case, right?

20  A    Right.

21  Q    But you have met with members of the Government several

22  times, correct?

23  A    Correct.

24  Q    And that was with Ms. Oken and Ms. McGrath, correct?

25  A    Correct.

J. HARRISON - CROSS - MS. SHERMAN                234

1    Q    And you also met with Special Agent Tambrino, who you've

2    been referring to Paul as several times, correct?

3    A    Correct.

4    Q    And they went through the types of questions that they'd

5    be asking you here today, correct?

6    A    I'm sorry, can you repeat that?

7    Q    Sure.  They went through with you the types of questions

8    they would be asking you here today,  correct?

9    A    Correct.

10   Q    And the types of questions that we may be asking you,

11   correct?

12   A    Correct.

13   Q    And you reviewed your Grand Jury testimony before coming

14   here today?

15   A    That, I did not.

16   Q    You reviewed video surveillance during the course of this

17   investigation?

18   A    Yes.

19   Q    And you reviewed your communications with Special Agent

20   Tambrino, correct?

21   A    Correct.

22   Q    Ms. Harrison, I want to talk a little bit about the area

23   that E&J  Boutique is located on and was located on in, I

24   guess, summer of 2021.

25             You indicated it's on Fort Hamilton Parkway between

*SAM      OCR      RMR      CRR      RPR*

1   70th Street and Bay Ridge Avenue, correct?

2   A    The current location is.

3   Q    Yes.

4   A    Correct.

5   Q    And all of the questions I'm about to ask are about the

6   current location.

7   A    Okay.

8   Q    And that block of Fort Hamilton Parkway, it has several

9   shops on both sides of the street, correct?

10  A    Correct.

11  Q    And traffic runs both ways, right?

12  A    Correct.

13  Q    And there is parking on both sides of the street?

14  A    That's correct .

15  Q    I'd like you to --

16        MS. SHERMAN:  Just the witness.

17  Q    -- take a look at what has previously been marked as

18  Defense Exhibit AA-2.

19        (Pause.)

20  Q    Do you recognize what you're looking at in this photo?

21  A    Yes, I do.

22  Q    What do you recognize it to be?

23  A    That's the corner of Bay Ridge Avenue and Fort Hamilton

24  Parkway.

25  Q    Okay.  And is that the -- is that a fair and accurate

J. HARRISON - CROSS - MS. SHERMAN                236

1    representation of what that corner looked like in the summer

2    of 2021?

3    A    That's a more updated photo, but yeah.

4    Q    Okay.

5            MS. SHERMAN:  I'd ask that that be admitted into

6    evidence as Defense Exhibit AA-2.

7            THE COURT:  Any objection?

8            MS. McGRATH:  No objection, Your Honor.

9            THE COURT:  Received in evidence without objection.

10           (Defense Exhibit AA-2, was received in evidence.)

11           MS. SHERMAN:  Can it be published for the jury,

12   please?

13           THE COURT:  You may.

14           (Exhibit published.)

15   BY MS. SHERMAN:

16   Q    And, Ms. Harrison, this photo is looking down Fort

17   Hamilton Parkway towards 70th Street, correct?

18   A    Correct.

19   Q    So, back is to Bay Ridge Avenue?

20   A    Yes.

21   Q    And on the left side of the screen, I think it's your

22   left, is Jimmy's 3 Sons, correct?

23   A    Correct.

24   Q    And can you with the -- with your finger just mark E&J

25   Boutique on the other side?

J. HARRISON - CROSS - MS. SHERMAN                237

1    A    (So marked.)

2    Q    Thank you.

3              So, Jimmy's 3 Sons Deli is located on the corner,

4    correct, of Bay Ridge Avenue and Fort Hamilton Parkway?

5    A    Correct.

6    Q    And E&J Boutique is across the street and a bit diagonal,

7    correct?

8    A    Correct.

9              MS. SHERMAN:  Now, I am going to show what has been

10   previously marked as Defense Exhibit AA-3, just for the

11   witness.

12   BY MS. SHERMAN:

13   Q    While we're trying to figure out how to get rid of the

14   mark, Ms. Harrison , can you tell us if you recognize what's

15   in that photo?

16   A    I see my store in that photo.

17   Q    Okay.  And is that a fair and accurate representation of

18   your store's new location, what it looked like?

19   A    That's what it looks like now, yes.

20   Q    Is there anything substantially different?

21   A    There was never a store next to me.

22   Q    Okay.

23   A    That cell phone store is new.

24   Q    Okay.  So other than the cell phone store, is it

25   substantially the same?

J. HARRISON - CROSS - MS. SHERMAN          238

1   A     And the flower shop is out of business now.  So, back

2   then it wasn't.

3   Q     Okay.  So just in terms of the geographic location?

4   A     Yes, that's correct.

5   Q     Okay.

6           MS. SHERMAN:  Subject to those limitations, I would

7   ask to introduce this into evidence as Defense Exhibit AA-3.

8           THE COURT:  Any objection?

9           MS. McGRATH:  No, Your Honor.

10          THE COURT:  Received without objection.

11          (Defense Exhibit AA-3, was received in evidence.)

12          MS. SHERMAN:  I'd ask to publish that for the jury.

13          THE COURT:  And you may.

14          (Exhibit published.)

15  BY MS. SHERMAN:

16  Q     Now, Ms. Harrison, this vantage point is looking at E&J

17  Boutique from the corner that Jimmy 's 3 Sons is on, correct?

18  A     Correct.

19          MS. SHERMAN:  Finally, I'd ask for the witness to be

20  shown Defense Exhibit AA-1.

21  Q     Do you recognize what is depicted in this photograph,

22  Ms. Harrison?

23  A     That's 9th Avenue and Bay Ridge Avenue.

24  Q     Right, okay.

25          So, you do recognize what's depicted in that photo?

J. HARRISON - CROSS - MS. SHERMAN                239

1   A     Yes, I do.

2   Q     Okay.  Is that a fair and accurate representation of what

3   that area looked like in 2021 geographically?

4   A     Yes.

5   Q     Okay.

6         MS. SHERMAN:  Ask to admit what's been previously

7   marked as Defense AA-1 into evidence.

8         THE COURT:  Any objection?

9         MS. McGRATH:  No, Your Honor.

10        THE COURT:  Received without objection.

11        (Defense Exhibit AA-1 was received in evidence.)  **

12        MS. SHERMAN:  Thank you.

13        And if we could publish for the jury.

14        THE COURT:  You may.

15        (Exhibit published.)

16  BY MS. SHERMAN:

17  Q     Now, Ms. Harrison, you said that this is 9th Avenue?

18  A     Correct.

19  Q     Okay.  What are we looking down, what street are we

20  looking down?

21  A     So, you're looking down Bay Ridge Avenue towards Fort

22  Hamilton Parkway.

23  Q     Okay.  And so, 9th Avenue is -- would be sort of right at

24  the back of the picture?

25  A     Correct.

J. HARRISON - CROSS - MS. SHERMAN                    240

1   Q    Okay.  And what we're looking at, as you look down, is

2   Jimmy's 3 Sons on the corner, correct?

3   A    Yes, that's the deli and grill.

4   Q    Great, okay.  Thank you.

5        MS. SHERMAN:  We can take them down, Ms. Kissick.

6   BY MS. SHERMAN:

7   Q    Now, you testified on direct about observing -- I am

8   going to go back to 2018 briefly -- about observing Mr. Bantis

9   across street from your store on several occasions, correct?

10  A    In what year was this?

11  Q    2018.

12  A    In 2018 that was at my previous location.

13  Q    Yes.

14  A    So I did observe him across the street from my previous

15  location, yes.

16  Q    Correct.  I believe you said it was a souvlaki shop?

17  A    Correct.

18  Q    Okay.  And there is a bus stop right in front of that

19  souvlaki shop, correct?

20  A    No, the bus stop is a few doors down.

21  Q    Okay.  On that side of the street, and again we're back

22  in 2018, on that side of the street there was a bus stop on

23  that block on that side of the street, correct?

24  A    Correct.

25  Q    Now, I want to move now to summer of 2021.

*SAM      OCR      RMR      CRR      RPR*

J. HARRISON - CROSS - MS. SHERMAN                241

1    A    Okay.

2    Q    I believe you testified that your new location opened in

3    May of 2021?

4    A    Correct.

5    Q    Okay.  And it wasn't entirely clear on direct.

6             The first time you started hearing someone yell at

7    you from a car, was that right after you moved into your new

8    location?

9    A    That was when I was moving into my new location.

10   Q    So in May of 2021?

11   A    In May of 2021 I moved to the new location.  I started

12   moving in around March.

13   Q    Okay.  So I just want to be clear, this -- this kind of

14   pattern of someone yelling at you from a car, this began in

15   around March of 2021?

16   A    It began around May.  He wasn't yelling it when I was

17   moving across.

18   Q    Got it.  So, starting in May of 2021 --

19   A    Correct.

20   Q    -- is when this started?

21   A    Yes.

22   Q    Someone started yelling at you from a car?

23   A    Correct.

24   Q    Okay.  You've spoken with various members of law

25   enforcement about Mr. Bantis allegedly harassing you, correct?

J. HARRISON - CROSS - MS. SHERMAN                242

1   A    Correct.

2   Q    And it's important to try and be as accurate with

3   information as you can so that law enforcement can do their

4   job, right?

5   A    Correct.

6   Q    And collect evidence, right?

7   A    Correct.

8   Q    And investigate?

9   A    Correct.

10  Q    Okay.  We heard on direct examination that you placed a

11  9-1-1 call on August 31st of 2021, correct?

12  A    Correct.

13  Q    And isn't it true when you called 9-1-1 on August 31 st

14  of 2021, you told the 9-1-1 operator that Mr. Bantis started

15  harassing you one week ago, correct?

16  A    Yes.

17  Q    And so, that would be one week before August 31st of

18  2021, right?

19  A    Correct.

20  Q    Now, you also had occasion to speak with Special Agent

21  Tambrino on August  31st of 2021, correct?

22  A    Yes.

23  Q    And that was at your store, at E&J Boutique, right?

24  A    No, I spoke to him over the phone first.

25  Q    Okay, I believe that --

J. HARRISON - CROSS - MS. SHERMAN          243

1   A    I'm not sure if that was the day I met him, it may have

2   been, but I spoke to him on the phone first.

3   Q    Okay.  And, again, you know it's important to be

4   truthful, correct?

5   A    Of course.

6   Q    And to give accurate information?

7   A    Yes.

8   Q    Okay.  And Agent Tambrino asked you when this harassment

9   began, right?

10  A    Correct.

11  Q    And isn't it true that you told Agent Tambrino on

12  August 31st of 2021, that Mr. Bantis started harassing you a

13  month-and-a-half ago?

14  A    Yes, I did.

15  Q    Okay.

16        Now, you also spoke on direct about how Mr. Bantis

17  was yelling at you during this time period, correct?

18  A    Correct.

19  Q    And you told the jury that during this time period he was

20  harassing you all the time, I think were your words, or I

21  can't quite remember?

22  A    I don't know if I said all the time, but he was doing it

23  frequently.

24  Q    Okay.  And you -- again, you spoke with Special Agent

25  Tambrino on August 31st of 2021, correct?

J. HARRISON - CROSS - MS. SHERMAN                244

1   A     Correct.

2   Q     And he asked you how frequently Mr. Bantis was harassing

3   you, right?

4   A     Correct.

5   Q     And on August 31st of 2021, you told Special Agent

6   Tambrino that every morning Mr. Bantis -- I'm sorry, almost

7   every morning Mr. Bantis would yell at you while you were

8   opening your store?

9   A     That is correct.  There would be some mornings he would

10  skip, there would go maybe three days without it.

11  Q     Okay.  Just the question was whether you told Special

12  Agent Tambrino --

13  A     Yes.

14  Q     -- that almost every morning he was -- he was harassing

15  you; okay.

16        And you also testified in the Grand Jury about how

17  many times you had seen Mr. Bantis, correct?

18  A     Yes.

19  Q     And it was Ms. Oken who was asking you questions in the

20  Grand Jury, correct?

21  A     Yes, she was.

22  Q     And you testified on September 16th of 2021, correct?

23  A     I don't remember the exact day.

24  Q     Okay.  Sometime in September of 2021?

25  A     Yes.

J. HARRISON - CROSS - MS. SHERMAN                245

1   Q    And you were under oath at that time?

2   A    Yes.

3   Q    Okay.  And were you asked this question and did you give

4   this answer, page 6, lines 12 through 15:

5            Question:  And did there come to be other occasions

6   when you saw that person?

7            Answer:  Yes.  Six or seven other occasions I did

8   see that same gentleman.

9            Were you asked that question and did you give that

10  answer?

11  A    Yes, I did.

12  Q    Now, I want to take a minute to talk about how this

13  alleged harassment started in the summer of 2021.

14           When this began, someone started yelling at you from

15  a white Lexus SUV, correct?

16  A    I don't know if it was a Lexus.  It was a white SUV.

17  Q    Okay.  And you believed that person to be Mr. Bantis,

18  yes?

19  A    Correct.

20  Q    And this person was yelling at you from inside of a car,

21  correct?

22  A    And -- and outside.

23  Q    Okay, but inside of a car at times; yes?

24  A    Inside and outside, yes.

25  Q    Okay.  So, at times inside the car, yes?

1    A    Correct.

2    Q    And the car was parked across the street from E&J

3    Boutique, right?

4    A    On several occasions, yes.

5    Q    Okay.  And the person who was yelling at you, who you

6    believed to be Mr. Bantis, was in the passenger seat, right?

7    A    Not every time.

8    Q    Okay.  So your testimony here today is that there are

9    times that Mr. Bantis was in the driver's seat of a white car

10   yelling at you from across the street?

11   A    Back passenger and front passenger.

12   Q    Okay.  So you're just distinguishing between the

13   passenger seats?

