716

```
1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    -----------------------------x
                                        21-CR-483(ENV)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4             Plaintiff,               Brooklyn, New York

5             -against-                November 17, 2022
                                       10:00 a.m.
6    CHRIS BANTIS,

7             Defendant.

8    -----------------------------x

9            TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
             BEFORE THE HONORABLE ERIC N. VITALIANO
10           UNITED STATES SENIOR DISTRICT JUDGE
                       BEFORE A JURY
11

12   APPEARANCES

13   For the Government:      UNITED STATES ATTORNEY'S OFFICE
                              Eastern District of New York
14                            271 Cadman Plaza East
                              Brooklyn, New York 11201
15                            BY:  LINDSEY OKEN, ESQ.
                                   TARA BRIGIT McGRATH, ESQ.
16                                 JENNIFER M. SASSO, ESQ.
                              Assistant United States Attorneys
17
     For the Defendant:       FEDERAL DEFENDERS OF NEW YORK
18                            One Pierrepont Plaza
                              Brooklyn, New York 11201
19                            BY:  NORA K. HIROZAWA, ESQ.
                                   MARISSA SHERMAN, ESQ.
20
     Also Present:            EMILY MOOSHER, PARALEGAL
21                            CAROLINE KISSICK, PARALEGAL
                              PAUL TAMBRINO, AGENT
22
     Court Reporter:          LINDA D. DANELCZYK, RPR, CSR, CCR
23                            Phone:  718-613-2330
                              Fax:    718-804-2712
24                            Email:  LindaDan226@gmail.com

25   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
```

PROCEEDINGS                                717

1              (In open court; Jury not present.)

2              THE COURTROOM DEPUTY:  All rise.

3              (Defendant enters the courtroom.)

4              THE COURTROOM DEPUTY:  Court is now open.

5              The Honorable Eric N. Vitaliano presiding.

6              Case on calendar is U.S.A. versus Chris Bantis.

7    Case Number 21-CR-483 on for jury trial -- charge conference

8    and jury trial.

9              Would the attorneys please note their appearance,

10   beginning with government counsel.

11             MS. OKEN:  Good morning, Your Honor.  Lindsey Oken

12   Tara McGrath and Jennifer Sasso on behalf of the United

13   States.  And we're joined by paralegal specialist Emily

14   Moosher.

15             THE COURT:  And good morning, all.

16             MS. HIROZAWA:  Good morning, Your Honor.  Nora

17   Hirozawa and Marissa Sherman, Federal Defenders, on behalf of

18   Chris Bantis.  And we're joined at counsel table by our

19   paralegal Caroline Kissick.

20             THE COURT:  And good morning to you all.  And

21   Mr. Bantis.

22             THE COURTROOM DEPUTY:  Counsel for both sides are

23   present, including the defendant.

24             THE COURT:  And good morning again.

25             We have two items to address in this session of the

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                      718

1    trial, since we're blocking out the whole day.

2            One is the principal focus will be on the charge

3    conference, the second is the allocution of Mr. Bantis with

4    respect to taking the stand.

5            Does the defense have a -- you rather do that first?

6            MS. SHERMAN:  He is prepared for the allocution,

7    Judge, thank you.

8            THE COURT:  Okay.

9            Now, Mr. Bantis, as your counsel and lawyers have

10   advised me that it is your plan not to take the stand, and

11   this allocution is really designed to assure me that that's a

12   decision that ultimately you have made.

13           So have you had a full and fair opportunity to

14   discuss that issue with your lawyers?

15           THE DEFENDANT:  Yes, Your Honor.

16           THE COURT:  And you understand that you have the

17   absolute right to take the stand and testify in your own

18   defense?

19           THE DEFENDANT:  Yes, Your Honor.

20           THE COURT:  And you have the absolute right to

21   remain silent, and if you chose that right, which is

22   apparently what your lawyers have told me you have chosen, I

23   will instruct the jury that they cannot hold your silence

24   against you.

25           You understand that?

PROCEEDINGS                                    719

1              THE DEFENDANT:  Yes, Your Honor.

2              THE COURT:  And have you made a personal decision as

3    to what you wish to do?

4              THE DEFENDANT:  Yes, I have, Your Honor.

5              THE COURT:  And what is that decision?

6              THE DEFENDANT:  I wish to remain silent.

7              THE COURT:  And no one's threatened you or forced

8    you to take that position?

9              THE DEFENDANT:  No, Your Honor.

10             THE COURT:  The Court finds the defendant

11   voluntarily and knowingly determined that he wishes to remain

12   silent, and the Court will instruct the jury that they cannot

13   hold his failure to take the stand against him in any way.

14             Okay.  So let us now, if there is not any other

15   housekeeping beforehand, we'll turn to the charge.

16             Any housekeeping, other than the charge conference,

17   that we should turn to?

18             Ms. Oken?

19             MS. OKEN:  Not from the government, Your Honor.

20             THE COURT:  Ms. Hirozawa.

21             MS. HIROZAWA:  Not from the defense.

22             THE COURT:  Okay.  So, therefore, as I indicated

23   yesterday, we have killed about two trees, but we have, in

24   fact, created a proposed charge and a verdict sheet.

25             The proposed charge has been marked as Court's

1    Exhibit 1.  The proposed verdict sheet has been marked as

2    Court's Exhibit 1A.

3                  (Court Exhibits 1 and 1A, were received in

4    evidence.)

5                  THE COURT:  And the way we do this is without

6    ceremony or status or what side of the room you're on.  We go

7    through the proposed charge front to back.  And we turn to the

8    page, the lowest numbered page that I decide may have an

9    objection or an exception.

10                 So I'll ask Ms. Oken first:  What page is your

11   earliest objection or exception on?

12                 MS. OKEN:  Page 18, Your Honor.

13                 THE COURT:  And, Ms. Hirozawa, do have anything

14   between 1 and 18?

15                 MS. SHERMAN:  Hi, Judge Vitaliano, this is Marissa

16   Sherman.  I'm going to handle the charge conference.

17                 Give me one second.  I don't have many comments, so.

18                 Yes, page 15.

19                 THE COURT:  You win.

20                 We'll start at page 15.

21                 Tell us what you think.

22                 MS. SHERMAN:  Well, Judge, assuming that I'm able to

23   reel Officer Selwanes in, we would just ask that when the

24   sentence ends, "He need not submit any evidence at all,"

25   period, that another sentence is added that said:  Even if the

CHARGE CONFERENCE                    721

1    defendant has submitted evidence, as he did during this trial,

2    the burden of proof never shifts to the defendant, it always

3    stays with the government.

4                THE COURT:  The government have any problem with

5    that?

6                MS. OKEN:  I don't think so, Your Honor.  Or perhaps

7    the sentence proceeding it which says, "The burden never

8    shifts for the defendant," there could be an added clause that

9    says:  Even if defense choses to present evidence.

10               But as a concept, we do not have any issue with

11   that.

12               THE COURT:  You want to amend that that way?

13               MS. SHERMAN:  We would prefer it the way that we

14   proposed but...

15               THE COURT:  I'm just asking.

16               MS. SHERMAN:  Yes.

17               THE COURT:  If we amend it, it doesn't really

18   matter.

19               MS. SHERMAN:  Right.

20               MS. OKEN:  We have no objection to that.

21               THE COURT:  That's fine?

22               MS. SHERMAN:  I can provide -- I typed it into -- I

23   don't know if Scott would like that, but I typed it into the

24   document itself.

25               THE COURT:  Whatever is easier for you, Scott.

CHARGE CONFERENCE                                    722

1              All right so.

2              MS. SHERMAN:  And, Judge, I also have one on

3    page 17.  It's just an added line as to the reasonable doubt.

4              The line that ends with, "Bear in mind that a

5    criminal case is different from a civil case," period.  We

6    would propose the following language:  It is not sufficient to

7    prove that the defendant is probably guilty.  In a criminal

8    case, the proof of guilt must be stronger than that, it must

9    be beyond a reasonable doubt.

10             MS. OKEN:  Your Honor, I think on that one we would

11   suggest that ingesting language that pertains to a different

12   standard will just cause confusion and that the Court's

13   reasonable doubt instruction is reasonable.

14             THE COURT:  Yes, I'm not going to make that change.

15             Which bring us to the next page, which is you,

16   Ms. Oken.

17             MS. OKEN:  Yes, Your Honor.

18             With respect to the First Amendment language in

19   here, we don't think the First Amendment has been raised or

20   implicated at all.  It's certainly not implicated by the fact

21   that this case which involves, among other things, threats of

22   death, so I think our proposal would be to strike the

23   First Amendment language from the charge.

24             THE COURT:  Scott will correct me if I'm wrong, but

25   is this, Scott, the language we got from Judge Chen or not?

CHARGE CONFERENCE                              723

1           THE LAW CLERK:  That's right.

2           THE COURT:  So this is language that Judge Chen has

3    used?

4           MS. OKEN:  It is, Your Honor.  And I think that case

5    was quite different, insofar as number one, there were no

6    threats of death in that case; and number two, it involved

7    posting a video to YouTube, which I think implicates more

8    First Amendment issues.

9           There was also in that case litigation pertaining to

10   the First Amendment, which has been absent from the record in

11   this case.

12          THE COURT:  But not before the jury, I assume.

13          MS. OKEN:  There was litigation advanced prior to

14   trial regarding the First Amendment, that's correct, Your

15   Honor.  We don't think First Amendment issues are implicated

16   here.  We've noted that in our letter objection.  We do

17   understand that this is language that Your Honor has received

18   from instructions used by Judge Chen.

19          THE COURT:  I don't -- Ms. Sherman --

20          MS. SHERMAN:  Yes.

21          THE COURT:  -- what's your view?

22          MS. SHERMAN:  We did request this charge, and in

23   part based on we looked at the charge in the *Hillard* case.  We

24   believe that -- the charge is pretty clear that the first --

25   that the government is still able to protect a witness from

1    retaliation.  And all this is saying that is -- and, in fact,

2    it says, "Where the government proves beyond a reasonable

3    doubt the speaker's intent to retaliate," and that is what

4    they have to prove.  So whether it's a threat of death or not,

5    if they believe there was a threat of death and that it was

6    intended to retaliate, then the First Amendment's not going to

7    apply.

8              THE COURT:  Yes, I thought it was -- I haven't seen

9    it before last night, but I think it's -- of course, this kind

10   of case is not exactly run of the mill, it does happen from

11   time to time, but it seemed like a -- in the sense that it's a

12   case where language can be the means of the individual crime,

13   I thought it was fairly balanced.

14             So I'm going to leave it in and overrule the

15   government's objection, particularly since it has been used in

16   similar cases in this courthouse.

17             MS. OKEN:  Understood, Your Honor.

18             Our next comment was not until page 69.

19             THE COURT:  Ms. Sherman, do you have anything

20   between page 18 and page 69?

21             MS. SHERMAN:  I believe so, which is my only

22   outstanding comment on the jury charge.  Just wait one second

23   here.

24             If I look at the table of contents, I'll get there a

25   lot quicker.

CHARGE CONFERENCE                        725

1          No, not before page 69.

2          THE COURT:  Okay.

3          And what is on page 69?

4          MS. OKEN:  So our comment was quite minor on

5    page 69, and it's just that the sort of heading here,

6    "Count One, Witness Retaliation" be moved below that sort of

7    first paragraph.

8          Primarily because the first paragraph reads, it's

9    sort of a general description of the allegations then it says,

10   "That the defendant is charged with retaliating," yada, yada,

11   yada, "including by threatening John Doe 1 and John Doe 2's

12   family members," Jessie Harrison and Andrew Harrison.

13         It is sort of inclusive, meaning this doesn't

14   purport to describe all of the ways in which they're alleged

15   to do that.

16         But we would just suggest moving the heading down so

17   as not to suggest that this is sort of the sole definition of

18   witness retaliation.

19         THE COURT:  And its location, can you show Scott?

20         MS. OKEN:  I can.

21         MS. SHERMAN:  And Ms. Sherman.

22         MS. OKEN:  I can.

23         THE COURT:  You know, particularly since we're

24   changing words there.  I'm not married to the format.

25         MS. OKEN:  Understood.  It would go after the first

CHARGE CONFERENCE                              726

1    sentence which ends, quote, "Victim 1 and Victim 2," and then

2    it would be moved down, and then the next portion would begin:

3    "The indictment reads".

4             THE COURT:  So you're creating more space; is that

5    what you're saying?

6             MS. OKEN:  Essentially.  Move the heading down after

7    the sort of general description of the case so as not to

8    suggest that that summary is a summary that is derived

9    necessarily from the exact statutory language or the exact

10   allegations.

11            THE COURT:  Do you have any problem with that,

12   Ms. Sherman?

13            MS. SHERMAN:  No, Your Honor.

14            THE COURT:  All right.  So, Lindsey, go show Scott

15   where you want it so he knows exactly where.

16            MS. OKEN:  So I think that just leaves the

17   government's comments left.  We do have a few, but I think

18   they are relatively minor.

19            The first is on pages 72 to 73.

20            THE COURT:  Ms. Sherman, do you have anything?

21            MS. SHERMAN:  No.

22            THE COURT:  Okay, 72 and 73.

23            MS. OKEN:  And this is where the Court advises the

24   jury of sort of different alternative ways that they may, if

25   they find unanimously, reach a guilty verdict.

CHARGE CONFERENCE                    727

1        And we would just suggest in the last clause, so the

2   charge reads, "You must agree unanimously on which witness the

3   defendant intended to retaliate against.  In other words, in

4   order to find the defendant guilty, you must unanimously find

5   that the defendant intended to retaliate against George

6   Harrison or you must unanimously find the defendant intended

7   to retaliate against James Harrison."

8        And for the third clause we would suggest that the

9   "must" be converted into a "may" in order to sort of

10  clarify --

11        THE COURT:  I'm not really thrilled with that

12  language there.  I put it in there more as a placeholder.  And

13  I will recommend this now and let counsel comment, strike

14  everything out from "in other words" on.

15        MS. OKEN:  I think we do think that illustrative

16  list is helpful.  And again, Your Honor, I think this would

17  make a lot more sense to the jury once they see the verdict

18  sheet.

19        THE COURT:  Right, that's why I didn't think it

20  needed it.  That's exactly why I didn't think it needed it,

21  Ms. Oken.

22        MS. OKEN:  Sure.

23        MS. SHERMAN:  Judge, while Ms. Oken is looking over,

24  the defense's position is we agree that I think after -- we

25  don't needs the words -- anything after "in other words," I

1   think we can strike that language.  I think it's pretty clear.

2            THE COURT:  Yes, it's pretty redundant, and I think

3   sometimes less is more.

4            MS. OKEN:  We see Your Honor's point, although we --

5   yes, I think we do sort of like the concept of at least

6   previewing for the jury, if not the substance of the verdict

7   form, maybe that there will be a verdict form that will

8   specify their options, something like that.

9            THE COURT:  And I think it's all in harmony, and I'm

10  going to strike it out.

11           MS. OKEN:  Okay.  Thank you, Your Honor.

12           THE COURT:  And I think it will be short and clear

13  because as you can see, I've opted with the first verdict

14  form, to the extent I think that's clearer.

15           MS. OKEN:  I think, not to harp on this point but,

16  Your Honor, I think we would suggest that that first sentence

17  then, to the extent everything else after is going to be

18  struck, we would suggest that there at least be some

19  indication that they must unanimously agree on which -- or

20  some suggestion that it could be both.

21           THE COURT:  I think that's in there.

22           MS. OKEN:  It's in the prior, okay, Your Honor.

23           THE COURT:  I think it's clear enough.

24           MS. OKEN:  Yes.  I think that's right, Your Honor.

25  Okay, we're good with that.  Thank you.

CHARGE CONFERENCE                                729

1          MS. SHERMAN:  Just to double check on that, Judge.

2     So what's getting struck is that paragraph where it says,

3     "Similarly," we're keeping that language, right?

4          THE COURT:  Yes, everything from "in other words"

5     on.  Everything before what was added stays.

6          MS. SHERMAN:  Okay.  So but when you say "everything

7     on," I just want to make sure I understand where it's ending.

8     What's being taken out.

9          THE COURT:  It begins at "in other words".

10         MS. SHERMAN:  Right.

11         THE COURT:  And it ends at the end of that

12    particular jargon.

13         MS. OKEN:  I think --

14         MS. SHERMAN:  Right, I think the only suggestion is

15    it ends at -- you know, "Find the defendant intended to

16    retaliate," period.  Because the next part of that same charge

17    is that they also have to unanimously find which victim he

18    intentionally threatened, and I think that we still want in.

19         So that's part of the same charge, so.

20         THE COURT:  Yes, it's -- what I mean is that the "in

21    other words" language that was added, right --

22         MS. SHERMAN:  Right.

23         THE COURT:  I know what it looked like before it was

24    added, the rest of that was in.

25         But, Scott, why don't you read --

CHARGE CONFERENCE                                    730

1          MS. SHERMAN:  Oh, I see, I see.

2          THE COURT:  -- read out loud the language.  He and I

3   discussed this already.  Read out loud the language that would

4   come out.  Everything else would stay.

5          THE LAW CLERK:  In other words, to find the

6   defendant guilty, you must unanimously find that the defendant

7   intended to retaliate against George Harrison, or you must

8   unanimously find that the defendant intended to retaliate

9   against James Harrison, or you must unanimously find that the

10   defendant intended to retaliate against both.

11          THE COURT:  Everything else stays.

12          MS. OKEN:  And I think that "in other words"

13   language repeats itself in the next paragraph.  So the

14   following the "similarly" sentence.  "Similarly, although the

15   indictment charges," then the following.  It says, "Once,

16   again, you must agree unanimously," and then there is the "in

17   other words" clause would come out there as well.

18          THE COURT:  Yes.  Same language comes out.

19          MS. OKEN:  Although, I apologize for sort of clawing

20   that back just a tiny bit, because that paragraph refers not

21   just to harm to a victim, it also refers to property damage.

22   And so I don't know that leaving it at which victim the

23   defendant intended to threaten would fully encapsulate that

24   they could find based on a threat to Jessie Harrison, a threat

25   to Andrew Harrison, a threat to both, a threat to property or

CHARGE CONFERENCE                                    731

1    a threat to property damage.

2              THE COURT:  Let me ask Scott.

3              There was second language added there as well?

4              THE LAW CLERK:  The only language added was the "in

5    other words" language.

6              THE COURT:  That one time?

7              THE LAW CLERK:  Both times.

8              So this paragraph also ended with the "in other

9    words" clause.

10             THE COURT:  So when you take that out, it is the way

11   I initially viewed it?

12             THE LAW CLERK:  Yes.

13             THE COURT:  It's clear enough.

14             Your exception, Ms. Oken, it's clear enough.

15             MS. OKEN:  Understood.  Thank you, Your Honor.

16             THE COURT:  Okay, so we're at 72, 73.

17             And next lowest number?

18             MS. OKEN:  My next on is very minor, but on page 81.

19             MS. SHERMAN:  Judge, we have one before that, yes.

20             Judge, it says to the statutory purpose charge.  We

21   did, in our papers, object to this charge, and I would point

22   out that that charge was not given by Judge Chen in the

23   *Hillard* case.  It's our contention that witness retaliation is

24   not a controversial law.  I think unlike, for example, maybe

25   possession of a gun --

1          THE COURT:  Let me stop you.

2          MS. SHERMAN:  Sure.

3          THE COURT:  Ms. Oken, was that charge not given by

4     Judge Chen?

5          MS. OKEN:  It was not requested in that case, Your

6     Honor, and, therefore, not given.

7          THE COURT:  Here's the problem I have, Ms. Sherman.

8     I normally adhere to *Sand*.  Do I particularly like it, though?

9     Not frankly.  But it's in *Sand*.  And I usually adhere to

10    what's in the *Sand* charge.

11         MS. SHERMAN:  I understand that.  I saw the *Sand*

12    charge, we tried to find cases where it was given and,

13    frankly, couldn't, so...

14         THE COURT:  You mean you couldn't find it in a place

15    where it was actually given.

16         MS. SHERMAN:  I could not locate a case where this

17    charge was given.  I understand that it's in *Sand*, but...

18         THE COURT:  How about you, Ms. Oken?  Do you know if

19    it's been given anywhere?

20         MS. OKEN:  I'd have to refer back to our notes on

21    that, Your Honor.

22         We do think, though, that given that it is in *Sand*

23    and we think it is sort of an important corollary to the

24    First Amendment charge, we do think that it makes sense to

25    keep it here.

CHARGE CONFERENCE                              733

1          THE COURT:  Well, you know, as I said to Scott last

2    night, the only thing is -- as far as I'm concerned, the only

3    think that it's got going for it is that it's in *Sand*.  I am

4    concerned by Ms. Sherman's research which shows that no one

5    has given it.  So, you know, it's sort of like the

6    independence.

7          My personal predilection is that we don't get it.

8    Here's what we'll do.  If you can -- we'll give Ms. Oken a

9    chance to have some -- someone do some quick research, see if

10   anybody can find it, if it was actually given by someone in a

11   case, and then we'll reassess it; but if not, we'll take it

12   out.

13         MS. OKEN:  We'll take a look.  Thank you, Your

14   Honor.

15         MS. SHERMAN:  Thank you, Judge.

16         THE COURT:  Okay.  What's next?

17         MS. OKEN:  My next is a minor thing on 81.

18         THE COURT:  Anything before 81, Ms. Sherman?

19         MS. SHERMAN:  No, Judge.  And I actually don't think

20   we have any other, just so you're aware.

21         THE COURT:  All right, 81.

22         MS. OKEN:  Under -- on the second to the last line

23   under a third clause, we might propose changing the "their" to

24   "his".  So that sentence would read:  "To retaliate against a

25   witness for his attendance or testimony," only because there's

CHARGE CONFERENCE                    734

1    only -- there's only one option for the jury in that regard.

2              MS. SHERMAN:  No objection to that.

3              THE COURT:  Then we'll change it.

4              Anything else?

5              Since the defense has nothing further, anything else

6    from you, Ms. Oken?

7              MS. OKEN:  We do have a small number of things left.

8              The next is on page 83.

9              THE COURT:  Okay.

10             MS. OKEN:  There is a paragraph there defining

11   bodily injury, and that paragraph occurs both on page 83 and

12   page 88.

13             This case does involve threats of bodily injury, so

14   we wouldn't say bodily injury is irrelevant, but I don't know

15   that we need to give an enumerated list of the types of bodily

16   injury, given what the allegations are in this case.  So we

17   would suggest streamlining that paragraph to sort of cut out

18   the meat of the first sentence and have it read instead:

19   Bodily injury means any injury to the body, no matter how

20   temporary.

21             So just with that last sentence, rather than an

22   enumerated list of cut, abrasion, bruise, burn, disfigurement,

23   given that those are not really at issue in this case.

24             THE COURT:  Ms. Sherman.

25             MS. SHERMAN:  Judge, I think that the allegations

1    here are threats of bodily injury.  Defining what bodily

2    injury means is part of the charge that goes to the jury, so

3    we would ask that we keep it.

4            MS. OKEN:  And we wouldn't strike it in its

5    entirely, we only suggest streamlining the second sentence

6    instead of giving an enumerated list of things that aren't

7    relevant here, but we do see that bodily injury does need to

8    be defined in some way for the jury.

9            THE COURT:  And, Ms. Sherman, you're agreeing or

10   disagreeing with Ms. Oken?

11           MS. SHERMAN:  Disagreeing.  I think we'd like to

12   maintain it.

13           THE COURT:  I'll ask the maven over here.

14           Where did we get this charge?

15           THE LAW CLERK:  This came from *Sand*.

16           THE COURT:  *Sand*.  It stays.  Okay?

17           Ms. Oken.

18           MS. OKEN:  So our next is on the following page,

19   actually page 84.  And I think this is mostly sort of a

20   structural proposal in the Court's definition of the third

21   element that the government must prove here, which is that the

22   defendant acted with intent to retaliate.

23           I think we would suggest that sort of first with

24   respect to intent, the Court refer back to its earlier

25   instruction on intent and just advise the jury that it has

CHARGE CONFERENCE                                             736

1    been previously instructed on that.

2              Then with respect to retaliate, we would propose

3    including a definition there of what retaliate means.  I think

4    the government had proposed one in its requested charge that

5    means:  To act in reprisal or as punishment for some past act.

6    But I think in a retaliation case it's important to give the

7    jury some sort of definition of "to retaliate".

8              THE COURT:  Ms. Sherman?

9              MS. SHERMAN:  I'm sorry.  I think we maintain that

10   as written it's fine.

11             THE COURT:  And, again, Scott, this is *Sand*?

12             THE LAW CLERK:  Yes.

13             THE COURT:  It stays.

14             MS. OKEN:  Our next, Your Honor, we think may be

15   just a typographical or copy and paste.

16             THE COURT:  That's certainly possible.

17             MS. OKEN:  I'm sure we put it in our requested

18   charge as well, but on page 85, Your Honor, there is -- there

19   is a discussion of supervised release, which I believe occurs

20   twice in this charge, and I don't know that it belongs here in

21   this particular subdivision, which is B1.

22             So I think we have just strike that language

23   entirely and it will come in later under the, I believe, B2

24   provision.

25             MS. SHERMAN:  Sorry, I lost where we're talking

CHARGE CONFERENCE                          737

1    about.

2              MS. OKEN:  So page 85, the paragraph that says,

3    "Supervised release is similar to parole."

4              THE COURT:  We say that twice.

5              MS. OKEN:  It's in there twice, and we think the

6    second place is where it belongings.

7              THE COURT:  It should only be there once.  Or you

8    want to add it in the place where it belongs?

9              MS. SHERMAN:  No objection.

10             THE COURT:  You got that, Scott?

11             THE LAW CLERK:  Yes, sir.

12             THE COURT:  Okay.

13             MS. OKEN:  And then I think that second place where

14   it occurs, which I believe is on page 91, we would just

15   suggest in that first sentence of that paragraph be amended to

16   say:  Supervised release is similar to parole or probation.

17             We don't disagree that it is similar to parole, but

18   the way it's been described to this jury by Officer Aliperti

19   is that it is similar to probation.

20             To the extent the jury has an understanding of what

21   parole means, we don't object to analogizing it to parole, but

22   for purposes of what it means as a functional matter, they did

23   hear evidence that it was similar to parole -- or probation,

24   rather, so we would suggest adding in "or probation" at the

25   end of that first sentence.

CHARGE CONFERENCE                    738

1           THE COURT:  Any objection, Ms. Sherman?

2           MS. SHERMAN:  No, that's fine.

3           THE COURT:  We can edit it.

4           Do you have more, Ms. Oken?

5           MS. OKEN:  Just a few, Your Honor.

6           Our next is on page 93.  And I believe the longer

7    definition that follow are accurate, but the elements as

8    articulated up front with respect to 1513(e), I think this may

9    have been languaged copied/pasted as well from the 1513(b)

10   provision.

11          And so the first element, rather than being "That

12   the defendant knowingly engaged in conduct," it should just be

13   that:  The defendant acted knowingly.

14          The second element, "That the defendant's conduct

15   was harmful to a person," for this subdivision should be:

16   That the defendant's action was harmful to a person, or I

17   suppose -- yes, the defendant's action was harmful.

18          And then the third element I think is accurate as it

19   is.

20          THE COURT:  Ms. Sherman?

21          MS. SHERMAN:  Judge, we would ask for the first to

22   keep as it, "the defendant knowingly engaged in conduct,"

23   because if you then -- if you take that out, it just then goes

24   to "the defendant's conduct," and there's no mention of

25   conduct, and the issue is whether -- whether Mr. Bantis

CHARGE CONFERENCE                                    739

1    knowingly engaged in conduct.  So we would ask to keep it as

2    written for the first element.

3              And then the second element, the defendant -- you

4    want to change from "conduct" to "action"?

5              MS. OKEN:  Yes, we think for both of those first

6    elements we would just mirror the statutory language.  So

7    acted knowingly and then action was harmful to a person.

8    Because that language is different from 1513(b) to 1513(e),

9    and we think that needs to sort of be reflective in the

10   language of the charge.

11             MS. SHERMAN:  I think, Judge, we would contend that

12   as written --

13             THE COURT:  I want to find out where the cut and

14   paste is the same?

15             MS. OKEN:  And, Your Honor, I should note it is

16   accurately articulated in the long form that follows, in terms

17   of it says, you know, element one is knowingly engaged in

18   conduct; element two action harmful to a person.

19             We don't object to the way that is spelled out, but

20   we think the short form version of it should be distinguished

21   from the 1513(b) language.

22             THE COURT:  We're waiting on -- is that language a

23   cut and paste?

24             THE LAW CLERK:  It's not *Sand*.

25             THE COURT:  So we should follow the *Sand* language

CHARGE CONFERENCE                              740

1   then.

2              THE LAW CLERK:  Right, this portion was not in *Sand*.

3              THE COURT:  We made it up, or something like that?

4              MS. OKEN:  I think we had proposed language that

5   just mirrored -- because it was not in *Sand*, be just mirrored

6   the statute.

7              THE COURT:  So did our change -- I'm a little bit

8   lost at sea here.  And I think that to the extent that -- let

9   me ask Ms. Sherman.

10              Ms. Sherman, is Ms. Oken incorrect in how she's

11   indicating what the statutory language is?  Is her proposal

12   closer to the statutory language?

13              MS. SHERMAN:  I think in looking at this, the word

14   "action" probably should be changed, now I'm looking at the

15   way that it's -- from "conduct" to "action".  I think that is

16   probably accurate.

17              But I think that still for the first element where

18   it says, "The defendant knowingly," I understand that the

19   statute says "knowingly," but then it moves into the action.

20              And if it's going to be broken into elements, I just

21   think that saying that "the defendant knowingly," and then

22   second the defendant's action, or took action that was harmful

23   to a person, there has to be some -- the "knowingly" has to be

24   connected with something.