14   A    Correct.

15   Q    All right.  But he was always in the passenger seats,

16   correct?

17   A    Correct.

18   Q    Okay.  And with the way traffic flows, if the car is

19   parked across the street from E&J Boutique, the driver's seat

20   and the passenger's seat behind the driver's seat would be

21   closest to E&J, correct?

22   A    That is correct.

23   Q    Okay.  And I believe you testified on direct that what

24   was being yelled out of the car was:  The Harrisons are rats?

25   A    Correct.

J. HARRISON - CROSS - MS. SHERMAN                247

1    Q    Now, Ms. Harrison, you testified extensively about

2    Mr. Bantis calling you a rat, correct?

3    A    That is correct.

4    Q    And that E&J are rats?

5    A    And that my brother was a rat.

6    Q    And that E&J are rats?

7    A    And that E&J was rats.

8    Q    And the term rat is a word that you, yourself, use,

9    correct?

10   A    No, I do not.

11   Q    All right.  On September 9th of 2021, you called 9-1-1

12   correct?

13   A    Correct.

14   Q    And members of the NYPD arrived, right?

15   A    Correct.

16   Q    And you spoke to them?

17   A    Yes, I did.

18   Q    And there was a time when you were speaking to members of

19   the NYPD when you were on the Jimmy's 3 Sons side of the

20   street, correct?

21   A    Yes.

22   Q    And you were talking to them about what happened on

23   September 9th of 2021?

24   A    Correct.

25   Q    And at the time that you were talking to the police, you

J. HARRISON - CROSS - MS. SHERMAN          248

1   saw a woman with red hair also talking to the police, correct?

2   A    A woman with red hair?

3   Q    Yes.

4   A    I don't recall.

5   Q    Okay.  I am going to bring up -- one second.

6           (Pause.)

7           MS. SHERMAN:  I am going to come back to that in one

8   second.

9           THE WITNESS:  Okay.

10  Q    While you were talking to the police, you referred to

11  another person who was talking to the police as a little rat,

12  correct?

13  A    I don't remember who the person was.

14  Q    Okay.

15  A    I actually don't remember a person being there.

16  Q    Okay.

17          MS. SHERMAN:  I ask to refresh the witness'

18  recollection with something outside of the presence of the

19  jury.

20          THE COURTROOM DEPUTY:  Is this here or --

21          MS. SHERMAN:  Yes, this is an audio.

22          THE COURTROOM DEPUTY:  Oh, okay.

23          MS. SHERMAN:  Judge, can we sidebar very quickly?

24          THE COURT:  Yes.

25          MS. SHERMAN:  Thank you.

Sidebar                                         249

1           (The following sidebar took place outside the

2     hearing of the jury.)

3           MS. SHERMAN:  Judge, the witness just said she

4     doesn't remember.  There is body cam footage in which she

5     refers to someone as a little rat.

6           The Government has indicated they want us to play

7     anything outside the presence of the jury, so that's what I'm

8     asking to do at this time to refresh recollection.

9           THE COURT:  Is to play what?

10          MS. SHERMAN:  The body cam footage where she calls

11    someone a little rat where she just said she didn't remember.

12    So, I'm trying to follow the Court's instruction.

13          THE COURT:  No, the Court's instruction was to use a

14    transcript.

15          MS. SHERMAN:  Okay.  I have our transcript that I

16    can show you.

17          THE COURT:  Yes, you can show her your transcript,

18    absolutely.  Just mark it.

19          MS. McGRATH:  Your Honor, to be clear, we've never

20    seen this transcript and we dispute that.

21          THE COURT:  Do you need a recess to take a look at

22    it?

23          MS. McGRATH:  We don't need a recess, but we have

24    also listened to the body cam extensively and we would dispute

25    that that's what was said during the body cam footage.

Sidebar                                                    250

1          THE COURT:  Well, this is to refresh her

2    recollection.  It is either going to refresh her recollection

3    or it is not coming into evidence.

4          She can bring in a piano to refresh her

5    recollection.

6          MS. McGRATH:  Understood, Your Honor.  We'll see

7    their transcript.

8          THE COURT:  Yes.

9          (Sidebar concluded.)

10

11         (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. HARRISON - CROSS - MS. SHERMAN                251

1              (In open court - jury present.)

2              MS. SHERMAN:  May I proceed?

3              THE COURT:  You may.

4              Ms. Sherman, is this document going to be marked

5    somehow to let me know what it is?

6              MS. SHERMAN:  I will mark it.  I'm not quite sure

7    what number or letters we're up to, but I will mark it.

8              THE COURT:  Just for identification.

9              MS. SHERMAN:  Yes, I will.

10             And just before I provide this, Judge, I just would

11   like to publish, I understand that the witness said they

12   didn't remember someone with red hair.  I would like to

13   publish one of the Government's exhibits.

14             THE COURT:  It's in evidence?

15             MS. SHERMAN:  Yes.

16             Can we publish Government Exhibit 130, please?

17             (Exhibit published.)

18             THE COURT:  Are you going to ask if that refreshes

19   her recollection?

20             MS. SHERMAN:  Thank you.

21             THE COURT:  Ms. Sherman, are you going to ask the

22   question --

23             MS. SHERMAN:  It just came up, Judge, sorry.  The

24   photo, itself, just came up.

25   BY MS. SHERMAN:

1  Q    Looking at Government Exhibit 130, which is the

2  photograph that you took of Chris Bantis --

3         MS. McGRATH:  Your Honor, apologies.  I believe this

4  is being projected to the Grand Jury [sic].

5         We understand this is being used to refresh the

6  witness' recollection and, importantly, should only be shown

7  to the witness.

8         MS. SHERMAN:  It's in evidence.

9         THE COURT:  Ms. Sherman represents it's in evidence

10 in this case.

11        MS. McGRATH:  It is, Your Honor, but we understand

12 it's for the purpose of refreshing.

13        THE COURT:  If it's in evidence, she may use it.

14        MS. SHERMAN:  Yes.

15 BY MS. SHERMAN:

16 Q    Ms. Harrison, looking at this picture, this is the

17 picture that you took of Chris Bantis on September 9th of

18 2021, correct?

19 A    Correct.

20 Q    Okay.  And there is a woman who is going into the Jimmy's

21 3 Sons with red hair, correct?

22 A    Brown hair, I think, but yeah, correct, I see it.

23 Q    Okay, thank you.

24        MS. SHERMAN:  Now, I am going to show  -- I am going

25 to bring up what is going to be marked as Defense EE for

J. HARRISON - CROSS - MS. SHERMAN                253

1    identification only.

2              (Pause.)

3              MS. SHERMAN:  May I approach the witness, Your

4    Honor?

5              THE COURT:  You may.

6              THE WITNESS:  Thank you.

7              MS. SHERMAN:  And don't read that  out loud to the

8    jury, Ms. Harrison, just let me know when you --

9              THE WITNESS:  I understand.

10   BY MS. SHERMAN:

11   Q    Does that refresh your recollection as to whether you

12   referred to a woman on 9/9 as a little rat?

13   A    Honestly, no.

14   Q    Okay.

15             Now, Ms. Harrison, you testified that from

16   approximately May of 2021 through September 9th of 2021,

17   Mr. Bantis was repeatedly yelling at you from inside a car and

18   outside of a car, correct?

19   A    Yes, he did.

20   Q    And referring to your brother as a rat; yes?

21   A    Correct.

22   Q    And threatening to kill you?

23   A    Correct.

24   Q    And you testified that you were worried you were going to

25   be -- you were going to die, correct?

*SAM      OCR      RMR      CRR      RPR*

J. HARRISON - CROSS - MS. SHERMAN                    254

1    A    That is correct .

2    Q    The first time you called 9-1-1 in relation to your

3    claims that Mr. Bantis was threatening you was in

4    two-thousand -- was on August 31st of 2021, correct?

5    A    That is correct.

6    Q    And the first time you spoke to Special Agent Tambrino --

7              THE COURT:  Ms. Sherman --

8    Q    -- about Mr. Bantis allegedly --

9              MS. SHERMAN:  Oh, I'm sorry.

10             THE COURT:  -- I just want to alert you we will be

11   taking a break.  You decide when there is a convenient landing

12   point.

13             MS. SHERMAN:  Well, I see that the jurors are ready

14   to take a break, so we can do it now.

15             THE COURT:  Okay, that may very well be.  All right,

16   thank you, Ms. Sherman.

17             Ladies and gentlemen, we will be taking, as

18   promised, our mid-afternoon break.  It will give you a chance

19   to relax and maybe use some other rooms.

20             Again, remember the instructions, do not discuss the

21   case amongst yourselves or with anyone else you may run into

22   in the hall.  Continue to keep an open mind.

23             We'll be back in about ten or fifteen minutes.

24             (Jury exits.)

25             THE COURT:  Okay, we will back in about ten or

J. HARRISON - CROSS - MS. SHERMAN                 255

1     fifteen.

2             Ms. Harrison, you are free to step down and refresh

3     and we'll see you in about ten or fifteen minutes.

4             MS. McGRATH:  And, Your Honor, do you mind just

5     instructing the witness that we're not permitted able to speak

6     to her, as we haven't gone over that with her yet?

7             THE COURT:  Yes.  Don't speak to counsel at this

8     point, you are under cross-examination.

9             (Witness steps down.)

10            (Recess taken.)

11

12            (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

J. HARRISON - CROSS - MS. SHERMAN                256

1          THE COURTROOM DEPUTY:  All Rise.  Counsel for both

2     sides are present including the defendant.

3          THE COURT:  Are we ready, Ms. Sherman?

4          MS. SHERMAN:  Yes, Judge.  Should I take my position

5     at the podium?

6          THE COURT:  Yes.

7          (Whereupon, the witness resumes the stand.)

8          (Jury enters the courtroom.)

9          THE COURT:  Be seated, please.  Counsel will

10    stipulate the jury is present and properly seated.

11         MS. OKEN:  Yes, your Honor.

12         MS. HIROZAWA:  So stipulated.

13         THE COURT:  Thank you, counsel.

14         Ladies and gentlemen, welcome back.  We're ready to

15    resume.  You'll recall that Ms. Harrison was on the witness

16    stand, Ms. Sherman was conducting her cross-examination.  We

17    pick up there.

18         Ms. Sherman.

19         MS. SHERMAN:  Thank you, Judge.  With permission, if

20    I can start a few questions back?

21         THE COURT:  Yes.

22         MS. SHERMAN:  Thank you.

23    CROSS-EXAMINATION

24    BY MS. SHERMAN:

25    Q    Ms. Harrison, you testified that from approximately May

J. HARRISON - CROSS - MS. SHERMAN                257

1    of 2021 through September 9, 2021 that Mr. Bantis was

2    repeatedly yelling at you from inside of a car and outside of

3    a car, correct?

4    A      Correct.

5    Q      That he was threatening to kill you, correct?

6    A      Correct.

7    Q      And referring to your store as a rat?

8    A      Correct.

9    Q      And your brother as a rat, correct?

10   A      Correct.

11   Q      You testified that you were terrified?

12   A      Correct.

13   Q      But the first time you called 911 in relation to your

14   claims that Mr. Bantis was allegedly threatening you in 2021,

15   was on August 31 of 2021, correct?

16   A      Correct.

17   Q      Ms. Harrison, you knew before May of 2021 that your

18   brother George Harrison had relocated, correct?

19   A      Yes.

20   Q      You knew he had changed his name, correct?

21   A      Yes.

22   Q      And you knew that he had cooperated with law enforcement,

23   correct?

24   A      Yes.

25   Q      You have someone screaming at you from a car that your

J. HARRISON - CROSS - MS. SHERMAN                258

1  brother is a rat, I think you said consistently over the span

2  of four months, but you don't call the police until August 31

3  of 2021?

4  A    That is correct.

5  Q    You know a number of police officers from the 68

6  precinct, correct?

7  A    Yes, I do.

8  Q    You publicly support the police, yes?

9  A    Yes, I do.

10 Q    You're not someone who hesitates to call the police,

11 correct?

12 A    Correct.

13 Q    And in fact, between April of 2021 and September 7 of

14 2021 you called the police seven times unrelated to issues

15 with Mr. Bantis?

16        MS. McGRATH:  Objection, your Honor.

17        THE COURT:  I'll allow it.

18        MS. McGRATH:  I believe this is consistent with your

19 prior ruling -- inconsistent with your prior ruling.

20        THE COURT:  We're not getting into the subject merit

21 of any calls.  I'll allow to ask the question whether or not

22 she called, has called the police on those occasions but not

23 the subject matter.

24 BY MS. SHERMAN:

25 Q    Ms. Harrison, you in fact contacted the police in the

*Rivka Teich CSR, RPR, RMR, FCRR*
*Official Court Reporter*

J. HARRISON - CROSS - MS. SHERMAN                 259

1    summer of 2021 because someone left a bad review for your

2    store on Yelp, correct?

3              THE COURT:  Sustained.

4    A    No.

5              THE COURT:  Sustained.  We're not going into the

6    subject matter of calls.

7    Q    Now Ms. Harrison, you had a cellphone in August and

8    September of 2021, correct?

9    A    Correct.

10   Q    And it has capability to take photographs, right?

11   A    Yes.

12   Q    In fact, we've seen photographs of you took of Mr. Bantis

13   on September 9, 2021, correct?

14   A    Yes.

15   Q    It had the capability to record video, correct?

16   A    Correct.

17   Q    And the capability to record audio, correct?

18   A    Correct.

19   Q    The photo that you took of Mr. Bantis on September 9,

20   2021, is the only photo you took of Mr. Bantis, correct?

21   A    Yes.

22   Q    You never took a photograph of Mr. Bantis sitting outside

23   your store, correct?

24   A    No, I did not.

25   Q    You never took a photograph of Mr. Bantis looking in your

J. HARRISON - CROSS - MS. SHERMAN                    260

1   windows, correct?