25              THE COURT:  Why don't we keep the "knowingly".

CHARGE CONFERENCE                              741

1          MS. OKEN:  We agree that it should be connected to a

2    verb, but we would use the verb that appears in the statute.

3    So the defendant acted knowingly rather than knowingly engaged

4    in conduct.  Because that engaged in conduct language --

5          THE COURT:  Why don't we conform this directly to

6    the statute.

7          MS. HIROZAWA:  And, Your Honor, this is Nora

8    Hirozawa.  I do think that the closest statutory language

9    would be that the defendant knowingly took action.  And I

10   think it's that taking affirmative taking of action that is

11   critical under the statute.

12         Simply saying that he acted knowingly is too close

13   to simply just the mens rea requirement.

14         MS. OKEN:  We have no issue with doing it that way.

15         THE COURT:  Knowingly taking action.

16         Thank you, Ms. Hirozawa.

17         MS. HIROZAWA:  Sorry to jump in.

18         THE COURT:  No, please, jump when you come up with

19   good suggestions here, please just in.

20         MS. HIROZAWA:  I spent a little time looking at the

21   1513 statute.

22         THE COURT:  Take pride in your work.  We appreciate

23   it.

24         So let's -- Scott, make sure it's -- the scrivener's

25   has gotten it the way everybody thinks it should be.

CHARGE CONFERENCE                                    742

1              THE LAW CLERK:  Yes, so --

2              THE COURT:  Read what you think everybody is going

3      to be happy with.

4              THE LAW CLERK:  So I now have it as:  First, the

5      defendant knowingly took an action.

6              Second, that the defendant's action was harmful to a

7      person.

8              MS. OKEN:  I think we would just propose a slight

9      revision for the first element to say knowingly took action.

10             THE COURT:  Yes.

11             MS. OKEN:  Or took any action.

12             THE COURT:  Just drop the "an" out.  Knowingly took

13     action.

14             MS. SHERMAN:  Thank you, Scott.

15             MS. OKEN:  I think, Your Honor, I just have three

16     left.

17             The first is on page 94.

18             THE COURT:  Okay.

19             MS. OKEN:  Where the second element is defined, the

20     second element being action harmful to a person.

21             And we think this description sort of just echos the

22     statutory language in a way that -- we propose providing

23     further elucidation on what harm means, given that it is quite

24     broad under 1513(e).  It doesn't necessarily need to be

25     physical harm, for example, so I think we would ask for an

CHARGE CONFERENCE                                743

1    illustrative list, such as --

2              THE COURT:  Yes.  And this is *Sand*, Scott?

3              THE LAW CLERK:  No, *Sand* does not have a 1513.

4              THE COURT:  At all?

5              THE LAW CLERK:  No.

6              THE COURT:  Yes, I think this is -- I've seen some

7    of the illustrative list proposal, and I -- it's always

8    fraught with danger, in my view.

9              MS. SHERMAN:  We agree with that, Judge.

10             And it was not given, there was not an illustrative

11   list given.

12             THE COURT:  Okay.  Yes, no, I'm not going to add

13   the -- it may lead as to a thorny note that we will have to

14   deal with, all of us, later.  Overruled.  Hope that cut

15   passes.

16             MS. OKEN:  Thank you, Your Honor.

17             So the next is, we may have addressed this earlier

18   with the parole or probation language, but that language also

19   appears on page 96.  I just want to make sure I flagged that

20   earlier.

21             THE COURT:  We'll track that over.

22             MS. OKEN:  Okay.  Thank you.

23             And then our final two...

24             THE COURT:  You're running out of pages, Mr. Oken.

25             MS. OKEN:  Apologies, Your Honor.

1          On page 97, there's language that says, "The

2     government does not need to prove that the federal offense for

3     which information was provided by George Harrison or James

4     Harrison was actually committed," and that sort of a

5     description of the possible commission.  And we agree that

6     that should be there but that possible language appears not

7     just for subdivision "(e)" but also for subdivision (e)(2).

8     So that would also appear on page 90.

9          THE COURT:  So where is it not appearing, on 90 or

10    92?

11         MS. OKEN:  It appears on 97, and we would propose

12    adding it on page 90 because that one is also (b)(2) -- in

13    (b)(2), in addition to subdivision "(e)".

14         THE COURT:  Ms. Sherman?

15         MS. SHERMAN:  To be honest, I missed that.

16         Can you repeat that, Ms. Oken?

17         THE COURT:  She went backwards.  It was her fault.

18         MS. SHERMAN:  What page are we talking about?

19         THE COURT:  9-0.

20         MS. SHERMAN:  And what's the language?

21         MS. OKEN:  You may want to start by looking the 97,

22    which has a sentence that reads, "The government does not need

23    to prove."

24         MS. SHERMAN:  Okay.

25         MS. OKEN:  And we think that also belongs on page 90

CHARGE CONFERENCE                                    745

1   with subdivision (b)(2).  That first sentence.  Not the

2   second.

3              MS. SHERMAN:  That's fine.

4              THE COURT:  Okay.  We'll track it over.

5              MS. OKEN:  And I'm so sorry, but I did misspeak with

6   respect to the parole or probation provision, which appears on

7   96.  We think it should also be struck from there because it

8   doesn't apply to 1513(e).

9              THE COURT:  So we're not adding --

10             MS. OKEN:  We're adding probation where it appears,

11  but I think it should not appear here.

12             THE COURT:  At all?

13             MS. OKEN:  Correct, not with respect to 1513.

14  Exactly.

15             THE COURT:  Any problem with that, Ms. Sherman?

16             MS. SHERMAN:  No objection.

17             THE COURT:  We got it, Scott?

18             THE LAW CLERK:  Yes.

19             THE COURT:  Okay.

20             Ms. Oken.

21             MS. OKEN:  And our final comment is on page 98.

22  This is the theory of the defense instruction, which says that

23  Mr. Bantis has pled not guilty and maintains that he did not

24  commit the offense charged.

25             Of our concern with that is it's sort of -- there's

CHARGE CONFERENCE                          746

1    a pretty clear presumption of innocence charge here, and to

2    the extent that this has a little bit of tension with that,

3    given that, number one, he has not pled not guilty in front of

4    this jury; and number two, he hasn't --

5              THE COURT:  I've already told them that he pled not

6    guilty.

7              MS. OKEN:  Sure.  But then it follows with maintains

8    that he did not commit the offense charged.

9              He's not going to maintain anything in front of this

10   jury because he's not going to take the stand.  And so we

11   think we would prefer to rest with the default standard

12   instruction that the Court gives on these matters rather than

13   indicating that there is a theory that has been advanced.

14             THE COURT:  This is the theory that's been advanced.

15   And it's my reading of the Circuit in this area, it's a very

16   hot stove.

17             This is what the defense theory is.  I'm going to

18   tell the jury that's what it is.

19             MS. OKEN:  Understood, Your Honor.  That was our

20   final comment.

21             THE COURT:  There was one finding, and no one seems

22   to have nibbled at or questioned.

23             I could not -- we had a charge on prior inconsistent

24   statement.  I can't remember anyone being confronted with a

25   prior inconsistent statement.

1              MS. SHERMAN:  I believe, Judge --

2              THE COURT:  Did I miss it?

3              MS. SHERMAN:  I believe I confronted Jessie Harrison

4     with grand jury testimony.

5              THE COURT:  I just may have gotten old.

6              MS. SHERMAN:  It may have not been that memorable.

7              THE COURT:  It may not have been.  But I could

8     not -- I could not recall.

9              All right, so that's moot.  That answers that.

10             MS. SHERMAN:  Thanks.

11             THE COURT:  I know it was there, but no one seemed

12     to object to it, everybody ran by it.

13             MS. SHERMAN:  Yes.

14             THE COURT:  Okay, that's fine.

15             MS. OKEN:  And, Your Honor, if we can refer back to

16     the statutory purpose language now.

17             THE COURT:  Yes.

18             MS. OKEN:  We do see a Second Circuit case where

19     that language was given, not with respect to 1513 but with

20     respect to closely related 1512 provision, and that statutory

21     purpose language was given there.

22             THE COURT:  And it was affirmed?

23             MS. OKEN:  It was.

24             MS. SHERMAN:  Judge, I would correct that.

25             I'm not sure that that was affirmed, but either way

1    it is a -- whether it's closely related or not, it's a

2    different statute.  And the statutory purpose language that's

3    in *Sand* for 1513, cites to that one case for -- that was a

4    1512 charge.

5          So I still maintain that there has not been -- we

6    cannot find it, I'm not saying there hasn't been, we cannot

7    find a single case where statutory purpose was given in a 1513

8    charge.  Mr. Bantis is not being charged under 1512, he's

9    being charged under 1513.

10         And I'm happy to provide further reasons for our

11   objection to that charge being given in this case.  But I

12   think the fact that it wasn't given in *Hillard*, which is the

13   most recent 1513 trial in this building, is illustrative.

14         MS. OKEN:  We think, Your Honor, given -- it's an

15   important corollary to the First Amendment charge, especially

16   in a case that doesn't exactly touch so much on the

17   First Amendment issues in the way that *Hillard* did, which is

18   why it wasn't was raised in that case, and we think that,

19   given the Second Circuit's blessing of this instruction in a

20   2001 Second Circuit case, suggests that it's a perfectly

21   appropriate charge, and it does appear in *Sand*.

22         MS. HIROZAWA:  Your Honor, not to get too in the

23   weed here.  This is Nora Hirozawa.  But there are three

24   different subsections of 1513 charged in a single count in

25   this indictment.  Two of the subsections are 1513(b), (1) and

1    (2), the other subsection is 1513(e).

2              The different subsections of 1513, as detailed in

3    our prior motion to strike, were at different times with

4    different legislature purposes.

5              And so I think that it adds a lot of additional

6    complication to be advising the jury about what the statutory

7    purpose was, when the statutory purpose of 1513(e), which was

8    part of the Sarbanes-Oxley Act, was to protect whistleblowers

9    from corporate retaliation.

10             So to the extent that the government wants to advise

11   about the statutory purpose, we would ask that the Court also

12   advise also them that 1513(e) was to protect whistleblowers

13   from retaliation by corporate employers.  And that is not at

14   all the factual context here, so I think it's plainly beyond

15   the purview of the jury.

16             THE COURT:  I guess many years ago when I was a

17   young lawyer, an older lawyer said, "You know, when you're in

18   a quandary, always follow your gut."  I don't like this

19   language.

20             MS. HIROZAWA:  We don't either, Your Honor.

21             THE COURT:  Strike it.

22             As a former legislator, I find it offensive, so

23   strike it.

24             So we have nothing further.  So we turn to the

25   verdict sheet itself.

1    MS. SHERMAN:  Thank you, Judge.

2    THE COURT:  Any comments on the verdict sheet?

3    MS. SHERMAN:  Very briefly from the defense, unless

4  the government wants to go first.

5    MS. McGRATH:  We're happy to let the defense go

6  first.

7    MS. SHERMAN:  The only comments, substantively in

8  terms of the elements, and this would apply for all 1, 2, 3,

9  all of them, is to separate out -- the way it reads right now

10  is it says, "1, with intent to retaliate against George

11  Harrison for attending Chris Bantis' sentencing proceeding,"

12  because that's the intent element, they also have to find

13  unanimously that he had the intent.

14    And the way it's written now is that that's almost

15  presupposed by the way it's written as opposed to leading to

16  unanimously finding intent.  So we would just ask to break

17  that down into another section so as -- or to another option

18  to check off that if they unanimously found that.

19    The way it reads now it just says that, and then it

20  has A, B, threatened bodily injury.  So we would ask to start

21  with the check that they unanimously found with intent to

22  retaliate against, and have that as a check box, and then I

23  would say that for all of them.

24    THE COURT:  Ms. Oken.

25    MS. McGRATH:  Your Honor, this is Tara McGrath for

1    the government.  We find that the verdict form in combination

2    with the Court's instructions make perfectly clear that the

3    jury has to find that he acted with the requisite intent and

4    that needs to be a unanimous finding.  There are already a

5    number of boxes they have to box.  It's quite a long verdict

6    form.  And we think that will further complicate.

7              THE COURT:  Well, could that be combined with

8    anything?

9              MS. McGRATH:  We believe it is, Your Honor.  So for

10   them to even continue down after, for instance, getting to the

11   first bullet, for them to even continue down --

12             THE COURT:  Read it aloud.

13             MS. McGRATH:  So the first is, "With intent to

14   retaliate against George Harrison for attending Chris Bantis'

15   proceeding in United States versus Chris Bantis, criminal

16   docket number 14388, the defendant Chris Bantis:  A,

17   threatened bodily injury to Jessie Harrison; B, threatened

18   bodily injury to Andrew Harrison; or C, threatened damage to

19   Jessie Harrison's property."

20             To the extent they don't find that the intent

21   element is satisfied, they wouldn't get --

22             THE COURT:  They wouldn't check a thing.  Let's it

23   take out then.

24             MS. McGRATH:  Your Honor, we -- as one alternative,

25   we did, and apologies for the late timing, propose another

CHARGE CONFERENCE                                    752

1   verdict sheet yesterday evening.  I don't know if that more

2   fully addresses the defendant's concern, but I'm happy to read

3   you one example of a bullet from that, if it's helpful.

4          And so in that version it would read:  The defendant

5   Chris Bantis engaged in conduct and thereby threatened bodily

6   injury to Jessie Harrison; A, with intent to retaliate against

7   George Harrison for testifying at Chris Bantis' sentencing

8   proceeding in United States versus Chris Bantis, criminal

9   docket number 14388.

10         MS. SHERMAN:  And, Judge, that does not address our

11  concerns.  In fact, we reviewed the proposed verdict sheet

12  from the government and had written a response, and then we

13  got Scott's verdict, or Your Honor's verdict sheet, and so we

14  didn't file a response, because the way that we anticipated

15  the verdict sheet, we agree with the way the verdict sheet is

16  laid out.

17         It was that one point, we just wanted an extra --

18  not an extra, but a box there, as well as it is for everything

19  else.  But the way that the government wrote their verdict

20  sheet, which absolutely presupposes that they found to

21  threaten body harm to Jessie Harrison, we absolutely oppose

22  that.

23         So the way Your Honor wrote, it makes more sense to

24  us.

25         (Continued on the following page.)

PROCEEDINGS                           753

1

2            THE COURT:  And what changed?  Because there is --

3    what changed?

4            MS. SHERMAN:  We literally just want to put -- so

5    where it says, with intent to retaliate against George Harris

6    as number one with intent to retaliate against George Harrison

7    and then it has A, B, C.  We're just asking that it's A, is

8    with intent to retaliate against George Harrison.  And then,

9    B, threaten bodily injury.  Just so the jury is indicating if

10   they have found that element unanimously.  That's the only

11   suggestion.

12           MS. McGRATH:  And, your Honor, the Government's

13   position is that requirements is very well established in both

14   the verdict form and in the instruction.  And it would be

15   unusual for the jury to have a check a box for every single

16   element of the crime.  Already they are not going to get to

17   any of the checked boxes as to the preference language.

18           THE COURT:  Okay.  Do you have -- it'll be easy for

19   me to see what you want us to do and I'll will take it back

20   and look at it and let you know.

21           MS. SHERMAN:  Sure.  And I'll just show it the

22   Government real quick before I give it to you.

23           THE COURT:  Yeah.

24           MS. McGRATH:  Your Honor, I will just note there are

25   went one 21 checkmarks and boxes that the jury has to

PROCEEDINGS                              754

1    consider.  And so, we don't think it's helpful for clarity for

2    any other reason to simply add more.

3              MS. SHERMAN:  Understood, judge.

4              And I just want to point out, there's three separate

5    subsections charged with multiple victims.  Multiple John

6    Does.  That's how the Government charged their case, so this

7    is why the verdict sheet looks this way.

8              THE COURT:  Yeah.  It's not a very -- it's not very

9    complicated -- I guess, may be because of my civil experience,

10   it's not a very complicated verdict sheet.  Ultimately.

11             MS. SHERMAN:  Judge, are the only other comment that

12   we have, and I did just provide this to Scott with the

13   proposed language, in the under where it says, guilty or not

14   guilty and there's the little explanation.  Where it says, if

15   you find the defendant guilty, please indicate by checking on

16   the appropriate line or lines which action you unanimously.

17   And then the language says, find, formes the basis of guilt.

18   We are going to request, which action you unanimously find the

19   Government has proven beyond a reasonable doubt.

20             THE COURT:  Any view from Ms. Oken?

21             MS. OKEN:  Your Honor, we think there has already

22   been a sufficient reasonable doubt instruction to the jury and

23   this verdict form mirrors the statutory.  To the extent that

24   we are sort of injecting more language in there.

25             THE COURT:  I'll take a look at it.  You're not

PROCEEDINGS                          755

1    onboard.  If everybody is onboard, I am willing to be

2    flexible.  If not, then I have to look more intently.

3               MS. SHERMAN:  Those are the only requests from the

4    Defense.  Thank you.

5               THE COURT:  Very good.  All right.  So now where are

6    we?  Ms. Sherman?

7               MS. SHERMAN:  I think it's the Government now, if

8    they have any suggestions.

9               MS. McGRATH:  We don't, your Honor.  We have no

10   further comment.

11              THE COURT:  I assume that.  I think the question

12   was, and now that we've done that.

13              MS. SHERMAN:  Got it.

14              THE COURT:  We're on your case now.

15              MS. SHERMAN:  Yes.

16              So Judge, I would like the opportunity -- I did meet

17   with or tried to meet with Officer Selwanes this morning.  Was

18   informed at the time that -- that he was informed that he

19   doesn't have to speak to defense attorneys.  And so, I asked

20   him to call his supervisor.  I don't know what the result of

21   that conversation was.  If he's still not willing to in any

22   way go over his testimony with me, I am going to request

23   permission to lead a bit, so if I can just check in with him

24   about that.

25              THE COURT:  Okay.  So is he here?

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                           756

1          MS. SHERMAN:  He is.

2          THE COURT:  All right.  So why don't you -- give us

3   a time.  What time is it now?

4          MS. SHERMAN:  11:24.

5          THE COURT:  So why don't we plan to reconvene at

6   1145.  Wait a minute.

7          Do you have the jury downstairs?

8          THE COURTROOM DEPUTY:  They're downstairs.  I don't

9   know if they're all here.

10         THE COURT:  So we'll reconvene at 11:45.  Let's

11  assume if everything goes sweetly with this witness, and then

12  where are we, Ms. Sherman?

13         MS. SHERMAN:  And then we'll be resting, Judge.

14         THE COURT:  Okay.  So let's assume -- let's assume

15  all that.  Let's assume that around noon-ish.

16         Where are we vis-à-vis the summations?

17         MS. McGRATH:  Your Honor, the Government is prepared

18  to begin its closing at that time.

19         THE COURT:  And how about the Defense?

20         MS. SHERMAN:  I believe -- I can check with

21  Ms. Hirozawa.  I believe the Government does their closing and

22  then I assume there would be a lunch break.  I think the

23  Defense would be prepared to do their closing after the lunch

24  break.  Yes.  And then, I assume the rebuttal would be after

25  that.

PROCEEDINGS                          757

1          THE COURT:  Yes.  That's a good assumption.

2          MS. OKEN:  Your Honor, we're happy to sort of -- I

3   think everybody is ready to go forward today with the rest of

4   the case and we can sort of see what time it is was when we

5   finish the Defense case and then either jump right into the

6   Government's summation or break for lunch after.  Or if we're

7   running a bit longer, break for lunch first and then go

8   through the parties jury addresses.

9          THE COURT:  Fine.  Okay.  So we're -- I got it.

10         MS. OKEN:  I guess all that is to say that we would

11  not prefer not to take lunch in the middle of the Government's

12  closing.  We don't expect for it to be particularly long.  To

13  the extent that we are running a little bit behind schedule,

14  we propose taking lunch first and then jumping into closing

15  arguments.

16         THE COURT:  You let me know.  My preference would be

17  to get the first summation out and then lunch and go from

18  there.  Tell me if that's feasible or not?  In other words, we

19  would go to summations, then lunch, and then all of a sudden

20  it's like lunch comes at 1:30.  That's not a problem either.

21         Do you understand?

22         MS. OKEN:  That's fine with the Government, your

23  Honor.

24         THE COURT:  Okay.  All right.  So we'll take a break

25  and wish Ms. Sherman good luck with her witness and wish

PROCEEDINGS                    758

1    William good luck with the jury.  This may all be moot.  We'll

2    find out who's here.

3              MS. SHERMAN:  Thank you.

4              MS. HIROZAWA:  Thank you, your Honor.

5              THE COURT:  Reconvene at. 11:45.

6              (A recess was taken.)

7              THE COURTROOM DEPUTY:  All rise.

8              (Judge enters the courtroom.)

9              (Defendant enters the courtroom.)

10             THE COURTROOM DEPUTY:  The court is back in session.

11             Counsel for both sides are present including the

12   defendant.

13             THE COURT:  All right.  Are we ready to proceed?

14             MS. SHERMAN:  Yes, Judge.

15             Just so the Court is aware, the witness is refusing

16   to prep with me.  So I'm going to try the best I can, but I

17   most likely would be asking for permission to lead.  And

18   before -- I can either do it before the witness testifies or

19   after.  The Defense just needs to move in the defense exhibits

20   that were part of the stipulation that was read into the

21   record.

22             THE COURT:  Okay.  I would move them in now.

23             MS. SHERMAN:  Will do.

24             THE COURT:  Actually, when the jury comes down.

25             MS. SHERMAN:  Right.

PROCEEDINGS                    759

1          THE COURT:  Meaning, first.

2          MS. SHERMAN:  We are all on the same page.

3          THE COURT:  Okay.

4          MS. OKEN:  And your Honor -- this is Ms. Oken from

5    the Government.

6          To the extent the parties might want to slightly

7    reconfigure the setup in advance of closing, would your Honor

8    like us to do that now or after the Defense has rested.

9          THE COURT:  So why don't you reconfigure it now?

10         MS. OKEN:  Sure.  Thank you, your Honor.

11         It should take a moment.

12         THE COURT:  No.  I mean, otherwise you are ready to

13   go.

14         MS. OKEN:  Yes.

15         THE COURT:  Who is going do the opening summations

16   for the Government?

17         MS. OKEN:  Ms. McGrath from the Government.

18         THE COURT:  Ms. McGrath.

19         MS. HIROZAWA:  Your Honor, my apologies, this is

20   Nora Hirozawa from the Defense.

21         I just wanted to check and see whether the Court

22   wanted to address Mr. Bantis' Rule 29 motion prior to closing

23   or whether the Court would reserve on that?

24         THE COURT:  You mean at the close of the case?

25         MS. SHERMAN:  Yes.

PROCEEDINGS                           760

1        MS. HIROZAWA:  Yes.  So before summations.  One of

2   the -- the reason I ask is one of the -- well, I suppose the

3   motion focuses on the 1513(b), one and two charges as it

4   pertains to property damage to Jessie Harrison specifically.

5   We don't believe there was any testimony about any threats

6   damaged to tangible property throughout the course of this

7   trial.  And the other part of the motion focus on 1513(e).  So

8   if the Court were to agree to dismiss on those bases, then we

9   would not address those subsections in our closing arguments.

10        THE COURT:  Yes.  I'm probably going to reserve

11   anyway.

12        MS. HIROZAWA:  We understand.  Scott's been busy.

13        THE COURT:  Nora, you want to present all of that in

14   a long oral argument.

15        MS. HIROZAWA:  No, your Honor.  We will rest on our

16   briefing.

17        THE COURT:  Yeah.  So we'll take it at sidebar.  You

18   make the motion and then I'll reserve at sidebar and then

19   we'll go right to summation.

20        MS. HIROZAWA:  Thank you, your Honor.

21        And if the Court has any questions or would like

22   oral argument, we are happy to --

23        THE COURT:  Yes, subsequent oral argument.

24        MS. HIROZAWA:  We feel that our briefing speaks for

25   itself.

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                            761

1          THE COURT:  I have been advised by the case manager

2     that everyone is ready so we will bring in the jury.

3               (Jury enters the courtroom.)

4          THE COURT:  Be seated, please.

5          Counsel will stipulate that the jury is present and

6     properly seated.

7          MS. OKEN:  We do, your Honor.

8          MS. HIROZAWA:  So stipulate.

9          THE COURT:  Thank you, Counsel.

10         Ladies and Gentlemen, welcome back.  We've tried to

11    certainly appreciate your continued attentiveness and patience

12    and sacrifice.  We try to deep your time in the box down as

13    much as we can and do the work that we have to do with the law

14    and the case outside of your presence.  And while you're more

15    comfortably seated, we've now done as much as that law piece

16    that we had to do to this point and we're ready now to resume.

17         You will recall when we left off yesterday the

18    Government had rested their case.  And you remember all those

19    building blocks that we now turn to the defense side.  You

20    will also recall from the very opening instructions that the

21    defendant had absolutely no burden of proof to produce any

22    witnesses.  It's his absolute right to remain client and do

23    not hold his silence against him.

24         Defense can call some witnesses and the defendant

25    does not testify.  Nothing changes.  You cannot hold the

*SHERNELLE GRIFFITH – Official Court Reporter*

PROCEEDINGS                    762

1   defendant's silence against him in in way.

2              Does the Defense have any witnesses it does wish to

3   call?

4              MS. SHERMAN:  Yes, your Honor.

5              THE COURT:  And you may do so, Ms. Sherman.

6              MS. SHERMAN:  Thank you.

7              We're calling a witness, Judge.  The Defense at this

8   time would like to move certain exhibits into evidence.  The

9   Defense moves to admit Defense Exhibits A, A1 through A4, B,

10  C, C1 through C7, D, D1 through D4, E, F, G, G1 through G4, H,

11  H1 through H2, I, J, J1 and J2, K, K1 through K4.  And that's

12  pursuant to the stipulation in Government's Exhibit 1016.

13             THE COURT:  So we remove the stipulation and all of

14  those exhibits come in pursuant to the stipulation.

15             MS. SHERMAN:  Thank you.

16             At this time, the Defense calls Officer Mina

17  Selwanes.

18             MS. HIROZAWA:  Your Honor, I'll grab him from the

19  hallway.

20             THE COURT:  Yes.

21             (Witness enters the courtroom.)

22             THE COURTROOM DEPUTY:  Please raise your right hand.

23             Do you solemnly swear or affirm that the testimony

24  you are about to give the truth, the whole truth, and nothing

25  but the truth so help you God.

PROCEEDINGS                              763

1           THE WITNESS:  Yes.

2           THE COURTROOM DEPUTY:  Please state your first and

3    last name and spell it for the record.

4           THE WITNESS:  M-I-N-A.  S-E-L-W-E-N-A-S.

5           THE COURTROOM DEPUTY:  Thank you have a seat,

6    please.

7           THE WITNESS:  Yes.

8           THE COURT:  Ms. Sherman.

9           MS. SHERMAN:  Thank you.

10          (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SELWANES - DIRECT - MS. SHERMAN                764

1          (Witness takes the witness stand.)

2    **MINA SELWANES,** called as a witness, having been first duly

3    sworn/affirmed, was examined and testified as follows:

4    DIRECT EXAMINATION

5    DIRECT EXAMINATION

6    BY MS. SHERMAN:

7    Q    Good afternoon, Mr. Selwanes?

8    A    Good afternoon.

9    Q    Officer Selwanes, are you a member of the New York Police

10   Department?

11   A    Yes, ma'am.

12   Q    And what is your title?

13   A    Parole Police Officer.

14   Q    What precinct do you work out of?

15   A    68th Precinct.

16   Q    And what are your duties and responsibilities as a patrol

17   officer?

18   A    Just to respond to radio calls.  So when somebody calls

19   9-1-1, that's the way of communication that we get the job and

20   then we respond to it.

21   Q    And just before we go further, Officer Selwanes, you were

22   subpoenaed to testify here today, correct?

23   A    Yes, ma'am.

24   Q    Okay.  And that was by the Defense, yes?

25   A    Yes.

SELWANES - DIRECT - MS. SHERMAN               765

1    Q    And the Defense or I, tried to speak with you before your

2    testimony, correct?

3    A    Yes.

4    Q    And you refused to prepare your testimony with me?

5    A    Yes.

6    Q    Thank you.

7    A    No problem.

8    Q    I want to draw your attention to September 9th of 2021.

9         Were you working that day?

10   A    Yes.

11   Q    And were you working alone or with a partner?

12   A    That day we were three officers in the car.

13   Q    Okay.  So there was three of you including yourself?

14   A    Yes.

15   Q    And were you in uniform or plain clothes?

16   A    Uniform.

17   Q    And did there come a time when you responded to 6906 Fort

18   Hamilton Parkway in Brooklyn?

19   A    Yes.

20   Q    And why did you respond to that that location?

21   A    The radio call we got, which is when somebody calls

22   9-1-1, I believe it was a radio run for a person with a

23   firearm.  We responded to that job that's why.

24   Q    Okay.  And what time did you arrive at 6906 Fort Hamilton

25   Parkway?

SELWANES - DIRECT - MS. SHERMAN                766

1    A    Around 11:10.

2    Q    And can you tell me the jury what is located at 6906 Fort

3    Hamilton Parkway?

4    A    It's a deli.

5    Q    Do you know the name of the deli?

6    A    Not off the top of my mind, no.

7    Q    Okay.  Is it Jimmy's 3 Sons?

8    A    I'm not 100 percent sure.

9    Q    Okay.  And when you arrived at the location, what did you

10   observe?