2   A    Correct.

3   Q    You never recorded any audio of Mr. Bantis yelling at

4   you, correct?

5   A    Yes.

6   Q    You never took any video of Mr. Bantis yelling at you,

7   correct?

8   A    Correct.

9   Q    Now in August of 2021, you and your husband -- you and

10  your fiancée, owned E&J Boutique, correct?

11  A    Yes.

12  Q    Your nephew Andrew Harrison was working there, correct?

13  A    Yes.

14  Q    And I believe you testified you had other employees,

15  correct?

16  A    Yes.

17  Q    A Cliff, I believe?

18  A    Correct.

19  Q    And someone named Jonathan Rubinov?

20  A    Correct.

21  Q    And you testified that in August of 2021 at times you had

22  Anthony Harrison, your other nephew, working there, correct?

23  A    For a week, and Blake also.

24  Q    And Blake, okay.  When this alleged harassment started

25  with Mr. Bantis in 2021, you told your nephew Anthony Harrison

J. HARRISON - CROSS - MS. SHERMAN                    261

1    about it, correct?

2    A     The harassment started before 2021 of September.

3    Q     I didn't say September.  I'm sorry, May of 2021?

4    A     Okay, May 2021.  I told him in September.

5    Q     Okay.  So you told him in September 2021?

6    A     Correct.

7    Q     And you told your nephew Anthony Harrison to look out for

8    Mr. Bantis, correct?

9    A     Yes.

10   Q     And to let you know if he saw him, correct?

11   A     Yes.

12         MS. SHERMAN:  Judge, I apologize, back on the

13   question that was objected to about the calling 911, I'm just

14   not sure that the witness actually answered the question, the

15   one that was overruled, if I could just reask that one

16   question?

17         THE COURT:  You may.

18         MS. SHERMAN:  Thank you.

19   BY MS. SHERMAN:

20   Q     Between April 2021 and September 7 of 2021 you called the

21   police seven times completely unrelated to Mr. Bantis?

22   A     I don't recall I did; but if it says I did, then I did.

23   Q     Okay.  Ms. Harrison, we discussed how you spoke with

24   several different members of law enforcement during the

25   investigation of this case, correct?

J. HARRISON - CROSS - MS. SHERMAN                262

1    A    Correct.

2    Q    You spoke with members of the New York Police Department,

3    right?

4    A    When they came to my store, yes.

5    Q    On --

6    A    Yes.

7    Q    You spoke with Special Agent Tambrino?

8    A    Yes.

9    Q    You had Special Agent Tambrino's cellphone number,

10   correct?

11   A    Correct.

12   Q    The first time you texted him about Mr. Bantis allegedly

13   harassing you during the summer 2021 was on August 31 of 2021?

14   A    Correct.

15   Q    You referred to him by his first name?

16   A    Correct.

17   Q    Between August 31 of 2021 and September 9 of 2021 you

18   texted Special Agent Tambrino over 30 times, correct?

19   A    Correct.

20   Q    You called him a number of times?

21   A    Correct.

22   Q    You continued to call Special Agent Tambrino after

23   Mr. Bantis' arrest on September 9 of 2021?

24   A    Yes, I did.

25   Q    You continued to text Special Agent Tambrino after

J. HARRISON - CROSS - MS. SHERMAN          263

1    Mr. Bantis' arrest on --

2    A    Yes, I did.

3    Q    -- 2021.  In fact, you texted Special Agent Tambrino on

4    November 7 of 2022 a picture of myself and my colleague,

5    correct?

6    A    Yes, I did.

7    Q    You referred to us as stooges, correct?

8    A    Yes, I did.

9    Q    That's because we were taking photographs of the area,

10   correct?

11   A    Correct.

12   Q    Ms. Harrison, you testified on direct that you did not

13   have any external cameras on your store in the summer of 2021,

14   correct?

15   A    Correct.

16   Q    You did have a camera that was from the inside of your

17   store but faced outwardly, correct?

18   A    Yes.

19   Q    You did have a security system in your store?

20   A    Inside, yes.

21   Q    You had a camera that faced the back garden area,

22   correct?

23   A    The backyard?

24   Q    Yes.

25   A    The backyard I do, yes.

J. HARRISON - CROSS - MS. SHERMAN                264

1    Q    You had the camera that was on the inside of the door but

2    facing on to the street, correct?

3    A    There is no camera on the door.

4    Q    Okay.  You had a camera on the window facing on to the

5    street?

6    A    I do not.

7    Q    Okay.  So in the summer of 2021, you did not have any

8    camera that was facing out of the store.

9    A    I had a camera inside, halfway inside, the store facing

10   the direction of the front window.

11   Q    Okay.

12   A    But it didn't reach outside.

13   Q    Okay.

14   A    It faces the front door so you can see the windows but

15   you can't see the actual ground outside.

16   Q    So facing out the front windows?

17   A    Halfway inside the store, looking at the front of the

18   store.  The front of the store has the glass windows, that's

19   what you're seeing, the glass windows.

20   Q    Right.  And you did not provide any footage to law

21   enforcement in connection with this case, correct?

22   A    Correct.

23   Q    We talked about the other businesses on the street of on

24   your block of Fort Hamilton Parkway, correct?

25   A    Yes.

J. HARRISON - CROSS - MS. SHERMAN                265

1    Q    I think we looked at Sancho Pancho Bakery?

2    A    Yes.

3    Q    And Sancho Pancho Bakery has a video surveillance camera

4    on the outside, correct?

5    A    I'm not sure.

6    Q    A number of the businesses on your block of Fort

7    Hamilton, so between Bay Ridge Avenue and 70th Street, have

8    video surveillance cameras on their store, correct?

9           MS. McGRATH:  Objection, your Honor.

10          THE COURT:  I'll allow it.  It's a preliminary

11   question.  If she knows.

12          THE WITNESS:  Can I answer it?

13          THE COURT:  If you know.

14   A    I'm note sure, I don't own those stores.

15   Q    I understand you don't own the stores.  Ms. Harrison,

16   you've had your store on that block or down the block for a

17   number of years now, correct?

18   A    Eight years.

19   Q    So you spend a lot of time on that block, correct?

20   A    Yes, I do.

21   Q    In addition in the text message you sent to Special Agent

22   Tambrino about my colleague and my taking photos, you

23   mentioned we were taking photos of the cameras on the stores

24   on your block, correct?

25   A    That is correct.

J. HARRISON - CROSS - MS. SHERMAN            266

1   Q     I want to switch gears for a bit and talk about a few

2   different specific dates in August and September 2021 that we

3   heard about on direct, okay?

4   A     Okay.

5   Q     I want to start with August 31 of 2021.  You describe

6   this on direct as a fight between your brother James Harrison

7   and Mr. Bantis, correct?

8   A     Yes.

9   Q     I believe on direct you testified that they were

10  screaming back and forth at each other, right?

11  A     Correct.

12  Q     And then that they chased each other down the block,

13  right?

14  A     Well, Chris was standing on the opposite side of the

15  street as my brother was, and kind of like egging him saying,

16  come on, come on.  And my brother, he's a tough guy, he went

17  after him.

18  Q     Okay.

19  A     So, yes.

20  Q     So your brother chased after Mr. Bantis?

21  A     Yes, to chase him away.

22  Q     Got it, okay.

23        I would like to pull up what has been moved into

24  evidence as Government Exhibit 208 -- sorry 207.  I'd like to

25  start at the beginning.  I'd like to play and pause at one

J. HARRISON - CROSS - MS. SHERMAN                 267

1    second?

2              THE COURT:  Which one are you doing, Ms. Sherman?

3              MS. SHERMAN:  Government Exhibit 207.

4    BY MS. SHERMAN:

5    Q    Ms. Harrison, in the corner, the left corner of this

6    screen, do you recognize who that is?

7    A    Where?

8    Q    The person in the black T-shirt and jean shorts?

9    A    I only see their body, not their face.

10   Q    That's your brother James Harrison, no?

11   A    I don't know.  I can't tell.

12   Q    To be clear, this is this video surveillance depicting

13   the Jimmy's 3 Sons side of Fort Hamilton, correct?

14   A    Yes.

15   Q    Looking across the street at your side of the street,

16   correct?

17   A    Correct.

18   Q    And you can see the date stamp is August 31 of 2021,

19   correct?

20   A    Yes.

21   Q    And you were present on that day, this is the day you

22   were saying there was a fight between Mr. Bantis and your

23   brother James, correct?

24   A    Correct.

25   Q    If we could play it.  You see the person in the black

J. HARRISON - CROSS - MS. SHERMAN                    268

1    T-shirt and jean shorts next to a red car, correct?

2    A    Yes.

3    Q    That's your red truck, correct?

4    A    Yes, it is.

5    Q    The car behind it is your brother James Harrison's black

6    Mercedes, correct?

7    A    That's the car he pulled up in, yes.

8    Q    I now want to pull up what is previously moved into

9    evidence as Government Exhibit 208.  That's Mr. Bantis

10   correct?

11   A    Walking with the bags in his hands, yes.  And that's

12   where he stops to start yelling at my brother.

13   Q    And then keeps walking, correct?

14   A    I don't know.  I can't see.

15   Q    We can watch it again.

16   A    Go ahead.

17              (Video played)

18   A    I see a shadow, I don't know where he went after that.  I

19   still see his shadow on the ground.

20   Q    You don't see the shoes?

21   A    The shoes are cut off in the video.

22   Q    That's my question, you don't see shoes in the video?

23   A    I can't see, it cuts it off.

24   Q    So in this clip Mr. Bantis is on the Jimmy's 3 Sons side

25   of the street, correct?

J. HARRISON - CROSS - MS. SHERMAN          269

1   A     Yes.

2   Q     You and your brother James Harrison are on your side of

3   the street, correct?

4   A     Correct.

5   Q     I believe you said that your nephew Anthony Harrison was

6   there as well correct?

7   A     Yes, he was.

8   Q     From what we can see in that clip, Mr. Bantis never

9   crosses the street, correct?

10  A     No, he did not.

11  Q     You already testified that James Harrison, your brother,

12  chased Mr. Bantis down the block?

13  A     Yes, he did, he chased him away.

14  Q     Your nephew Anthony Harrison also chased him down the

15  block, correct?

16  A     I don't recall.  I was too nervous that day with

17  everything going on, I wasn't paying attention.

18  Q     I understand that.  If we can pull up for the witness

19  3500-JH-16.  Can you read that to yourself, Ms. Harrison?

20          (Witness reviewing document.)

21          Does that refresh your recollection as to whether or

22  not your nephew Anthony Harrison also chased Mr. Bantis down

23  the street.

24  A     Anthony was with James when they arrived, so I think they

25  took off together; but I don't know if he was chasing him or

J. HARRISON - CROSS - MS. SHERMAN                    270

1    not.

2    Q    Ms. Harrison, you were interviewed by Special Agent

3    Tambrino --

4    A    Correct.

5    Q    -- correct?

6    A    Yes.

7    Q    And that was on August 31 of 2021, correct?

8    A    Correct.

9    Q    Same day as this incident, correct?

10   A    I don't recall the day I met with him.  It might have

11   been the same day.

12   Q    Okay.  This incident was on August 31?

13   A    Yes.

14   Q    And you met with Special Agent Tambrino?

15   A    I don't remember if I met with him that day.

16   Q    You spoke with him that day?

17   A    Yes, I did.

18   Q    Isn't it true you told Special Agent Tambrino that your

19   nephew, Anthony Harrison, chased Mr. Bantis down the street?

20   A    James chased Mr. Bantis down the street.

21   Q    That's not the question.

22        Isn't it true that you told Special Agent Tambrino

23   that your nephew Anthony Harrison chased Mr. Bantis down the

24   street?

25   A    I may have told him that.

1    Q    Okay.

2    A    Because they were together.

3    Q    Okay.  Ms. Harrison, you testified on direct about an

4    incident on September 5 of 2021 where your nephew Anthony

5    Harrison called you, correct?

6    A    Yes.

7    Q    You testified on direct that you called 911 on that day?

8    A    Yes, I did.

9            MS. SHERMAN:  May we approach briefly, Judge?

10           THE COURT:  Yes.

11           (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Sidebar conference.)

2              MS. SHERMAN:  Judge, we never received a September 5

3    911 call, which would be potentially Brady but clearly a

4    violation of 3500.

5              MS. McGRATH:  Your Honor, we don't have one.  We're

6    not aware of one of it being in existence.

7              MS. SHERMAN:  You requested all the 911 calls,

8    correct?

9              MS. OKEN:  My understanding, candidly, is she may be

10   confused about that, honestly.

11             MS. SHERMAN:  Okay.

12             MS. OKEN:  That's my understanding.

13             MS. SHERMAN:  Okay.

14             (End of sidebar conference.)

15             (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

J. HARRISON - CROSS - MS. SHERMAN                273

 1                    (In open court.)

 2    BY MS. SHERMAN:

 3    Q    Ms. Harrison, I want to move to the events of September 9

 4    of 2021.  This is the day that Mr. Bantis was arrested,

 5    correct?

 6    A    Correct.

 7    Q    You saw Mr. Bantis get arrested, correct?

 8    A    Yes, I did.

 9    Q    You testified on direct that you were sweeping outside

10    your store when Mr. Bantis started screaming at you, right?

11    A    Yes.

12    Q    He was on the corner of Fort Hamilton Parkway?

13    A    And Bay Ridge Avenue.

14    Q    So in front of Jimmy's 3 Sons?

15    A    Yes.

16    Q    That's across the parkway from your store, correct?

17    A    Correct.

18    Q    You testified that you went back into your store and

19    called 911, correct?

20    A    Yes, I did.

21    Q    You also testified that he made a gesture at you,

22    correct?

23    A    Yes, I did.

24    Q    You testified that he put his two fingers to his head,

25    correct?