11   A    Once we arrived, there was a woman, which is the caller.

12   She said that somebody --

13   Q    Without saying what anyone said, what did you observe?

14   A    The first thing was a woman was standing over there.

15   Q    Okay.

16   A    Across the street from the deli.

17   Q    And did there come a time when you went into the deli?

18   A    Yes.

19   Q    And when you went into the deli, what did you observe?

20   A    I mean, there is a reason why I went to the deli.

21   Q    I understand that.

22        When you went into the deli, what did you observe?

23   A    I observed somebody by the register.

24   Q    Okay?

25   A    Paying for merchandise.

SELWANES - DIRECT - MS. SHERMAN                767

1   Q    Did you see what merchandise they were paying for?

2   A    No.

3   Q    Okay.  And the person you saw, if you saw them in the

4   courtroom today would you be able to recognize them?

5   A    Yes.

6   Q    Okay.  Can you -- if you recognize the person here today,

7   can you point them out?

8   A    The gentleman with the mask.

9        MS. SHERMAN:  Indicating Mr. Bantis.

10       THE COURT:  The record will reflect.

11  Q    And when you saw Mr. Bantis paying at the register, what

12  was the next action that you took?

13  A    I asked him for his identification.  His ID.

14  Q    Did he comply with your commands?

15  A    Yes.

16  Q    And when you were in the deli with Mr. Bantis, was there

17  other police officers in the deli?

18  A    Yes.

19  Q    Okay.  And after you looked at his identification, did

20  there come a time when you observed another officer conduct a

21  pat down of Mr. Bantis?

22  A    Yes.

23  Q    And can you tell the jury what a pat down is?

24  A    A pat down is when a police officer runs their hand along

25  the outer garments of an individual trying to detect like

SELWANES - DIRECT - MS. SHERMAN                768

1   objects or like foreign bodies.

2   Q    Okay.  And what areas of the body are checked during the

3   pat down?

4   A    Mostly the waistband, pockets.  That's about it.

5   Q    In the chest area?

6   A    Chest area too.

7   Q    And when you observed -- do you remember the officer who

8   conducted the pat down?

9   A    Yes.

10  Q    Okay.  Who was that?

11  A    Officer Perez.

12  Q    Okay.  And when you observed Officer Perez conduct the

13  pat down, did you observe whether any weapons were recovered

14  from Mr. Bantis?

15  A    There was nothing recovered.

16  Q    Was there any contraband recovered from his person?

17  A    No contraband.

18  Q    Okay.  And when Officer Perez was patting down

19  Mr. Bantis, did he resist at all?

20  A    No.

21  Q    Did he pull away at all?

22  A    No.

23  Q    Did he comply with all of your commands?

24  A    He did comply.

25  Q    And did you come to find out whether Mr. Bantis had any

1    belongings with him?

2    A      Yes.  He had a backpack.

3    Q      He had a -- I'm sorry?

4    A      Correction.  Just a bag.  Could be a gym bag.

5    Q      Okay.  And did you or any other officers conduct a search

6    of that bag?

7    A      Yes.  It was myself.

8    Q      You conducted the search?

9    A      Yes.

10

11                   (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SELWANES - DIRECT - MS. SHERMAN                    770

1   DIRECT EXAMINATION (Continued)

2   BY MS. SHERMAN:

3   Q    Okay.  And what were the circumstances of the search of

4   the bag?

5   A    When I looked into the bag, he just had his gym clothes

6   and a water bottle.  Nothing else.

7   Q    And did you conduct that search pursuant to a search

8   warrant?

9   A    No, I asked him for consent.  If it was okay for me to

10  look in his bag.

11  Q    And consent was given?

12  A    Yes.

13  Q    Okay.  And so I think you just said there was gym

14  clothes.

15          Can you describe in as much detail what you can

16  remember what the contents of the bag were?

17  A    A bottle of water, maybe a tank top, as far as I

18  remember.

19  Q    Was there a towel?

20  A    Yes.

21  Q    Was there a bathing suit?

22  A    I don't remember that.

23  Q    Was there deodorant?

24          MS. OKEN:  Objection, Your Honor.

25          THE COURT:  Yes, I'm going to allow it.

SELWANES - DIRECT - MS. SHERMAN          771

1          Counsel is trying to refresh his recollection.

2    A    I don't recall.

3          MS. SHERMAN:  Okay.

4          One moment.  Can I show the witness, just for the

5    witness, defense M, M2.

6          (Exhibit published to the witness.)

7    Q    Officer Selwanes, if you can you look at your screen.

8          MS. OKEN:  Your Honor, may we just take one brief

9    moment to approach?

10         THE COURT:  Sure.

11         (Continued on the next page.)

12         (Sidebar conference.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                                772

1        (The following occurred at sidebar.)

2        MS. McGRATH:  Your Honor, during the proceeding we

3   requested to refresh witness' recollection with body-camera

4   footage without audio.  Your Honor instructed that it could

5   only be done with transcripts.

6        I understand that was also your instruction before

7   we began today, and they are now showing this witness

8   body-camera footage without the audio, which we understand is

9   contrary to all your prior rulings, including during the

10  government's case.

11       MS. SHERMAN:  So I specifically didn't say

12  body-camera footage for this reason.  I don't know how else to

13  do it with this witness.  He wouldn't talk to me beforehand,

14  and I'm trying my best.

15       THE COURT:  What are you showing him?

16       MS. SHERMAN:  His surveillance while he's searching

17  the bag to see the contents of the bag.

18       MS. HIROZAWA:  There's also a difference between the

19  prior witness to refresh with his own body-camera footage.

20       MS. SHERMAN:  I didn't specifically use the word

21  "body-camera footage".  I understand.  I would have prepared

22  with him before, if he had let me.

23       THE COURT:  How long is it?

24       MS. SHERMAN:  It's short.

25       THE COURT:  We're in a box here because of that.

SIDEBAR CONFERENCE                         773

1    However, to the extent that he's going to say --

2              MS. SHERMAN:  Yes.

3              THE COURT:  I'll let it go.

4              MS. SHERMAN:  Thank you, Your Honor.

5              MS. HIROZAWA:  In the alternative, if the government

6    wants to allow us to refresh his recollection with the photos,

7    that the government took of the contents of the bag, we can do

8    that.

9              MS. SASSO:  That's fine.

10             MS. SHERMAN:  I just want to know what was in the

11   bag.

12             THE COURT:  What's in the bag?

13             MS. OKEN:  No, no, I'm trying to think of the best

14   way to do it.  Because I don't know --

15             MS. SHERMAN:  Let's just get it.

16             MS. OKEN:  I'm sorry, are you just looking for

17   anything that's not in the bag?

18             MS. SHERMAN:  I just want to put in what's in the

19   bag.

20             MS. OKEN:  What's in the bag.

21             THE COURT:  There's an inventory sheet.

22             MS. OKEN:  I don't know where it is, but...

23             MS. SHERMAN:  We kept trying and trying.

24             MS. OKEN:  Let's see if we can find the photo.

25             MS. SHERMAN:  Fine.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

SIDEBAR CONFERENCE                    774

1              THE COURT:  Just a little --

2              MS. SHERMAN:  It doesn't matter to me.  I just

3    wanted to say.

4              THE COURT:  Nobody's looking at it.

5              MS. OKEN:  Okay.

6              (End of sidebar conference.)

7              (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SELWANES - DIRECT - MS. SHERMAN                 775

1    DIRECT EXAMINATION (Continued)

2              (In open court; Jury present.)

3              THE COURT:  Ms. Hirozawa.

4              MS. SHERMAN:  Waiting on the government, Judge.

5              Carrie, just for the witness.

6              (Exhibit published to the witness.)

7    BY MS. SHERMAN:

8    Q    Is there something on your screen, Officer Selwanes?

9              THE COURT:  And this is for purposes of refreshing

10   your recollection.

11             MS. SHERMAN:  Right.

12             THE COURT:  There'll be a series of questions that

13   will follow up after you've had an opportunity to review it.

14   BY MS. SHERMAN:

15   Q    Officer Selwanes, did that refresh your recollection as

16   to the contents of the bag?

17   A    Yes.

18   Q    Okay.  What were the contents of the bag?

19   A    I think my body camera was angled in a certain way, I

20   can't see the whole view of that, but there was definitely gym

21   clothes.

22   Q    Okay.  Was there a bathing suit in the bag?

23   A    It's not that clear.

24   Q    Okay, I'll move on.

25             Did you recover any weapons in the bag?

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

SELWANES - CROSS - MS. OKEN                    776

1   A     No.

2   Q     Did you recover a gun in the bag?

3   A     No.

4   Q     Did you recover a wooden stick in the bag?

5   A     No.

6   Q     Did you recover any pipe in the bag?

7   A     No.

8          MS. SHERMAN:  Okay.  One second, please.

9          (Pause in the proceedings.)

10         MS. SHERMAN:  No further questions.  Thank you.

11         THE COURT:  Thank you, Ms. Sherman.

12         Any cross?

13         MS. OKEN:  Very briefly, Your Honor.

14  CROSS-EXAMINATION

15  BY MS. OKEN:

16  Q     Good afternoon, Officer Selwanes.

17  A     Good afternoon.

18  Q     You mentioned on direct there was a reason that you went

19  to that deli, right?

20  A     Yes.

21  Q     And that reason was the 9-1-1 call?

22  A     Yes.

23  Q     And that 9-1-1 call reported a possible firearm; is that

24  right?

25  A     Yes.

SELWANES - CROSS - MS. OKEN                777

1   Q    Okay.  And is that what's known as a "1010 firearm"?

2   A    Yes.

3   Q    Okay.  And it was a report of a suspicious person, right?

4   A    Yes.

5   Q    As well as a report of a possible firearm?

6   A    Yes.

7   Q    Okay.  And you mentioned when you arrived you saw a woman

8   there; is that right?

9   A    Yes.

10  Q    And that was the woman who called 9-1-1?

11  A    Yes.

12  Q    Okay.  And that woman was in distress when you arrived?

13       MS. SHERMAN:  Objection.

14       THE COURT:  Sustained.

15  Q    Did you interact with the woman that you saw when you

16  arrived?

17       MS. SHERMAN:  Objection.

18       THE COURT:  I'll allow that.

19       Did you interact with her?

20  BY MS. OKEN:

21  Q    You interacted with the woman that you saw when you

22  arrived, correct?

23  A    Yes.

24  Q    And what did you observe about that woman?

25       MS. SHERMAN:  Objection.  Outside of the scope of

1    direct.

2             THE COURT:  You can ask him -- you're talking about

3    what he did when he got there.  That was what the direct

4    examination was.

5    BY MS. OKEN:

6    Q    You interacted with that woman, correct?

7    A    Yes.

8    Q    And what did you observe about that woman?

9    A    She was scared.

10            MS. SHERMAN:  Objection.

11            THE COURT:  That was his impression.  I'll allow it.

12   BY MS. OKEN:

13   Q    And did you learn what had happened before you arrived?

14            MS. SHERMAN:  Objection.

15            THE COURT:  I'm going to sustain that.

16   BY MS. OKEN:

17   Q    When you say she looked scared, can you tell us what you

18   mean?

19   A    She was like in distress, like her features was like

20   somebody just --

21            MS. SHERMAN:  Objection.

22            THE COURT:  We don't want you to speculate what

23   somebody might have done.

24   BY MS. OKEN:

25   Q    What were your observations that led you to believe that

SELWANES - CROSS - MS. OKEN                    779

1   she was in distress?

2   A    Body language.  She's just looked scared.

3           MS. OKEN:  One moment.

4   Q    Did she make any gestures?

5           MS. SHERMAN:  Objection.

6           THE COURT:  I'll allow gestures.

7           Do you recall if she made any gestures?

8           THE WITNESS:  Yes.

9   BY MS. OKEN:

10  Q    What gesture did she make?

11  A    She said that somebody --

12          MS. SHERMAN:  Objection.

13          THE COURT:  Not what she said.

14  BY MS. OKEN:

15  Q    Can you describe what gestures she made?

16  A    (Witness complying.)

17          MS. OKEN:  No further questions, Your Honor.

18          MS. SHERMAN:  Sorry, I just think that needs that to

19  be noted for the record.

20  BY MS. OKEN:

21  Q    Can you verbally describe for us the gesture that she

22  made?

23  A    She raised her hand, and she pointed me to a certain

24  direction.

25          MS. OKEN:  No further questions, Your Honor.

PROCEEDINGS                              780

1          THE COURT:  Any redirect?

2          MS. SHERMAN:  No.

3          THE COURT:  Thank you, officer.  You're excused.

4          THE WITNESS:  Thank you.

5          (The witness was excused.)

6          THE COURT:  Any other witnesses for the defense?

7          MS. SHERMAN:  No, the defense rests.

8          THE COURT:  The defense rests.

9          Ladies and gentlemen, it's another building block.

10  I will ask you to remain silently in the jury box.  I need to

11  speak with counsel at sidebar.

12          (Continued on the next page.)

13          (Sidebar conference.)

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    781

1              (The following occurred at sidebar.)

2              THE COURT:  That's it?

3              MS. HIROZAWA:  We're done.

4              THE COURT:  I assume there's no rebuttal case.

5              MS. OKEN:  That's correct, Your Honor.

6              MS. HIROZAWA:  We're going to make our motion to

7    Rule 29.

8              THE COURT:  You're renewing your Rule 29 motion at

9    the close of the case?

10             MS. HIROZAWA:  Correct.

11             MS. SHERMAN:  Yes, moving to dismiss on the elements

12   of every subsection of the charge.

13             THE COURT:  Okay.  The Court reserves decision

14   pending receiving briefing from the defense, and we will

15   receive other briefing as counsel wish to submit.

16             MS. OKEN:  Thank you, Your Honor.

17             MS. HIROZAWA:  Thank you, Your Honor.

18             THE COURT:  Now is Tara is ready for summation?

19             MS. OKEN:  We are, Your Honor.  She's preparing her

20   laptop right now.

21             THE COURT:  So what you think, Ms. Sherman, an hour?

22             MS. OKEN:  Yes, yes.  Maybe like 30 minutes or so

23   but, yes, we are ready to go now.

24             (Discussion was had off the record.)

25             MS. OKEN:  Let's just go on just in case.

SIDEBAR CONFERENCE                      782

1              Our only request with respect to timing, as we

2      mentioned earlier, is that we not break in the middle.

3              THE COURT:  No.

4              MS. OKEN:  Okay, great.

5              Thank you, Your Honor.

6              THE COURT:  We like keeping crazy hours.

7              MS. OKEN:  Thank you.

8              (End of sidebar conference.)

9              (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

783

1              (In open court;                                    .)

2

3              (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                          784

1              (In open court; Jury present.)

2              THE COURT:  All right, ladies and gentlemen, we are

3    to the next of the building blocks.

4              And if you will recall from what Scott Woods told

5    you at the beginning of the trial, the next of the building

6    blocks is the summations, the closing arguments of counsel.

7              The government has the right to open the summations,

8    and it also has the right to close the summations in a

9    rebuttal.

10             And just like the openings, absolutely nothing that

11   you will hear from the lawyers is evidence.  What you will

12   hear from the lawyers are their arguments as to what they

13   think the evidence has shown or failed to show.  That's what

14   you will hear from them, and they're asking you to listen

15   carefully to what they have to say.  And then when you go back

16   at the time of deliberation, you can take a look at the facts

17   as you see them and try out their arguments, both the

18   government as well the defense.

19             Now the opening argument on behalf of the government

20   will be given by Assistant United States Attorney

21   Tara McGrath.

22             Ms. McGrath.

23             MS. McGRATH:  Thank you, Your Honor.

24             And I have a PowerPoint, I don't know what you might

25   need to do to share it.

SUMMATION - MS. McGRATH                    785

1           THE COURT:  PowerPoints used, that, too, is not

2    evidence itself, but sometimes you may see an exhibit used

3    that's in evidence.  You will only see during the course of

4    the summations.  If there's a reference to an exhibit it's

5    actually an exhibit that's in evidence.

6           And keep in mind that at some point during your

7    deliberation, the exhibits that are on paper or photos and the

8    like will be delivered to you.  So you don't have to remember

9    all of these exhibit numbers.  You will actually have them

10   with you in the jury room.

11          Ms. McGrath.

12          MS. McGRATH:  Thank you, Your Honor.

13          The defendant time and again made death threats to

14   Jessie and Andrew Harrison, against the entire Harrison

15   family.  I'm going to fucking kill you.  I want you dead.  I

16   want your brother dead.  You have no idea who you're fucking

17   with.

18          He would call them rats over and over.  He would

19   stare Jessie down, make his hand into the shape of a gun and

20   point it at his temple.  He would grab at his waistband making

21   her believe he had a gun.

22          The defendant wanted the whole neighborhood to know

23   that George and James were quote/unquote rats, and by

24   extension their whole family, and E&J Boutique were rats.  And

25   because of that they had to pay.

SUMMATION - MS. McGRATH                    786

1           The defendant wanted George and James to pay for

2    what they had done to him, all those years earlier in 2014,

3    when they reported the defendant to the FBI, and when they

4    made recordings of the defendant spewing death threats in

5    connection with his loan sharking.

6           The defendant wanted the Harrison family to pay for

7    reporting him to his probation officer in 2019.

8           And even years later, in 2021, the defendant was

9    still thinking about George and James' involvement in his

10   earlier case, and that's when he made these threats against

11   them and their family members.

12          Ladies and gentlemen, that is witness retaliation.

13   The defendant's conduct was designed to punish witnesses and

14   to deter them from speaking with law enforcement.

15          Today, now that you've seen all the evidence, we

16   have an opportunity to walk you through the testimony and the

17   exhibits that prove the defendant's crime beyond a reasonable

18   doubt.

19          As a roadmap, I'm going to give you a very quick

20   overview of the crime charged when we get into the evidence in

21   more detail.  Once we've looked at the evidence, I'll then

22   walk you through how the evidence fits into each element of

23   the crime charged.

24          Following closing statements, Judge Vitaliano will

25   instruct you on the law.  To the extent anything I say differs

SUMMATION - MS. McGRATH                787

1    from what he says, of course follow the judge.

2            The defendant is charged with one count, witness

3    retaliation.

4            But importantly there are three different prongs to

5    this charge, each of which has slightly different elements,

6    and each of which is a different basis on which the defendant

7    is guilty.

8            The three prongs are Section 1513(b)(1), 1513(b)(2),

9    and 1513(e).  As you can see from this table, each has three

10   elements:  A knowledge element, a harm element, and how the

11   defendant acted with intent to retaliate.

12           So first, with respect to knowingly, each prong

13   requires that the defendant acted knowingly.

14           Sections 1513(b)(1) and (b)(2) have the same harm

15   requirement, whereas Section 1513(e) has a separate harm

16   requirement.  And finally, while each prong has an intent to

17   retaliate requirement, the reason for the retaliation differs

18   among each of them.  As we'll claim, the government has proven

19   each of these elements without a reasonable doubt.

20           The first element, which as I mentioned, is the same

21   for each of the prongs, is that the defendant acted knowingly.

22   In other words, he acted deliberately and purposefully.

23           The second element the government must prove relates

24   to harm.  Both Sections 1513(b)(1) and (b)(2) require the

25   government to prove that the defendant threatened bodily harm

SUMMATION - MS. McGRATH            788

1    to Jessie or Andrew, or that he threatened property damage to

2    E&J Boutique.

3           For Section 1513(e), the government must prove that

4    the defendant took any action harmful to George or James.

5    Harm in its most common meaning, and includes harm to

6    reputation, emotional distress and fear for their safety.

7           The final element the government must prove is that

8    the defendant acted with the intent to retaliate.

9           Now as I mentioned, each of these three prongs have

10   slightly different requirements in this regard.

11          1513(b)(1), the first on this table, requires that

12   the government prove the defendant acted with the intent to

13   retaliate against George Harrison for intending or providing

14   testimony at a federal proceeding; here, the defendant's

15   sentencing, in 2015.

16          Section 1513(b)(2) requires the government to prove

17   that the defendant acted with the intent to retaliate against

18   George or James for providing information to law enforcement

19   about the possible commission of a federal offense or a

20   possible violation of supervised release.

21          And Section 1513(e) requires the government to prove

22   that the defendant acted with the intent to retaliate against

23   George or James for providing truthful information to law

24   enforcement about the possible commission of a federal

25   offense.

SUMMATION - MS. McGRATH                    789

1          So now that you have some familiarity with the legal

2     framework, take a careful look at the evidence.  They will put

3     the defendant's action into context so you can see what he

4     said, what he did, and why he did it.

5          The PowerPoint will contain exhibit numbers and

6     references to the transcript.  The PowerPoint itself, as the

7     Judge noted, is not in evidence, but when you're deliberating,

8     feel free to review any of the exhibits and request any of the

9     transcripts.

10          It all starts in 2013 when the defendant made

11     extortionate loans to George and James Harrison.  You heard

12     from George that he and his wife were struggling financially

13     after he suffered an on-the-job injury at the New York

14     Sanitation Department.

15          So George went to the defendant to borrow money, but

16     the defendant charged sky-high interest rates.  George made

17     weekly payments.  The payments were just on interest.

18          George told you what happened when he missed a

19     payment.  The defendant, quote, went crazy.  The defendant

20     drove to George's house, held a wooden club to his face, and

21     threatened to kill him.  And George believed the defendant.

22          Finding it impossible to keep up, and fearing for

23     his life, George reported the defendant's crime to the FBI.

24          What George didn't know was that his brother James

25     was in a similar boat.  James had borrowed money from the

SUMMATION - MS. McGRATH                    790

1   defendant and also sought help from law enforcement.  In

2   short, George and James, fearing for their lives, went to law

3   enforcement to report the defendant's crime.

4          In 2014, both George and James agreed to record

5   their conversations with the defendant and provide those

6   recordings to law enforcement.

7          You heard George and Detective Chimienti explain how

8   those recordings were made and who they were given to.  And

9   you heard the recordings yourself.  Recordings where the

10  defendant accused James of reporting the defendant to the

11  cops.  Recordings where the defendant described the many

12  gruesome ways he was going to kill James.  And recordings

13  capturing the minute-by-minute detail of the defendant's

14  loan-sharking of George.

15         And we'll listen to just a few excerpts from those

16  recordings now.

17         (Audio recording played.) (Audio recording stopped.)

18         MS. McGRATH:  In 2014, the defendant was indicted by

19  the U.S. Attorney's Office for the Eastern District of New

20  York with extortionate extension of credit, a federal crime.

21         You heard testimony from the defendant's defense

22  lawyer, Andrew Rendeiro, that during the case, the consensual

23  recordings made by George and James were referenced in

24  multiple court filings and at multiple court proceedings.

25         In October 2014, the defendant pled guilty.  He

SUMMATION - MS. McGRATH                    791

1    admitted under oath that he had, quote, loaned money to

2    brothers James and George with the understanding that violence

3    could be used to collect payments.

4            And during that proceeding, the prosecutor made

5    plain for the record both John Doe is George, the person who

6    is on the recording that was provided in discovery to the

7    defendant on July 29th, 2014.  And the defendant told the

8    Court that that was correct.

9            You also saw George and James referenced in the

10   defendant's presentence report, or PSR.  The PSR described for

11   the Court what the defendant did to George and James, and it

12   referenced the recordings.

13           Mr. Rendeiro testified that he gave a copy of that

14   report to the defendant, and that they reviewed it together.

15           And finally, George testified that he attended the

16   defendant's sentencing in 2016 and he made a victim impact

17   statement.

18           You heard George repeat his chilling words in this

19   same courtroom just days ago, quote, I'm afraid that when this

20   man gets out, he's going to come after me and my family.  I

21   know every day that while he sat in that jail cell, that the

22   only think that he could think of is when he gets out he's

23   going to bring harm to me and my family.

24           As you've seen throughout this trial, even years

25   later, the defendant could not shake the memory of George and

SUMMATION - MS. McGRATH                    792

1    James going to the cops.

2              You've also heard testimony and seen the defendant's

3    sentencing transcript where Judge Vitaliano ordered a special

4    condition; that the defendant have not have contact with the

5    victim or the victim's family.

6              At that time, Mr. Rendeiro represented to the Court,

7    "My client understands and he will not have contact with

8    them."  And just a few days ago, Mr. Rendeiro testified that

9    his representation was accurate.

10             You heard testimony from U.S. Probation Officer,

11   Kristen Aliperti, that the defendant was put on supervised

12   release in the spring of 2017.

13             Officer Aliperti testified that she met the

14   defendant to discuss the conditions of his supervised release,

15   including the no contact order.

16             The defendant told her he understood.  In fact, on

17   July 28th, 2017, the defendant signed a copy of the judgment

18   in this case and acknowledged that he understood all of his

19   conditions.

20             But you know that during his supervised release, the

21   defendant was thinking of his victim.  Officer Aliperti

22   testified that the defendant was resentful.  He indicated he

23   was on supervised release because he had been informed on by a

24   quote/unquote rat.

25             You heard testimony from Jessie Harrison, George and

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

SUMMATION - MS. McGRATH                793

1   James' younger sister, that she owned a boutique on Fort

2   Hamilton Parkway called E&J.  It sold cards and sports

3   memorabilia.  And in 2018, that store was located at 7001 Fort

4   Hamilton Parkway, across from a souvlaki restaurant.

5           Jessie Harrison also testified that a strange bald

6   man came at her store and peered into the glass as if he were

7   looking for someone.  He didn't come inside.  He didn't speak

8   to her.  He didn't buy anything.  He just pressed his face

9   against the glass.

10          She also told you that while sweeping her

11  storefront, she started noticing as bald man wearing a velour

12  tracksuit leering at her from across the street.

13          And that time she had no idea it was the defendant,

14  a convicted loan shark who had terrorized her brothers all

15  those years ago.  One day, she was on the phone with George

16  when it was happening, and she told him about it.  She told

17  you that George panicked.  She had no idea why, and she had no

18  idea what George did with that information.

19          But you know, because George testified about the

20  same encounter.  George knew that the defendant was on

21  probation, and that he had what George called "an order of

22  protection" covering him and his family.  Once George learned

23  that the defendant was lurking outside the store, he called

24  the FBI.

25          And you heard testimony from Officer Aliperti that

SUMMATION - MS. McGRATH                794

1  she learned about the defendant's breach of the no contact

2  order.  She learned that the defendant was leering at the

3  Harrison sisters and that he was staring into her store, and

4  she confronted him.

5          The defendant's reaction is telling.

6  Officer Aliperti testified that first the defendant made a

7  bald denial.  He claimed to have no idea who the sisters were

8  or what E&J Boutique even was.  But he quickly changed tune.

9          Suddenly he knew where the store was located, but he

10 offered excuses for why he was there.  He claimed he used the

11 bus across the street and a few doors down.  He claimed he

12 liked the souvlaki restaurant across the street.

13         And after that, the defendant asked Officer Aliperti

14 over and over again what she had learned and whether anyone

15 was accusing him of threatening them; or in other words, if

16 anyone had ratted again.

17         In June 2018, Officer Aliperti issued him a formal

18 letter repeating the no contact conditions.  The defendant

19 signed that letter again acknowledging that he understood he

20 could have no contact with his victim.  Jessie Harrison

21 testified that she didn't see the defendant again for years.

22         In the summer of 2020, the defendant came off

23 supervised release, and he no longer had the Probation

24 Department looking over his shoulder.

25         Jessie testified that in March or April of 2021,

SUMMATION - MS. McGRATH                    795

1  when she was getting ready to move her store from 7001 to 6906

2  Fort Hamilton Parkway, her brother James was there.  A bald

3  white man appeared and starting hysterically laughing at

4  James.  This man and James got into a fight, and Jessie

5  hurried into her store.  James didn't tell her who he was, and

6  that point she still had no idea it was Chris Bantis.

7           Now Jessie also testified that when she moved stores

8  around May of 2021, something strange started happening.  She

9  would get to the store shortly before 11 a.m., open the gate

10 and start her day.  While sweeping outside, a raspy male voice

11 started screaming to her, "The Harrisons are rats.  E&J are

12 rats.  I want you dead."

13          At first she didn't even know where it was coming

14 from.  And she dismissed it.  She assumed it was a crazy

15 person who knew her last name because her whole family were

16 born and raised in that neighborhood.  They were known around

17 there.  But the threats continued, and she started seeing

18 where they were coming from.  A bald white man walk on the

19 seat or in the passenger side of a white SUV.

20          Consistent with Jessie's testimony, you've seen

21 security footage from a bakery across the street showing the

22 defendant fixated on E&J, walking into the street, removing

23 his sunglasses to stare and glaring at the storefront while

24 his lips are moving.

25          (Video recording played.)

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

SUMMATION - MS. McGRATH                    796

1          MS. McGRATH:  In this video you can see the

2   defendant with his sunglasses in his hand in the middle of the

3   street staring in the direction of E&J.

4          (Video recording stopped.)

5          MS. McGRATH:  And again there you can see the

6   defendant with his head tilted fully to the right, again

7   staring in the direction of the store.

8          And you've seen text messages from the defendant's

9   phone, which we'll look at that more closely later, showing

10  the defendant's deep-seated hatred for people who report

11  crimes to law enforcement or who he labeled "rats".

12          Jessie testified that on August 31st, 2021, she

13  pulled up to her store with her brother, her partner Erik, and

14  her brother and nephew Anthony following in a car behind them.

15  And while she was opening the gate, the bald white man spotted

16  her brother and started screaming, "I'm going to fucking kill

17  you."  James started screaming back.

18          Jessie confused, asked repeatedly, "Who is that

19  person?"  And finally James told her, "This was Chris Bantis"

20  Everything flipped.  The man that had been threatening her for

21  weeks was the convicted loan shark that terrorized her

22  brothers all those years before.  The man she had heard so

23  much about as a child, a man she knew her brother was

24  terrified of.

25          George told you the same thing.  He testified that

SUMMATION - MS. McGRATH                           797

1    he heard from his mother that Jessie was being threatened and

2    he panicked.  He called Jessie, and he called the FBI.