J. HARRISON - CROSS - MS. SHERMAN          274

1    A     Yes.

2    Q     Police responded on to your store on September 9 of 2021,

3    correct?

4    A     Yes.

5    Q     You spoke with them, right?

6    A     Yes, I did.

7    Q     This was obviously the same day that this had happened,

8    correct?

9    A     Yes, I believe it was the same day, I think that's the

10   day he got arrested.  September 9 was the day of his arrest

11   and I spoke to them.

12   Q     Yes.  You spoke to them on the day they arrested you?

13   A     On the day he was arrested.

14   Q     Yes, the same day that you're saying he put his hand to

15   his head in a gesture?

16   A     Yes.

17   Q     You took that as a threat?

18   A     Yes, I did.

19   Q     It's important, as we talked about, to give accurate

20   details, correct --

21   A     Correct.

22   Q     -- to the police, yes?

23   A     Yes.

24   Q     Particularly accurate details what you perceive as a

25   threat, correct?

J. HARRISON - CROSS - MS. SHERMAN                275

1    A    Correct.

2    Q    Isn't it when you spoke to police officers, right, they

3    are wearing body cameras correct?

4    A    Yes.

5    Q    Isn't it true that you did not say anything to the police

6    who responded on September 9 of 2021 about Mr. Bantis putting

7    his two fingers to his head, correct?

8    A    I did not.

9    Q    It wasn't until you testified in the Grand Jury a full

10   week later that you mentioned that Mr. Bantis put his two

11   fingers to his head, correct?

12   A    Correct.

13   Q    I'd like to pull up what is moved into evidence as

14   Government Exhibit 283 and pause it at the beginning.

15        What we're looking at here, Ms. Harrison, is two

16   different angles of Fort Hamilton on September 9 of 2021,

17   correct?

18   A    Yes.

19   Q    On the left side of the screen we're looking at your side

20   of the street, correct?

21   A    Yes.

22   Q    On the right side of the screen we're looking at the

23   Jimmy's 3 Sons side, correct?

24   A    Correct.

25   Q    Can you point out for the jury where Jimmy's 3 Sons is on

J. HARRISON - CROSS - MS. SHERMAN                    276

1    the right side of the screen?

2    A    (Indicating.)

3    Q    Thank you.  The camera on the right side of the screen is

4    the Jimmy's 3 Sons side of Fort Hamilton looking towards Bay

5    Ridge Avenue, correct?

6    A    Correct.

7    Q    And the camera on the left side of the screen is the E&J

8    Boutique side of the street, of Fort Hamilton Parkway, looking

9    towards Bay Ridge Avenue?

10   A    Correct.

11   Q    Before we discuss Government Exhibit 283, I would ask

12   that the stipulation which was marked Government Exhibit

13   1016 -- withdrawn.

14          I would ask to remind the jury that, as has been

15   stipulated by the parties, that the time stamp on the left

16   video is 56 minutes slow but the accurate time stamp is the

17   time stamp on the right video.  Okay.

18          I'm actually going to ask Carry if you skip ahead to

19   7:20 on the exhibit and stop at 7:45.

20          I ask you watch the left side of the screen,

21   Ms. Harrison.

22          (Video played)

23          We just saw you come out of E&J Boutique, correct?

24   A    I don't know.  It went too fast.

25   Q    If we can play it back at a slower speed, Carry.  Go back

J. HARRISON - CROSS - MS. SHERMAN                277

1    to 7:20, play it at a slower speed.

2             (Video played)

3    A    Yes.

4    Q    That's where E&J is located, on the left side of the

5    screen, where you came out of?

6    A    Yes.

7    Q    You were going to meet the police who had responded,

8    correct?

9    A    Correct.

10   Q    You're wearing a pink shirt on that day, correct?

11   A    Yes.

12   Q    And I think khaki shorts?

13   A    Yes.

14   Q    Fair to say that E&J Boutique is just beyond that blue

15   awning, correct?

16   A    Which blue awning?

17   Q    On the left side of the screen, the blue awning towards

18   the back of the screen, right under the camera?

19   A    That blue awning would probably be, I think that's the

20   printing place.  I'm about three or four stores down.

21   Q    Okay.  I'd like to backtrack a bit.  I'd like to play

22   Government Exhibit 283 starting at the beginning and pausing

23   at 15 seconds.

24             You're not pictured right now in these screens,

25   correct?

J. HARRISON - CROSS - MS. SHERMAN                278

1    A    No.

2    Q    Looking at the right side of the screen, top, middle

3    corner, a bus came into view, correct?

4    A    Yes.

5    Q    I'd like to start again playing at 15 seconds and pausing

6    at 41 seconds.

7                (Video played)

8                The person that walked across the right of the

9    screen is Mr. Bantis, correct?

10   A    Can you go back on that please?

11   Q    Sure.

12               (Video played)

13   A    It looks like it is, yes.

14   Q    He walked across the street, presumably into Jimmy's 3

15   Sons, correct?

16   A    Yes.

17   Q    He's wearing the black tank top?

18   A    Yes.

19   Q    And the white shorts, correct?

20   A    Yes.

21   Q    And carrying a black duffel bag, yes?

22   A    Some kind of bag, but yes.

23   Q    In the interest of time, I would ask to play the rest of

24   Government Exhibit 283 but at the speed of 3.0.  I'm going to

25   ask that you tell us to pause at the point that Mr. Bantis is

J. HARRISON - CROSS - MS. SHERMAN          279

1    yelling at you and gesturing you and threatening you.

2    A    Okay.

3              (Video played)

4    A    I don't know how I would be able to tell, you don't have

5    the angle.

6    Q    Let's start the beginning at 00.

7              (Video played)

8    A    There is no way to determine that from the video.  I

9    wouldn't be able to point out the time.

10   Q    Okay, so you can't point out the time on this video,

11   correct?

12   A    No.

13   Q    Now you called 911 on September 9 of 2021, correct?

14   A    Correct.

15   Q    We listened to that on your direct testimony?

16   A    Yes.

17   Q    That was at approximately 11:06 a.m.?

18   A    Correct.

19   Q    During that 911 call, you told the 911 operator that

20   Mr. Bantis was threatening to shoot you, yes?

21   A    Correct.

22   Q    You told the 911 operator that he has a gun, correct?

23   A    Correct.

24   Q    And during your 911 call on September 9, of 2021, you

25   told the 911 call operator that you have an Order of

J. HARRISON - CROSS - MS. SHERMAN          280

1   Protection against Mr. Bantis, correct?

2   A    Correct.

3   Q    That's not true, right?

4   A    That is not true.

5   Q    On September 9 of 2021, you did not have an active Order

6   of Protection against Mr. Bantis, correct?

7   A    I did not.

8   Q    During your 911 call in September 9 of 2021, you told the

9   911 operator there was a Marshal's warrant for Mr. Bantis,

10  correct?

11  A    Yes.

12  Q    That was not true, correct?

13  A    My brother showed me one.  My brother George sent me a

14  photo of a Marshal's notice and told me to say this to get

15  help that I needed.

16  Q    So your brother George sent you a photograph of a

17  supposed warrant, and told you to tell them, tell 911, that

18  there was a warrant so they would come?

19  A    Yes.  If I was ever in trouble, tell 911 because the guy

20  is dangerous.

21  Q    Got it.  In fact, during your 911 call you affirmatively

22  stated to the operator tell NYPD he is armed, correct?

23  A    Correct.

24  Q    You testified on direct already that you never saw a gun

25  on Mr. Bantis, correct?

J. HARRISON - CROSS - MS. SHERMAN               281

1    A    He made a gesture of the a gun.

2    Q    That's not my question --

3    A    I did not see a gun.

4    Q    Ms. Harrison, you understand that the NYPD takes the

5    report of a crime very seriously, correct?

6    A    Correct.

7    Q    You understand that the NYPD takes the report of someone

8    violating an Order of Protection very seriously, correct?

9    A    Correct.

10   Q    And that the NYPD takes the report of a warrant out for

11   someone's arrest very seriously, correct?

12   A    Correct.

13   Q    Ms. Harrison, I want to briefly address September 8 of

14   2021.  You testified on direct that you called 911 on

15   September 8 of 2021, right?

16   A    I still believe I did, yes.

17   Q    I'm talking about September 8 now.

18   A    I understand.

19   Q    Again, you weren't at your store on September 8 of 2021,

20   correct?

21   A    I don't remember if I was or not.  What day was that?

22   Q    This is the day that you say Mr. Bantis got into an

23   altercation with your nephew?

24   A    I was not there.

25   Q    You were at the Aqueduct Casino with your fiancée?

J. HARRISON - CROSS - MS. SHERMAN                282

1    A    Yes.

2    Q    Any information you got from that day came from your

3    nephews, correct?

4    A    Yes.

5    Q    Again, going back to your 911 call that you made on

6    September 9 of 2021, which is the date Mr. Bantis was

7    arrested, you testified that you told the operator -- we heard

8    you tell the operator that Mr. Bantis pulled a pipe out on you

9    yesterday, correct?

10   A    Yes, I did.

11   Q    Yesterday would have been September 8 of 2021 correct?

12   A    Yes.

13   Q    Again, you were not there at the store on September 8,

14   2021, correct?

15   A    No, I was not.

16   Q    When you spoke to the 911 operator on September 9, 2021

17   you said that Mr. Bantis was armed yesterday, correct?

18   A    Yes.

19   Q    Again that would have been September 8, 2021, yes?

20   A    Correct.

21   Q    You were not there on September 8, 2021?

22   A    I arrived later in the day.

23   Q    You did not see Mr. Bantis on September 8, 2021, correct?

24   A    Correct.

25        MS. SHERMAN:  One moment, please.  No further

J. HARRISON - REDIRECT - MS. McGRATH          283

1    questions.

2              THE COURT:  Thank you, Ms. Sherman.

3              Ms. McGrath, do you have any redirect?

4              MS. McGRATH:  Yes, your Honor.

5    REDIRECT EXAMINATION

6    BY MS. McGRATH:

7    Q    Ms. Harrison, you were asked some questions on

8    cross-examination about meeting with the Government?

9    A    Yes.

10   Q    We've met a few times?

11   A    Yes, we have.

12   Q    I've also asked to meet with you a few times when you

13   refused, correct?

14   A    Correct.

15   Q    Including last week?

16   A    Yes.

17   Q    Including over the weekend?

18   A    Yes.

19   Q    And including today before you testified, correct?

20   A    Yes, I did refuse.

21   Q    You were also asked about some other 911 calls you made

22   in the summer of 2021, do you remember that?

23   A    Yes.

24   Q    Have you been called to testify in any of those 911

25   cases?

J. HARRISON - REDIRECT - MS. McGRATH                284

1   A    No, I have not.

2   Q    You were also asked questions about cameras that you have

3   at your store, E&J Boutique?

4   A    Correct.

5   Q    Is are you familiar with the term retention policy?

6   A    No.

7   Q    How long is the footage saved for the internal cameras in

8   your store?

9   A    It doesn't save.

10  Q    You were also asked questions on cross about seeing

11  someone inside and outside of a white car, the defendant,

12  inside and outside of a white car screaming at you?

13  A    Correct.

14  Q    When you saw the defendant outside the white car, what,

15  if anything, was he doing?

16  A    He was actually putting a bag of laundry inside the

17  bag -- car, as he was screaming at me.

18  Q    You testified that you first learned that the person

19  making these screams, putting a face to the name, was on

20  August 31, 2021; is that correct?

21  A    That's correct.

22  Q    How did that change the way you felt about these threats?

23  A    So at first when it was happening I didn't know who it

24  was.  I kind of thought it was a prank.  Scared me a little

25  bit.  I'm very well known in the area, I have family in the

1   area.  I just thought somebody was playing games.  After

2   hearing the voice screaming at my brother, and my brother

3   telling me who it was, I realized, Jesus Christ, this is not

4   good.  I didn't know his name until that point.  I didn't know

5   that was him.

6   Q    The first time -- so the first you learned that the

7   person screaming at you was Chris Bantis was August 31?

8   A    That's correct.

9   Q    Is that the first time you called 911?

10  A    About it, yes.

11  Q    You were also asked questions about whether you told

12  Special Agent Tambrino that James was chasing your brother

13  (sic), Anthony was chasing your brother (sic).  If we can pull

14  up for the witness only 3500-JH-17.  If we can blow up the

15  lower portion.  If you could read that to yourself then I'll

16  ask you about it.

17            (Witness reviewing document.)

18  A    Yes.

19  Q    We can take that down.

20            Ms. Harrison, does that refresh your recollection

21  about what you told Special Agent Tambrino regarding who had

22  chased the defendant away?

23  A    Yes.

24  Q    Who did he tell him?

25  A    I did say Anthony and my brother.

J. HARRISON - REDIRECT - MS. McGRATH          286

1    Q     You were also asked some questions about who instigated,

2    who started, the dispute on August 31.  Did you speak to

3    police officers that day?

4    A     I don't remember if I did or not.

5                (Continued on next page.)

J. HARRISON - REDIRECT - MS. McGRATH                287

1              MS. SHERMAN:  Objection.

2              There was no questions regarding who instigated

3    anything on August 31st.

4              THE COURT:  Well, if it relates to the fight, you

5    inquired about the fight; didn't you?

6              MS. SHERMAN:  Yes.

7              THE COURT:  Okay, I'll admit it.

8    REDIRECT EXAMINATION (Continued)

9              THE WITNESS:  I'm sorry, can you repeat the question

10   again?

11   Q    Sure.

12              And perhaps -- so you called 9-1-1 on August 31st?

13   A    Yes, I did.

14   Q    Did the police arrive?

15   A    Yes.

16   Q    Did you speak to them?

17   A    If they arrived to the store, then, yes, I did.

18              I always met with the police when they arrived.

19   Q    And did you explain to them what happened?

20   A    Yes, I did.

21              THE COURT:  Do you recall them actually coming?

22              THE WITNESS:  Yes, now I do.  I'm sorry.

23   Q    And did you tell them --

24              THE COURT:  Would you have spoken to them if they

25   didn't come into the store, and only met with them outside?