3            Their testimony is also consistent with the security

4    footage in evidence as Government Exhibits 207 and 208.  At

5    about 10:10 a.m., you see the defendant walking out of

6    Jimmy's, staring at Jessie Harrison across the street, just in

7    front of the restaurant to the left.

8            And in Government Exhibit 208, Jessie saw the

9    defendant walk off screen, you see him turn around, his feet

10   facing backwards, towards the direction of E&J Boutique.

11           (Video recording played.)

12           MS. McGRATH:  Pay careful attention to the

13   defendant's feet as he leaves the screen.

14

15           (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

SUMMATION - MS. McGRATH                    798

1          MS. McGRATH:  (Cont'g.)  You can see him turn, walk

2     backwards, and face the direction of E&J.

3          Jessie and George's testimony is also corroborated

4     by the phone records.  You've seen cell site records showing

5     the defendant lingering in the vicinity after this fight.

6          MS. HIROZAWA:  Objection.  Misstates testimony.

7          THE COURT:  I'm going to allow it.

8          It's the jury's recollection that controls.

9          MS. McGRATH:  You've seen that Jessie called the

10    police to report the crime, and you heard from the testimony

11    and seen through the evidence when each of these calls was

12    made.  Let's look at that more closely.

13         You see that George and Jessie spoke for the first

14    time that day around 10:25 a.m.  Immediately, George called

15    Special Agent Tambrino.  Then for the first time, Jessie and

16    Special Agent Tambrino speak.  Moments later she calls 9-1-1

17    for help.

18         The defendant continued to fixate on E&J Boutique

19    and the Harrison family.  You saw security footage from

20    September 2nd showing the defendant glaring at the store,

21    mouthing something.

22         (Video recording played; video recording stopped.)

23         You heard testimony from Andrew Harrison, who also

24    worked at E&J Boutique that until late August or early

25    September 2021, he had no knowledge of who Chris Bantis was.

SUMMATION - MS. McGRATH                    799

1   Andrew told you that around that time Jessie warned him that

2   the defendant had been harassing the family and the store and

3   Jessie testified to the same.

4          You also heard testimony from Andrew that on

5   September 5th, 2021, he was at E&J with his brother Anthony

6   going about their workday when the defendant placed his hands

7   over his eyes and pressed his face up against the glass.  The

8   defendant was searching.  Andrew called Jessie and she was,

9   quote, frantic.  Jessie told you that after Andrew called her,

10  she panicked and contacted the FBI.

11         Again, their testimony is corroborated by the phone

12  records.  You can see in the phone location records that on

13  September 5th, half an hour before the defendant was staring

14  into E&J, he was in the neighborhood, blocks away.  Their

15  testimony is corroborated by the call detail record.  On

16  September 5th, Andrew called Jessie at 12:30 p.m. and minutes

17  later she contacted the FBI.

18         You've seen evidence showing that the defendant's

19  conduct reached new levels on September 8th, 2021.  Just the

20  day before he was texting Nikki, bragging that he would never

21  be called a rat.  He said, quote, Nobody will ever tell my son

22  that his father is a rat, so the quicker you put me back into

23  that fucking room, the quicker I do my time.  Go fuck

24  yourself.

25         On September 8th the defendant was carrying a wooden

SUMMATION - MS. McGRATH                    800

1   club in his duffle bag and security footage shows you that

2   once again when he left Jimmy's he glared in the direction of

3   E&J, mouthing.

4              (Video recording played; video recording stopped.)

5              Andrew testified that the defendant was calling E&J

6   rats, the Harrison rats and that they didn't know who they

7   were fucking with.  And Andrew testified what it meant to be

8   called a rat.  That you were someone who couldn't be trusted

9   in the community.

10             The footage shows you that the Harrisons had had

11  enough.  Anthony crossed the street and confronted the

12  defendant taking a, quote, jab step in that direction before

13  turning back to the store.  But it didn't end there.  You've

14  seen the footage showing the defendant dropping his bag to the

15  floor, rummaging through it and pulling out a wooden club,

16  which he waved in the air.  The defendant charged to the end

17  of the sidewalk, club in hand.

18             (Video recording played; video recording stopped.)

19             And you've seen footage showing Anthony and Andrew

20  going back to the store, grabbing a baseball bat and walking

21  outside before returning to E&J.  Minutes later, the defendant

22  was back, pacing on the street in front of the store.  Andrew

23  testified about all of that.  He told you that when the

24  defendant dropped his bag, the defendant threatened that he

25  had a gun and Andrew thought he was about to die.  Andrew

1   testified that he and his brother locked themselves in E&J

2   Boutique, and that he called Jessie who told him she was going

3   to call 9-1-1.

4           Jessie also testified about what happened on

5   September 8th.  Jessie wasn't at the store, but she got a call

6   from Andrew who sounded terrified.  Jessie learned that the

7   defendant was back and she feared he had a gun.  She called

8   9-1-1 and raced back to the store and when she arrived Andrew

9   was in tears and petrified.  Anthony was a nervous wreck.

10  They had to go home and Jessie told you that she felt so

11  guilty she had put them in that situation.

12          Again, Jessie and Andrew's testimony are consistent

13  with the phone record.  At 11:25 a.m. Andrew called Jessie.

14  After they got off the phone she immediately called 9-1-1.

15  Jessie contacted Andrew several more times and she contacted

16  the FBI.

17          You've also seen physical evidence from the events

18  of that day.  Special Agent Wheeler testified that two days

19  later, on September 10th, 2021, he conducted a search of the

20  defendant's basement apartment pursuant to a search warrant.

21  He testified that they found the clothes the defendant had

22  been wearing, and he testified that he found the wooden club

23  pinned between the couch cushions.

24          This is the club the defendant used that day when he

25  told Andrew and Anthony that he had a gun and that he was

1    going to kill them.

2              You've heard testimony and you've seen evidence

3    showing how everything came to a head on September 9th.

4    Jessie couldn't afford to close up shop, but she also knew

5    that Andrew and Anthony couldn't work that day so she and her

6    partner Erik came to work instead.  She arrived and began to

7    sweep the storefront immediately outside and that's when the

8    defendant started screaming, I want you dead, you're fucking

9    dead.  He gestured to his waistband and he made his hand into

10   the shape of a gun and pointed it at his temple.  Jessie

11   panicked.  She ran inside, locked the door, and called 9-1-1.

12   You heard her 9-1-1 call and you heard the panic in her voice.

13             (Audio recording played; audio recording stopped.)

14             Jessie told you during that call she observed Erik

15   going to the window to try to see if the defendant had a gun

16   and she told him to come back.  Jessie testified that she took

17   a photograph of the defendant standing in front of Jimmy's

18   Deli.  She told you she took that photo of him because she

19   thought she was about to die.  Jessie's photograph

20   corroborates her account.  You can see that one minute after

21   calling 9-1-1 she takes a photo of the defendant standing in

22   the doorway of E&J Boutique.  You've seen security footage

23   showing the defendant standing in the doorway of Jimmy's on

24   several occasions, but you also saw how on this day you

25   couldn't see the defendant from that camera angle.  That

SUMMATION - MS. McGRATH                803

1   camera couldn't pick up the defendant, but Jessie's eye could.

2          You've seen Jessie's pleading and desperate text

3   messages which also corroborate her account.  One minute later

4   she texted, Please, he is here.  Help me.  Paul, he is here.

5   Jessie's partner Erik also called 9-1-1 and you heard at the

6   end of the call that the NYPD arrived.

7          (Audio recording played; audio recording stopped.)

8          And the phone records corroborate Jessie's account.

9   You can see that she called 9-1-1 at 11:06, and then she sent

10  desperate and pleading text messages in the minutes after

11  before her husband and partner called 9-1-1.

12         You've heard testimony from Jessie and George about

13  how these events have destroyed their family.  Jessie blames

14  her brothers, James and George, for putting her in the

15  situation.  They no longer speak, they no longer have a

16  relationship.

17         One of the big questions you have to answer in this

18  trial is why.  Why was the defendant targeting the Harrison

19  family in 2018 and in 2021?  Why was he targeting E&J

20  Boutique, and you know the answer.  Despite the many years

21  that had passed since 2014, the defendant was not able to get

22  George and James ratting on him off of his mind.  You heard it

23  from his probation officer, who testified that around 2018 he

24  was resentful because he felt he was in his own predicament

25  after being, quote/unquote, ratted on.

SUMMATION - MS. McGRATH                    804

1          You heard it from Jessie and Andrew that the

2     defendant repeatedly called them rats, threatened to kill

3     George and James, and threatened to kill them.

4          And you heard it from the defendant himself.  For

5     example, in his 2021 jail call where he told Spiro Bantis,

6     quote, people make mistakes.  I'm going to suffer for it again

7     just like I did before.

8          (Audio recording played; audio recording stopped.)

9          And, you know, what was in the defendant's mind at

10    that time because you've seen his text messages.  On

11    August 21st, 2021, more than five years after his sentencing,

12    the defendant was still thinking about George in that

13    courtroom.  Quote:  There is nobody supposed to be at my

14    sentencing, he said.  But George was there.  And despite

15    George's relocation efforts, the defendant was keeping tabs on

16    George.  The defendant knew where he was.  Quote:  He's in

17    Tennessee right now, the defendant said.  And you heard from

18    George he had in fact relocated to Tennessee.

19          James was on the defendant's mind too.  Quote:  And

20    the other piece of shit, I see him.  He was ready to call

21    9-1-1.  Every dog has its day.

22          In 2016, George Harrison spoke at the defendant's

23    sentencing in front of the defendant and before this court

24    stating, quote, I am afraid that when this man gets out he's

25    going to come after me and my family.  And in 2018 and in

SUMMATION - MS. McGRATH                    805

1    2021, the defendant turned his nightmare into a reality.

2              Now that we've walked through the evidence, I'm

3    going to show you how the evidence fits into each of the

4    elements of the charged crime.  As you know, the defendant is

5    charged with one count of witness retaliation, but there are

6    three prongs to the statute each of which is a different basis

7    on which the defendant is guilty.

8              Each of the three prongs has three elements:  Acting

9    knowingly, harm, and acting with the intent to retaliate.

10   We'll go through each of these in a bit more detail.

11             So Section 1513(b)(1), as we discussed, requires

12   that the defendant acted knowingly or, in other words,

13   voluntarily and purposefully.  You've heard overwhelming

14   evidence about the defendant's deliberate and targeted

15   actions.  They were not by mistake or accident.

16             Section 1513(b)(1) requires that the defendant's

17   conduct threatened bodily harm to Jessie or Andrew, or

18   threatened property damage to E&J Boutique.

19             MS. HIROZAWA:  Objection, your Honor.  Misstates the

20   charge.

21             THE COURT:  Ladies and gentlemen, the Court will be

22   instructing you on the charge, I didn't quite get exactly what

23   counsel said in her summation.  To the extent that what she

24   said is going to be inconsistent with what you will receive

25   from me in the charge, you are to disregard counsel's

SUMMATION - MS. McGRATH                    806

1    expression and follow only the Court's instruction on the law.

2    You may continue Ms. McGrath.

3              MS. McGRATH:  Thank you, your Honor.

4              This is a good juncture to recall the many threats

5    the defendant made to Jessie.  He told Jessie he wanted her

6    dead, he made his hands into the shape of a gun and pointed it

7    at his temple.  He grabbed his waistband to make her believe

8    he had a gun.  Each of those statements and actions

9    constitutes a threat of bodily harm.

10             Let's look back at the threat the defendant made to

11   Andrew.  The defendant told Andrew he had a gun while

12   rummaging in his duffle bag for a weapon.  The defendant waved

13   a wooden club in the air while telling Andrew that he was

14   going -- that he had no idea who he was fucking with and he

15   was going to fucking get it.  And the defendant gestured to

16   his waistband again to make Andrew believe he had a gun.

17             And, finally, let's recall the defendant's threats

18   to E&J Boutique.  He pressed his face in the glass and he

19   showed his waistband.  He walked from other end of the street

20   into the street towards the store as if he would shoot and he

21   waved his wooden club.

22             Finally, Section 1513(b)(1) requires that the

23   government prove the defendant made those threats with the

24   intent to retaliate against George Harrison for attending or

25   testifying at an official proceeding.  And you've seen that

SUMMATION - MS. McGRATH                      807

1    here.

2              You heard evidence that in 2016 the defendant was

3    sentenced in this federal courthouse, you've seen the

4    transcript from the sentencing, and you've heard testimony

5    from George about the haunting words he spoke at the

6    defendant's sentencing.  Expressing his fear about the

7    defendant's future retaliation.

8              Turning to Section 1513(b)(2), that prong also has

9    three elements, the first two of which are the same as

10   Section 1513(b)(1).  Again, you've seen and heard evidence

11   about the defendant's death threats to Jessie and Andrew and

12   the way in which he acted like he had a gun to shoot at her

13   through the window of the store.

14             The last element is different between the two

15   sections.  Here, the government must prove the defendant acted

16   with the intent to retaliate against a person for providing

17   information to law enforcement about either the possible

18   commission of a federal offense or the possible violation of a

19   condition of supervised release.  For this section the person

20   the defendant was retaliating against was either George or

21   James or both, and because this prong is a bit more involved,

22   you can break it down piece by piece.

23             MS. HIROZAWA:  And your Honor, just for the record

24   I'm objecting to the demonstrative which lists E&J as a

25   victim.

SUMMATION - MS. McGRATH                    808

1          THE COURT:  All right.  Your objection is noted.

2          MS. McGRATH:  Let's start with retaliation for

3    providing information to law enforcement.  How do you know the

4    defendant was retaliating against George and James for

5    providing this information?  You heard testimony that George

6    and James sought help from law enforcement after they were

7    threatened by the defendant in connection with his

8    loansharking.

9          You heard the consensual recordings that George and

10   James made in which the defendant used death threats and

11   capturing the minute by minute of his illegal loan business.

12         You heard overwhelming evidence that the defendant

13   knew he had been reported to law enforcement.  In a recorded

14   conversation with George, the defendant said that James went

15   to the cops.  That's in Government Exhibit 12.

16         The defendant's former lawyer, Andrew Rendeiro, also

17   testified that recordings were in multiple filings and

18   referenced at multiple court appearance, including the

19   defendant's guilty plea.

20         And how do you know they went to a law enforcement

21   officer?  I expect Judge Vitaliano will instruct you that for

22   purposes of this statute a law enforcement officer includes an

23   FBI special agent or an FBI task force officer.  You heard

24   testimony from George that he went to the FBI to report the

25   defendant's crime.  And you heard testimony from Officer

SUMMATION - MS. McGRATH                    809

1    Chimienti that he was part of a federal task force with the

2    FBI and that he investigated federal offenses.

3            And how do you know that George and James'

4    information related to the possible commission of a federal

5    offense?  Detective Chimienti testified that he was working

6    with the FBI investigating federal crimes and you know that

7    the defendant was ultimately charged with and pled to

8    extortionate extension of credit, a federal crime.

9            Now let's turn to retaliation for providing

10   information relating to the possible violation of a condition

11   of supervised release.  How do you know George provided

12   information about a possible violation?  First, you've seen

13   numerous exhibits laying out the no contact condition of

14   supervised release and the defendant's signature acknowledging

15   that he understood those conditions.

16           Second, George testified that while the defendant

17   was on probation, George learned that the defendant was

18   harassing his sister at E&J.  George testified that there was

19   what he called an order of protection preventing the defendant

20   from having any contact with his victims, and George testified

21   that he notified the FBI.

22           And, finally, you heard from U.S. Probation Officer

23   Kristen Aliperti that she received information from the FBI

24   about the possible breach and promptly confronted the

25   defendant.

SUMMATION - MS. McGRATH                810

1           Finally, turning to Section 1513(e), like the

2    earlier two we discussed, Section 1513(e) requires the

3    defendant acted knowingly.  The harm element for this prong

4    encompasses any action harmful.  Harm includes not just

5    physical harm, but also reputational harm, emotional harm, and

6    fear for your safety.  Let's recap some of the threats the

7    defendant made to George and James.

8           You heard testimony that on August 31st, 2021, when

9    the defendant saw James Harrison in front of E&J Boutique, the

10   defendant screamed, I am going to fucking kill you and labeled

11   him a rat.  You heard testimony that for weeks the defendant

12   shouted at Jessie Harrison, quote, George is a rat and that

13   the Harrisons are rats, and I want your brother dead.

14          And you heard testimony about how the defendant's

15   threats destroyed the family relationship between Jessie,

16   James and George.  You've heard and seen throughout this trial

17   testimony and evidence indicating the defendant's hatred of

18   rats and the stain that accompanies the person and their

19   family when labeled one.

20          The final element is the defendant acted with the

21   intent to retaliate against someone for providing truthful

22   information to law enforcement about the possible commission

23   of a federal offense.  This element is very similar to the

24   last element of Section 1513(b)(2), but here the information

25   provided has to be truthful.  So let's recap briefly.

SUMMATION - MS. McGRATH                811

1          George and James went to law enforcement to report

2     the defendant's loansharking.  They made consensual recordings

3     capturing the defendant's voice, his death threats, and the

4     operation of his loan business.  That information was provided

5     to the FBI and the defendant pled guilty to the federal crime

6     of extortionate extension of credit, and at the defendant's

7     guilty plea he acknowledged that he had, in fact, loaned money

8     to, quote, brothers James and George with the understanding

9     that violence could be used to collect payment.

10          Ladies and gentlemen, thank you for your patience

11     and for your careful attention over the course of this trial.

12     I submit to you that we have proven beyond any reasonable

13     doubt that the defendant committed the crime of witness

14     retaliation and we ask that you return the only verdict

15     consistent with the evidence, guilty.

16          THE COURT:  Thank you, Ms. McGrath.

17          All right, ladies and gentlemen, that will bring us

18     to the close of our elongated morning session and to the lunch

19     break.  All of the admonitions that I've given you continue to

20     apply.  We're still on that building block but the case is not

21     over, it's not been given to you for deliberation so that you

22     are to continue to keep an open mind.  You're not to discuss

23     the case amongst yourselves or with anyone else.  You're not

24     to do any research with respect to the case during your lunch

25     break.

PROCEEDINGS                                    812

1              Again, we're on radio silence, no communication by

2    any form or means to anyone, anywhere, that you are a juror,

3    that you're coming to this courthouse and participating in

4    this trial.

5              With all of those admonitions we wish you a good

6    lunch and where are we timewise, William.

7              (Pause in proceedings.)

8              We don't want to squeeze you too much so try to get

9    back to the jury room -- again, the cafeteria is still open

10   for you, and you're still certainly free to visit other

11   establishments in the neighborhood, but try to get back to the

12   jury room sometime between 2:15 and 2:30 and we will resume

13   the trial on the summation building block where we leave it

14   now.

15             Again, enjoy your lunch and I will forward to seeing

16   you shortly.

17             (Jury exits courtroom.)

18             THE COURT:  All right.  So we will see you at around

19   2:30 or so.  Again, the usual rules apply, you can leave

20   anything you want to leave, William will lock it up.  If you

21   think you might need it, take it with you.  We'll see you at

22   that time.

23             Anything we need to attend to in the meantime?

24             MS. OKEN:  No, your Honor.

25             I think no from both sides, your Honor.

PROCEEDINGS                                          813

1              THE COURT:  Okay.  Enjoy your lunch.

2         (Luncheon recess.)

3         (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                                        814

1              A F T E R N O O N   S E S S I O N

2              (Time noted:  2:15 p.m.)

3              (In open court; Jury not present.)

4              THE COURTROOM DEPUTY:  All rise.

5              (Judge enters the courtroom.)

6              (Defendant enters the courtroom.)

7              THE COURTROOM DEPUTY:  Court is back in session.

8              Counsel for both sides are present including the

9      defendant.

10             THE COURT:  All right.  Are we ready to go?

11             MS. OKEN:  Yes, your Honor.

12             MS. HIROZAWA:  We are, your Honor.

13             THE COURT:  And Ms. Hirozawa, you're going to handle

14     the --

15             MS. HIROZAWA:  I am, your Honor.

16             THE COURT:  When the Court was entering the

17     summation by Ms. McGrath, there was a Defense objection to a

18     demonstrative board.  The Court said it noted it.  The Court

19     reviewed it, the objection, during lunch break and the

20     objection is overruled.

21             MS. HIROZAWA:  Understood, your Honor.

22             Thank you for taking a look at that.

23             THE COURT:  You're welcome.

24             All right.  We are ready to begin.  The jury is

25     here.  Bring the jury in.  They're here.  Which is always the

SHERNELLE GRIFFITH – Official Court Reporter

SUMMATION - MS. HIROZAWA                815

1    good news.  They've come back.

2              THE COURT:  Ms. Oken, you're doing any rebuttal?

3              MS. OKEN:  That's correct, your Honor.

4              THE COURT:  So we'll take a short break after Nora

5    is finished to give you a chance to assemble your thoughts

6    because it is a rebuttal and not a second summation and then

7    we'll take that.

8              MS. OKEN:  Great.

9              Thank you, your Honor.

10             (Jury enters the courtroom.)

11             THE COURT:  Be seated, please.

12             Counsel will stipulate that the jury is present and

13   properly seated.

14             MS. OKEN:  We do, your Honor.

15             MS. HIROZAWA:  So stipulated.

16             THE COURT:  Thank you very much, Counsel.

17             Ladies and Gentlemen, welcome back.

18             Hope you enjoyed your lunch.  As you will recall, we

19   are at the summation phase of the building blocks.  We have

20   heard the opening summations by the Government and now we have

21   the summation on behalf of the defendant by Ms. Nora Hirozawa.

22             Ms. Hirozawa.

23             MS. HIROZAWA:  Thank you, your Honor.

24             Mr. Bantis did not threaten Jessie or Andrew

25   Harrison.  He did not threaten them with the specific intent

1    to retaliate against George or James Harrison.  And he

2    certainly did not take any action harmful to George or James

3    Harrison.  There is no video.  There is no credible witness

4    testimony because it didn't happen.  Mr. Bantis is not guilty.

5           Now, you may remember at the beginning of this case,

6    Ms. Sherman got up here and told you what this case is about

7    and what this case isn't about.  She told you that the

8    Government was would try to distract you with a bunch of

9    witnesses, testimony, and evidence from Mr. Bantis's 2014

10   case.  That's exactly what they did.  But as she told you at

11   the beginning, this case is not about whether George and James

12   Harrison cooperated with law enforcement back in 2014.  It is

13   not about whether Mr. Bantis liked George or James Harrison.

14   It's not about whether they like him, they don't mister.

15          What you are here to decide is whether the

16   Government has proved to you beyond a reasonable doubt that

17   between 2018 and 2021, Mr. Bantis knowingly threatened Jessie

18   Harrison or Andrew Harrison with bodily jury or threatened

19   Jessie Harrison with damage to her tangible property.

20          The Government is also arguing that Mr. Bantis took

21   harmful action against George and James Harrison for

22   cooperating with law enforcement.  And as you've seen over the

23   past week, the Government simply has failed do that because it

24   did not happen.  The Government is asking you to believe

25   beyond a reasonable doubt that Mr. Bantis has been engaged in

SUMMATION - MS. HIROZAWA                    817

1    nefarious pattern of stalking and threatening Jessie Harrison

2    for months.  Over four months.  But he when their video

3    surveillance analyst went through three weeks of video

4    footage, it showed Mr. Bantis going about his daily life.

5    Going to the gym, getting off the bus, going to Jimmy's 3

6    Sons, smoking a cigarette, picking up his sandwich, walking

7    home to his home a block and and a half a way.  The home that

8    Mr. Bantis's family has owned for 55 years.

9            The Government is asking you to believe that

10   Mr. Bantis was stalking Jessie Harrison, but you know that's

11   not true and you can see that.  Not just from the video

12   surveillance record, but from this Human Resource

13   Administration records.  You can see that Mr. Bantis was going

14   to Jimmy's 3 Sons before E&J ever moved locations.  Sometimes

15   he goes to Jimmy's 3 Sons early in the morning before the gym.

16   At times when E&J isn't even open.  At times when Jessie

17   Harrison and Andrew Harrison is not present.

18           Now, let's turn to look at the Government's

19   evidence.  The witnesses they're asking you to credit, who are

20   unbelievable and unreliable, and the video evidence does not

21   support their claims.  And the Government does not do

22   sufficient investigation to back any of it up.

23           Now, Jessie Harrison is at the center of the

24   Government's case, but her testimony just does not add up.

25   She's unreliable.  She's unbelievable.  And when you look at

*SHERNELLE GRIFFITH - Official Court Reporter*

SUMMATION - MS. HIROZAWA                818

1   the other evidence that we've seen it doesn't align.  Jessie

2   testified, told you all, that Mr. Bantis was stalking her and

3   threatening her, quote unquote almost every day.  Between

4   May 2021 and September 2021.

5          Jessie told you repeatedly that Mr. Bantis would

6   scream at her from a white car as she was opening the store.

7   Jessie was certain of that.  He was always in a white car in

8   the front or rear passenger seat or right outside of the car.

9   But you heard from Agent Ortiz, whose sole job was to look for

10  Mr. Bantis in three weeks of video footage and track his every

11  move.  Agent Ortiz told you that over the course of those

12  three weeks she never saw Mr. Bantis in a car.  She never saw

13  him outside of a car.  She never saw him anywhere near a car.

14  Every single time she saw Mr. Bantis, he was walking on foot.

15         Agent Ortiz told you that many of the times she saw

16  Mr. Bantis, he was walking from the bus stop.  You heard from

17  Probation Officer Aliperti that Mr. Bantis has been taking the

18  bus since 2017.  He's been taking the bus getting off the bus

19  and going to Jimmy's 3 Sons and walking home a block and a

20  half away.

21         Now, remember just like Parkway Florist, Sancho

22  Pancho, the 99 cents store, E&J is a business.  They have

23  security cameras.  But Jessie Harrison told you that their

24  security cameras don't save footage.  If someone had been

25  yelling the Harrisons are rats, George is a rat, I want you

1    dead, E&J is rats for over four months.  Surely Jessie

2    Harrison would have installed security cameras that actually

3    records footage.  Surely the Government would have gone out

4    and collected some evidence that showed Mr. Bantis in a white

5    car.

6            Now, the Government will get up here in a minute,

7    I'm sure, and argue to you that just because it's not on

8    video, doesn't mean it didn't happen.  The Government will

9    claim that the angel is wrong.  They'll ask you to speculate

10   about what Mr. Bantis was doing when he was standing in the

11   doorway of Jimmy's 3 Sons.  They'll ask you to speculate about

12   that Mr. Bantis is screaming and gesturing across two lanes of

13   traffic at Jessie Harrison over at E&J Boutique.  But remember

14   what the burden is here.  The burden is not within the realm

15   of possibility.  The burden that the Government is held to is

16   beyond a reasonable doubt.

17           Now, think about the other testimony and evidence

18   that you've heard this week.  Jessie Harrison told you herself

19   that she never called 9-1-1 in response to this person

20   screaming at her from a car until August 31, 2021.  And that's

21   despite Jessie Harrison calling 9-1-1 seven other times

22   between April 2021 and September 2021.  If this had happened,

23   Jessie Harrison would have called 9-1-1.

24           She never took a photograph of Mr. Bantis like the

25   one she took on September 9th or the one she took of me and

SUMMATION - MS. HIROZAWA                    820

1    Ms. Sherman out in the neighborhood.  She never recorded

2    Mr. Bantis.  She didn't take a photo.  She didn't record him

3    because it didn't happen.

4            And think about what her nephew Andrew said.  Andrew

5    has worked at E&J Boutique for six years on a weekly basis.

6    He was working from June 2021 to September 2021.  He never saw

7    Mr. Bantis until he stated, September 5th.  And Andrew stated

8    he never even heard about the alleged threats to his aunt

9    Jessie until the end of August 2021.  Think about that.

10           Jessie Harrison claims someone is screaming threats

11   to her on an almost daily basis for four months, but Andrew

12   never hears them.  He never sees them.  Jessie Harrison has to

13   alert Andrew to look out for the person who is supposedly

14   terrorizing his place of employment and his aunt for months.

15   It doesn't make sense because it didn't happen.

16           Now, is it possible that Jessie Harrison genuinely

17   felt scared, worried.  Is it possible that someone yelled

18   these things at Jessie Harrison from a white car between May

19   and August 2021?  Sure.  Jessie testified that at first she

20   thought kind of -- she kind of thought it was a prank.  Those

21   are her words.  She told you that she is very well-known in

22   the area.  So she just thought someone was playing games.

23           But it makes you wonder what kind of reputation

24   Jessie Harrison has in the neighborhood if someone is shouting

25   I want you dead is considered a prank.  We know that Jessie

SUMMATION - MS. HIROZAWA                              821

1    called the police on people in the neighborhood other than

2    Mr. Bantis at least seven times between April 2021 and

3    September 2021.  And we know that Jessie's brother George

4    cooperated against someone else besides Mr. Bantis.

5         And it's certainly possible that or people in the

6    neighborhood might have say motivate to yell threats at Jessie

7    Harrison.  Even if it did happen, what you have to remember is

8    that there's no evidence that it was Mr. Bantis.  More

9    importantly, the Government has not proved to you beyond a

10   reasonable doubt that happened or that Mr. Bantis did it.

11        Now, I want to talk about August 31st.  The day that

12   Jessie really began instigating and calling 9-1-1 against

13   Mr. Bantis.  We know that Mr. Bantis and James Harrison got

14   into an argument that day.  We know that James Harrison chased

15   Mr. Bantis down the block that day.  We know that Anthony

16   Harrison chased Mr. Bantis down the block that day.

17        Jessie Harrison described August 31st as a fight

18   between Mr. Bantis and her brother.  She did not say anything

19   about Mr. Bantis threatening her on August 31st.  Now, Jessie

20   also told you that she wasn't even present at E&J on

21   September 5th the day that Andrew and Anthony said they saw

22   Mr. Bantis peering through the window or September 8th.  So

23   let's talk about September 9th, the only other date that

24   Jessie Harrison got -- called the police on Mr. Bantis, which

25   is the day that he gets arrested.