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

J. HARRISON - REDIRECT - MS. McGRATH                288

1          THE WITNESS:  If they were outside, I would have

2     went outside and spoke with them, yes.

3          THE COURT:  Proceed.

4          MS. McGRATH:  Thank you, Your Honor.

5     Q    And do you recall telling them what you had heard the

6     defendant say to your brother?

7     A    Yes.

8     Q    Do you remember what that is today?

9     A    He was telling my brother that he was going to fucking

10    kill him.

11    Q    And did you tell the police that?

12    A    Yes, I did.

13    Q    And at what point did the defendant -- did your brother

14    chase the defendant away?  Was it before or after?

15    A    After he had said that.

16    Q    And you were also asked about a 9-1-1 call on August 31st

17    when you said that the -- you know, that the harassment had

18    been going on for one week.

19          Do you remember that?

20    A    Yes.

21    Q    Was that true?

22    A    August 31st was the day that Andrew and Anthony were in

23    the store, correct?

24    Q    Correct.

25    A    It was going on for longer than a week.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

J. HARRISON - REDIRECT - MS. McGRATH          289

1    Q    And why did you say one week?

2    A    I was so nervous, honestly, I couldn't even talk.  I was

3    just hearing that my nephew was going to get killed that day.

4    Q    You were also asked about a 9-1-1 call on September 8th,

5    2021.

6         Do you remember that?

7    A    Yes.

8    Q    And your statement that the defendant had a gun.

9    A    Correct.

10   Q    And prior to that time, had the defendant screamed things

11   to you indicating he had a gun?

12   A    No, but he did threaten my life.

13   Q    And did he make gestures to you?

14   A    On the 9th he did.

15   Q    And did you believe, when you said to the operator -- why

16   did you say he had a gun?

17   A    That was the date Andrew had called me and told me what

18   was going on at the store.

19        Andrew said he came --

20        MS. SHERMAN:  Objection.

21        THE WITNESS:  -- and grabbed something out of a bag.

22        THE COURT:  It's not being offered for the truth.

23        THE WITNESS:  Can I keep going?

24        MS. McGRATH:  Yes.

25   A    He grabbed something out of a bag.  Andrew I think

J. HARRISON - REDIRECT - MS. McGRATH          290

1    assumed he was a gun.

2              THE COURT:  You can't tell us what Andrew assumed.

3              THE WITNESS:  Andrew told me it was a gun.

4              MS. SHERMAN:  Move to strike.

5              THE COURT:  It's stricken.

6    Q    You were also asked a number of questions about --

7              THE COURT:  Just close the loop.

8              The statement you made to 9-1-1 about the gun was

9    based on information you received from Andrew?

10             THE WITNESS:  That is correct.

11   BY MS. McGRATH:

12   Q    And did you believe that -- based on the information you

13   were told, did you believe the defendant had a gun?

14   A    A hundred percent, yes.

15   Q    And you were asked a number of questions about

16   September 9th on cross-examination.

17             Do you remember those?

18   A    Yes.

19   Q    And we watched some video footage?

20   A    Yes.

21   Q    To be clear, was there any audio in that footage?

22   A    No.

23   Q    And could the camera angle that we saw show the

24   storefront of Jimmy's?

25   A    No.

J. HARRISON - REDIRECT - MS. McGRATH          291

1   Q    To be clear, you testified earlier that on September 9th,

2   2021, you saw the defendant in front of Jimmy's, correct.

3   A    Yes, I did.

4   Q    So from your vantage, you could see the defendant?

5   A    Yes, I did.

6   Q    And you took photos of the defendant?

7   A    Yes, I did.

8        MS. McGRATH:  Okay, let's scroll up first to what's

9   in evidence as Government Exhibit 113.

10  Q    And can you just again circle, if you can see it on the

11  screen, where Sancho Pancho Bakery is?

12  A    (Witness complying.)

13  Q    And where Jimmy's Deli is?

14  A    (Witness complying.)

15       MS. McGRATH:  And if we can turn to what's in

16  evidence as Government Exhibit 130.

17  Q    And you testified earlier that this was a photo that you

18  took after calling 9-1-1, correct?

19  A    Correct.

20  Q    And where are you standing when you took this photo?

21  A    I'm inside my store up against the glass window.

22  Q    And so was that the view that you had of the defendant?

23  A    Yes, it was.

24       MS. McGRATH:  And if we can pull up what's in

25  evidence as Government Exhibit 214A.

J. HARRISON - REDIRECT - MS. McGRATH          292

1          (Exhibit published.)

2          MS. McGRATH:  And, Ms. Moosher, if you can just zoom

3    in to the portion of that -- where the timestamp is.

4    Q    And do you see the timestamp on this?

5    A    Yes, I do.

6    Q    What is it?

7    A    It's 11:07.

8    Q    And do you notice an individual walking into Jimmy's?

9    A    It's the same individual that's in the photo when I took

10   the photo.

11   Q    And so at 11:07 a.m., you had a vantage of the defendant,

12   correct?

13   A    Yes.

14   Q    And that vantage was not visible in the security footage

15   that defense counsel showed you?

16   A    Correct.

17   Q    You were also asked about the gestures the defendant made

18   to you on September 9th.

19          Do you remember that?

20   A    Yes, I do.

21   Q    And one of them was grabbing at his waistband, correct?

22   A    Yes.

23   Q    And one of them was pointing his two fingers --

24   A    That's correct.

25   Q    And you were asked if you provided all that information

J. HARRISON - REDIRECT - MS. McGRATH                    293

1   to the police when they responded, correct?

2   A    Correct.

3   Q    And do you remember telling the police when they

4   responded that he had made a gesture?

5   A    I don't recall if I did or not.

6   Q    Is there something that would refresh your recollection?

7   A    If you had the body cam footage maybe.

8            MS. McGRATH:  Your Honor, permission to play

9   something for the witness without audio?

10           THE COURT:  Is it in evidence?

11           MS. McGRATH:  It is not.

12           THE COURT:  No.

13           MS. McGRATH:  Ms. Harrison, I'll direct just your

14  attention to Government Exhibit 804AT.

15           (Exhibit published to the witness.)

16  Q    Ms. Harrison, does that refresh your recollection

17  regarding whether you made a gesture to the police when they

18  responded?

19  A    I may have made a gesture to them.

20           I don't recall if I definitely did.  But I did tell

21  them that he was threatening to kill me.

22  Q    And whether or not you made a gesture, do you recall the

23  interaction that --

24  A    Yes, I do.

25  Q    And how -- how long was that interaction?

1   A     With the police?  Maybe like five minutes or less.

2   Q     And in particular, the portion that we're looking at at

3   this moment, do you recall how long that was?

4   A     Oh, it was like two seconds.

5   Q     Where did the police go of after this interaction?

6   A     So it started in front of Jimmy's, and I believe they

7   came back across the street with me.

8                MS. McGRATH:  Your Honor, just one moment, please.

9                THE COURT:  Surely.

10               Ms. Harrison, when you refer to the police, you're

11   referring to the New York City Police Department officers?

12               THE WITNESS:  Yes, the NYPD.

13               THE COURT:  And they were in uniform?

14               THE WITNESS:  Yes, they were.

15               THE COURT:  And they come in a radio car?

16               THE WITNESS:  Yes, they did.

17               And if I could answer that question one more time, I

18   did tell them that he did this to me (indicating).

19               THE COURT:  The gesture?

20               THE WITNESS:  The gesture, yes, he did.  I did say

21   that.

22               I did tell one of the officers definitely that he

23   did this (indicating).

24               MS. SHERMAN:  Your Honor, if we can clarify what the

25   gesture is for the record.

J. HARRISON - REDIRECT - MS. McGRATH          295

1          THE WITNESS:  He used two of his fingers, pointed

2     them at his temple, making it in the shape of a gun like he

3     was going to kill me.  And as he screaming that he was going

4     to kill me.

5          MS. McGRATH:  Your Honor, no further questions.

6          THE COURT:  The gesture you're describing was not --

7     was prior to the time the police arrived?

8          THE WITNESS:  Correct.

9          THE COURT:  Thank you, Ms. McGrath.

10         MS. SHERMAN:  Judge, if we can briefly approach.

11         THE COURT:  Sure.

12         MS. SHERMAN:  Thank you.

13         (Continued on the next page.)

14         (Sidebar conference.)

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                              296

1        (The following occurred at sidebar.)

2        MS. SHERMAN:  Judge, the witness just testified that

3   she definitely told the police on August 31st that Mr. Bantis

4   had two fingers to his head.

5        THE COURT:  Just now?

6        MS. SHERMAN:  Yes, correct.

7        She did not do that.  And that's clear from the body

8   cam.  I understand we're not playing the body cam for the

9   jury, but I would ask the government to stipulate they know

10  that's not on the body cam, but she did not tell that on

11  August 31st.

12       MS. McGRATH:  Your Honor, apologies, I was walking

13  back to my table.

14       The follow-up questions you asked, did they pertain

15  to August 31st?

16       MS. SHERMAN:  I'm sorry, September 9th, the wrong

17  date.

18       MS. McGRATH:  Um, I think in the body camera

19  footage, that does not occur.

20       MS. OKEN:  I think -- can we take under advisement

21  overnight so we can look at the body cam before we make a

22  representation of what's in it?  I just want to be certain

23  that we're being accurate.

24       THE COURT:  Yes.  And whether or not this gesture

25  occurs at a time when the body cam film is there.

SIDEBAR CONFERENCE                          297

1          MS. McGRATH:  Right.

2          THE COURT:  You have to remind me, I don't know.

3          MS. McGRATH:  Right.

4          MS. SHERMAN:  Okay.

5          THE COURT:  You come back.

6          MS. OKEN:  Thank you, Your Honor.

7          (End of sidebar conference.)

8          (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. HARRISON - RECROSS - MS. SHERMAN          298

1              (In open court;                              .)

2              MS. McGRATH:  Your Honor, the government has no

3    further questions of the witness.

4              THE COURT:  Thank you, Ms. Harrison.

5              Ms. Sherman, any further recross?

6              MS. SHERMAN:  Just one question.

7              Is it okay I do it from the table, Judge.

8    RECROSS-EXAMINATION

9    BY MS. SHERMAN:

10   Q    On redirect, Ms. Harrison, you were asked -- or showed

11   the photos you took of Mr. Bantis on September 9th of 2021,

12   correct?

13   A    Correct.

14   Q    And just to be clear, you took those photos zoomed in,

15   correct?

16   A    Yes.

17             MS. SHERMAN:  Okay.  No further questions.

18             THE COURT:  Thank you very much.

19             So we are a completed with this witness?

20             MS. McGRATH:  Yes, Your Honor.

21             THE COURT:  Ms. Harrison, thank you very much.  We

22   appreciate it.

23             THE WITNESS:  Can I go?

24             THE COURT:  Yes.

25             (The witness was excused.)

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                    299

 1            THE COURT:  I don't know if the counsel has to

 2   gather some papers before we bring the other witness in?

 3            (Pause in the proceedings.)

 4            THE COURT:  Ms. Oken, where to next?

 5            MS. OKEN:  Your Honor, the government does have

 6   another witness available today.  It's approximately 5:30 now.

 7   If the Court is inclined for us to start with the next

 8   witness, we're happy to do that.

 9            THE COURT:  Tell me how long do you anticipate the

10   direct?

11            MS. OKEN:  I think we anticipate the direct will be

12   less than 30 minutes.  We have only three exhibits with this

13   witness.  It certainly won't be as long as the prior witness.

14            THE COURT:  Let's press on.  You're anticipating

15   under 30 minutes.  We'll at least get your direct out of the

16   way.

17            I'll ask counsel for defense what they may have and

18   then we'll go from there.

19            MS. OKEN:  Thank you, Your Honor.

20            With that the government calls U.S. Probation

21   Officer Kristen Aliperti.

22            (Continued on next page.)

23

24

25

ALIPERTI - DIRECT - MS. OKEN                    300

1              (Witness takes the witness stand.)

2    **KRISTEN ALIPERTI,** called as a witness, having been first duly

3    sworn/affirmed, was examined and testified as follows:

4              THE COURTROOM DEPUTY:  Please stand right there.

5              Please raise your right hand.

6              THE WITNESS:  Yes.

7              THE COURTROOM DEPUTY:  Please state your first and

8    last name and spell it for the record.

9              THE WITNESS:  Kristen Aliperti.  K-R-I-S-T-E-N.

10   A-L-I-P, as in Peter, E-R-T-I.

11             THE COURTROOM DEPUTY:  Thank you.  Have a seat,

12   please.

13   DIRECT EXAMINATION

14   BY MS. OKEN:

15   Q    Good afternoon.

16             Where do you work?

17   A    United States Probation for the Eastern District of New

18   York.

19   Q    And what is United States Probation?

20   A    So we're a Probation Department that supervises

21   individuals who are sentenced either after serving a term of

22   incarceration and/or not serving a term of incarceration and

23   being sentenced to probation, we monitor their supervision.

24   Q    And for an individual who is sentenced to a term of

25   incarceration, what is that called?

ALIPERTI - DIRECT - MS. OKEN                     301

1   A    Supervised release.

2   Q    And, Officer Aliperti, do you work for a prosecutor's

3   office?

4   A    No.

5   Q    Who do you work for?

6   A    I work for the United States Probation, but we're an arm

7   of the court.

8   Q    And how long have you worked for United States Probation?

9   A    Six years and two months, approximately.

10  Q    What is your current title?

11  A    United States Probation Officer Specialist, also referred

12  to as a senior United States Probation Officer.