*SHERNELLE GRIFFITH - Official Court Reporter*

SUMMATION - MS. HIROZAWA                822

1          On September 9th, Jessie called 9-1-1 and told the

2     police Mr. Bantis was threatening her.  Specifically she told

3     him that he had a gun.  That he was armed.  And you heard

4     yesterday that Jessie's partner, Eric Feuer also called 9-1-1

5     that day, the same morning, and told the 9-1-1 operator that

6     Mr. Bantis threatened to shoot him and that he also saw a gun

7     specifically on Mr. Bantis's waist.

8          We know that was a lie.  Jessie Harrison and

9     Eric Feuer were together when they made those 9-1-1 calls.

10    You heard Jessie refer to him on her own 9-1-1 call.  Jessie

11    said that he had gone to the window of the store to get a

12    better look.  And then, after that Eric lies about seeing a

13    gun.  He even lied about the specific place where he saw the

14    gun on Mr. Bantis.  And then, the Government plays this 9-1-1

15    call for you yesterday knowing that it is not truthful

16    information and they don't even call Eric Feuer as a

17    witness --

18               MS. McGRATH:  Objection, your Honor.

19               THE COURT:  Sustained.

20               MS. HIROZAWA:  -- at this trial to answer for his

21    lies.

22          You heard this morning, NYPD officers showed up on

23    the scene, at least three of them.  Because reporting threats

24    with a gun is something that the police take very seriously.

25    They search Mr. Bantis's person.  And you heard from

1    Officer Selwanes, that Mr. Bantis was cooperative.  He gave

2    him his ID.

3              He consented to the pat down.  He consented to a

4    search of his gym bag.  And the police searched both

5    Mr. Bantis's person and his gym bag.  What to they find?  Gym

6    clothes, a towel, a water bottle.  They do not find a gun.

7    Because Mr. Bantis did not have a gun.  They don't find a gun

8    at his home when they search it.  Even though they are

9    authorized to search for firearms.  And he did not put a gun

10   in his bag that day.  He did not have a gun on his waist.  And

11   as Jessie Harrison admitted on the stand to you, she never

12   actually saw a gun.  She lied to get the police to come to get

13   Mr. Bantis arrested.

14             Now, you know the Government -- you know that

15   Mr. Bantis did not threaten Jessie Harrison because of the

16   video surveillance.  Because the Government has not showed you

17   a single second of video surveillance showing any contact at

18   all between Mr. Bantis and Jessie.  You know Mr. Bantis has

19   never threated Jessie because her story doesn't add up.

20             Now, let's talk about Jessie's nephew Andrew.

21   Andrew has no relationship with his uncle George or his uncle

22   James.  And Andrew testified that he's only ever seen

23   Mr. Bantis two times.  The first time he saw a man he believed

24   to be Mr. Bantis was on September 5, 2021.  Andrew told you

25   that he saw a man looking in the window of E&J that day.

SUMMATION - MS. HIROZAWA                    824

1          He had no contact with that man.  He didn't say

2     anything to the man.  The man say anything to him.  It was

3     Anthony, who you didn't hear from, that told Andrew that the

4     man was Mr. Bantis.  Andrew told you he never seen Mr. Bantis

5     before.  He had no idea what he looked like.  This could have

6     been anyone.  Someone looking in the window for a rear

7     baseball card or video game, but we know it wasn't Mr. Bantis.

8          Now, how do we know that?  You know from FBI Agent

9     Richard Busick.  The Government's cell site location

10    information expert.  That Mr. Bantis was not at E&J on

11    September 5th.  Unlike August 31st and September 8th,

12    Agent Busick testified that he was definitively able to tell

13    you that Mr. Bantis's phone pinned off a tower closer to his

14    home at all of the relevant call times on September 5th.

15         And he was able to tell you that that tower

16    precluded him from concluding that Mr. Bantis was at E&J at

17    those times.  Now, the Government may claim that the cell site

18    location data only shows a person's location at the time they

19    place a call or send a text message.  But Mr. Bantis isn't on

20    the Sancho Pancho video footage that the Government has played

21    for you either.  The Government is asking you to speculate

22    about where Mr. Bantis was when their evidence simply does not

23    show it.  And they certainly did not prove it beyond a

24    reasonable doubt.

25         So let's talk about the only actually time that

SUMMATION - MS. HIROZAWA                825

1    Andrew saw Mr. Bantis.  That was on September 8th.  Mr. Bantis

2    was going about his daily business.  You'll see on the screen

3    in the upper right corner, his bus arrives, pulls into the bus

4    station, the bus stop, that Agent Ortiz identified for you

5    yesterday.  He had gone to the gym.  Took the bus back to Fort

6    Hamilton Parkway and went into Jimmy's 3 Sons.

7              And I'm going to let this keep playing.you are

8    welcome to continue watching it.

9              As he's walking home from Jimmy's 3 Sons, Anthony

10   Harrison burst out of E&J and started walking directly across

11   Fort Hamilton Parkway through ongoing traffic to the side of

12   the street Mr. Bantis is own.  Mr. Bantis never goes to the

13   side of the street where E&J is.

14             Anthony is visibly gesturing at Mr. Bantis as soon

15   as he walked out of E&J.  And Andrew, his brother, testified

16   that he was yelling at Mr. Bantis.  He was red.  He was mad.

17   Anthony followed Mr. Bantis down the sidewalk and lunged at

18   him.  And it was only then that Mr. Bantis rummaged around in

19   his gym bag for a wooden stick to defended himself.

20             You'll see more clips of this later.  So if it's not

21   lining up with exactly what I'm saying, do not worry about

22   that.  And you can always ask to review all video footage.

23             By the time Mr. Bantis finally finds the stick in

24   his gym bag, Anthony was back across the street.  He was

25   nowhere near Mr. Bantis and Andrew wasn't either.  Mr. Bantis

SUMMATION - MS. HIROZAWA                826

1    yelled and shook the stick.  And I'll note here, it is a

2    wooden stick.  It is not a gun.  It is not a metal pipe.  It's

3    not a wooden club.  The stick is in evidence.  Pick it up for

4    yourselves.

5             Mr. Bantis never crossed over to E&J's side of the

6    street.  He never swung the stick at Anthony.  And yet,

7    Anthony comes out of E&J brandishing a baseball bat.  He

8    wasn't just displaying it so that Mr. Bantis knew he could

9    defend himself.  He was hiding it behind his back until he

10   stepped in the middle of Fort Hamilton Parkway towards

11   Mr. Bantis until he was ready to use it.

12            Now, Andrew was really just a bystander to this

13   whole encounter.  Look at the video and look at where Andrew

14   is in this video.  You see Anthony walk out of E&J already

15   gesturing.  And he doesn't go to the bodega.  He makes a B

16   line to exactly where Mr. Bantis is on the other side of the

17   street.

18            Anthony is already across the street by the time

19   Andrew comes out.  Andrew was just a bystander.  But don't get

20   me wrong, he's certainly not a neutral observer.  He's telling

21   you a version of this story to back his family up.  He didn't

22   witness the initial encounter between Anthony and Mr. Bantis.

23   He doesn't know who started it.  Andrew did not lunge at

24   Mr. Bantis and he didn't appear to be yelling at Mr. Bantis.

25   This whole time Andrew is just trialing his brother.

1          Now, you know from the video surveillance that

2    Andrew is exaggerated.  You know that he wasn't hiding behind

3    parked cars for ten minutes or at all.  You know that he was

4    walking calmly back and forth across Fort Hamilton Parkway.

5    And you know that he never called 9-1-1 that day.  You know

6    that he was minimizing Anthony's conduct and exaggerating

7    Mr. Bantis's conduct.  Stretching his story to fit the

8    narrative that his aunt Jessie told him.

9          Now, Andrew claims that Mr. Bantis threatened him

10   and Anthony with a gun.  While -- and we don't know exactly

11   what Mr. Bantis was saying on September 8th because there is

12   no audio on this.  But as you're watching the video

13   surveillance, don't just look at Mr. Bantis.  Don't just look

14   at Anthony and Andrew.  Look at the guy sitting in front of

15   florist shop.  Look at the guy sitting on the fire hydrant.

16   Look at the people walking by.  They're all looking at

17   Anthony.

18         If Mr. Bantis had been yelling, I have a gun while

19   rummaging through his bag, you think all these people would

20   just be sitting there.  You would see a reaction.  People

21   would be running, crouching, hiding.  And don't just limit

22   that to this video.  Think about this as you review all of the

23   video footage in this case.  All of the days that the

24   Government claims Mr. Bantis is shouting across the street

25   loud enough for Jessie Harrison to hear all the way on the

1    other side of the street at E&J.

2            What are the reactions of people walking by?  Are

3    the people walking by reacting in way you might expect if they

4    hear a man yelling, I'm going to kill you.  I want you dead.

5    Or are they on their cell phones or they're leading their

6    normal lives.  And remember, whatever Mr. Bantis said to

7    Anthony, it was not motivated by any specific intent to

8    retaliate against George and James Harrison for cooperating

9    with police back in 2014.  It was motivated by a split second

10   flight or fight reaction.  And also remember, Anthony Harrison

11   is not a charged victim here.  The Government is not claiming

12   that Mr. Bantis ever yelled threats at Anthony Harrison.

13           Now, the Government played a call for you that

14   Mr. Bantis placed to his bother Spiro from jail.  The

15   Government argued that when Mr. Bantis said, people make

16   mistakes, he was referring to witness retaliation.  But just

17   think about it, Mr. Bantis is sitting in a jail cell.  He's

18   talking about what happened on September 8th.  And in

19   hindsight, he probably wished he had chosen flight other fight

20   because jail is horrible and Chris Bantis knew it.

21           But use your common sense.  Who was the aggressor in

22   this situation?  Who was just trying to defend himself.  Who

23   crossed two lanes of ongoing traffic to start beef?  Who

24   stayed on their side of the street?  You may have noticed that

25   during Andrew's testimony he recited a couple of times what he

1    recalled Mr. Bantis saying on September 8th.  Each time, he

2    reported that Mr. Bantis said, your fucking done.  You don't

3    know who you messed with.  But then, after a pause, he would

4    add, oh, and also that E&J were rats and that the Harrison's

5    were rats.

6          Again, use your common sense.  It's a weird phrase.

7    And it's the exact same phrase that Jessie Harrison claims

8    Mr. Bantis was yelling at her for months.  The Harrison's

9    recite the word rat like it's some sort of magic word.  A word

10   that transforms a street scuffle into a federal criminal case.

11   And as Jessie Harrison knows, getting your way, is all about

12   knowing the magic words to say to police.

13         Now, let's talk for a second about common sense.  As

14   I mentioned, I'm going to ask you to use your common sense.

15   And I think this is a case where it's fairly straightforward.

16   Mr. Bantis -- in assessing who the aggressor is in this case,

17   Mr. Bantis who never enters E&J, never walks on E&J side of

18   the street, never crosses over to E&J side of the street.  Or

19   the Harrison family, who when they see Mr. Bantis walking on

20   the other side of the parkway, going Jimmy's 3 Sons, cross

21   over to his side of the street, yell at him, lunge at him.

22         Your common sense tells you what the video clearly

23   demonstrates.  It's the Harrisons who instigate these

24   interactions. Mr. Bantis is not acting to retaliate for

25   testimony that occurred eight years ago.  He's standing up for

SUMMATION - MS. HIROZAWA                    830

1   himself when this family chases after him when he's trying to

2   go about his day buying a sandwich.  And remember, we don't

3   have to prove that to you.  It's the Government who has to

4   prove this charge beyond a reasonable doubt.

5          They didn't to that and they can't to that because

6   Mr. Bantis never threatened Jessie, Andrew, or any other

7   member of the Harrison family in retaliation for George and

8   James' cooperation eight years ago.  The video evidence

9   doesn't support it and the only thing that does is a word of a

10  woman who has admitted lied to police to get what she wanted.

11         Now, I want to talk a little bit about the specific

12  subsections that the Government has charged here.  And it's

13  important that you understand that all 12 of you must agree on

14  these specific elements in order to find Mr. Bantis guilty or

15  not guilty.  It may sound confusing, boring.  I know the

16  Government already put their chart up on a slide because stay

17  with me because Mr. Bantis's fate hinges on this.

18         Now, under first subsection 1513(b)(1), the

19  Government must prove to you beyond a reasonable doubt that

20  Mr. Bantis knowingly threatened bodily injury to Jessie, or

21  Andrew Harrison or that Mr. Bantis knowingly threatened

22  damaged to the tangible property of Jessie Harrison.  That's

23  not included on this slide.  We didn't hear any testimony at

24  all about any damage to tangible property or any threatens of

25  damage to tangible property.  So I would submit you don't need

1    to consider that.

2            To find Mr. Bantis guilty, you have to unanimously

3    agree on who he threatened and what threatened; bodily injury

4    or property damage.  And you have to unanimously agree that

5    Mr. Bantis made those threats with the specific intent to

6    retaliate against George Harrison for testifying at his

7    sentencing hearing.

8            Now, 1513(b)(2), second subsection, is very similar.

9    Just like 1513(b)(1), you have to agree on who he threatened.

10   And you have to agree on what he threatened.  The difference

11   is that you also have to unanimously agree that Mr. Bantis

12   made those threats with the specific intent to retaliate

13   against George Harrison for providing information regarding

14   the commission of a federal offense or in violation of

15   supervised release to law enforcement or that he acted with

16   the specific intent to retaliate against James Harrison for

17   doing the same.  So that's the key difference.

18           The third subsection of the Government has charged,

19   1513(e) is a little different.  Just bear with me.

20           Under 1513(e), the Government must prove beyond a

21   reasonable doubt that Mr. Bantis knowingly took an action.

22   That Mr. Bantis's action was harmful to either George or James

23   Harrison and that Mr. Bantis acted with the intent to

24   retaliate against that specific person for providing truthful

25   information to law enforcement regarding the commission of a

1   federal offense.  You have to decide whether he committed a

2   harmful act, took harmful action against George or James,

3   unanimously.  And you have to ensure that whoever you find,

4   you may find that he took a harmful action against, that that

5   person actually was the one who personally provided

6   information to law enforcement and was in retaliation for that

7   information.

8           Now, the Government will argue to you that under

9   1513(e) any alleged threats to Jessie or Andrew could

10  constitute harmful action to George or James.  They'll argue

11  that its resulted in a deterioration of their relationships.

12  But the Government has to show that any harm stems from an

13  action that Mr. Bantis actually and knowingly took.  And that

14  the action that he specifically -- and that he specifically

15  intended to retaliate against the person who personally

16  provided information.  This is not a chain of causations.

17  This is not the butterfly effect.  Mr. Bantis has to take

18  action that is harmful to George or James.  Attenuated harm is

19  not sufficient.

20          Now, you maybe wondering, there's a lot of subtle

21  variations in this charge.  Why is the wording so confusing?

22  You know why, because the Government is throwing everything at

23  the wall just to see if what sticks.  Property damage, we

24  didn't hear a single word of testimony about property damage.

25  So just remember as you're going to through the jury

1    instructions, as Judge Vitaliano is instructing you, stay

2    focused and do not become overwhelmed by the choose your own

3    adventure options that the Government will argue to you.  All

4    of them end with not guilty.

5         Now, Judge Vitaliano will give you other

6    instructions on the law as well.  And he'll tell you that you

7    can consider not just the evidence that you have heard and

8    seen, but also the absence of evidence.  So I want to talk

9    about a few elephants in the room.  Where is James Harrison?

10   The Government charged James Harrison as a victim, a named

11   victim in this case, but where is he?  What do we know about

12   him.

13        You heard a lot of about James Harrison from back in

14   2014.  You heard about the voicemails that he received from

15   Mr. Bantis back in 2014.  And those voicemails sound bad.  But

16   you have to ask yourself, what did the 83 minute voicemail

17   that Mr. Bantis was responding to sound like.  The 83 minute

18   voicemail that George Harrison admitted contained threats to

19   Mr. Bantis' family.

20        You heard Jessie Harrison tell you that her bother

21   James is a tough guy.  And that on August 31st, he chased

22   Mr. Bantis down the block.  Why isn't he here?  Why don't we

23   hear from him?  How can you know whether he was threatened or

24   whether Mr. Bantis took any harmful action towards him, if we

25   don't hear from him.  The Government may claim that you should

SUMMATION - MS. HIROZAWA                834

1    consider reputational or emotional harm to James.  But how can

2    you, when you have no idea what his representation is.  You

3    have no idea what an emotional harm he may have actually felt.

4           And James wasn't the only person to chase Mr. Bantis

5    down the block on August 31st.  Jessie told you that her

6    nephew Anthony also chased Mr. Bantis down the block that same

7    day.  Who is Anthony Harrison.  Where is Anthony Harrison.

8    Jessie's nephew who worked at E&J Boutique for just one week.

9    Yet somehow allegedly saw Mr. Bantis three times and chased

10   him not once, but twice.  Who's the real victim here?  Who is

11   the aggressor?  Who has beef with who?

12          And why didn't Jessie and Andrew want Anthony to

13   talk to the NYPD when they arrived on August 31st or

14   September 8th?  Why didn't Anthony ever talk to

15   Agent Tambrino?  And speaking of Agent Tambrino, why -- or

16   Paul as the Harrison's call him, why didn't we hear from him?

17   Agent Tambrino is the case agent on this case.  He was the

18   case agent on Mr. Bantis's case back in 2014.

19          He responded to E&J Boutique repeatedly.  He's

20   exchanged more than 100 text messages and calls with Jessie

21   Harrison.  You heard that Agent Tambrino went around looking

22   at video surveillance footage with Andrew Harrison back in

23   2021.  He was present for the Government's preparation with

24   every single witness that you've heard from.  He's been

25   sitting right here at counsel table the entire time.  Not like

SUMMATION - MS. HIROZAWA                835

1    he wasn't available.

2           The Government brought in a bunch of witnesses who

3    are tangentially involved in this investigation and provided

4    you with tiny crumbs of so called evidence.  We heard from

5    Agent Busick from that cell phone data for three specific

6    dates.  Drove around Dyker Heights for a day.  You heard from

7    Agent Ortiz who reviewed three weeks of video from Sancho

8    Pancho.  You heard from Agent Wheeler who retrieved a stick

9    from Mr. Bantis's home.  You heard from Agent Olszweski who

10   download the data from Mr. Bantis's phone.

11          The Government spent a lot of taxpayer money to fly

12   retired Detective Chimienti here from North Carolina to play

13   some voicemail recordings for you from 2014 recordings.

14   Recordings that Mr. Bantis doesn't dispute took place.  They

15   spent a lot of money to supply George Harrison into court for

16   you and put him through yet another court proceeding just to

17   testify about what happened in 2014.  Things that we don't

18   contest.  They spent a lot of money --

19          MS. McGRATH:  Objection, your Honor.

20          THE COURT:  Sustained.

21          MS. HIROZAWA:  -- bringing Agent Busick here to tell

22   you that Mr. Bantis --

23          MS. McGRATH:  Objection, your Honor.

24          THE COURT:  Sustained.

25          MS. HIROZAWA:  They brought in Agent Busick here to

SUMMATION - MS. HIROZAWA                    836

1    tell you that Mr. Bantis was either at his own house or in his

2    own neighborhood on August 31st or September 8th.  But we have

3    not heard a single word, a single peep, from the one person

4    involved in this case who could actually answer some of your

5    questions.

6            So if you're left wondering, where is the video

7    surveillance?  Why didn't they collect other dates?  Why

8    didn't they collect other hours?  Where are the photos?  Where

9    is James Harrison?  Where is Anthony Harrison?  Where is a

10   single eyewitness who isn't related to the Harrison family?

11   Where is the evidence?  You don't have to look, he's been

12   sitting right here at the Government's table for the past

13   week.

14           This is the Federal Bureau of Investigations and

15   they did not to their basic homework.  They have all the

16   resources of the federal government at their disposal, but

17   they didn't preserve video surveillance.  They didn't talk to

18   key witnesses, like James and Anthony Harrison.  And they

19   didn't brother interviewing any of the dozens of people

20   walking down Fort Hamilton Parkway who may have witnessed

21   these encounters.  And whether it's laziness or intentionally

22   choosing not to gather and present you with evidence that

23   could or would contradict the Harrison family story, that's up

24   to you.

25           Now, you heard these vulgar voicemails and

*SHERNELLE GRIFFITH - Official Court Reporter*

1    recordings from 2014.  Text messages Mr. Bantis sent that were

2    laced with profanity.  I want to be clear, the recordings and

3    the voicemail are from 2014.  You simply cannot conclude

4    anything about Mr. Bantis's intent in 2021 from a recording

5    made seven years ago.

6             And let's talk about what these text messages

7    actually show.  No one is accusing Mr. Bantis of contacting

8    George or threatening George.  George told you himself that he

9    has no contact at all with Mr. Bantis since the 2014 case.

10            These text messages do nothing to show you what

11   actually happened on Fort Hamilton Parkway in August and

12   September 2021.  They do not show that Mr. Bantis threatened

13   Jessie and Andrew Harrison.  They do not show that Mr. Bantis

14   took any harmful action against George or James.  And they

15   don't tell you anything about what Mr. Bantis is thinking when

16   Anthony Harrison comes charging across Fort Hamilton Parkway

17   at him.

18            The danger with evidence like this, is that it might

19   create the impression that Mr. Bantis is a bad guy.  You may

20   not like his behavior, but that is not what you are here to

21   decide.  You are here to decide a very narrow question, which

22   is whether Mr. Bantis threatened Jessie Harrison and Andrew

23   Harrison with the specific intent to retaliate for George and

24   James' cooperation.  Those calls, those text messages, do not

25   help you in any way in making that decision.  And you promised

1    at the beginning of this case that you would not let sympathy

2    or bias cloud your judgment.

3

4                    (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SUMMATION - MS. HIROZAWA                    839

1          MS. HIROZAWA:  Now I also want to talk briefly about

2    the period when Mr. Bantis was on probation from 2017 to 2020.

3    The government has gone on and on about Mr. Bantis leering at

4    Jessie Harrison in 2018.  Now, remember, Mr. Bantis lives a

5    block away from where E&J was located at that time.

6          Officer Aliperti came up and told you that she never

7    gave Mr. Bantis a list of the specific members of the entire

8    Harrison family or the specific locations he was supposed to

9    avoid.  His lawyer told you, yeah, a list is necessary to put

10   someone on notice and the judge said at his sentencing, yes,

11   this will be subject to a list provided by probation.

12         Officer Aliperti never told Mr. Bantis to avoid E&J

13   Boutique before June 2018.  She never told him to avoid the

14   Harrison sisters specifically before June 2018.  And what the

15   government has characterized as Mr. Bantis' admissions,

16   Officer Aliperti told you what he admitted to was using the

17   bus stop and hanging out at the souvlaki restaurant that

18   happened to be across the street from E&J Boutique.  Once

19   Officer Aliperti told Mr. Bantis not to spend time there, to

20   change his bus route, even though it was right there, a block

21   from his house, Mr. Bantis did that.

22         Ultimately, the conduct that the government has

23   discussed in 2018 tells you nothing other than Mr. Bantis was

24   instructed not to go near E&J Boutique, not to have contact

25   with the Harrison sisters back in 2018 when there was a court

SUMMATION - MS. HIROZAWA                    840

1    order telling him not to, he didn't.

2              Now I want to talk a little bit more about a

3    critical problem in the government's case because at court the

4    government is asking you to rest Mr. Bantis' fate on Jessie

5    Harrison's words.  Ultimately, this case comes down to what

6    Jessie Harrison told you when she came in here.  But what do

7    we know about Jessie Harrison?  What do we know that is not in

8    dispute?  Jessie Harrison got up on the stand and told you

9    that she lies to the police to get what she wants.  She told

10   you that she called 9-1-1 on September 9th, the day of

11   Mr. Bantis' arrest, and told them that Mr. Bantis had a gun,

12   when she never saw a gun.  She told you she had an order of

13   protection against Mr. Bantis, when she did not and she knew

14   she did not.  She told you that there -- that she told the

15   9-1-1 operator that there was a marshals warrant for

16   Mr. Bantis, when there was not.  She testified that her

17   brother, George, even sent her a photo of a marshals notice

18   and told her to lie to get the help she needed.  Jessie

19   Harrison told you she lied.

20             Judge Vitaliano will tell you, when he gives you the

21   jury instructions, to evaluate the credibility of the

22   witnesses you've heard from.  And he will tell you

23   specifically, that if a witness is shown to have willfully

24   lied about any material matter, you have the right to conclude

25   that the witness also lied about other matters.  That

1    witness -- that instruction is for witnesses like Jessie

2    Harrison.

3            While we're talking about credibility, let's talk

4    about George Harrison.  We could all see that George, when he

5    came into testify, appeared to be struggling and suffering

6    from some kind of physical problem.  And I think it's natural

7    to feel some sort of sympathy for him, I know I do, but you

8    cannot keep that from allowing you to scrutinize the testimony

9    in this case.  The fact that someone has cooperated with law

10   enforcement does not mean that you should not believe them.  I

11   want to be clear that is not what we're saying, but you do

12   have a duty to consider what a witness's motivation is to

13   testify.

14           We know that George borrowed money from someone a

15   few years before he borrowed money from Mr. Bantis back in

16   2013.  He did not pay that person back, and --

17           MS. McGRATH:  Objection, your Honor, misstates

18   evidence.

19           THE COURT:  Again, the jury's recollection will

20   control.

21           MS. HIROZAWA:  You heard that he cooperated in a

22   prior loansharking case.  He -- and just like in this case, as

23   you heard extensively, loansharking involves borrowing money

24   from someone, being charged interest and the way you end up

25   cooperating is if you can't pay it back.  Just like it

SUMMATION - MS. HIROZAWA                842

1    happened in this case.

2                 So we know that George then called up the FBI and

3    conducted secret recorded calls for them.  And when that other

4    person who loaned him money, pled guilty, George Harrison

5    collected restitution.  Then George testified that in 2013 his

6    financial situation changed.  George borrowed money again,

7    this time from Mr. Bantis.  He didn't pay that money back and

8    Mr. Bantis threatened him to get it back.  And George again

9    recorded calls for the FBI.  Again, George collected

10   restitution.  And in addition -- and that was in addition to

11   the $12,000 that the federal government paid him for

12   relocation expenses.

13                 And George told you Mr. Bantis never physically hurt

14   him.  He testified that Mr. Bantis would go crazy on him.  And

15   when you initially heard that maybe you thought Mr. Bantis

16   really pummeled him, really beat him up bad, I know I did, but

17   George told you that never happened.  He would hold a bat to

18   his cheek and yelled things and throw a tantrum.  That was

19   seven years ago.  So, when George shows up to court, when he

20   says he was scared, when he said that he dreaded the day

21   Mr. Bantis got out of jail at his sentencing hearing, when he

22   says Mr. Bantis is dangerous.  When George shows up at trial

23   today seven years later to testify, you know he's doing so for

24   a reason because he knows better than to bite the hand that

25   feeds him.  And he's taught Jessie how to manipulate that hand

SUMMATION - MS. HIROZAWA                843

1    too.

2              MS. McGRATH:  Objection, your Honor.

3              MS. HIROZAWA:  Now --

4              THE COURT:  I'm going to sustain that.

5              MS. HIROZAWA:  -- when these prosecutors --

6              THE COURT:  Disregard that, ladies and gentlemen.

7              MS. HIROZAWA:  When these prosecutors took this

8    case, when they decided to try it in federal court, they took

9    on a burden of proof to prove Mr. Bantis guilty of witness

10   retaliation beyond a reasonable doubt.  That burden of proof

11   is on the government, on them alone and it never shifts not

12   even when Mr. Bantis chooses to put on a witness of his own.

13   We do not have to prove what happened; they do.  And that

14   burden of proof is the highest burden in the American legal

15   system.  Proof beyond a reasonable doubt.  It means you're not

16   asking which version is more likely, theirs or ours.  If

17   there's a reason to doubt, just one, and it does not have to

18   be the same reason for all of you, you must find Mr. Bantis

19   not guilty.  And the thing to consider is that it could be a

20   variety of reasons.  For one of you it could be the fact that

21   you did not hear from Anthony Harrison, James Harrison or

22   Agent Tambrino, who has been present for this entire trial.

23   For another one of you, it could be the lack of any evidence

24   to support Jessie Harrison's claims that Mr. Bantis was

25   yelling at her, stalking her, gesturing at her.  For another

1    one of you, it could be that the video surveillance you did

2    see showed the only people charging at anyone were members of

3    the Harrison family coming after Mr. Bantis.  And because the

4    government did not present to you any video, audio or other

5    evidence of Jessie Harrison's claims that Mr. Bantis

6    threatened her, and because we know that Andrew Harrison's

7    interaction with Mr. Bantis was limited to that one day when

8    his brother came charging across the street towards Mr. Bantis

9    and lunging at him, and because we all agree that George and

10   James cooperated with law enforcement in 2014 and that

11   Mr. Bantis and George and James don't like each other, what

12   this case really comes down to is Jessie Harrison.

13          The government is asking you to rest Mr. Bantis'

14   fate on her word.  On the word of a woman who admitted on the

15   stand to lying to police.  A witness who didn't flinch at

16   lying to the police.  When we all know in this day and age

17   that telling the police that someone has a gun, that they are

18   armed could be a death sentence.  Why would you trust her word

19   now.

20          So if you have questions about what happened between

21   James Harrison and Mr. Bantis on August 31st, if you have

22   questions about why Anthony Harrison attacked Mr. Bantis, if

23   you have questions about what other camera angles -- what

24   other camera angles would have shown, you ask the government.