13  Q    And how long have you been a United States Probation

14  Officer Specialist?

15  A    Approximately two years.

16  Q    Can you tell us what some of your responsibilities are as

17  a probation officer specialist?

18  A    So we're the senior officers in the department.  We have

19  extensive knowledge in a variety of cases; whether it be

20  mental health, substance abuse, sex-offense type cases.  We

21  participate in department initiatives; whether it's specialty

22  courts that are subject matter experts.  In addition to we

23  help mentor younger officers.

24  Q    What was your title before you were a specialist?

25  A    United States Probation Officer.

1  Q    And was that your title in 2017 and in 2018?

2  A    Yes.

3  Q    What are some of the responsibilities of a probation

4  officer?

5  A    So we assist a person under supervision with complying

6  with the conditions of supervised release.  In addition to, we

7  help link them with various resources to make positive

8  productive changes in their lives and behaviors.

9  Q    Tell us a bit about your educational background.

10  A    So I have an undergraduate degree in psychology and

11  criminal justice, and hold a master's degree in mental health

12  counseling.

13  Q    What did you do before you worked for the Probation

14  Department?

15  A    I worked for an agency that provided treatment services

16  to individuals who are under supervision.

17  Q    And how long were you there?

18  A    Approximately four years.

19  Q    Now you mentioned a term earlier called "supervised

20  release".

21         Just at a very high level, can you tell us what

22  "supervised release" is?

23  A    So supervised release is a term of supervision that

24  during that time people are subject to various conditions that

25  we help to enforce.  So they're under monitoring for a

ALIPERTI - DIRECT - MS. OKEN                      303

1    specific duration of time.

2    Q     So is it similar to being on probation?

3    A     Yes.

4              THE COURT:  But it is probation by the probation

5    officer.  You mean talking about between probation and

6    supervised release?

7              MS. OKEN:  Yes, Your Honor, clarifying the

8    similarities between the two.

9    Q     Who imposes conditions of supervised release?

10   A     The judge.

11   Q     And when are those conditions typically imposed?

12   A     At sentencing.

13   Q     Can you give us some examples of the types of conditions

14   that might be imposed on someone who's on supervised release?

15   A     So when an individual can be subject to mandatory

16   conditions, standard conditions and special or additional

17   conditions of supervised release and/or probation.

18   Q     And what happens if an individual doesn't comply with a

19   condition of supervised release?

20   A     There's a variety of responses at our disposal.  Simply

21   from verbally reprimanding someone all the way to filing a

22   formal violation of supervised release.  In the middle we can

23   modify conditions.  We can deliver written reprimands.

24   Q     Are you familiar with the defendant Chris Bantis?

25   A     Yes.

ALIPERTI - DIRECT - MS. OKEN                    304

1   Q    How are you familiar with him?

2   A    He was assigned to my caseload.  Or in other words, I was

3   assigned as his probation officer.

4   Q    And approximately when were you first assigned to be his

5   probation officer?

6   A    Around the spring of 2017.

7   Q    And was that around or shortly before the time that he

8   began his term of supervised release?

9   A    Yes.

10  Q    And how long were you his supervising probation officer?

11  A    Throughout the entirety of his supervision term.

12  Q    To your knowledge, was the defendant ever employed during

13  the term of supervised release?

14  A    No.

15        MS. HIROZAWA:  Objection.  Relevance, Your Honor.

16        THE COURT:  I'm going to allow it, but let's move

17  on.

18  Q    About how often would you interact with the defendant?

19  A    Approximately once a month.

20  Q    And were those monthly interactions face to face?

21  A    Yes.

22  Q    In addition to those face-to-face interactions, did you

23  have other interactions with the defendant?

24  A    Yes.  By phone.

25  Q    Before you met the defendant for the first time, did you

1    know anything about him?

2    A    Yes.

3              MS. HIROZAWA:  Objection.  Relevance.

4              THE COURT:  I'm going to allow it.  Describing how

5    she prepares his supervision.

6              MS. HIROZAWA:  Your Honor, can we speak at sidebar

7    briefly?

8              THE COURT:  No, that's okay.

9    Q    How did you come to learn about him before meeting him?

10   A    I'm sorry, what did you say?

11   Q    Let's start with that last question.

12             Before you met the defendant for the first time --

13             THE COURT:  And we'll pinpoint it.  Does this

14   question relates to a time after he is beginning with the time

15   you knew that you were going to be the probation officer

16   responsible to monitor Mr. Bantis' supervised release.

17   Q    Yes, at that time did you know anything about the

18   defendant?

19   A    Yes.  We have access to his judgment and commitment

20   order, in addition to a presentence report, which includes

21   information regarding Mr. Bantis.

22             THE COURT:  So you reviewed all of those before you

23   actually met Mr. Bantis for the first time?

24             THE WITNESS:  Yes.

25             MS. OKEN:  I'd like to show the witness only what's

ALIPERTI - DIRECT - MS. OKEN                    306

1    been marked as Government Exhibit 50A.

2              (Exhibit published to the witness.)

3    Q    Do you recognize this?

4    A    Yes.

5    Q    And what is it?

6    A    It's a presentence investigation report.

7    Q    And is this prepared by the Probation Department in the

8    ordinary course of business?

9    A    Yes.

10   Q    Also maintained in the Probation Department's files in

11   the ordinary course of business?

12   A    Yes.

13             MS. OKEN:  Your Honor, at this time we move to admit

14   Government Exhibit 50A into evidence.

15             THE COURT:  Any objection?

16             MS. HIROZAWA:  Only to cumulative evidence.

17             THE COURT:  I'll allow it.  It's received.

18             (Government Exhibit 50A, was received in evidence.)

19             MS. OKEN:  Thank you, Your Honor.

20             May we publish it to the jury?

21             THE COURT:  You may.

22             (Exhibit published.)

23   Q    If we can take a close look at the top third of this

24   document.

25             First, Officer Aliperti, if you can tell us, what is

ALIPERTI - DIRECT - MS. OKEN                    307

1    a presentence investigation report?

2    A    So it's a report that's written by a probation officer

3    that covers the offense conduct, an individual's criminal

4    history, personal characteristics that are specific to them

5    and their life.  In addition to statutory provisions and --

6    for sentencing, and any aggravating or mitigating factors that

7    might be present.

8    Q    And is a presentence investigation report sometimes

9    called a "PSR"?

10   A    Yes.

11   Q    And who prepares a PSR?

12   A    A probation officer.

13   Q    And, again, at what stage of the case is that -- is it

14   typically prepared?

15   A    After a finding of guilt or a plea of guilt.

16   Q    And is it prepared prior to sentencing or after

17   sentencing?

18   A    Prior to sentencing.

19   Q    Okay.  And who is it prepared for?

20   A    The judge.

21   Q    Generally speaking, tell us what the purpose is of a

22   presentence investigation report?

23   A    So it's to better understand personal characteristics of

24   a defendant or an individual under supervision, in addition to

25   providing details regarding the offense and then covering any

ALIPERTI - DIRECT - MS. OKEN                    308

1    other, you know, financial ability to pay potential

2    restitution or not.  And to offer sentencing parameters.

3    Q    Now does a PSR ever reference a victim or victims of a

4    crime?

5    A    Yes.

6    Q    I'd like to -- taking a close look at what we're zoomed

7    in on here.

8            Tell us what case is this particular PSR from?

9    A    United States of America versus Chris Bantis.

10   Q    And can you tell us what year that case is from?

11   A    2014.

12   Q    Let's -- I'd like to zoom in a little bit further below.

13   And I'm going to ask you:  Is the name of the defendant's

14   attorney listed on this document?

15   A    Yes.

16   Q    Okay, and what is the name of his attorney?

17   A    Andrew S. Rendeiro.

18   Q    I'd like to direct your attention now to page 3, which I

19   believe, Ms. Moosher, is the second page of the document.

20           Do you see the header for the offense which is just

21   above paragraph 5?

22   A    Yes.

23   Q    And I'll ask you to please read that paragraph aloud.

24   A    In October of 2013, John Doe began borrowing sums of

25   money from the defendant.  The defendant informed John Doe

ALIPERTI - DIRECT - MS. OKEN                    309

1    that he must pay, in quotes, five points or 5 percent

2    interest, in parentheses, every week which amounts to

3    260 percent interest per year.  From that time until the

4    defendant's arrest in this case, John Doe paid the defendant

5    several hundred dollars each week at the above rate, all of

6    which constituted interest.  The defendant told John Doe that

7    if John Doe failed to make timely payments, the defendant

8    would, in quotes, take a bat to John Doe's head, end quote.

9    The defendant showed John Doe a bat near the door of the

10   defendant's residence and a hammer that the defendant kept on

11   the floor of the automobile he drove.  The defendant also

12   informed John Doe that he had multiple firearms.

13   Q    I'd like to direct your attention now to the next page of

14   the document, which I believe is page 3 of the document.

15          Do you see the heading for victim impact above

16   paragraph 7?

17   A    Yes.

18          MS. OKEN:  I'll ask Ms. Moosher to please zoom in on

19   that, and I'll ask you to read it aloud.

20   A    The provisions of the mandatory Victim Restitution Act of

21   1996 apply to this Title 18 offense.  An affidavit of loss was

22   completed by John Doe, and submitted to the Probation

23   Department.  John Doe reports a loss due to the instant

24   offense in the amount of $7,800.  He also included a statement

25   related to the impact of the offense on him.  The unedited

ALIPERTI - DIRECT - MS. OKEN                310

1    statement is as follows:  Due to payments to Chris Bantis

2    because of the threats of bodily harm caused me to fall behind

3    in my bills and caused me to get evicted from my home.

4    Q    What is "restitution"?

5    A    Restitution is a loss that somebody suffers.  It's

6    ordering the repayment of that loss during the commission of a

7    crime.

8    Q    Was the defendant required to pay restitution as part of

9    his sentence?

10   A    Yes.

11   Q    Now let's return to the prior page, so page 2 of the

12   document.

13           Do you see the heading for additional relevant

14   conduct above paragraph 6?

15   A    Yes.

16   Q    And I'll ask if you would please read those first two

17   sentences aloud.

18   A    In addition to the extortion of John Doe, the defendant

19   also made similar threats to a second victim.  In recorded

20   voicemail messages, the defendant threatened to hurt his

21   second victim and threatened to kill his second victim.  He

22   referenced possessing a firearm.

23   Q    After the PSR was prepared, was defendant ultimately

24   sentenced?

25   A    Yes.

ALIPERTI - DIRECT - MS. OKEN                311

1    Q    And what type of sentence did he receive?

2    A    It was a term of incarceration followed by a term of

3    supervised release.

4    Q    And as you testified earlier, was he also required to pay

5    restitution?

6    A    Yes.

7    Q    Approximately when did you first meet with the defendant?

8    A    In July of 2017.

9    Q    At that very first meeting, had the defendant yet begun

10   his term of supervised release?

11   A    Yes, he would have began it at that point.

12   Q    Is that true of the very first time you met the

13   defendant?

14   A    No, I'm sorry, I had first met the defendant in April of

15   2017.  He had not yet begun his term of supervised release.

16   Q    And what happened at that first meeting?

17   A    So we briefly reviewed the conditions of supervised

18   release.  I introduced myself to Mr. Bantis as his supervising

19   probation officer.

20   Q    And did you thereafter meet with him after he began his

21   term of supervised release?

22   A    Yes, that was in July of 2017.

23   Q    Okay.  And what happened at that meeting?

24   A    So that was the initial meeting where he was under

25   supervision.  So he would have been processed and part of

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

1    processing is he takes fingerprints and photo.  Then we review

2    the judgment and commitment order, or the J&C, as we'll refer

3    to it, with him in depth.

4            MS. OKEN:  I'd like to show the witness only what's

5    been marked as Government Exhibit 51A.

6            (Exhibit published to the witness.)

7    Q    Do you recognize Government Exhibit 51A?

8    A    Yes.

9    Q    And what is it?

10   A    The judgment or the J&C.

11   Q    And is it a fair and accurate copy of the defendant's

12   sentencing?

13   A    Yes.

14           MS. OKEN:  Your Honor, we move to admit Government

15   Exhibit 51A into evidence.

16           THE COURT:  Any objection?

17           MS. HIROZAWA:  Your Honor, this is currently showing

18   one page.  Just to clarify, how many pages are in the --

19           MS. OKEN:  I'm happy to flip through it for

20   counsel's benefit.

21           MS. HIROZAWA:  Thank you, Your Honor.

22           No objection.

23

24           (Continued on the following page.)

25

ALIPERTI - DIRECT - MS. OKEN                    313

1              MS. HIROZAWA:  No objection, Your Honor.

2              THE COURT:  Received in evidence without objection.

3              MS. OKEN:  And, Your Honor, may we show it to the

4    jury?

5              THE COURT:  You may.

6              (Government Exhibit 51-A, was received in evidence.)

7              (Exhibit published.)

8    DIRECT EXAMINATION (Continued)

9    BY MS. OKEN:

10   Q    I think you referred to this document as a J and C or a

11   judgment.

12              Tell us what is a judgment.

13   A    So, it details the sentence in its entirety.  What an

14   individual was convicted of, incarceration, supervised

15   release, any conditions that they're subject to, and then

16   financial penalties as well.

17   Q    Now, directing your attention to page 1, we'll look at

18   the top third of this page to start.

19              Do you see where it says United States District

20   Court, Eastern District of New York?

21   A    Yes.

22   Q    And what court is that?

23   A    This court.

24   Q    And is this court a state court or a federal court?

25   A    A federal court.

ALIPERTI - DIRECT - MS. OKEN                    314

1    Q    Okay.  Now, looking at the left portion, the top left

2    corner, can you tell us what case this is from?

3    A    United States of America versus Chris Bantis.

4    Q    And does this document, again, list his attorney's name?

5    We'll zoom out a bit.

6    A    Yes.

7    Q    And, again, can you remind us who that?

8    A    Andrew S. Rendiero [sic] or Rendeiro.

9    Q    Now, I'll direct your attention to the bottom of this

10   first page.  The last two lines.