25   Ms. Oken is about to get back up here, she's going to have the

SUMMATION - MS. HIROZAWA                          845

1   last word.  See if she answers whatever lingering questions

2   you have.  But what you cannot do, what you're prohibited from

3   doing is looking to Chris Bantis.

4              Judge Vitaliano will instruct you that Mr. Bantis

5   didn't have to do anything, present anything, ask a single

6   witness a single question.  And he didn't have to testify.

7   It's his constitutional right to remain silent.

8              The government's job is prove this case and to do

9   that they must overcome the presumption of innocence.  Now

10  what does the presumption of innocence mean?

11             Judge Vitaliano will instruct you, but it means in

12  essence, that when Chris Bantis walked into this courtroom he

13  walked in here innocent, and he walks out of here innocent

14  unless each and every one of you believed that the government

15  has proved their case beyond a reasonable doubt.

16             Judge Vitaliano will instruct you that the

17  presumption of innocence does not get a little bit less, a

18  little bit lower or a little lighter just because you have a

19  prior conviction.  It does not get lower just because

20  Mr. Bantis accepted responsibility and pled guilty for his

21  actions in 2014.  We all agree, that Mr. Bantis made a mistake

22  in 2014, that is not what this case is about.

23             So, if any one of you starts saying, well, he did

24  something before, you know he probably did something again, I

25  trust that the rest of you will stand up for Mr. Bantis'

SUMMATION - MS. HIROZAWA                846

1    constitutional rights and remind that person that it makes it

2    no more likely that he is guilty in this case and we're not

3    here -- and we're not supposed to consider that.

4           The government failed here.  They failed to prove

5    beyond a reasonable doubt that Mr. Bantis threatened Jessie or

6    Andrew Harrison in retaliation for George or James Harrison's

7    cooperation back in 2014.  And they failed to prove beyond a

8    reasonable doubt that Mr. Bantis took any harmful action

9    against George or James in retaliation for their prior

10   cooperation, because it simply did not happen.

11          September 9th, 2021 was an ordinary morning for

12   Mr. Bantis, then all of a sudden, just as he was buying his

13   sandwich as Jimmy's 3 sons, his world was turned upside down.

14   Mr. Bantis has waited over a year for all of you to set his

15   world right again.  Mr. Bantis did not do this, the government

16   did not prove it, find him not guilty.

17          THE COURT:  Thank you, Ms. Hirozawa.

18          Ladies and gentlemen, we will take a 10, 15-minute

19   break to refresh and then we will return to hear the rebuttal

20   argument.  Do not discuss the case amongst yourselves or with

21   anyone else, continue to keep an open mind, the case is not

22   over yet and we will see you shortly.

23          (Jury exits courtroom.)

24          THE COURT:  Okay, we'll see you in 10 or 15 minutes.

25   Ms. Oken, you can put your thoughts together.

PROCEEDINGS                                    847

1          MS. OKEN:  Thank you, your Honor.

2          (Recess.)

3          THE COURTROOM DEPUTY:  All rise.  Counsel for both

4    sides are present including the defendant.

5          THE COURT:  Ms. Oken, are you ready?

6          MS. McGRATH:  Your Honor, this Tara McGrath for the

7    government.  We have one brief matter we would like to raise

8    before the jury is brought in if that's all right.

9          THE COURT:  Yes.

10         MS. McGRATH:  In our initial request to charge we

11   had asked that an uncalled witnesses are equally available

12   instruction be included.  We didn't raise it this morning

13   because we did think your Honor had adequately addressed the

14   lay of the land with the instruction at page 37 headed, All

15   Available Evidence Need Not Be Produced.  In light of the

16   defendant's summation, and the several points which the

17   government objected and where those objections were sustained,

18   we do think the request we had included is appropriate and, if

19   helpful, I'm happy to read it for you briefly.

20             There are several persons whose names you have heard

21   during the course of the trial, but who did not appear here to

22   testify and one or more of the attorneys has referred to their

23   absence from the trial.  I instruct you that each party had an

24   equal opportunity or lack of opportunity to call any of these

25   witnesses.  Therefore, you should not draw any inferences or

PROCEEDINGS                                           848

1   reach any conclusions as to what they would have testified to

2   had they been called.  Their absence should not affect your

3   judgment in any way, and the instruction has been adapted from

4   the Sand instructions at number six and seven.

5           We'd also request a curative instruction regarding

6   government spending using taxpayer dollars.  To add insult to

7   injury, a number of the witnesses that the defense raised were

8   not witnesses for whom the government had to spend any money

9   for their purported travel.

10          THE COURT:  I'm not following that last one.

11          MS. McGRATH:  During the defense summation

12  Ms. Hirozawa noted several times that while certain witnesses

13  were absent, the government had spent taxpayer dollars

14  bringing in someone from North Carolina, I think they believed

15  that someone came in from Tennessee, bringing in Special Agent

16  Busick from, you know, somewhere else.  And that's -- while

17  certainly some people did fly in for this trial, others did

18  not, they are very much local and we don't think it is

19  appropriate for the jury to speculate as to how money is being

20  spent on this, particularly where on the other side of the

21  coin the defense is arguing that certain witnesses should have

22  been called, but who aren't.  And so in their minds they may

23  be thinking that we're balancing some sort of budget where

24  some people can come and some people can't and it just seems

25  like it's a matter wholly inappropriate for their

PROCEEDINGS                                    849

1    consideration.

2              THE COURT:  The defense want to be heard.

3              MS. SHERMAN:  Judge, this is Marissa Sherman.  In

4    terms of the curative instruction, I'm not sure what the

5    instruction that's being asked is.  The objection was made,

6    the Court sustained it and told the jury not to consider it.

7    So I'm not sure what a further instruction on that would be.

8              Also just want to clarify, Ms. Hirozawa said

9    absolutely nothing about Tennessee and I am not sure if they

10   are referring to George Harrison, but in fact said nothing

11   about location for George Harrison, very careful about that.

12   So I'm not sure exactly what they're asking.  The objection

13   was made, it was sustained.

14             THE COURT:  I think the curative instruction is sort

15   of -- there's really two different pieces to it, the second

16   piece may be the fact that what either side spends on the cost

17   of the litigation is not for the jury's consideration.

18             MS. SHERMAN:  And I don't think that we're going --

19   if the judge -- if the judge, if your Honor wants to give that

20   instruction, that's fine.

21             THE COURT:  Yes.  Now the uncalled witness.

22             MS. SHERMAN:  As to that, Judge, I think that the

23   fact is that the witnesses that Ms. Hirozawa was referring to,

24   one is the case agent who is sitting at the table, at the

25   government's table, clearly not equally available to the

PROCEEDINGS                                    850

1    defense.  The others are members of the family of the people

2    who testified, also clearly not equally available to the

3    defense.

4              THE COURT:  I don't know if you can ever find a

5    charge where I actually gave that instruction in a criminal

6    case.  I give it in a civil case, but I find it collides too

7    much with the other instruction which says that the defendant

8    doesn't have to call anybody.  So the fact that there is

9    somebody equally available to the defendant, in my view, is

10   not relevant, because it collides with the defendant's right

11   to remain silent and produce no one.  So to comment on, you

12   know, witnesses that are not called, they took the chance,

13   that basically collides with the charge.

14             MS. McGRATH:  Your Honor, even -- we understand your

15   concern, certainly Special Agent Tambrino, we were informed by

16   the defense that they did intend to call him up until about

17   yesterday, but we would request an instruction that would

18   simply indicate that the jury shouldn't draw inferences if

19   individuals weren't called as to what they would have

20   testified to had they been called and that their abstention

21   affects the judgment.  While they're, of course, permitted to

22   consider whether the government has met its burden, it is

23   inappropriate to speculate what X, Y, Z person may or may not

24   have said.

25             MS. SHERMAN:  Judge, the one response to that I

PROCEEDINGS                                        851

1    think is that included in the instructions that your Honor is

2    giving is that they are allowed to consider the lack of

3    evidence, that's exactly what we were commenting on.

4              THE COURT:  Right.  They are allowed to consider the

5    lack of evidence, but not what the evidence would be if one of

6    the persons named testified.

7              MS. SHERMAN:  Sure, and I -- maybe I didn't hear

8    it --

9              THE COURT:  They can't say okay, you know, had

10   Special Agent Tambrino testified he would have said this.  The

11   jury can't speculate on that.

12             MS. SHERMAN:  Sure.  I don't think Ms. Hirozawa in

13   any -- at any point said this is what they may have said.

14   What she repeatedly commented on is the fact that we didn't

15   hear from these witnesses, that one of them is a named victim,

16   I mean that's what she commented on.

17             THE COURT:  Yes, and I think that's fine.  The

18   question is whether or not there should be an instruction that

19   says you can consider the absence of a witness that a witness

20   didn't testify, but you can't speculate as to what they may

21   have said if they did testify.

22             MS. McGRATH:  And, your Honor, briefly, Ms. Hirozawa

23   did note that they should consider what James Harrison, for

24   example, would have said about the harm, reputational or

25   otherwise, that he would have incurred had he been there.  So

PROCEEDINGS                              852

1    we do think your Honor's suggestion is appropriate.

2              MS. SHERMAN:  Just briefly to respond to that,

3    that's not what she said.  What she said was, had -- they are

4    trying to prove beyond a reasonable doubt that he suffered

5    some emotional, reputational harm, how can we know what that

6    is if we didn't hear from him.  That's all she said.  She

7    didn't say --

8              THE COURT:  Same thing.  That doesn't collide with

9    my instruction.

10             MS. SHERMAN:  I understand so --

11             THE COURT:  We don't know what he would have said.

12             MS. SHERMAN:  Right.  Sure.

13             THE COURT:  And they can't fill in the blanks.

14             MS. SHERMAN:  Okay.  Sure.  And if the Court's going

15   to give that instruction I think our position just is that the

16   comments in summation were proper on lack of evidence.  I

17   don't think --

18             THE COURT:  I don't disagree with that.  I don't

19   disagree with that.  There's an instruction on that.  So we

20   are on the same page.

21             Okay.  Anything else in the housekeeping variety?

22             MS. HIROZAWA:  Not from the defense.

23             THE COURT:  So we evaluate where we are timewise

24   whether or not we reach the deliberation stage today, but we

25   shall see.  It will be dependent first on you, Ms. Oken, and

1    speed reader over here Mr. Woods.

2            MS. McGRATH:  And sincere apologies, your Honor,

3    just because we're about to rebut, is the Court going to take

4    the request under advisement or has the Court made a decision

5    one way or the other?

6            THE COURT:  On which?

7            MS. McGRATH:  On the advising that the jurors

8    shouldn't speculate as to --

9            THE COURT:  I'm going to -- listen, I'm going to

10   give those two curative instructions.

11           MS. McGRATH:  Thank you very much.

12           THE COURT:  Okay.  Ready?

13           MS. SHERMAN:  Yes, your Honor.

14           MS. OKEN:  Yes, your Honor.

15           THE COURT:  Hearing silence, I assume you are.

16           MS. OKEN:  I apologize, your Honor.

17           THE COURT:  William, get the jury.

18           (Jury enters courtroom.)

19           THE COURT:  Be seated, please.  Counsel will

20   stipulate that the jury is present and properly seated?

21           MS. OKEN:  We do, your Honor.

22           THE COURT:  Ms. Sherman, Ms. Hirozawa?

23           MS. HIROZAWA:  So stipulated.

24           THE COURT:  Thank you very much.

25           Ladies and gentlemen, welcome back.  We're ready

PROCEEDINGS                                854

1    just about to hear the rebuttal summation.

2              We were talking to counsel about legal issues.

3    There are a couple of things, two things I want to point out

4    to you.  In your considerations it is not before you why

5    either side spends money on certain things in preparation of

6    their case or why they spent it, that is none of them is

7    appropriate for you to consider.

8              And as you will hear further in the instructions,

9    the formal instructions that I will give you, for your

10   deliberations it is the evidence that's produced or the

11   evidence that seems to be missing, that's for you to consider,

12   but when it comes to a witness who may not have testified you

13   can consider everything other than what the witness might have

14   said.  You can't speculate as to what the witness might have

15   said had the witness actually appeared.  Everything else is

16   fair for your deliberations.  All right.

17             With those instructions, we are ready now for the

18   rebuttal summation, the final of that building block, and it

19   will be given to us by Assistant United States Attorney

20   Lindsey Oken.  Ms. Oken.

21             MS. OKEN:  Thank you, your Honor.

22             We just heard about an hour-long closing argument

23   about a couple of cherry-picked moments in time.  Defense

24   wants you think that this case is only about some

25   cherry-picked snapshots in time.  They want you to forget

1    everything that happened before those moments.  They want you

2    to forget everything that happened after those moments and,

3    you know, I get why they want you to forget those other

4    moments, they don't look so good for the defendant.

5            They want you to forget about what happened in 2014.

6    They want you to forget about it because that's when George

7    and James went to law enforcement because they were scared for

8    their lives.  That's when they agreed to help law enforcement

9    by making recordings that led to the defendant's arrest in his

10   loansharking case.

11           2014 is also when the defendant was charged in this

12   federal courthouse and when those recordings that George and

13   James made were turned over in discovery.  In 2014, is when

14   the defendant pled guilty and admitted in court that he loaned

15   money to brothers George and James with the understanding that

16   violence could be used to collect payment.

17           They want you to forget about 2016, that's when the

18   defendant was sentenced.  That's when George came to court and

19   told the judge that he was afraid that when this man got out,

20   he was going to come after George and his family.  That's when

21   the defendant was ordered to pay restitution to George to make

22   him whole for the losses that he endured because of the

23   defendant's extortionate loan.

24           They want you to forget about what happened in 2018

25   when Jessie Harrison started seeing the defendant across the

REBUTTAL SUMMATION - MS. OKEN                    856

1   street in those velour jumpsuits you saw.

2           When the defendant was confronted by his probation

3   officer for stalking the Harrison sisters, even though the

4   conditions of his supervised release prohibited him from going

5   anywhere near them.  When he was told expressly stay away from

6   the Harrison sisters, stay away from E&J Boutique.

7           They certainly want you to forget about most of

8   2021, they want you to forget about early 2021 March or April

9   after E&J moved to its new location.  When the defendant was

10  done with supervised release, done reporting to his probation

11  officer, and when the defendant tried to start a fight with

12  James while Jessie and her sister Lisa were nearby.

13          They want you to forget about May 2021, June 2021,

14  July 2021, when she started seeing him more.  When the store

15  was now at its new location and when she started hearing that

16  raspy voice she described.  The same raspy voice that you all

17  heard.  The Harrisons are rats, George is a rat.  I want you

18  dead.

19          They want you to forget about August 31st, 2021 when

20  Jessie heard a man screaming from across the street, the day

21  that she finally put two and two together and the first time

22  that she called 9-1-1.

23          They want you to forget about September 5th, 2021,

24  when the defendant pressed his face against the front window

25  of the E&J Boutique when Jessie's nephew Andrew was working.

1        They want you to forget about most parts of

2   September 8th, 2021.  They want you to forget about how the

3   defendant started shouting from across the street goading

4   Andrew and Anthony to come outside and fight.  They want you

5   to forget about how the defendant rummaged through this bag on

6   the street after he told them he had a gun and how he pulled a

7   wooden club out of that bag and brandished it out on the

8   street in the open.  They want you to forget about how he came

9   back a second time that day, while Andrew and Anthony were

10  locked inside the store.  When the defendant kept shouting

11  profanities and death threats from across the street.

12        They certainly want you to forget about

13  September 9th, 2021, when the defendant came back, gestured to

14  Jessie Harrison, told her you're fucking dead.

15        Now, the judge is going to instruct you on the law,

16  what he says controls, but I expect that he's going to

17  instruct you that this charge spans from June of 2018 to

18  September of 2021.  So if you unanimously find that any one

19  time, any one single time the defendant threatened Jessie or

20  Andrew to retaliate or punish George or punish James, the

21  defendant is guilty.

22        Now, Ms. McGrath walked you meticulously through all

23  the proof and all of the threats that were hurled at Jessie

24  and Anthony, I'm not going to do that again, but what I will

25  tell you is we don't want you to look at the evidence

REBUTTAL SUMMATION - MS. OKEN                858

1    selectively.  We want you to look at all of it.  Every last

2    piece of it.

3           So let's talk about some of that evidence.  There's

4    been a lot of talk about video evidence.  That was supposed to

5    be the big reveal in this case, remember.  The video, video

6    doesn't lie.  We agree, watch the video.  Watch the

7    defendant's head turn every time he walked down that block.

8    Watch his mouth move even though no one is with him.  Watch

9    his feet when they're almost out of frame, when he turns

10   toward E&J, takes a few step backwards, watch him drop his bag

11   to the ground on September 8th, 2021, like Andrew told you he

12   did, and while he was at the same time telling Andrew and

13   Anthony he had a gun.  Watch him pull out that club, a club

14   that he casually kept in his bag?  A club that he stashed

15   under a couch cushion?  Watch how long he waves that club

16   around and watch him come back moments later when Andrew and

17   Anthony were locked inside the store feeling sure that the

18   defendant had gone back to retrieve a gun.

19          Remember that footage with the little arrow at the

20   top, when he's dodging back and forth trying not to get hit by

21   a car and he's shouting threats that are loud enough for

22   Andrew and Anthony to hear from inside the store.  Watch all

23   of the video.  All of it.

24          And by the way, why don't passersby get involved?

25   Ladies and gentlemen, I will remind you, we're in Brooklyn,

REBUTTAL SUMMATION - MS. OKEN                859

1    New York.  Think about that.  Think about what happens on the

2    streets of Brooklyn, New York and what people do when they see

3    someone holding a stick in the air and waving it around.

4            We want you to watch the video.  We want you to look

5    at all the evidence, but when you do you should also keep in

6    mind what the video doesn't show.  You should look back at

7    Government Exhibit 104.  Ms. Ortiz explained to you that the

8    bakery footage, it barely captures the other side of that

9    block.  So if the defendant came from his own home, if he came

10   from anywhere from the direction of 70th Street, neither of

11   those bakery cameras were going to pick him up, like on

12   September 5th when he pressed his face up against the windows.

13   Let's remember how that camera couldn't capture him when he

14   stood in the doorway of Jimmy's, but you saw Government

15   Exhibit 129, that snapshot that Jessie took, the bakery camera

16   couldn't see him that day, but Jessie could see him that day

17   and you all have seen him that day.

18           The government is not hiding from the video.  We

19   called a surveillance specialist to sit on the stand and walk

20   you through it.  And Andrew told you about being asked to go

21   door to door on Fort Hamilton Parkway with an agent who was

22   looking for footage.  And you also saw footage from places

23   like the bakery that Andrew didn't even go to.  So why isn't

24   there more footage, the defense asks?  Well, you know the

25   answer to that too.

1      The cell phone evidence, it shows you that Jessie

2   didn't contact police in May or June or July.  She suffered in

3   silence until the last day of August 2021, that was the first

4   time she called 9-1-1.

5      Now, video is great, it's icing on the cake, we want

6   you to watch all of it, but the defendant wants you to wonder

7   about the evidence in the case that you didn't see, the

8   witnesses you didn't hear from.  They want to distract you

9   from the evidence that you did see.  We're not here to waste

10  your time, ladies and gentlemen.

11     And the judge instructed you, that you shouldn't

12  speculate as to what witnesses who weren't here would have

13  said.  I expect he's also going to instruct you that no one

14  technique, no one piece of evidence is required.  Look at the

15  evidence you saw, and look at all of it.

16     Now the defense has suggested that Jessie Harrison's

17  story shouldn't be believed.  But how do you know that you can

18  believe Jessie Harrison's testimony?  I want you to think

19  about the ways it lines up, the ways it is corroborated by the

20  other evidence in this case.  The way her testimony lines

21  right up with George's, even though they barely speak.

22     Think about how the phone records that Ms. McGrath

23  showed you, phone records that come from the phone provider,

24  they lay out a timeline of phone contact that is almost

25  exactly how Jessie remembered it.  And think about the video

REBUTTAL SUMMATION - MS. OKEN                861

1  you watched showing the defendant glaring across the street

2  and also think about the limits of that video and what it

3  couldn't show.

4          Think about cell site evidence that puts the

5  defendant in that area on the days leading up to his arrest.

6  That data can't pinpoint an exact spot.  Special Agent Busick

7  told you that's just not how the technology works.  But the

8  other evidence in this case, it can.

9          Think about the 9-1-1 calls that you heard with your

10 own ears.  Think about the panic in Jessie's voice.  Listen to

11 them again if you'd like to, ask for them.

12         And think about Jessie's demeanor on the stand.

13 Think about how she wouldn't stand for a wrong questions or

14 wrong answers or wrong suggestions, not from the defense and

15 also not from Ms. McGrath.  Think about her testimony that she

16 was here because she got a subpoena.  And remember

17 Ms. McGrath's questions about how Jessie was asked to meet

18 with the government, and how multiple times she said no.

19 Think about the defendant's own statement on that jail call

20 you heard.

21         What they don't want you to think about are the

22 inconsistencies and explanations the defendant has given for

23 his conduct over the years.  Remember Officer Aliperti from

24 the Probation Department told you that in 2018 the defendant's

25 story changed in the span of a single conversation.  First,

REBUTTAL SUMMATION - MS. OKEN                862

1    she told you he denied even knowing where E&J was.  But

2    suddenly he admitted, well, he was there, but he gave an

3    excuse, he uses the bus stop, goes to the souvlaki place.

4    Then he repeatedly asked her whether there was a report that

5    he threatened somebody at a time when Officer Aliperti had

6    said nothing about threats.  In the span of one conversation

7    he couldn't even keep his story straight and now in 2021 the

8    defense is asking you to believe yet another story.  He just

9    takes the bus there.

10             MS. HIROZAWA:  Objection.

11             THE COURT:  Overruled.

12             MS. OKEN:  The defense is asking you to believe yet

13   another story.  He just takes the bus there, nothing else.

14   Just goes to Jimmy's, nothing else.  Well, you heard from

15   Andrew, Jimmy's was open in 2018, but at that time it wasn't

16   across the street from E&J Boutique, the souvlaki place was.

17             MS. HIROZAWA:  Objection.  Facts not in evidence.

18             MS. OKEN:  The souvlaki place.

19             THE COURT:  Yes, I heard the souvlaki place.

20             (Continued on the next page.)

21

22

23

24

25

1         THE COURT: (Cont'g.) Yes, I heard the souvlaki

2    place. I can't tell you that -- the jury's recollection will

3    control it, but there's evidence about all of those locations.

4    And if Ms. Oken is misstating them, the jury is going to be

5    the light that finds it.

6         MS. OKEN: So you heard from Andrew, Jimmy's was

7    open, 2018. But at that time, not across the street from E&J.

8         You heard from Officer Aliperti the souvlaki place

9    left. The one that the defendant told his probation officer,

10   Officer Aliperti, was the reason he went was across the street

11   was E&J.

12        In 2018, he really loved souvlaki, got to have that

13   souvlaki. But you also heard from Jessie that the souvlaki

14   place still open in 2021, but now in 2021, E&J's not there any

15   more. New location moved to another block. We're not

16   interested in souvlaki any more. Now it's about Jimmy's the

17   deli, right?

18        MS. HIROZAWA: Objection. Misleading. Shifting.

19        THE COURT: No, she's not shifting the burden, she

20   recognizes the burden's clearly on the government, not on you.

21        MS. OKEN: Now it's all about Jimmy's, the deli

22   right across the street from E&J.

23        The defendant's jail call from 2021 also tells you

24   yet another version of the story. Don't be mad at me. I'm an

25   asshole. People make mistakes and I'm gonna to suffer for it

1    again.  Just like I did before.

2              Now, ladies and gentlemen, I will remind, you the

3    defense has no burden of proof here.  It is our burden.  We

4    embrace that burden.

5              But when they give you a theory, when they give you

6    a story, you should scrutinize it.  Think about all of the

7    explanations that the defendant has given over time.  Think

8    about whether you can believe anything.

9              Now you also heard a few pieces about the defendant.

10   How he liked to spend his free his time.  He lives with his

11   mother at 71st and 10th, in Brooklyn, New York.  A few blocks

12   away from E&J.

13             He goes to the gym early most mornings.  He works

14   out there.  He takes the bus there and back and afterwards he

15   goes to Jimmy's.  None of those things are in dispute.  And

16   none of those things are the reason he's here today.

17             It is not a crime to live a few blocks away from E&J

18   Boutique.  It is not a crime to take the bus.  And it is

19   certainly not a crime to go to the Jimmy's.  But it is a crime

20   to leave your home, take the bus, go to Jimmy's and then shout

21   death threats to the family members of the people who reported

22   your crimes.  It is no defense and no excuse that those people

23   happened to live in your same neighborhood.

24             Now remember, it's not exactly a coincidence that

25   this all takes place in the defendant's neighborhood.  We

REBUTTAL SUMMATION - MS. OKEN                865

1    started this story in 2014.  The defendant was a loan shark,

2    and his victims George and James were guys from the

3    neighborhood.  Guys like George who were down on their luck.

4    George Harrison got out of there.  He moved away, even James.

5    But the family's still there.  You heard from them, they were

6    born and raised here in Brooklyn.  They're alive and their

7    businesses are on that block of Fort Hamilton Parkway.

8            But take a closer look at the defendant's schedule

9    anyway.  You have some of those records in evidence.  They

10   were documents that we moved after we read some stipulations.

11   But look, for example, at September 5th, 2021.  The day that

12   the defendant was peering in the windows, face pressed up

13   against the glass of E&J.

14           Now the phone records show that Andrew called Jessie

15   at 12:25 p.m. that day.  And she calls Special Agent Tambrino

16   five minutes later.

17           Well, the defendant didn't check in to the gym on

18   September 5th.  And take a look at his SNAP benefits card.

19   You won't see a transaction at Jimmy's.

20           Now defense has put forward this theory that there

21   is a grand Harrison family conspiracy.  So let's take a look

22   at that one.  But before we do, I would like to first say a

23   few words about the Harrison family.

24           They are some brand of co-conspirators.  Jessie is

25   not at fault because she sat and suffered in silence until

REBUTTAL SUMMATION - MS. OKEN                    866

1   August 31st.  She is not at fault because she told 9-1-1 she

2   had -- that he had a gun, when she believed he had a gun

3   because he wanted her to believe he had a gun.

4           The Harrisons are a family.  They may not be a

5   picture perfect family, but they are a family.  They are small

6   business owners.  They are members of this community.  They

7   deserve to be treated with some respect in this courtroom,

8   just like anybody else.

9           But the defense went after them, tried to dirty them

10  up.  What does any of that --

11          MS. HIROZAWA:  Objection.

12          THE COURT:  Sustained.

13          MS. OKEN:  What does any of that matter?  The laws

14  of this country are supposed to protect everyone.  The doors

15  in this courthouse should be open for everyone, not just for

16  people who have average families, not just for businesses that

17  can't afford surveillance cameras.

18          MS. HIROZAWA:  Objection.

19          THE COURT:  I'll allow that.

20          MS. OKEN:  And it is certainly not just for perfect

21  victims.  It's for victims who are real people.  Real people

22  like Jessie Harrison who panic and call 9-1-1.  Real people

23  like Andrew and Andrew Harrison who get fed up and who stand

24  up for themselves and their family?  It's for everyone.  That

25  includes the Harrisons.

1            The Harrisons have a right, the same right as

2    everybody else, to go to work every day, to feel safe at their

3    place of business, to not have death threats and insults and

4    violent gestures thrown at them.  They have a right to be left

5    alone.

6            But let's set aside and indulge this conspiracy

7    theory for just one moment.

8            MS. HIROZAWA:  Objection.

9            THE COURT:  Sustained.

10           MS. OKEN:  Now I'm going to remind you again, the

11   defendant has no burden of proof here.  The burden is ours.

12   But, again, when they give a theory, you should scrutinize it

13   and scrutinize it closely.  You should use your common sense.

14   The common sense that you use all the time in your daily

15   lives.  No one is asking you to leave that common sense at the

16   door.

17           So let's scrutinize the Harrison family's conspiracy

18   theory.  And when you do, I submit you're going to be left

19   with one pretty big question, and that is:  Why?

20           Remember back in 2014, Jessie had no idea what was

21   going on with the defendant's loan sharking case.  She didn't

22   know what happened to George or James back then.  George told

23   you he kept it from her.  Remember that Jessie had to be

24   subpoenaed to testify here in court, and that several times

25   she refused to meet with the government.

1          Jessie also told you that she and George barely have

2     a relationship any more.  That she and James aren't close.

3     And the defense wants you to think she's making all this up.

4     For what?

5          And what about Andrew?  Andrew who hasn't spoken to

6     George in years.  Andrew who isn't close to James.  Andrew who

7     was a kid in his 20s when all this happened.  We have not seen

8     one shred of proof of the grand conspiracy.

9          MS. HIROZAWA:  Objection.

10          THE COURT:  Yes, the idea of proof, Ms. Oken, stay

11     away from that, please.  Comment on the evidence without the

12     no evidence that there's a conspiracy, nor claim, that I can

13     recall.

14          MS. OKEN:  In fact, let's talk about what the

15     evidence does show.

16          Phone records showing Jessie ignoring George's call

17     on September 5th, September 8th.  Several times on

18     September 9th.  And what about James?  No call between Jessie

19     and James at all between August 1st and September 9th, 2021.

20     No calls between George and James either.

21          Special Agent Busick testified about those phone

22     communications, and the records themselves are in evidence.

23     So ask yourself, what motive does Jessie have in any of this?

24     What motive does Andrew have in any of this?  And by the way,

25     if they did want to come in here and lie to you, wouldn't they

1   have done a better job?  Andrew still thinks that this is a

2   pipe.  We have it here.  We have it in this courtroom.  He

3   still thinks it's a pipe.  Who in this case does have motive?