11          What is the date of this judgment?

12   A    February 1st, 2016.

13   Q    Now, let's look back at the middle of this page.  Do you

14   see where it says in all caps, THE DEFENDANT?

15   A    Yes.

16   Q    Okay.  Can you please read those first two lines aloud?

17   A    The defendant pleaded guilty to Count One of a two-count

18   Indictment.

19   Q    And below those check boxes, do you see where it says:

20   The defendant is adjudicated guilty of these offenses?

21   A    Yes.

22   Q    Again, what offense is listed?

23   A    18 U.S .C. 892(a), extortionate extension of credit.

24   Q    Now direct your attention to the next page of this

25   document, page 2, and what's the title on this page?

SAM      OCR      RMR      CRR      RPR

1    A    Imprisonment.

2    Q    Okay.  And, generally speaking, what type of information

3    is included on this page?

4    A    However many months or years an individual is sentenced

5    to imprisonment.

6    Q    Let's move on to page 3.

7         And what is the title on this page?

8    A    Supervised release.

9    Q    Can you please read the first two lines under supervised

10   release?

11   A    Upon release from imprisonment, the defendant shall be on

12   supervised release for a term of three years.

13   Q    Do you see where it says "Standard Conditions of

14   Supervision"?

15   A    Yes.

16   Q    What are standard conditions?

17   A    So, standard conditions are conditions that are adopted

18   by the Court for most every individual under supervised

19   release, and they involve or they cover how often somebody

20   reports to us, if they're working, and various other types of

21   conditions.

22   Q    Now, I'll direct your attention now to page 4.

23              (Continued on the following page.)

24

25

ALIPERTI - DIRECT - MS. OKEN                316

1   BY MS. OKEN:

2   Q    (Cont'g.)  Then additional supervised release terms?

3   A    Yes.

4   Q    And what does that mean?

5   A    Those are the special conditions of supervised release,

6   or in addition to the mandatory standard conditions,

7   conditions that an individual is required to comply with.

8   Q    And are those special conditions specific to a particular

9   defendant?

10  A    Yes.

11  Q    I'd like to direct your attention to Number 6 on this

12  page.

13          Can you please read that, those two lines aloud?

14  A    Yes.

15          The defendant shall not associate in person, through

16  mail, electronic mail or telephone with any victims of the

17  offense, or family members of victims of the offense, pursuant

18  to a prohibition list provided by the U.S Probation

19  Department.

20  Q    Now tell us what does that condition mean?

21  A    That condition means that Mr. Bantis cannot associate at

22  any point or in any way with victims or any family members of

23  the victims in his offense.

24  Q    If we can zoom in on that one more time.

25          (Continued on the following page.)

*SAM      OCR      RMR      CRR      RPR*

1          MS. OKEN:  And, Ms. Moosher, if we could zoom in on

2     that one more time.

3     DIRECT EXAMINATION (Continued)

4     BY MS. OKEN:

5     Q     Do you see where it says "pursuant to a prohibition list

6     provided by the U.S. Probation Department"?

7     A     Yes.

8     Q     Did you provide the defendant a list?

9     A     No.

10    Q     Why not?

11    A     Because we had discussions with Mr. Bantis at the time

12    about whether or not he was aware of who he needed to stay

13    away from.

14          In addition to, typically victim lists aren't

15    provided in that manner.  His case was a rather small case, so

16    through discussions we were able to discern that he knew who

17    he needed to stay away from.

18    Q     I'd like to now direct your attention to the blue text

19    below.  And I'll ask you to please read that blue text above

20    the signature line.

21    A     Sure.

22          Upon finding a violation of probation or supervised

23    release, I understand that the Court may; one, revoke

24    supervision; two, extend the term of supervision; and/or

25    three, modify the conditions of supervision.  These conditions

ALIPERTI - DIRECT - MS. OKEN                    318

1  have been read to me.  I fully understand the conditions and

2  have been provided a copy of them.

3  Q     And do you see those two signatures below?

4  A     Yes.

5  Q     And whose signatures are those?

6  A     Mr. Bantis's and then myself.

7  Q     And what's the purpose of having Mr. Bantis sign?

8  A     It's for him to acknowledge that we reviewed the

9  judgment, he understands it, and that he's aware of any

10 potential consequences or penalties, in essence, of violating

11 any of the conditions.

12 Q     And you read a line that said, "These conditions have

13 been read to me."

14        Did you, in fact, read the conditions to the

15 defendant?

16 A     Yes.

17 Q     Okay.  And it also says, I fully understand the

18 conditions and have been provided a copy of them.

19        Did you, in fact, provide a copy of them?

20 A     Yes.

21 Q     And can you just tell us the date that this document was

22 signed by the defendant?

23 A     July 28th, 2017.

24 Q     You testified previously that the defendant was required

25 to pay restitution.  Is that right?

ALIPERTI - DIRECT - MS. OKEN                    319

1   A    Yes.

2   Q    Okay.  And restitution, you testified, is owed to a

3   victim of a crime?

4   A    Yes.

5   Q    Okay.  Now, what's your understanding of where those

6   payments are sent to?

7   A    We instruct an individual under supervision to remit

8   payments to the Clerk's office.

9   Q    Okay, so they're not sent to the victim directly?

10  A    Well, no, we send them -- he sends them to the Clerk's

11  office, and then they're disbursed from there.

12  Q    Okay.

13       Did any condition of the defendant's supervised

14  release make reference to restitution?

15  A    Yes.

16  Q    And what condition is that?

17  A    A special condition.

18  Q    And what was the condition?

19  A    That he comply with restitution.

20  Q    Did the defendant ever express his views on making

21  restitution payments?

22  A    Yes.

23       MS. HIROZAWA:  Objection, calls for hearsay and

24  irrelevant.

25       THE COURT:  Why don't you lay the foundation.

ALIPERTI - DIRECT - MS. OKEN                    320

1           During your time supervising Mr. Bantis, did he make

2    restitution payments?

3           THE WITNESS:  Yes.

4    BY MS. OKEN:

5    Q    And did the defendant ever make statements expressing --

6           MS. HIROZAWA:  Objection.

7    Q    -- his own views --

8           THE COURT:  Sustained.

9    Q    In your -- well, did the defendant ever miss restitution

10   payments?

11   A    Yes.

12   Q    And did you have occasion to discuss restitution with him

13   on any of those occasions?

14   A    Yes.

15   Q    Okay.  And was the defendant ever reminded to pay

16   restitution?

17   A    Yes.

18   Q    I'd like to now direct your attention to June of 2018.

19          Did there come a time when you needed to speak to

20   the defendant again about his terms of supervised release?

21   A    Yes.

22   Q    Okay.  And why did you do that?

23   A    So, we received information through collateral law

24   enforcement contact that there were concerns about Mr. Bantis

25   associating with family members of the victims in his offense.

ALIPERTI - DIRECT - MS. OKEN                          321

1   Q    And did you learn the identity of those family members?

2   A    Yes.

3   Q    And what names did you learn?

4   A    The Harrison sisters.

5   Q    And did you learn the name of their business?

6   A    Yes.

7   Q    And what name did you learn?

8   A    E&J Boutique.

9   Q    And after you learned about that conduct, what did you

10  do?

11  A    So, we had a discussion with Mr. Bantis in the office.

12  Q    And was that also in June of 2018?

13  A    Yes.

14  Q    And tell us what was the purpose of that meeting?

15  A    So, the purpose of the meeting was to, number one,

16  reinstruct Mr. Bantis regarding the conditions of supervised

17  release.  In addition, to respond and determine, you know,

18  what was occurring and why it was occurring.

19          So, we had a discussion with him.  We issued a

20  written letter of reprimand.  We reinstructed him during that

21  visit.

22          MS. HIROZAWA:  Objection, Your Honor.

23          THE COURT:  Overruled.

24  Q    And what was the defendant's initial reaction?

25  A    So, there was an initial denial of any understanding or

ALIPERTI - DIRECT - MS. OKEN                    322

1    knowledge of what was alleged.

2    Q    And did he maintain that denial?

3    A    No.

4    Q    And how did that response -- how did that denial shift in

5    any way?

6    A    So, it shifted because he was able to identify that he

7    was taking a bus stop and eating food from a restaurant that

8    was in the vicinity of the restaurant -- of the victim's

9    employment, the victim's family members' employment at the

10   time.

11              So it went from:  No, I have no idea; to, you know:

12   There's a bus stop there that I frequent and take the bus

13   from.

14   Q    And you mentioned a restaurant in the area.

15              Do you recall the name of that restaurant?

16   A    Yes.

17   Q    And what was it?

18   A    George's Souvlaki.

19   Q    Do you know whether there was, in fact, a souvlaki place

20   there?

21   A    Yes.

22   Q    And do you know whether there was, in fact, a bus stop

23   there?

24   A    Yes.

25   Q    And how do you know that?

ALIPERTI - DIRECT - MS. OKEN                323

1   A    We went to the area to confirm that.

2   Q    Do you know whether there were other bus stops in the

3   area, as well?

4   A    In my discussion with Mr. Bantis, we identified that

5   there were other bus stops, yes.

6   Q    Did the defendant say anything else during that meeting?

7   A    He had questions about what specifically was told to us

8   and whether or not anyone had said he had threatened anyone.

9   Q    Did he ask that a single time or more than once?

10  A    More than once.

11  Q    And at that time had you mentioned anything about what

12  the report had been?

13  A    No, in terms of we did not mention anything having to do

14  with threats at that time.

15  Q    And I think you mentioned the defendant was reinstructed

16  on the terms of his supervised release?

17  A    Uh-hum, yes.

18  Q    I want to show you what's been marked as Government

19  Exhibit 52-A.

20       Do you recognize this?

21  A    Yes.

22  Q    What is it?

23  A    It's a letter that we have prepared for Mr. Bantis.

24  Q    And is it a fair and accurate copy of a letter that you

25  prepared for Mr. Bantis ?

1  A    Yes.

2  Q    And who created it?

3  A    I did.

4  Q    And did you create it in the ordinary course of your

5  business as a probation officer?

6  A    Yes.

7           MS. OKEN:  Your Honor, at this time we'd move to

8  admit Government Exhibit 52-A and ask to publish it to the

9  jury?

10          THE COURT:  Any objection?

11          MS. HIROZAWA:  None other than already stated.

12          THE COURT:  The exhibit will be received in

13 evidence, and you may publish.

14          (Government Exhibit 52-A, was received in evidence.)

15          MS. OKEN:  Thank you, Your Honor.

16          (Exhibit published.)

17 BY MS. OKEN:

18 Q    Officer Aliperti, what is the date on this letter?

19 A    June 18th, 2018.

20 Q    And is it on letterhead?

21 A    Yes.

22 Q    And whose letterhead is it on?

23 A    The Probation Department's letterhead.

24 Q    Do you see where it says "Dear Mr. Bantis"?

25 A    Yes.

ALIPERTI - DIRECT - MS. OKEN                325

1   Q    I'll ask that you please read the first paragraph aloud

2   start ing there.

3   A    This correspondence serves as an official letter.

4   Special condition of supervised release.  Specifically, the

5   defendant shall not associate in person, through mail,

6   electronic mail or telephone, with any victims of the offense,

7   or family members of victims of the offense,  pursuant to a

8   prohibition list provided by the U.S. Probation Department.

9   Q    And is that the same condition that we saw in the

10  judgment in Government Exhibit 51-A?

11  A    Yes.

12  Q    And at a very high level, what is the purpose of this

13  letter?

14  A    The purpose of this letter is to -- to, essentially, have

15  Mr. Bantis be on notice that this was an issue that arose in

16  his supervised release and that where we discussed it, we

17  documented it, and he's not to continue doing it further.

18  Q    Did you sign this letter?

19  A    Yes.

20  Q    And did the defendant sign this letter as well?

21  A    Yes.

22  Q    And on what date did you sign?

23  A    June 18th, 2018.

24  Q    And, again, what is the purpose of asking the defendant

25  to sign?

ALIPERTI - DIRECT - MS. OKEN                    326

1   A    It's an acknowledgement that he understands and that to

2   document, again, the discussion that he was part of.

3   Q    Now, in addition to this written letter, did you verbally

4   review the defendant's judgment with him?

5   A    Yes.

6   Q    And did you verbally review, again, the conditions of his

7   supervised release?

8   A    Yes.

9   Q    And was the defendant instructed on that specific

10  condition, staying away from his victims and their family?

11  A    Yes.  And we also suggested that he take a different bus

12  stop, given the, you know, easy availability of multiple forms

13  of transportation in the city.

14  Q    And in giving that instruction, and specifically the

15  instruction on this condition, did you refer to anyone

16  specifically by name?

17  A    Yes.

18  Q    Who did you refer to by name?

19  A    The Harrison sisters.

20  Q    And did you refer to any specific places by name?

21  A    E&J Boutique.

22  Q    And did the defendant confirm that he was aware of the

23  conditions of his supervised release?

24  A    Yes.

25  Q    Did the defendant contact you at any point after that

ALIPERTI - DIRECT - MS. OKEN                    327

1   meeting?

2   A     Yes.

3   Q     Did he contact you once or more than once?

4   A     More than once.

5   Q     And what did he say?

6   A     He was -- he wanted to reassure myself that there would

7   be no further issues, that he understood what was expected,

8   and that he didn't want me to believe that there was anything

9   that had gone wrong here.

10  Q     Did the defendant, during his term of supervised release,

11  ever express any resentment towards the victim?

12  A     Yes.

13  Q     What did he say?

14          MS. HIROZAWA:  Objection; hearsay, relevance.

15          MS. OKEN:  Your Honor, this is for statements of the

16  defendant.