4            In opening statements, the defense told you that

5   this story really begins in 2018.  They want you to start the

6   movie in the middle.  And that's because everything that

7   happened in 2014, everything that happened in 2016, all of

8   that is the reason we're here today.  The defendant was mad.

9   Now that his victims recorded him, now that they asked for

10  help when they felt their lives were in danger.  And the

11  defendant, you saw, he doesn't like rats.

12           Remember Government Exhibit 12, that recording when

13  the defendant told George that he thought James was going to

14  the cops.  Quote, I have him shitting in his fucking pants

15  crying.  Big tough guy, crying like a girl.  And the defendant

16  reminded George, "If he approaches you and says anything, just

17  don't say nothing."

18           And remember Officer Aliperti's testimony that the

19  defendant expressed resentment towards the victims.  That he

20  was to give restitution payments to George.  And that he felt

21  like George had told on him.  And what words did he use?

22  "Rat".

23           Remember Government Exhibit 533.  That text message

24  that was sent two days before his arrest when the defendant

25  said, quote, Nobody will ever tell my friends that his father

REBUTTAL SUMMATION - MS. OKEN          870

1   is a rat.  And remember Government Exhibit 528, that text

2   message sent in August of 2021, seven years after the

3   defendant was arrested, five years after the last time he came

4   face to face with George.  And the very same summer he was

5   tormenting E&J Boutique.

6            The defendant is still talking about George

7   Harrison.  Still talking about, quote, the other piece of shit

8   who the defendant needs around.  He still feels wronged

9   because they brought him to justice once before.  Who in this

10  case has motive?

11           Ask yourselves, does all of this evidence just

12  coincidentally look bad for the defendant?  Is there a

13  conspiracy orchestrated by victims --

14           MS. HIROZAWA:  Objection.

15           THE COURT:  Sustained.

16           MS. OKEN:  Ask yourself is the answer to your

17  questions the most obvious one, the one that all of the

18  evidence points to.  The defendant was mad.  Mad at George.

19  Mad at James.  And he took that anger out on their family.

20           Ladies and gentlemen, the answer is the one

21  compelled by all of the evidence in this case.  The defendant

22  is guilty.

23           THE COURT:  Thank you, Ms. Oken.

24           Ladies and gentlemen, we ask you to remain in the

25  jury box, we'll talk to counsel at the sidebar.

1          (Continued on the next page.)

2          (Sidebar conference.)

SIDEBAR CONFERENCE                    872

1          (The following occurred at sidebar.)

2          THE COURT:  My best guess is that it's about an hour

3    to read the charge.  It's not a lot of pages.  It's not

4    lengthy.  So that would probably put us around 6 p.m.  So

5    maybe if we read the charge to 6 p.m., and I give them the

6    case to deliberate tomorrow morning.

7          Everybody agree?

8          MS. OKEN:  Yes.

9          MS. McGRATH:  Yes, for the government.

10          THE COURT:  Okay.

11          Before we do that, should we take a five-minute

12    break?

13          MS. HIROZAWA:  Yes.

14          MS. SHERMAN:  Yes.  Yes, I don't think they'll be

15    able to maintain full attention.

16          THE COURT:  Yes, yes.

17          (End of sidebar conference.)

18          (Continued on the next page.)

19

20

21

22

23

24

25

PROCEEDINGS                                      873

1              (In open court; Jury present.)

2              THE COURT:  All right, ladies and gentlemen, we are

3       almost ready for the next building block, but in consultation

4       with counsel, we think a ten-minute break will probably be

5       beneficial for all.  So we will take that break.

6              Again, the case is not over.  So continue to follow

7       the instructions, which is to continue to keep an open mind.

8       Don't discuss the case amongst yourselves, or with anyone else

9       you may run into in the hall.

10             (Jury exits the courtroom.)

11             THE COURT:  All right, ten minutes, and we'll

12      resume.

13             MS. OKEN:  Thank you, Your Honor.

14             (A recess was taken at 4:50 p.m.)

15             THE COURTROOM DEPUTY:  All rise.

16             (Defendant enters the courtroom.)

17             THE COURTROOM DEPUTY:  Counsel both sides are

18      present, including the defendant.

19             THE COURT:  All right, do we have anything to attend

20      to before we bring the jury back?

21             MS. OKEN:  No, Your Honor.

22             MS. HIROZAWA:  Very briefly, Your Honor, from the

23      defense.

24             We'd like to request a curative instruction.

25      Ms. Oken made multiple references to a conspiracy theory.

PROCEEDINGS                              874

1              THE COURT:  You want me to give them a multiple same

2    curative instruction?

3              MS. HIROZAWA:  Oh, I'm sorry, I was just repeating

4    for the court reporter.

5              THE COURT:  Oh, okay.  Yes.

6              MS. HIROZAWA:  And so we objected, the Court

7    sustained some of those objections.

8              THE COURT:  Then I told them that there was no claim

9    by the defense that there was a conspiracy.

10             MS. HIROZAWA:  That's fine, Your Honor.

11             THE COURT:  I don't know what you call that, but I

12   did instruct them that way.

13             MS. HIROZAWA:  Thank you, Your Honor.

14             THE COURT:  Other than that, we're ready?

15             MS. HIROZAWA:  Yes.

16             (Pause in the proceedings.)

17             (Jury enters the courtroom.)

18             THE COURT:  Be seated.

19             Counsel will stipulate that the jury is present and

20   properly seated.

21             MS. OKEN:  We do, Your Honor.

22             MS. HIROZAWA:  So stipulated.

23             THE COURT:  Thank you, counsel.

24             Ladies and gentlemen of the jury, we are ready to

25   move on to the next of the building blocks, and you will

1    recall from Scott's presentation at the very beginning of the

2    trial, the next building block is the formal instructions on

3    the law from the Court.

4              It's commonly referred to as the Court's charge to

5    the jury.  Tells you what the law is that you will apply to

6    the facts as you find them.

7              The clerk will mark the charge as Court's Exhibit 2

8    and the verdict sheet as Court's Exhibit 2A.

9              (Court Exhibits 2 and 2A, were received in

10   evidence.)

11             THE COURT:  And I will ask my law clerk, Scott, to

12   read my final instructions to you.

13             THE LAW CLERK:  Members of the jury, now that the

14   evidence in this case has been presented, and the attorneys

15   for the government and the defendant have the concluded their

16   closing arguments, it is my responsibility to instruct you as

17   to the law that governs this case.  Before I do so, I want to

18   thank you for your patience and cooperation.

19             My instructions will be in three parts:

20             First, I will instruct you regarding the general

21   rules that define and govern the duties of a jury in a

22   criminal case.

23             Second, I will instruct you as to the legal elements

24   of the crime charged in the indictment; that is, the specific

25   elements that the government must prove beyond a reasonable

JURY CHARGE                                                    876

1   doubt to warrant a finding of guilt.

2           And third, I will give you some general rules

3   regarding your deliberations.

4           By way of a refresher, you have now heard all the

5   evidence in the case, as well as the final arguments of the

6   lawyers for the parties.

7           It is your duty to find the facts from all the

8   evidence in this case.  You are the sole judges of the facts,

9   and it is, therefore, for you and you alone to pass upon the

10  weight of the evidence, to resolve such conflicts as may have

11  appeared in the evidence, and to draw such inferences as you

12  deem to be reasonable and warranted from the evidence or lack

13  of evidence in this case.

14          With respect to any question concerning the facts,

15  it is your recollection of the evidence that controls.

16          To the facts as you find them, you must apply the

17  law in accordance with my instructions.  While the lawyers may

18  have commented on some of these legal rules, you must be

19  guided only by what I instruct you about them.  You must

20  follow all the rules as I explain them to you.  You may not

21  follow some and ignore others; even if you disagree with or do

22  not understand the reasons for some of the rules, you are

23  bound to follow them.

24          I express no view whether the defendant is guilty or

25  not guilty or as to any fact.  You should not draw any

JURY CHARGE                                    877

1    inference or reach any conclusion as to whether the defendant

2    is guilty or not guilty from anything I may have said or done.

3    You will decide the case solely on the facts you find and the

4    law as I give to you.

5            In reaching your verdict, you are to perform the

6    duty of finding the facts without bias or prejudice as to any

7    party.  You must remember that all parties stand equal before

8    a jury in the courts of the United States.  The fact that the

9    government is a party and the prosecution is brought in the

10   name of the United States does not entitle the government or

11   its witnesses to any greater consideration than that afforded

12   to any defendant.  By the same token, you must give it no less

13   consideration.  Your verdict must be based solely on the

14   evidence or lack of evidence.

15           For the same reasons, the personalities and the

16   conduct of counsel are not in any way in issue.  If you formed

17   reactions of any kind to any of the lawyers in this case,

18   favorable or unfavorable, whether you approve or disprove of

19   their behavior, those reactions must not enter into your

20   deliberations.

21           During the course of the trial, I may have

22   admonished an attorney.  You should draw no inference against

23   the attorney or the client.  It is the duty of the attorneys

24   to offer evidence and press objections on behalf of their

25   side.  It is my function to cut off counsel from an improper

JURY CHARGE                                    878

1    line of argument or question, and to strike answers when I

2    think it is necessary.  But you should draw no inference of

3    from that.

4              The indictment that was filed against the defendant

5    is the means by which the government gives him notices of the

6    charges against him and brings him before the court.  The

7    indictment is an accusation and nothing more.  The indictment

8    is not evidence, and you are to give it no weight in arriving

9    at your verdict.

10             The defendant, in response to the indictment,

11   pleaded not guilty.  The defendant is presumed to be innocent

12   unless his guilt has been proven beyond a reasonable doubt,

13   and that presumption alone, unless overcome, is sufficient to

14   acquit him.  The defendant is on trail for the crime charged

15   against him in the indictment and not for anything else.

16             The government has the burden; that is, the

17   obligation of proving guilt beyond a reasonable doubt.  This

18   burden never shifts to the defendant.  The defendant does not

19   have to prove his innocence; he need not submit any evidence

20   at all.  And even if the defendant had submitted evidence, as

21   he did during this trial, the burden of proof never shifts to

22   the defendant.  It always stays with the government.

23             Since, in order to convict the defendant of a given

24   charge, the government is required to prove that charge beyond

25   a reasonable doubt.  The question then is:  What is reasonable

1    doubt?

2              The words almost define themselves.  It is a doubt

3    based upon reason.  It is a doubt that a reasonable person has

4    after carefully weighing all the evidence or lack of evidence.

5    It is a doubt that would cause a reasonable person to hesitate

6    to act in a matter of importance in his or her personal life.

7    Proof beyond a reasonable doubt must, therefore be proof of a

8    convincing character that a reasonable person would not

9    hesitate to rely upon in making an informed decision.

10             A reasonable doubt is not caprice or whim.  It is

11   not speculation or suspicion.  It is not an excuse to avoid

12   the performance of an unpleasant duty.  The law does not

13   require that the government prove guilt beyond all possible

14   doubt:  Proof beyond a reasonable doubt is sufficient to

15   convict.  But bear in mind that a criminal case is different

16   from a civil case.

17             If, after fair and impartial consideration of the

18   evidence, you have a reasonable doubt as to the defendant's

19   guilt with respect to a particular charge against him, you

20   must find the defendant not guilty of that charge.  On the

21   other hand, if after fair and impartial consideration of all

22   the evidence, you are satisfied beyond a reasonable doubt of

23   the defendant's guilt with respect to a particular charge

24   against him, you should find the defendant guilty of that

25   charge.

1        Although the First Amendment protects the freedom of

2   speech, its protections are not absolute and do not extend to

3   certain categories of speech.  The First Amendment permits the

4   government to protect a witness from retaliation where the

5   government proves beyond a reasonable doubt the speaker's

6   intent to retaliate, and that the speech was an integral part

7   of that retaliation.  On the other hand, if you find that the

8   speech was not integral to any alleged retaliation or was not

9   expressed with the required bad intent to retaliate, it

10  remains First Amendment protected speech, which cannot be the

11  basis of a crime.

12       I wish to expand now on the instructions I gave you

13  at the beginning of the trial as to what is evidence and how

14  you should consider it.  Evidence comes in several forms

15  including:

16       A.  Sworn testimony of witnesses, both on direct and

17  cross-examination, and regardless of who called the witness:

18       B.  Exhibits that have been received in evidence by

19  the court; and

20       C.  Facts to which all the lawyers have agreed or

21  stipulated.

22       The parties have stipulated to certain facts in this

23  case.  Such a stipulation is an agreement among the parties

24  that a certain fact is true.  You must consider such

25  stipulated facts as true.

JURY CHARGE                                            881

1        As I said at the beginning of the trial, certain

2   things are not evidence and are to be disregarded by you in

3   deciding what the facts are.  They are at follows:

4        First, arguments or statements by lawyers are not

5   evidence.

6        Questions put -- questions put to the witnesses are

7   not evidence.  It is the question combined with the answer

8   that is evidence.

9        In addition to the lawyers' questions, I

10  occasionally may have asked questions for purposes of

11  clarification.  Please do not assume that the questions are

12  evidence or that I hold any opinion on matters to which any

13  questions may have related.  I do not.  Those questions were

14  asked solely in an effort or attempt to making something

15  clearer.

16       Similarly, objections to questions or to offered

17  exhibits are not evidence.  In this regard, attorneys have a

18  duty to their clients to object when they believe evidence

19  should not be received.  You should not be influenced by the

20  objection or by the Court's ruling on them.  If the objection

21  was sustained, ignore the question.  If the objection was

22  overruled, treat that answer like any other answer.

23       Of course, testimony that has been stricken or that

24  you have been instructed to disregard is not evidence and must

25  disregarded.

1            Equally obvious, anything you may have seen or heard

2     outside the courtroom is not evidence.

3            Finally, it would be improper for you to consider,

4     in reaching your decision as to whether the government

5     sustained its burden of proof any personal feelings you may

6     have about the defendant's race, religion, national origin,

7     ethnic background, sex, gender orientation, or age.  All

8     persons are entitled to the presumption of innocence, and the

9     government has the same burden of proof.  In addition, it

10    would be equally improper for you to allow any feelings you

11    might have about the government of the United States or the

12    nature of the crime charged to interfere with your

13    decision-making process.

14           To repeat, your verdict must be based exclusively

15    upon the evidence or the lack of evidence in this case.

16           The government has offered evidence in the form of

17    recordings of telephone calls.  These telephone calls were

18    lawfully recorded.

19           When the recordings were played, I advised you to

20    listen very carefully to the recordings themselves.  You

21    should make your only interpretation of what appears on the

22    recording based on what you heard.  If you think you heard

23    something differently than the way it appeared on the

24    transcript, what you heard is controlling.  You, the jury, are

25    the sole judges of the facts.

JURY CHARGE                         883

1          I told you that evidence comes in various forms such

2    as the sworn testimony of witnesses, exhibits and

3    stipulations.

4          There are, in addition, two different kinds of

5    evidence, direct and circumstantial.

6          Direct evidence is the communication of a fact by a

7    witness who testified to the knowledge of that fact as having

8    been obtained through one of the five senses.  So, for

9    example, a witness who testified to knowledge of a fact

10   because he or she saw it, heard it, smelled it, tasted it or

11   touched it, is giving evidence which is direct.  What remains

12   is your responsibility to pass upon the credibility of the

13   testimony that witness gave.

14         Circumstantial evidence is evidence which tends to

15   prove a fact in issue by a proof of other facts from which the

16   fact and issue may be inferred.  The word "infer," or the

17   expression "to draw an inference," means to find that a fact

18   exists from proof of another fact.  For example, if a fact in

19   issue is whether it is raining at the moment, none of us can

20   testify directly to that fact sitting as we are in what is

21   essentially a windowless courtroom.  Assume, however, that as

22   we are sitting here, a person walks into the courtroom wearing

23   a raincoat that is dripping wet and carrying an umbrella that

24   was dripping water.  We may infer from those facts that it is

25   raining outside.  In other words, the fact of rain is an

1    inference that could be drawn from the wet raincoat and the

2    dripping umbrella.

3            However, from the direct evidence of your

4    observation of a person entering the courtroom wearing a wet

5    raincoat and carrying a wet umbrella, alone you could not

6    infer exactly when the rain had started or for how long it had

7    rained.

8            An inference is to be drawn only if it is logical

9    and reasonable to do so.  In deciding whether to draw an

10   inference, you must look at and consider all the facts in the

11   light of reason, common sense, and experience.  Whether a

12   given inference is or is not to be drawn is entirely a matter

13   for you, the jury, to decide.  Please bear in mind, however,

14   that an inference is not to be drawn by guesswork or

15   speculation.

16           I remind you once again that you may not convict the

17   defendant unless you are satisfied of his guilt beyond a

18   reasonable doubt, whether based on direct evidence,

19   circumstantial evidence, or the logical inferences to be drawn

20   from such evidence.

21           Circumstantial evidence does not necessarily prove

22   less than direct evidence, nor does it necessarily prove more.

23   You are to consider all the evidence in this case, direct and

24   circumstantial, in determining what the facts are and in

25   arriving at your verdict.

1          I will now instruct you further about inferences.

2     During the trial, you may have heard the attorneys use the

3     term "inference," and in their arguments they may have asked

4     you to infer, on the basis of your reason, experience and

5     common sense, from one or more prudent facts, the existence of

6     some other facts.

7          An inference is not is a suspicion or a guess.  It

8     is a logical conclusion that a disputed fact exists that we

9     reach in light of another fact, which has been shown to exist.

10    There are times when different inferences may be drawn from

11    facts, whether proved by direct or circumstantial evidence.

12    It for you, and you alone, to decide what inferences you will

13    draw.

14         Keep in mind that the mere existence of an inference

15    against the defendant does not relieve the government of the

16    burden of establishing its case beyond a reasonable doubt.

17         The fact that one side or the other called more

18    witnesses or introduced more evidence does not mean that you

19    should find the facts in favor of the side who called more

20    witnesses.  You must not permit the number of witnesses or

21    documents supplied or the amount of time taken in examining a

22    witness to overwhelm your judgment.  The weight of the

23    evidence is by no means determined by the number of witnesses

24    or the length of their testimony or the quantity of documents.

25    You must keep in mind that the burden of proof is always on

JURY CHARGE                                    886

1    the government and the defendant is not required to call any

2    witness or offer any evidence because the defendant presume to

3    be innocent.

4            By the same token, you do not have to accept the

5    testimony of any witness who has not been contradicted or

6    impeached if you find the witness not to be credible.  You

7    also have to decide which witnesses to believe and which facts

8    are true.  To do this, you must look at all the evidence,

9    drawing upon your own common sense and personal experience.

10   But, again, you must keep in mind that the burden of proof is

11   always on the government and the defendant is not required to

12   call any witnesses or offer any evidence because he is

13   presumed to be innocent.

14           The law does not require any party to call as

15   witnesses all persons who may have had been present at any

16   time or place involved in the case or who may appear to have

17   some of the matter at issue in this trial.  Nor does the law

18   require any party to produce as exhibits all papers and things

19   mentioned during the course of the trial.  And, of course, the

20   defendant in a criminal case is not required to call any

21   witnesses or produce any evidence at all.

22           During the course of the trial, you heard testimony

23   that attorneys interviewed witnesses when preparing for and

24   during the trial.  You must not draw any unfavorable inference

25   from that fact.

JURY CHARGE                                887

1          On the contrary, attorneys are obliged to prepare

2    their case as thoroughly as possible, and in the discharge of

3    that responsibility, properly interview witnesses in

4    preparation for the trial and from time to time as may be

5    required during the course of trial.

6          During the trial, you have heard argument by counsel

7    that the government did not utilize specific investigative

8    techniques or exhaustively pursue every piece of information.

9    You may consider these facts in deciding whether the

10   government has met its burden of proof, because, as I told

11   you, you should look at all of the evidence or lack of

12   evidence in deciding whether the government has proven a

13   particular charge beyond a reasonable doubt.

14         However, you are also instructed that there is no

15   legal requirement that the government use any specific

16   investigative techniques or pursue every investigative lead to

17   prove its case.  Law enforcement techniques are not your

18   concern.  Your concern is to determine whether or not, based

19   upon all the evidence presented in the case, the government

20   has proven that the defendant is guilty beyond a reasonable

21   doubt.

22         In deciding what the facts are, you must decide

23   which testimony to believe and which testimony not to believe.

24   In making that decision, you should use the same reason you

25   would employ in making determinations important in your own

JURY CHARGE                                              888

1    affairs that are based on information given to you by others.

2              There are a number of factors you may take into

3    account in determining whether the testimony of a witness is

4    believable, including the following:

5              1, did the witness impress you as honest?

6              2, did the witness have any particular reason not to

7    tell the truth?

8              3, did the witness have a personal interest in the

9    outcome of the case?

10             4, did the witness seem to have a good memory?

11             5, did the witness have the opportunity and ability

12   to observe accurately the things they testified about?

13             6, did the witness appear to understand the

14   questions clearly and answer them directly?

15             7, did the witness' testimony differ from the

16   testimony of other witnesses?

17             People sometimes forget things.  A contradiction may

18   be an innocent lapse of member or it may be an intentional

19   falsehood.  Consider, therefore, whether the contradiction, if

20   there was one, has to do with an important fact or only a

21   small detail.

22             Different people observing an event may remember it

23   differently and, therefore, testify about it differently.

24             But, if any witness is shown to have willfully lied

25   about any material matter, you have the right to conclude that

JURY CHARGE                                        889

1    the witness also lied about other matters.  You may either

2    disregard all of that witness' testimony, or you may accept

3    whatever part of it you think deserves to be believed.

4              You may consider the factors I have just discussed

5    with you in deciding how much weight to give to testimony.

6

7              (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  (Cont'g.)  In evaluating the credibility

2    of witnesses, you should take into account any evidence that a

3    witness who testified may benefit in some way from the outcome

4    of this case.  Such an interest in the outcome creates a

5    motive to testify falsely and may sway the witness to testify

6    in a way that advances his or her own interests.  Therefore,

7    if you find that any witness whose testimony you are

8    considering may have an interest in the outcome of this trial,

9    then you should bear that factor in mind when evaluating the

10   credibility of his or her testimony and accept it with great

11   care.

12          This is not to suggest that every witness who has an

13   interest in the outcome of a case will testify falsely.  It is

14   for you to decide to what extent, if at all, a witness's

15   interest has affected or colored his or her testimony.

16          The defendant did not testify in this case.  Under

17   our constitution, he has no obligation to testify or to

18   present any other evidence because it is the prosecution's

19   burden to prove the defendant guilty beyond a reasonable

20   doubt.  That burden remains with the prosecution throughout

21   the entire trial and never shifts to the defendant.  A

22   defendant is never required to prove that he is innocent.

23          You may not attach any significance to the fact that

24   the defendant did not testify.  No adverse inference against

25   him may be drawn by you because he did not take the witness

JURY CHARGE                                            891

1    stand.  You may not consider this against the defendant in any

2    way in your deliberations in the jury room.

3

4           In this case, i have permitted Special Agent Richard

5    Busick to testify as an expert witness and to express opinions

6    about certain matters that are in issue.  A witness may be

7    permitted to testify to an opinion on those matters about

8    which he or she has special knowledge, skill, experience and

9    training.  Such testimony is presented to you on the theory

10   that someone who is experienced and knowledgeable in the field

11   can assist you in understanding the evidence or in reaching an

12   independent decision on the facts.

13          In weighing this opinion testimony, you may consider

14   the witness's qualifications, opinions, the reasons for

15   testifying, as well as all of the other considerations that

16   ordinarily apply when you are deciding whether or not to

17   believe a witness's testimony.  You may give the opinion

18   whatever weight, if any, you find it deserves in light of all

19   the evidence in this case.  You should not, however, accept

20   opinion testimony merely because I allowed the witness to

21   testify concerning that opinion.  Nor should you substitute it

22   for your own reason, judgment, and common sense.  The

23   determination of the facts in this case rests solely with you.

24          Among the exhibits in this case were photographs,

25   diagrams, and maps received in evidence to assist you in

JURY CHARGE                                    892

1    evaluating the testimony relating to the locations, scenes, or

2    objects depicted therein.  You are the sole judges of the

3    accuracy of the photographs, diagrams, and maps and you are

4    the sole judges of the weight to be given to them.  You may

5    consider the factors i have just discussed with you in

6    deciding how much weight to give to the evidence presented.

7              During this trial, you have heard the testimony of

8    active or retired law enforcement employees.  The fact that a

9    witness is a law enforcement employee does not mean that his

10   or her testimony is entitled to any greater weight.  By the

11   same token, the testimony of such a witness is not entitled to

12   less consideration for that reason.  At the same time, it is

13   quite legitimate for defense counsel to try to attack the

14   credibility of a law enforcement witness on the grounds that

15   his or her testimony may be colored by a personal or

16   professional interest in the outcome of the case.

17             You should consider the testimony of a law

18   enforcement employee just as you would any other evidence in

19   the case and evaluate his or her credibility just as you would

20   that of any other witness.  After reviewing all the evidence,

21   you will decide whether to accept the testimony of a law

22   enforcement employee and what weight, if any, that testimony

23   deserves.

24             You have heard evidence, including audio recordings,

25   showing that the defendant previously engaged in conduct,

JURY CHARGE

1   including other crimes, other than the crime charged in the

2   indictment.  The defendant is not on trial for committing any

3   acts not charged in the indictment or for acts for which he

4   was previously convicted.  Consequently, you may not consider

5   the evidence of these other acts as a substitute for evidence

6   that the defendant committed the crime charged in this case.

7   For example, you may not consider the evidence of these acts

8   as threats or harmful action that the Government must prove to

9   you in this case.  Nor may you consider evidence of those

10  other acts as proof that the defendant has a criminal

11  propensity; that is, you may not conclude that he likely

12  committed this crime because he committed a crime in the past.

13          Instead, you may consider that evidence for limited

14  purposes, and you may consider it only for the following

15  limited purposes, which i will now describe. You may only

16  consider evidence of uncharged conduct:

17          (A).

18          As evidence that John Doe number one or John Doe

19  number two provided information to a law enforcement officer

20  relating to the commission or possible commission of any

21  federal offense;

22          (B).

23          As evidence that John Doe number one or John Doe

24  number two provided truthful information to a law enforcement

25  officer relating to the commission or possible commission of

*SHERNELLE GRIFFITH - Official Court Reporter*

1    any federal offense;

2              (C).

3              As evidence enabling you to understand the complete

4    story of the charged crime; or

5              Whether the defendant had a motive to commit the

6    acts charged in the 2022 indictment.

7              You have heard evidence that a witness made a

8    statement on an earlier occasion, which counsel argues is

9    inconsistent with the witness's trial testimony.  Evidence of

10   what is arguably a prior inconsistent statement was placed

11   before you for the limited purpose of helping you decide

12   whether to believe the trial testimony of the witness, who

13   contradicted himself or herself.  If you find that the witness

14   made an earlier statement that conflicts with his or her trial

15   testimony, you may consider that fact in deciding how much of

16   his or her trial testimony, if any, to believe.

17             In making this determination, you may consider

18   whether the witness purposely made a false statement or

19   whether it was an innocent mistake; whether the inconsistency

20   concerned an important fact, or whether it had to do with a

21   small detail; whether the witness had an explanation for the

22   inconsistency, and whether that explanation appealed to your

23   common sense.

24             It is exclusively your duty, based upon all the

25   evidence and your own good judgment, to determine whether the

JURY CHARGE                                    895

1    prior statement was inconsistent.  And, if so, how much

2    weight, if any, should be given to the inconsistent statement

3    in determining whether to believe all, part, or none of the

4    witness's testimony.

5          I will now turn to the second part of this charge

6    and will, as I indicated at the outset, instruct you as to the

7    specific elements of the crime charged that the Government

8    must prove beyond a reasonable doubt to warrant a finding of

9    guilt in this case.

10         The defendant is formally charged in an indictment.

11   As i instructed you at the beginning of this case, an

12   indictment is a charge or accusation.  The indictment in this

13   case contains one count.

14   To repeat, an indictment is merely an accusation in writing.

15   It is not evidence of guilt.  It is entitled to no weight in

16   your determination of the facts.  The defendant has pleaded

17   not guilty, thereby placing in issue each allegation in the

18   indictment.

19         The count charged in this indictment is witness

20   retaliation.

21         The indictment accuses the defendant of violating

22   the same statute in more than one way.  In other words, the

23   indictment alleges that the statute in question was violated

24   by various acts which are in the indictment joined by the

25   conjunctive word "and," while the statute and the elements of

JURY CHARGE                                        896

1    the offense are stated in the disjunctive, using the word

2    "or." in these instances, it is sufficient for a finding of

3    guilt if the evidence established beyond a reasonable doubt

4    the violation of the statute by any one of the acts charged.

5            During these instructions on the elements of the

6    crime charged, you will hear me use the words "knowingly," and

7    "intentionally" from time to time.  Before you can find the

8    defendant guilty, you must be satisfied that the defendant was

9    acting knowingly and intentionally.

10           A person acts knowingly, if he or she acts

11   intentionally and voluntarily and not because of ignorance,

12   mistake, accident, or carelessness.  Whether the defendant

13   acted knowingly may be proven by her conduct and by all of the

14   facts and circumstances surrounding the case.

15           A person acts intentionally, if he or she

16   acts deliberately and purposefully.  That is, the acts must

17   have been the product of his or her conscious, objective

18   decision rather than the product of a mistake or accident.

19           These issues of knowledge and intent require you to

20   make a determination about the defendant's state of mind,

21   something that can rarely be proven directly.  A wise and

22   careful consideration of all the circumstances before you may,

23   however, permit you to make a determination as to the

24   defendant's state of mind.  Indeed, in your everyday affairs,

25   you are frequently called upon to determine a person's state

JURY CHARGE                                    897

1    of mind from his or her words and actions.  The indictment

2    charges on or about certain dates.  It does not matter if the

3    indictment charges that a specific act occurred on or about a

4    certain date and the evidence indicates that in fact it was on

5    other another date.  The law only requires substantial

6    similarity between the dates alleged in the indictment and the

7    date established by testimony or exhibits.