17          THE COURT:  It would be an admission.

18          You may answer.

19  A     So, yes, he felt that he was here because he was informed

20  on, in essence, and that that's why this was occurring in his

21  life.

22  Q     Approximately, when did the defendant complete his term

23  of supervised release?

24  A     In 2020, in the summer of 2020.

25          MS. OKEN:  Just one moment, Your Honor.

ALIPERTI - DIRECT - MS. OKEN          328

1          (Pause.)

2          MS. HIROZAWA:  Your Honor, could we request a point

3   of clarification once we're back on the record?

4          THE COURT:  Do you want to do it over here, do we

5   need to talk?

6          MS. HIROZAWA:  Just a point of clarification when --

7   we'll address it on cross, Your Honor.

8          THE COURT:  That's one way to clarify things.

9   BY MS. OKEN:

10  Q    Just one final question, Officer Aliperti.

11         When -- when you mentioned that the Government --

12  that the defendant, rather, commented on having been informed

13  on, do you recall any terms in particular that he used?

14  A    Rat.

15         MS. OKEN:  No further questions.

16         THE COURT:  Shall we start on the defense side for

17  cross?

18         MS. HIROZAWA:  Your Honor, we would like to address

19  one matter with the Court prior to beginning

20  cross-examination.

21         THE COURT:  Sure.

22         MS. HIROZAWA:  So in the interest of time, I think

23  it's prudent to release the jury.

24         (Sidebar held outside the hearing of the jury.)

25

329
Sidebar

1          (The following sidebar took place outside the
2  hearing of the jury.)
3          THE COURT:  So, how long?
4          MS. HIROZAWA:  Your Honor, I'd say, about thirty or
5  forty minutes.
6          THE COURT:  Oh, that long?
7          MS. HIROZAWA:  Yes.
8          THE COURT:  If it was going to be short, then.
9          MS. HIROZAWA:  But we can discuss this after you --
10         THE COURT:  Yes, that's what I wanted to see, if it
11 would be brief.
12         (Sidebar concluded.)
13
14         (Continued on the following page.)
15
16
17
18
19
20
21
22
23
24
25

PROCEEDINGS                                   330

1            (In open court - jury present.)

2            THE COURT:  Ladies and gentlemen, in consultation

3    with counsel it appears that this would be a good place to

4    take our break for the day.  And so, we shall.

5            Again, we appreciate your service, your sacrifice,

6    and we will send you home with the instructions repeated

7    because they are important.

8            Remember not to discuss the case amongst yourselves

9    or with anyone else.  You are to continue to keep an open

10   mind.  We've heard a lot of testimony, including testimony

11   about locations.  Even if you live in the area that we have

12   heard about today during the trial, please make it your

13   business to go around it, to not go to it.  Try to not pass by

14   any of the locations we've talked about, not to do any

15   research at all about anything involving this case, either

16   electronically or through some old-fashioned method.

17           We do remain on radio silence, so that there is no

18   communication through social media or any other means of

19   communication about the trial, or the fact that you are a

20   juror, the fact that you are coming to the federal court in

21   Brooklyn, nothing about any of the personalities or issues in

22   the case.

23           And to the extent, again, using that broader

24   definition of media that goes beyond radio, TV and newspapers,

25   but into the internet age and social media, if there is any

PROCEEDINGS                                        331

1    notice in the media about the trial or anything that touches

2    on the trial, you are to completely disregard it.

3              Again, I urge you to disregard any immediate

4    accounts about civil or criminal proceedings, for fear that

5    you may hear or see something there that will ultimately

6    confuse you about what your responsibilities and duties are

7    here.

8              So, with all of those instructions, we are going to

9    send you home for a pleasant evening.  We are going to ask you

10   to come back to the Central Jury Room at around the same time

11   that we asked you for today, somewhere between 9:30 and 9:45,

12   and we will start as close as we can to that time.

13             It is possible, as you saw today, that the Court and

14   the lawyers have to address some legal issues that relate to

15   what you are going to see, so sometimes we get a later start.

16   It's not that we are not working on the case, it is just that

17   we are trying to spare you as much time, give you as much free

18   time as you can.  They don't want to call you on, your

19   services, unless we absolutely need them.

20             So, again, we do appreciate those services.  We

21   appreciate the sacrifice that you make.  We wish you a

22   pleasant evening.  And see you back here tomorrow as we resume

23   trial then.  So, have a good night and travel safely.

24             (Jury exits.)

25             THE COURT:  Okay, Officer Aliperti, you are excused

PROCEEDINGS                                332

1  as well and we will see you tomorrow morning.

2            THE WITNESS:  Thank you.

3            MS. OKEN:  Your Honor, given that the witness is

4  currently testifying and the Government won't be communicating

5  with her overnight, would this be a prudent time to advise her

6  as to the time she should return tomorrow?

7            THE COURT:  The same time as the jury is due.

8            THE WITNESS:  10:00?

9            THE COURT:  So if you are here at 10:00, we'll be in

10  good shape.

11            THE WITNESS:  Thank you, Your Honor.

12            MS. OKEN:  Thank you, Your Honor.

13            THE COURT:  Thank you.

14            (Witness steps down and exits the courtroom.)

15            THE COURT:  So, Ms. Hirozawa, you were asking about

16  a point of clarification, I think one shortly before we broke?

17            MS. HIROZAWA:  Yes, Your Honor.

18            As the Court is aware, the records that we have

19  received from Probation are significantly redacted.

20            THE COURT:  Yes.

21            MS. HIROZAWA:  The same is true for --

22            THE COURT:  I assume the exhibits are redacted as

23  well.

24            MS. OKEN:  Yes, Your Honor.

25            MS. HIROZAWA:  There are no records from Probation,

PROCEEDINGS                          333

1    in terms of the chronological reports, that are being entered

2    into evidence, to our knowledge.  So, there are no redactions.

3              The judgment, the PSR, that were admitted through

4    Ms. Aliperti were redacted, and we previously discussed those

5    redactions.

6              My concern, Your Honor, is that the scope of Officer

7    Aliperti's testimony exceeded our understanding of the scope

8    of the information that the Government intended to elicit,

9    including information about Mr. Bantis's employment while on

10   supervision.  Which his lack of employment was due, in part,

11   to his medical conditions, which the Government previously

12   moved to preclude us from discussing.

13             Additionally, it elicited information about the lack

14   of information provided to Mr. Bantis regarding certain

15   incidents and that information that Officer Aliperti received

16   regarding the alleged incident in 2018.

17             That information is not documented anywhere in the

18   redacted records that we've received, nor in the redacted

19   e-mails, e-mail communications that we received from the

20   Government related to e-mail communications between Officer

21   Aliperti and Officer Tambrino.

22             To the extent that Officer Aliperti has now

23   testified as to the information that she received and that was

24   conveyed to Mr. Bantis or not conveyed, we need unredacted

25   copies of the chronological history reports and the e-mail

PROCEEDINGS                                    334

1    communications with Agent Tambrino to be able to assess that

2    and effectively cross-examine on it.

3             MS. OKEN:  Your Honor, I think this may also be

4    another area where we can short circuit it.

5             I am not aware of any communications on that topic,

6    certainly none that the Government is in receipt of, that we

7    have held back.

8             I think, as the Court is aware, the vast, vast

9    majority of the redactions in the chronology reports are

10   redactions that were made by the Probation Department, itself,

11   and that appeared in the versions that both the Government and

12   defense counsel received.

13            There are -- to be candid, there are a few

14   additional redactions that the Government made consistent with

15   3500 and -- and such, but the vast majority are redactions

16   that were made by the Probation Department.

17            And the Government is certainly not aware of any

18   written communications on those topics that we have that we

19   have not shared.

20            MS. HIROZAWA:  Your Honor, to the extent that there

21   are any redactions or copies that Ms. Oken received that are

22   less redacted than the copies that we have received from

23   Probation,  we would request that those be disclosed prior to

24   cross-examination.

25            And additionally, we would --

PROCEEDINGS                        335

1          THE COURT:  Well, they may disclose them to me.  It

2    doesn't mean I am going to disclose them to you.

3          MS. HIROZAWA:  Well, to the extent they go towards

4    our -- the topics that were raised on direct examination, we

5    would request in camera review and subsequent disclosure to

6    the defense.

7          MS. OKEN:  And to be clear, I'm not aware of

8    anything that exists on those topics.  The redactions we're

9    talking about are minimal and are things like names of

10   individuals with no relevance to the case.

11         MS. HIROZAWA:  There also, for example, Your Honor,

12   is no information that I recall in the chronological reports

13   regarding Mr. Bantis's employment.

14         THE COURT:  If you want me to strike that before the

15   jury tomorrow, I will.

16         MS. HIROZAWA:  Your Honor, we are happy to address

17   it to the extent we choose to on cross-examination.

18         THE COURT:  It was an extra question.  I let it in

19   because it was a preliminary question.  Frankly, I didn't know

20   what the answer was.  The answer could have been yes, for all

21   I knew.

22         I thought it was a harmless question, but if you

23   think it's prejudicial, I will tell the jury that that answer

24   is stricken and to disregard it --

25         MS. OKEN:  And, Your Honor --

PROCEEDINGS                         336

1                THE COURT:  -- and there would be nothing to cross

2      about it.

3                MS. HIROZAWA:  Understood, Your Honor.

4                THE COURT:  If you think it's that prejudicial, I

5      will have it stricken in the morning.

6                MS. HIROZAWA:  We will consider it overnight, Your

7      Honor.

8                THE COURT:  Well, yes, you can consider it, but that

9      is what I am going to do.

10               MS. HIROZAWA:  Understood.

11               THE COURT:  You have raised the issue, I am

12     addressing the issue.  The answer is that that answer will be

13     stricken.  The jury will be told to disregard it and there

14     will be no cross on it.

15               Is there anything else we need to --

16               MS. OKEN:  Nothing from the Government.

17               THE COURT:  -- attend to?

18               Well, Ms. Hirozawa was requesting clarification, not

19     you.

20               MS. OKEN:  I apologize, Your Honor.

21               MS. HIROZAWA:  No, Your Honor.

22               THE COURT:  Thank you.

23               All right, then we will see you all tomorrow.

24     Again, same starting time and, hopefully, we will be able to

25     move in without lots of housekeeping.

PROCEEDINGS                    337

1          MS. OKEN:  Thank you, Your Honor.

2          MS. SHERMAN:  Judge, this is Marissa Sherman.

3          THE COURT:  Yes.

4          MS. SHERMAN:  As a reminder, I have a sentencing in

5     front of Judge DeArcy Hall tomorrow at 2 o'clock.

6          THE COURT:  Okay.

7          MS. SHERMAN:  And I'm not sure how long it will

8     take, I hope no more than an hour, but I just wanted to let

9     the -- make sure the Court is aware of that.

10         THE COURT:  So, you wouldn't mind if we squeeze you,

11    right, by working late and then send you to Judge DeArcy Hall,

12    and we will all have lunch while you're sentencing?

13         MS. SHERMAN:  I am prepared for that, Judge.  I'll

14    eat a big breakfast.

15         THE COURT:  Okay.

16         All right, so plan on that, Ms. Oken, and your team.

17    That we will probably just space the day out where we are

18    taking lunch, it was -- I had asked William this question not

19    realizing it could pop up what the fancy American Grill's

20    rules are.

21         Does anybody know when they actually stop serving

22    lunch?

23         MS. MACE:  3:00 p.m., Your Honor.

24         THE COURT:  Okay, so the cafeteria will be open at

25    that point, so we are in good shape.

PROCEEDINGS                          338

1              MS. SHERMAN:  Thank you.

2              MS. OKEN:  Thank you, Your Honor.

3              THE COURT:  All right.  And then we will see you

4    all, and Marissa has a big huge breakfast, and then we'll go

5    to trial.

6              Have a good evening, everybody.

7              MS. OKEN:  Thank you, Your Honor.

8              MS. HIROZAWA:  Thank you, Your Honor.

9              (Defendant exited the courtroom.)

10             (Matter adjourned to Tuesday, November 15, 2022 at

11   10:00 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*SAM      OCR      RMR      CRR      RPR*

339

1                           I N D E X

2   WITNESS                                     PAGE

3   **GEORGE HARRISON**

4   DIRECT EXAMINATION      BY MS. McGRATH      115

5   CROSS-EXAMINATION       BY MS. SHERMAN      143

6   REDIRECT EXAMINATION    BY MS. McGRATH      154

7
    **ANDREW RENDEIRO**
8
    DIRECT EXAMINATION      BY MS. OKEN         158
9
    CROSS-EXAMINATION       BY MS. SHERMAN      177
10

11  **JESSICA HARRISON**

12  DIRECT EXAMINATION      BY MS. McGRATH      189

13  CROSS-EXAMINATION       BY MS. SHERMAN      233

14  REDIRECT EXAMINATION    BY MS. McGRATH      283

15  RECROSS-EXAMINATION     BY MS. SHERMAN      298

16
    **KRISTEN ALIPERTI**
17
    DIRECT EXAMINATION      BY MS. OKEN         300
18

19

20

21

22

23

24

25

340

```
 1                    E X H I B I T S

 2   GOVERNMENT                               PAGE

 3   1                                        117

 4   12, 13, 14, 15 and 16A                   129

 5   24                                       136

 6   22                                       161

 7   26                                       165

 8   23 & 23A                                 175

 9   1016                                     185

10   283                                      185

11   300 through 303                          187

12   300T through 303T                        188

13   1010                                     188

14   105, 106 and 107                         193

15   108 and 117                              194

16   118                                      195

17   115, 119, 122 and 125                    196

18   109 to 114                               198

19   127 to 128                               198

20   301-A                                    220

21   129 and 130                              222

22   50A                                      306

23   51-A                                     313

24   52-A                                     324

25
```

341

```
 1                    E X H I B I T S

 2   DEFENSE                              PAGE

 3   AA-2                                 236

 4   AA-3                                 238

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```