8              I will now address the count charged in the

9    indictment.

10             The defendant is charged with retaliating against

11   George Harrison and James Harrison, respectively identified in

12   the indictment as John Doe number one and John Doe number two,

13   including by threatening their family members Jessica Jessie

14   Harrison and Andrew Harrison, respectively identified in the

15   indictment as victim one and victim two.

16             The indictment reads:

17             In or about and between June 2018 and September

18   2021, both dates being approximate and inclusive, within the

19   Eastern District of New York and elsewhere, the defendant

20   Chris Bantis did knowingly and intentionally:

21             (1).

22             Engage in conduct and thereby threaten to cause

23   bodily injury to one or more other persons, to wit:  Victim

24   one and victim two, individuals whose identities are known to

25   the grand jury, and to damage the tangible property of victim

1    one, with intent to retaliate against John Doe number one and

2    John Doe number two, individuals whose identities are known to

3    the grand jury for;

4              (A) information relating to the commission and

5    possible commission of a federal offense and the commission

6    and possible commission of a violation of conditions of

7    supervised release given by one or more persons, to wit:  John

8    Doe number one and John Doe number two, to one or more law

9    enforcement officers;

10             And (B) the attendance of John Doe number one at an

11   official proceeding and his testimony in an official

12   proceeding, to wit:  A federal sentencing proceeding in the

13   Eastern District of New York;

14             And (2) with intent to retaliate, take one or more

15   actions harmful to John Doe number one and John Doe number two

16   for providing to one or more law enforcement officers truthful

17   information relating to the commission and possible commission

18   of a federal offense.

19             The indictment charges that the defendant acted with

20   intent to retaliate against John Doe number one and John Doe

21   number two.  As I previously instructed you, however, the

22   Government need only prove beyond a reasonable doubt that the

23   defendant acted with intent to retaliate against either George

24   Harrison or James Harrison, or both.  To find the defendant

25   guilty, you must agree unanimously on which witness the

1    defendant intended to retaliate against.

2              Similarly, although the indictment charges that the

3    defendant intentionally threatened bodily injury to victim one

4    and victim two and intentionally threatened to damage the

5    property of victim one, the Government must prove that the

6    defendant intentionally made one or more of those threats.

7    Once again, you must agree unanimously as to which victim the

8    defendant intended to threaten.

9              There are three statutes relevant to this charge:

10   18 U.S.C. § 1513(B)(1), 18 U.S.C. § 1513(B)(2), and 18 U.S.C.

11   § 1513(E).

12             § 1513(B)(1) provides:

13             Whoever knowingly engages in any conduct and thereby

14   causes bodily injury to another person or damages the tangible

15   property of another person, or threatens to do so, with intent

16   to retaliate against any person for the attendance of a

17   witness or party at an official proceeding, or any testimony

18   given or any record, document, or other

19   object produced by a witness in an official proceeding shall

20   be guilty of a crime.

21             § 1513(B)(2) provides:

22             Whoever knowingly engages in any conduct and thereby

23   causes bodily injury to another person or damages the tangible

24   property of another person, or threatens to do so, with intent

25   to retaliate against any person for any information relating

JURY CHARGE                                        900

1    to the commission or possible commission of a federal offense

2    or a violation of conditions of probation, supervised release,

3    parole, or release pending judicial proceedings given by a

4    person to a law enforcement officer shall be guilty of a

5    crime.

6            Lastly, § 1513(E) provides:

7            Whoever knowingly, with the intent to retaliate,

8    takes any action harmful to any person, including interference

9    with the lawful employment or livelihood of any person, for

10   providing to a law enforcement officer any truthful

11   information relating to the commission or possible commission

12   of any federal offense, shall be guilty of a crime.

13           Different elements are required to prove a crime

14   under each of these statutes, which i will explain to you in

15   turn.  Each of these three statutes is charged as an

16   alternative basis on which you can find the defendant guilty

17   of the crime charged.  That means that the Government must

18   prove, beyond a reasonable doubt, all of the elements of at

19   least one of these statutes.

20           In order to prove the defendant guilty under §

21   1513(b)(1), the Government must prove each of the following

22   elements beyond a reasonable doubt:

23           First, that the defendant knowingly engaged in

24   conduct;

25           Second, that by such conduct, the defendant

*SHERNELLE GRIFFITH - Official Court Reporter*

JURY CHARGE                              901

1    threatened to cause bodily injury to a victim or to cause

2    damage to a victim's property, and;

3         Third, the defendant acted with the intent to

4    retaliate against a witness for his attendance or testimony at

5    an official proceeding.

6         Element one:  Knowingly engaging in conduct.

7         The first element the Government must prove beyond a

8    reasonable doubt is that the defendant acted knowingly.  An

9    act is done knowingly if it is done voluntarily and purposely

10   and not by accident or mistake.

11        Element two:  Threatening bodily injury or property

12   damage.

13        The second element the Government must prove beyond

14   a reasonable doubt is that the defendant's conduct threatened

15   to cause bodily injury to Jessie Harrison or Andrew Harrison,

16   or to cause damage to the property of Jessie Harrison.

17        Bodily injury means a cut, abrasion, bruise, burn or

18   disfigurement, physical pain, illness or the impairment of the

19   function of a bodily member, organ or mental facility.  It

20   includes any injury to the body no matter how temporary.

21        It is not necessary to prove that Jessie Harrison or

22   Andrew Harrison actually was injured or that Jessie Harrison's

23   property was actually damaged; it is sufficient if the

24   defendant knowingly threatened to cause such bodily injury or

25   property damage.

JURY CHARGE                                902

1          A threat is simply the expression of intention to do

2     harm.  A threat may be communicated by words as well as

3     gestures.  In order to find that the defendant threatened to

4     cause Jessie Harrison or Andrew Harrison bodily harm, you need

5     not find that he intended to carry out the threat.

6               Element three:  Intent to retaliate

7          The third element the Government must prove beyond a

8     reasonable doubt is that the defendant acted with the intent

9     to retaliate against George Harrison for his attendance or

10    testimony at an official proceeding.

11         An official proceeding means a proceeding before a

12    court, judge or federal agency.  The proceeding may be civil

13    or criminal.  You are instructed that a federal sentencing

14    proceeding is an official proceeding.  You are instructed that

15    a federal sentencing proceeding is an official proceeding.  In

16    order to satisfy this element, it is not necessary for the

17    Government to prove that the defendant knew he was breaking

18    any particular law.

19         In order to prove the defendant guilty under section

20    1513(b)(2), the Government must prove each of the following

21    elements beyond a reasonable doubt:

22    First, that the defendant knowingly engaged in conduct;

23    threatened to cause bodily injury to a victim or to cause

24    damage to a victim's property;

25              Second, that by such conduct the defendant

*SHERNELLE GRIFFITH - Official Court Reporter*

1    threatened to cause bodily harm to a victim or to cause damage

2    to a victim's property and;

3              Third, that the defendant acted with the intent to

4    retaliate against a person for providing information to a law

5    enforcement officer relating to the commission or possible

6    commission of a federal offense or a violation of a condition

7    of supervised release.

8              Element one:  Knowingly engaging in conduct

9              As in section 1513(b)(1), the first element the

10   Government must prove beyond a reasonable doubt is that the

11   defendant acted knowingly.  An act is done knowingly if it is

12   done voluntarily and purposely and not by accident or mistake.

13             Element two:  Threatening bodily injury or property

14   damage.

15             As in section 1513(b)(1), the second element the

16   government must prove beyond a reasonable doubt is that the

17   defendant's conduct threatened to cause bodily injury to

18   Jessie Harrison or Andrew Harrison, or to cause damage to the

19   property of Jessie Harrison.

20             Bodily injury means a cut, abrasion, bruise, burn or

21   disfigurement, physical pain, illness or the impairment of the

22   function of a bodily member, organ or mental facility.  It

23   includes any injury to the body no matter how temporary.  It

24   is not necessary to prove that Jessie Harrison or Andrew

25   Harrison actually was injured or that Jessie Harrison's

JURY CHARGE                                              904

1    property was actually damaged; it is sufficient if the

2    defendant knowingly threatened to cause such bodily injury or

3    property damage.  A threat is simply the expression of

4    intention to do harm.  A threat may be communicated by words

5    as well as gestures.  In order to find that the defendant

6    threatened to cause Jessie Harrison or Andrew Harrison bodily

7    harm, you need not find that he intended to carry out the

8    threat.

9            Element three:  Intent to retaliate.

10           The third element the Government must prove beyond a

11   reasonable doubt is that the defendant acted with the intent

12   to retaliate against George Harrison or James Harrison for

13   providing information to a law enforcement officer relating to

14   the commission or possible commission of a federal offense or

15   a violation of a condition of supervised release.  This

16   includes proving that the defendant knew that George Harrison

17   or James Harrison provided such information to a law

18   enforcement officer.

19           The Government does not need to prove that the

20   federal offense for which information was provided by George

21   Harrison or James Harrison was actually committed.  Rather, it

22   must prove that George Harrison or James Harrison provided

23   truthful information regarding the commission or possible

24   commission of a federal offense.

25           A law enforcement officer means an officer or

1   employee of the federal government authorized to prevent,

2   investigate or prosecute offenses or serving as a probation

3   officer.  You are instructed that a special agent or a task

4   force officer with the Federal Bureau of Investigation is a

5   law enforcement officer.  You are also instructed that the

6   crimes of extortionate extension of credit and extortionate

7   collection of credit, in violation of 18 U.S.C. § 892(a) and

8   18 U.S.C. § 894(a), are federal offenses.

9           Supervised release is similar to parole or

10  probation.  During supervised release, a defendant is

11  supervised in a non-custodial setting by a U.S. probation

12  officer, pursuant to terms imposed by the court and U.S.

13  probation.  If a defendant violates a condition of supervised

14  release, he may be punished.  In order to satisfy this

15  element, it is not necessary for the Government to prove that

16  the defendant knew he was breaking any particular law.

17          In order to prove the defendant guilty under §

18  1513(e), the Government must prove each of the following

19  elements beyond a reasonable doubt:

20          First, that the defendant knowingly took action;

21          Second, that the defendant's action was harmful to a

22  person and;

23          Third, that the defendant acted with intent to

24  retaliate against that person for providing truthful

25  information to law enforcement.

JURY CHARGE                                      906

1          Element one:  Knowingly engaging in conduct.

2          As in § 1513(b)(1) and § 1513(b)(2), the first

3    element the Government must prove beyond a reasonable doubt is

4    that the defendant acted knowingly.  An act is done knowingly

5    if it is done voluntarily and purposely and not by accident or

6    mistake.

7          Element two:  Action harmful to a person.

8          The second element the Government must prove beyond

9    a reasonable doubt is that the defendant took one or more

10   actions that were harmful to either George Harrison or James

11   Harrison.

12         Element three:  Intent to retaliate.

13         The third element the must prove beyond a reasonable

14   doubt is that, in taking action harmful to George Harrison or

15   James Harrison, the defendant intended to retaliate against

16   that person for providing truthful information to a law

17   enforcement officer relating to the commission or possible

18   commission of a federal offense.  This includes proving that

19   the defendant knew that George Harrison or James Harrison

20   provided such truthful information to a law enforcement

21   officer.

22         As in § 1513(b)(2), a law enforcement officer means

23   an officer or employee of the federal government authorized to

24   prevent, investigate or prosecute offenses or serving as a

25   probation officer.  You are instructed that a special agent or

*SHERNELLE GRIFFITH - Official Court Reporter*

JURY CHARGE                                    907

1  a task force officer with the Federal Bureau of Investigation

2  is a law enforcement officer.  You are also instructed that

3  the crimes of extortionate extension of credit and

4  extortionate collection of credit, in violation of 18 U.S.C. §

5  892(a) and 18 U.S.C. § 894(a), are federal offenses.

6          The Government does not need to prove that the

7  federal offense for which information was provided by George

8  Harrison or James Harrison was actually committed.  Rather, it

9  must prove that George Harrison or James Harrison provided

10  truthful information regarding the commission or possible

11  commission of a federal offense.  In order to satisfy this

12  element, it is not necessary for the Government to prove that

13  the defendant knew he was breaking any particular law.

14          Mr. Bantis has pled not guilty and maintains that he

15  did not commit the offense charged.

16          You are about to go into the jury room, members of

17  the jury, to begin your deliberations.  That brings us to the

18  third and final part of my charge which provides some general

19  rules regarding your deliberations.

20          In order that your deliberations may proceed in an

21  orderly fashion, first you should have a foreperson.

22  Traditionally, juror number one acts as foreperson.  Of

23  course, his or her vote is entitled to no greater weight than

24  that of any other juror.

25          Keep in mind that nothing i have said in these

*SHERNELLE GRIFFITH - Official Court Reporter*

JURY CHARGE                                                  908

1    instructions is intended to suggest to you in any way what i

2    think your verdict should be.  That is entirely for you to

3    decide.  By way of reminder, i charge you once again that it

4    is your responsibility to judge the facts in this case from

5    the evidence presented during the trial and to apply the law,

6    as i have given it to you, to the facts as you find them from

7    the evidence.

8           When you retire, it is your duty to discuss the case

9    for the purpose of reaching agreement if you can do so. Each

10   of you must decide the case for yourself, but should do so

11   only after considering all the evidence, listening to the

12   views of your fellow jurors, and discussing it fully.  It is

13   important that you reach a verdict if you can do so

14   conscientiously.  You should not hesitate to reconsider your

15   opinions from time to time and to change them if you are

16   convinced that they are wrong.  However, do not surrender an

17   honest conviction as to weight and effect of the evidence

18   simply to arrive at a verdict.

19          Any verdict you reach must be unanimous.  That is,

20   with respect to each count, you must all agree as to whether

21   your verdict is guilty or not guilty as to that count.

22          Deliberations are to take place only in the jury

23   room.  You will not discuss this case with anyone outside the

24   jury room.  And that includes your fellow jurors.  You will

25   only discuss the case when all 12 deliberating jurors are

1    together, in the jury room, with no one else present, behind

2    the closed door.  At no other time is there to be any

3    discussion about the merits of the case.  Period.

4              Finally, you cannot allow a consideration of the

5    punishment which may be imposed upon the defendant, if

6    convicted, to influence your verdict in any way or to enter

7    into your deliberations.

8              I instruct you, however, that none of the counts in

9    this case is a capital count.  By that i mean that the death

10   penalty is not a possible punishment for any of the counts in

11   this case.  Regardless, the duty of imposing a sentence rests

12   exclusively with me.  Your duty is to weigh the evidence in

13   the case and to determine whether the Government has proven

14   every element beyond a reasonable doubt solely upon such

15   evidence and upon the law without being influenced by any

16   assumption, conjecture, sympathy, or inference not warranted

17   by the facts.

18             As i am sure you can imagine, it is very important

19   that you not communicate with anyone outside the jury room

20   about your deliberations or about anything touching this case.

21             There is only one exception to this rule.  If it

22   becomes necessary during your deliberations to communicate

23   with me, you may send a note, through the marshal, signed by

24   your foreperson or by one or more members of the jury.  No

25   member of the jury should ever attempt to communicate with me

JURY CHARGE                                910

1   except by a signed writing, and i will never communicate with

2   any member of the jury on any subject touching the merits of

3   the case other than in writing, or orally here in open court.

4          If you send any notes to the court, do not disclose

5   anything about your deliberations.  Specifically, do not

6   disclose to anyone not even to me how the jury stands,

7   numerically or otherwise, until after you have reached a

8   unanimous verdict on each count or have been discharged.

9          Keep in mind too that in deliberations, the jury's

10  recollection governs, nobody else's.  Not the court's if i

11  have made reference to the testimony and not counsel's

12  recollection.  It is your recollection that must govern

13  during.  Your deliberations.  If necessary during those

14  deliberations, you may request by jury note a reading from the

15  trial transcript that may refresh your recollection.

16         Please, as best you can, try to be as specific as

17  possible in your requests for read backs.  In other words, if

18  you are interested only in a particular part of a witness's

19  testimony, please indicate that to us.  It may take some time

20  for us to locate the testimony in the transcripts, so please

21  be patient.  And, as a general matter, if there is ever a

22  delay in responding to a jury note, please understand there is

23  a reason for it.  None of us goes anywhere.  As soon as a jury

24  note is delivered to the court by the marshal, we turn our

25  attention to it immediately.

JURY CHARGE                              911

1          In the same way, if you have any questions about the

2     applicable law or you want a further explanation from me, send

3     me a note.  We will provide a response as soon as we can.

4

5          (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JURY CHARGE                                    912

1          THE LAW CLERK:  (Cont'g.)  I have provided the jury

2   with a verdict sheet, which is self-explanatory.  Needless to

3   say, however, if you have any questions about the verdict

4   sheet, do not hesitate to send the Court a note asking for

5   further instructions.

6          With respect to each count, you are to resolve

7   individually the issue of whether the government has

8   established beyond a reasonable doubt the essential elements

9   of the offense, as I have described them to you, that is, you

10  must all agree unanimously as to whether your verdict is

11  guilty or not guilty.

12         When you have reached a decision, have the

13  foreperson record the answers, sign the verdict form and put

14  the date on it and notify the marshal by note that you have

15  reached a verdict.  Bring the completed verdict sheet with you

16  when summoned by the Court.

17         Keep in mind that you must not be influenced by

18  sympathy, prejudice, or public opinion.  I remind you at the

19  outset that each of you has undertaken a solemn obligation, a

20  sworn obligation to decide this case solely on the evidence.

21  You must carefully and impartially consider the evidence,

22  follow the law as I state it, and reach a just verdict

23  regardless of the consequences.

24         As you begin your deliberations, remember your oath

25  sums up your duty and, that is, without fear or favor to any

JURY CHARGE                                                913

1    person or party, you will well and truly try the issues in

2    this case according to the evidence given to you in court and

3    the laws of the United States.

4             In a few minutes I'm going to excuse our alternate

5    jurors.  As I told you before, your services were required as

6    a safeguard against the possibility that one of the regular

7    jurors might be unable to complete his or her service.  I

8    commend the alternate jurors for their faithful attendance and

9    attention.  On behalf of the court and the parties, I thank

10   you for your service.

11            Members of the jury, I ask your patience for a few

12   moments longer.  It may be necessary for me to spend a few

13   moments with counsel and the reporter at the sidebar, if so, I

14   will ask you to remain patiently in the box without speaking

15   to each other and we will return in just a moment to submit

16   the case to you.

17            Thank you again for your time and attentiveness.

18            (Continued on the next page.)

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                            914

1          (The following occurred at sidebar.)

2          THE COURT:  Objections or exceptions to the charge

3    as read?

4          MS. HIROZAWA:  No, your Honor, from the defense.

5          MS. OKEN:  From the government we have two very

6    brief points to note which I think both were inadvertent.

7          The first is at page 64 the Dates Approximate page

8    was inadvertently spliced in the middle of the knowingly and

9    intentionally charge, and so the back half of that charge or

10   the -- not the back half but the ending portion of it says --

11         THE COURT:  On a different page?

12         MS. OKEN:  It followed -- it refers back to an

13   earlier portion of the instruction but because the Dates

14   Approximate was spliced in the middle, it inadvertently refers

15   back to the Dates Approximate page.  So I think we would just

16   ask that those two --

17         THE COURT:  We're not giving them anything yet, so

18   if we have to correct the pagination we can.

19         MS. OKEN:  So the pagination is actually right, but

20   page 64, which is correctly labeled 64, was inadvertently

21   placed between pages 67 and 68 and read in that order.

22         THE COURT:  All right.  So what's the clarification?

23         MS. OKEN:  So I think we would just ask at minimum

24   the knowingly and intentionally instruction be reread with

25   pages 66 through 68 and without 64 in the middle.

SIDEBAR CONFERENCE                          915

1              THE COURT:  Okay.

2              MS. OKEN:  So that's the first.

3              And then the second, it looks like in this version

4    of the charge the word "truthful" was inadvertently added to

5    Section 1513(b)(2), and that should only appear in 1513(e).

6              THE COURT:  Is that accurate?

7              MS. HIROZAWA:  That's correct under the law.  I

8    noticed during the reading that's it correct under the

9    statute.

10             MS. OKEN:  And so with respect to the best way of

11   addressing it --

12             THE COURT:  Give them back to Scott and he'll reread

13   those.

14             MS. OKEN:  Okay.

15             MS. HIROZAWA:  Your Honor, I don't know if while

16   we're here we should renew our Rule 29 motion before the case

17   is given to the jury or if you want to have --

18             THE COURT:  We're not going to do it now, the case

19   is closed.

20             MS. SHERMAN:  Judge, after this is read are we then

21   letting the jury go?

22             THE COURT:  We're going to let them go.

23             MS. SHERMAN:  Okay.

24             THE COURT:  We'll give them instructions about what

25   happens, but they're not deliberating now.

SIDEBAR CONFERENCE                             916

1            MS. SHERMAN:  Okay.

2            MS. HIROZAWA:  What time will the Court come back

3    tomorrow?

4            THE COURT:  They'll come back at 10.  We'll swear

5    the marshal tomorrow and separate the alternates just in case

6    something happens overnight.

7            MS. McGRATH:  Your Honor, is it your intention to

8    release the alternates at this time or to have them come back

9    tomorrow as well.

10           THE COURT:  Everybody is coming back tomorrow

11   because the jury hasn't been given to the marshal yet, so

12   everybody comes back.  Should they come back on Monday, I

13   don't keep the alternates here, I tell them they have to

14   follow all the rules and have to be ready.

15           MS. McGRATH:  Okay.

16           MS. SASSO:  Your Honor, I believe there was an

17   instruction that indicated that the alternates were going to

18   be released --

19           THE COURT:  Well --

20           MS. SASSO:  -- so if we can make clear that they are

21   not going to be released.

22           THE COURT:  Yes, don't worry.

23           MS. SASSO:  Perfect.  Thank you.

24           THE COURT:  That's what would have happened if we

25   actually went into deliberations in night court, but we're not

SIDEBAR CONFERENCE                    917

1   doing that.

2            MS. HIROZAWA:  Thank you, your Honor.

3            (End of sidebar conference.)

4            (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                                918

1              (In open court.)

2              THE COURT:  Ladies and gentlemen, there was a couple

3     of inserts that got swiped in the wrong place so we're trying

4     to decipher that and Scott will reread two very brief sections

5     as they were intended to be read, and when you get -- you will

6     be getting within the jury room a copy of what Scott read, as

7     modified by what he is now going to read, and they will have

8     page references.  So Scott will give us the page reference of

9     what he's now reading and it will make up the written charge

10    that you will have available to you in the deliberation room.

11    Mr. Woods.

12             THE LAW CLERK:  Page 66.  During these instructions

13    on the elements of the crime charged, you will hear me use the

14    words "knowingly" and "intentionally" from time to time.

15    Before you can find the defendant guilty, you must be

16    satisfied that the defendant was acting knowingly and

17    intentionally.  A person acts knowingly if he or she acts

18    intentionally and voluntarily not because of ignorance,

19    mistake, accident or carelessness.  Whether the defendant

20    acted knowingly may be proven by her conduct by all the facts

21    and circumstances surrounding the case.  A person acts

22    intentionally if he or she acts deliberately and purposefully,

23    that is, the acts must have been the product of his or her

24    conscious objective decision rather than the product of a

25    mistake or accident.

PROCEEDINGS                                    919

1           These issues of knowledge and intent require you to

2     make a determination about the defendant's state of mind,

3     something that can rarely be proven directly.  A wise and

4     careful consideration of all the circumstances before you may,

5     however, permit you to make a determination as to the

6     defendant's state of mind.  Indeed, in your every day affairs

7     you are frequently called upon to determine the person's state

8     of mind from his or her words and actions in given

9     circumstances.  You are asked to do the same here.  I will now

10    address the count charged in the indictment.

11          Page 87.  The government does not need to prove that

12    the federal offense for which information was provided by

13    George Harrison or James Harrison was actually committed,

14    rather they must prove that George Harrison or James Harrison

15    provided information regarding the commission or possible

16    commission of a federal offense.

17          THE COURT:  Those are the clarifications.  All

18    right.  Ladies and gentlemen, the plan is as follows:  We're

19    not going to reinvent night court, it is too late to begin

20    deliberations, thus the charge as read basically assumes that

21    we would have gone right to the next building block, which

22    would actually be the deliberations.  So, for example, at this

23    point the alternates will not be separated from the regular

24    jurors and we're going to ask all of the jurors, both regular

25    and alternate, to return to the courthouse tomorrow morning at

PROCEEDINGS                                    920

1    the usual time, around 9:45, we'll begin as close to 10 as we

2    can.

3              As I indicated to you yesterday, we will not be

4    working -- you will not be working on this case in the

5    afternoon so that we will wrap up our work not later than

6    1 p.m. tomorrow afternoon, so for careful planning of the

7    balance of your day you can count on not being here after

8    1 o'clock.

9              Now the last building block is actually the

10   beginning of deliberations.  That's not happened yet, it will

11   not happen until tomorrow, so that means all of the rules that

12   I continue to give you each night still apply.  You are still

13   to keep an open mind.  You are not to discuss the case amongst

14   yourselves or with anyone else.

15             You are not to use the overnight hours to do any

16   research, either electronically or some old-fashioned, nothing

17   about anything that touches upon this case, the personalities,

18   the laws, anything you've just heard in the charge, no

19   homework.  This is everything that gets done in the classroom,

20   also known as the courtroom.  You are certainly not to even,

21   if you live in the neighborhood, to go by any of the streets

22   and buildings that we've heard mentioned during the course of

23   the trial.

24             Again, we also remain on radio silence.  No

25   communication to anyone about the fact that you're a juror,

PROCEEDINGS                                921

1    that you're coming to the courthouse in Brooklyn or anything

2    that touches on the case, the lawyers, the personalities, the

3    issues that are before the case and, lastly, again that broad

4    definition of media.  To the extent there's any commentary or

5    news about this case in any form of media, whether it's

6    old-fashioned print, radio, TV or the more modern social

7    media, Facebook, all the rest of those wonderful inventions,

8    you are to totally disregard and shut it out.

9              Again, the Court encourages you to do the same with

10   respect to any legal proceeding that may be covered in that

11   broader definition of media for fear you may hear something

12   there or see something there that contradicts what you've now

13   been told is your role here.

14             So we do wish you a pleasant evening.  Get some rest

15   and relax, return to the courthouse again tomorrow morning at

16   9:45 in the Central Jury Room.  And that jury room that's

17   referenced in the charge refers only to the deliberation room,

18   that's here behind the courtroom and it's only when the 12

19   jurors who will be deliberating the case are present and there

20   will be a marshal outside to protect the integrity of the

21   process.

22             So again, enjoy the evening, I look forward to

23   seeing you all tomorrow and get some rest.

24             (Jury exits courtroom.)

25             THE COURT:  Okay, so we'll have Scott rerun those

PROCEEDINGS                                        922

1    pages correctly and everybody else keep the pages that they

2    have and save a tree or two and we'll just insert it in the

3    copy, we'll mark it 2A amended.  It will be the clean copy

4    that will go that to the -- another copy, a clean copy that

5    will go into the jury room tomorrow along with the verdict

6    sheet and that brings us to the next supply -- I guess I

7    finally started to chuckle, Marissa, when you read in all the

8    documents that you were reading in.  There's got to be a

9    point -- here's what my normal practice is to take all of the

10   exhibits that are basically paper and photos and send them in

11   without a note.  The things that you all have been showing,

12   either it's audio or things that are electronic only, they'll

13   have to request that and we'll bring them back into the

14   courtroom if they make a request for something like that kind

15   of exhibit.

16          So that you do have some work to do to make sure --

17   I know you've been on daily, so you probably have a listing of

18   all the -- I don't know if you will need the help of the

19   reporter at all with respect to today's exhibits, but it

20   behooves us all if you can have them all assembled and ready

21   to go in tomorrow at around 10.

22          MS. OKEN:  We can do that, your Honor.

23          MS. HIROZAWA:  Likewise, your Honor.

24          THE COURT:  Sounds good.  I can't think of anything

25   else.  Anybody thinking for me, anything else we need to

PROCEEDINGS                              923

1    attend to?

2              MS. OKEN:  Nothing from the government.  Thank you,

3    your Honor.

4              MS. HIROZAWA:  Not from the defense, your Honor.

5              THE COURT:  You are still celebrating your birthday?

6              MS. SHERMAN:  I'm intending to wait until this

7    weekend, Judge.

8              THE COURT:  Have a good one either way.

9              MS. SHERMAN:  Thank you.

10             THE COURT:  Good night, everybody.  Thank you.  We

11   will see you all tomorrow at 10.

12             MS. OKEN:  Thank you.

13             MS. HIROZAWA:  Thank you, your Honor.

14             (Whereupon, the trial adjourned at 6:30 p.m. to

15   resume Friday, November 18, 2022 at 10:00 a.m.)

16

17

18

19

20

21

22

23

24

25

924

1                          I N D E X

2     WITNESS                                   PAGE

3     **MINA SELWANES**

4     DIRECT EXAMINATION     BY MS. SHERMAN      764

5     CROSS-EXAMINATION      BY MS. OKEN         776

6
      SUMMATION              BY MS. McGRATH      785
7
      SUMMATION              BY MS. HIROZAWA     815
8
      SUMMATION              BY MS. HIROZAWA     839
9
      REBUTTAL SUMMATION     BY MS. OKEN         854
10
      JURY CHARGE            BY THE COURT        875
11

12                         E X H I B I T S

13    COURT                                     PAGE

14    1 and 1A                                  720

15    2 and 2A                                  875

16

17

18

19

20

21

22

23

24

25